# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

A.W., a minor, by his mother and next friend, M.W.,

        Plaintiff,

   v.

KENOSHA UNIFIED SCHOOL DISTRICT NO. 1 BOARD OF EDUCATION and SUE SAVAGLIO-JARVIS, in her official capacity as Superintendent of the Kenosha Unified School District No. 1,

        Defendants.

Civ. Action No. 2:16-cv-00943

**COMPLAINT**

## INTRODUCTION

1.     Plaintiff A.W., a 16-year-old boy, is a rising senior at George Nelson Tremper High School ("Tremper") in the Kenosha Unified School District No. 1 ("KUSD") in Kenosha, Wisconsin. A.W. is a boy. He is also transgender. A.W. was assumed to be a girl when he was born, and was designated "female" on his birth certificate, but has a male gender identity and lives as a boy in all aspects of his life. A.W.'s family, classmates, medical providers, and others recognize A.W. as a boy, respect his male gender identity, and support his right to live and be treated consistent with that gender identity.

2.     Defendants Kenosha Unified School District No. 1 Board of Education (the "Board"), Superintendent Sue Savaglio-Jarvis, and their agents, employees, and representatives, have repeatedly refused to recognize or respect A.W.'s gender identity and have taken a series of discriminatory and highly stigmatizing actions against him based on his sex, gender identity, and transgender status. The actions, as described more fully herein, have included (a) denying him

1

access to boys' restrooms at school and requiring him to use girls' restrooms or a single-occupancy restroom; (b) directing school staff to monitor his restroom usage and to report to administrators if he was observed using a boys' restroom; (c) intentionally and repeatedly using his birth name and female pronouns, and failing to appropriately inform substitute teachers and other staff members of his preferred name and pronouns, resulting in those staff referring to him by his birth name or with female pronouns in front of other students; (d) instructing guidance counselors to issue bright green wristbands to A.W. and any other transgender students at the school, to more easily monitor and enforce these students' restroom usage; (e) requiring him to room with girls on an orchestra trip to Europe and requiring, as a condition of his ability to participate in a recent overnight school-sponsored orchestra camp held on a college campus, that he stay either in a multi-room suite with girls, or alone in a multi-room suite with no other students, while all other boys shared multi-room suites with other boys; and (f) initially denying him the ability to run for junior prom king, despite being nominated for that recognition based on his active involvement in community service, instructing him that he could only run for prom queen, and only relenting and allowing him to run for prom king after a protest by many of those same classmates.

      3.     Through these actions, Defendants have discriminated against A.W. on the basis of sex, including on the basis of his gender identity, transgender status, and nonconformity to sex-based stereotypes, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and on the basis of sex and transgender status in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Defendants' actions have denied A.W. full and equal access to KUSD's education program and activities on the basis of his sex.

4.      Plaintiff, through his mother and next friend, M.W., brings this action against Defendants based on these unlawful and discriminatory actions.

5.      Plaintiff seeks a declaratory judgment, preliminary and permanent injunctive relief, and damages resulting from Defendants' discriminatory actions.

## PARTIES

6.      Plaintiff A.W. is a 16-year-old boy.  He was born in 1999.  He resides in Kenosha, Wisconsin and is a student at Tremper High School, a public high school in the Kenosha Unified School District No. 1.  He will begin his senior year at Tremper on September 1, 2016.

7.      M.W. is A.W.'s mother and brings this action as his next friend.  M.W. resides in Kenosha, Wisconsin and is employed by the Kenosha Unified School District No. 1 as a high school teacher at Tremper.

8.      Defendant Kenosha Unified School District No. 1 Board of Education is a seven-member elected body responsible for governing the Kenosha Unified School District No. 1, a public school district serving over 22,000 students in kindergarten through 12th grade who reside in the City of Kenosha, Village of Pleasant Prairie, and Town and Village of Somers.  The Board derives its authority to govern KUSD directly from the Wisconsin Constitution and state statutes. The school district is a recipient of federal funds from the U.S. Department of Education, the U.S. Department of Agriculture, and the U.S. Department of Health and Human Services, and, as such, is subject to Title IX of the Education Amendments of 1972, which prohibits sex discrimination against any person in any education program or activity receiving Federal financial assistance.  The Board designates responsibility for the administration of KUSD to its Superintendent of Schools, currently Dr. Sue Sarvaglio-Jarvis, who oversees a number of

3

district-level administrators.  KUSD operates 42 schools, including six high schools.  One of the high schools is Tremper, a 1,695-student public high school located in Kenosha, serving students in grades 9 through 12.  Tremper's administration includes a principal and three assistant principals.  The Board is vicariously liable for the acts or omissions of its employees, agents, and representatives, including those of the other Defendant Savaglio-Jarvis and other Tremper administrators, staff, and volunteers.

9. Defendant Sue Savaglio-Jarvis is the Superintendent of the Kenosha Unified School District and is sued in her official capacity.  At all times relevant to the events described herein, Savaglio-Jarvis acted within the scope of her employment as an employee, agent, and representative of the Board.  In such capacity, she carried out the discriminatory practices described herein (a) at the direction of, and with the consent, encouragement, knowledge, and ratification of the Board; (b) under the Board's authority, control, and supervision; and (c) with the actual or apparent authority of the Board.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343(a)(3), and is authorized to order declaratory relief under 28 U.S.C. §§ 2201 and 2202.

11. Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b) because the claims arose in the District, the parties reside in the District, and all of the events giving rise to this action occurred in the District.

4

# FACTS

## *Gender Identity and Gender Dysphoria*

12.     Sex is a characteristic that is made up of multiple factors, including hormones, external physical features, internal reproductive organs, chromosomes, and gender identity.

13.     Gender identity—a person's deeply felt understanding of their own gender—is the determining factor of a person's sex.  Gender identity is often established as early as two or three years of age, though a person's recognition of their gender identity can emerge at any time. There is a medical consensus that efforts to change a person's gender identity are ineffective, unethical, and harmful.  A person's gender identity may be different from or the same as the person's sex assigned at birth.

14.     The phrase "sex assigned at birth" refers to the sex designation recorded on an infant's birth certificate.  For most people, gender identity aligns with the person's sex assigned at birth, a determination generally based solely on the appearance of a baby's external genitalia at birth.  For transgender people, however, the gender they were assumed to be at birth does not align with their gender identity.  For example, a transgender boy is a person who was assumed to be female at birth but is in fact a boy.  A transgender girl is a person who was assumed to be a boy at birth but is in fact a girl.

15.     Gender Dysphoria is a condition recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition ("DSM-5").  It refers to clinically significant distress that can result when a person's gender identity differs from the person's assumed gender at birth.  If left untreated, Gender Dysphoria may result in profound psychological distress, anxiety, depression, and even self-harm or suicidal ideation.

16.     Treatment for Gender Dysphoria is usually pursuant to the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"), published by the World Professional Association for Transgender Health ("WPATH") since 1980. WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of Gender Dysphoria. WPATH published the seventh and most recent edition of the Standards of Care in 2011.

17.     Consistent with the WPATH Standards of Care, treatment for Gender Dysphoria consists of the person "transitioning" to living and being accepted by others as the sex corresponding to the person's gender identity. A key stage in that process is a "social transition," in which the individual lives in accordance with his gender identity in all aspects of life. A social transition, though specific to each person, typically includes adopting a new first name, using and asking others to use pronouns reflecting the individual's true gender, wearing clothing typically associated with that gender, and using sex-specific facilities corresponding to that gender. Failing to recognize or respect a transgender person's gender is contrary to established medical protocols and can exacerbate an individual's symptoms of Gender Dysphoria.

18.     Medical treatments, such as hormone therapy or surgical procedures, may also be undertaken to facilitate transition and alleviate dysphoria, typically after an individual's social transition. Under the WPATH Standards of Care, living full-time in accordance with one's gender identity in all aspects of life for at least one year is a prerequisite for any medical interventions. Medical treatments are not necessary or appropriate in all cases.

6

19.     A social transition requires that a transgender boy be recognized as a boy and treated the same as all other boys by parents, teachers, classmates, and others in the community. This includes being referred to exclusively with the student's new name and male pronouns, being permitted to use boys' restrooms and overnight accommodations on the same footing as other male students, and having the right to keep information about the student's transgender status private.  Singling out a transgender student and treating him differently than other boys communicates the stigmatizing message to that student and the entire school community that he should not be recognized or treated as a boy, simply because he is transgender.  This undermines the social transition and exposes the student to the risk of renewed and heightened symptoms of Gender Dysphoria such as anxiety and depression.  It also frequently leads transgender students to avoid using school restrooms altogether, often resulting in adverse physical health consequences such as urinary tract infections, kidney infections, and dehydration, and other consequences such as stress and difficulty focusing on classwork.

### *Plaintiff's Background*

20.     A.W. has been a student in KUSD's schools since kindergarten.  On September 1, 2016, he will begin his senior year at Tremper High.  A.W. is an excellent student: he has a high grade point average and is currently ranked in the top five percent of his class of over 400 students.  All of his academic classes in his junior year were either Advanced Placement or Honors level classes.  He is also very involved in many school activities, including the school's Golden Strings orchestra, theater, tennis team, National Honor Society, and Astronomical Society.  After graduation, he hopes to attend the University of Wisconsin-Madison and study biomedical engineering.  A.W. also works part-time as an accounting assistant in a medical office.

7

21.     A.W. is a boy. He is also transgender.  He was designated "female" on his birth certificate and lived as a girl until middle school, when he recognized that he is, in fact, a boy, and he began to experience profound discomfort with being assumed to be a girl by others.

22.     At the end of eighth grade, in the spring of 2013, A.W. told his parents that he is transgender and a boy.  Shortly thereafter, he told his older brothers.

23.     During the 2013-2014 school year, A.W.'s freshman year of high school at Tremper, A.W. began confiding to a few close friends that he is a boy.  He slowly began transitioning more publicly to live in accordance with his male identity: he cut his hair short, began wearing more traditionally masculine clothing, and began to go by a typically masculine name and masculine pronouns.

24.     At the beginning of his sophomore year, in the fall of 2014, A.W. told all of his teachers and peers that he is a boy, requesting that he be referred to using male pronouns and his new name.  On Christmas, 2014, A.W. told his extended family, including grandparents, aunts, uncles, and cousins, that he is a boy.

25.     A.W. has undertaken his gender transition under the guidance and care of therapists and medical doctors.  He was diagnosed with Gender Dysphoria by his pediatrician. Around the time of his public transition, A.W. began seeing a gender specialist therapist to support him in his transition.  He is currently under the care of clinical psychologist, who is also a gender specialist.  In April 2016, he began consulting with an endocrinologist at Children's Hospital of Wisconsin to discuss hormonal therapy, which he intends to begin in the near future.

26.     Since A.W.'s transition at school, he has been widely known and accepted as a boy by the school community.  At a Golden Strings orchestra performance at a hotel on January 17, 2015, A.W. wore a tuxedo, just like all the other boys, with the support of his orchestra

8

teacher, Helen Breitenbach-Cooper. Students and teachers who did not know A.W. prior to his transition did not and would not have recognized him as different from any other boy until the discriminatory events described in this complaint took place.

### KUSD's Refusal to Permit Plaintiff Access to Restrooms Consistent with His Gender Identity

27.    In the spring of 2015, during A.W.'s sophomore year, A.W. and his mother had several meetings with A.W.'s guidance counselor, Debra Tronvig, during which they requested that A.W. be permitted to use the boys' restrooms at school. The counselor spoke to the school's principal, Richard Aiello, and one of its assistant principals, Brian Geiger, and she advocated that A.W. be permitted to use the boys' restrooms. However, at a meeting in March 2015, she reported back to A.W. and his mother that the school administrators had decided that A.W. would only be permitted to use the girls' restrooms or the single-user, gender-neutral restroom in the school office. Tronvig and the school administrators did not suggest or indicate any circumstance under which A.W. might be permitted to use the boys' restrooms in the future.

28.    After that meeting, A.W. felt overwhelmed, helpless, hopeless, and alone. Both of the restroom options offered by Defendants were discriminatory, burdensome, or unworkable. A.W. was deeply distressed by the prospect of using the girls' restrooms, as it would hinder and be at odds with his public social transition at school, undermine his male identity, and convey to others that he should be viewed and treated as a girl. He was also deeply distressed by the prospect of using the office restroom, which is located in the rear of the office, behind the office secretaries' work stations—far out of the way from most of his classes—and is only used by office staff and visitors. It is A.W.'s understanding that no other students are allowed to use the office restroom. A.W. feared the questions he would face from students and staff about why he was using that particular restroom; the inconvenience of traveling long distances from (and

9

missing time in) his classes to use that restroom; and the fact that he would be segregated from his classmates and further stigmatized for being "different."

29.    At the same time, A.W. was fearful of the potential disciplinary consequences if he failed to comply with the administrators' directives not to use the boys' restroom. He worried that such a disciplinary record could potentially interfere with his ability to get into college, as he had no prior record of discipline. As a result of that fear and anxiety, seeing no plausible options, A.W. largely avoided using any restrooms at school for the rest of that school year, and, when absolutely necessary, he only used a single-user girls' restroom near his theater classroom.

30.    In order to avoid using restrooms at school, A.W. severely restricted his liquid intake. This was particularly dangerous because A.W. suffers from vasovagal syncope, a medical condition that results in fainting upon certain physical or emotional triggers. The triggers cause a person's heart rate and blood pressure to drop suddenly, reducing blood flow to the brain and resulting in a loss of consciousness. Because dehydration and stress trigger his fainting episodes, A.W.'s primary care doctor requires him to drink 6-7 bottles of water and a bottle of Gatorade daily.

31.    In addition to vasovagal syncope, A.W. also suffers from migraines triggered by stress. During his sophomore year, while avoiding using restrooms, A.W. experienced greatly heightened symptoms of both vasovagal syncope and stress-related migraines. He also experienced increased symptoms associated with Gender Dysphoria, including depression, anxiety, and suicidal thoughts.

32.    A.W. also worried that the emotional and physical toll caused by the school's treatment of him would lead to medical or psychological harm that would delay or make it

10

unsafe for him to begin hormone treatment as part of his transition.  This anxiety further increased his symptoms of Gender Dysphoria.

33.     In July 2015, A.W. took a trip to Europe with his school orchestra group, Golden Strings.  In response to A.W.'s request to room with other boys, his orchestra teacher, Breitenbach-Cooper, checked with school administrators and then informed him that he would not be permitted to do so.  A.W. felt hurt and embarrassed when he learned of the school's decision.  Once again, he understood the school's decision to be based on a perception that he is not really a boy, and he felt degraded and humiliated by the administrators' continued failure to recognize and respect his gender identity.

34.     As a result of the school's decision, A.W. was forced to share a room with a girl. During the trip, the students were frequently grouped by gender while traveling between destinations, and A.W. was consistently grouped with girls.

35.     In July 2015, while on the trip to Europe, feeling less scrutinized, A.W. began to use male-designated bathrooms.  During that trip, A.W. saw a news story about a lawsuit against the Gloucester County School District in Virginia by another transgender student who was denied access to boys' restrooms at his high school.  That story reported that the U.S. Department of Justice had concluded that transgender students have the right to use restrooms in accordance with their gender identity under Title IX and had filed a brief in the Virginia case, *G.G. v. Gloucester County School Board*, asserting that the school district's policy violated transgender students' rights under Title IX.  A.W. was elated to learn that he did, in fact, have the legally protected right to use the restroom consistent with his gender.  For the rest of the trip, A.W. exclusively used male-designated bathrooms, and he continued to do so upon returning to the United States.

11

36.     When he returned to school for his junior year, in September 2015, A.W. continued exclusively using boys' restrooms, including at Tremper. He did so for the first seven months of the school year without any incident. No other students ever made an issue of A.W. using the boys' bathroom. A.W. did not discuss this decision with administrators or teachers, because he understood it to be his legal right.

37.     In late February 2016, after observing A.W. using a boys' bathroom, a Tremper teacher advised two assistant principals, Geiger and Wendy LaLonde, of that fact. Geiger then informed the other administrators of A.W.'s restroom use and asked them what the school's policy was.

38.     Aiello, LaLonde, Geiger, and the third assistant principal, Holly Graf, agreed that, although neither KUSD nor Tremper had any existing written policy on students' restroom usage, the school's policy should be that transgender students, including A.W., would not be permitted to use school restrooms corresponding to their gender identity. Consistent with the school's previous decision in spring 2015, they decided that A.W. would not be permitted to use the boys' restroom and, instead, would only be permitted to use the girls' restrooms or the single-user restroom in the school office.

39.     Following that decision, Graf emailed A.W.'s guidance counselor, Tronvig, and requested that Tronvig relay the school's restroom policy to A.W. and his mother. Tronvig responded by email that she did not know what that policy was. Graf and Tronvig then met in person and Graf explained to Tronvig that A.W. would not be permitted to use the boys' restrooms.

40.     In late February 2016, Tronvig called M.W. to inform her of the administration's decision that A.W. would only be permitted to use the girls' restrooms or the single-user restroom in the school's main office.

41.     When A.W. learned about the school's decision, in early March 2016, he was distressed.  He felt humiliated and deeply uncomfortable by the idea of using a girls' restroom, even more so than the previous year—because he is not a girl, he had not used female-designated restrooms at school or elsewhere for a long time, and because using the girls' restrooms as a boy risked subjecting him to ridicule, scrutiny, stigma, and harassment by other students and school staff.  For the reasons alleged above, he also felt deeply uncomfortable with using the single-user main office restroom.  He believed that either alternative would imply his status as a transgender boy required him to be segregated from other students, despite the fact that he had used the boys' restrooms regularly and otherwise been treated as a boy by nearly everyone in the school community for many months.

42.     A.W. was also afraid of what disciplinary consequences he might face if he failed to comply with the school's policy.  Faced with two unacceptable options proposed by the school administrators, A.W. continued to use the boys' restrooms, as he had been doing already.  That approach was the only way A.W. felt he could mitigate the physical harm that he would suffer if he refrained from all restroom use during the school day and during his after-school extracurricular activities.  Because of his active involvement in after-school activities, a typical school day for A.W. lasts from 7 a.m. to 4 or 5 p.m., *i.e.*, 9 or 10 hours.  Some activities require him to be on Tremper's campus until as late as 10 p.m., a 15-hour day.  These long days at school make avoiding restrooms altogether impossible.

13

43. A.W.'s decision to use the boys' restroom consistent with his legal right, though in defiance of school policy, nevertheless exacted an emotional toll. A.W. became more depressed and anxious, grew distracted from his school work, and began to have trouble sleeping.

44. On or about March 10, 2016, A.W. and his mother met with Graf and Tronvig. During that meeting, Graf referred to A.W. exclusively by his birth name. In that meeting, Graf told M.W. that the reason A.W. could not use the boys' restrooms was because he could only use restrooms consistent with his gender as listed in the school's official records. Graf said that the only way the school could change A.W.'s gender in its records would be if the school received legal or medical documentation confirming his transition to male.

45. M.W. explained that, to her knowledge, A.W. was too young for transition-related surgery. Graf repeated that the school would need some kind of medical documentation, but declined to indicate what type of medical "documentation" would be sufficient to demonstrate that A.W.'s gender marker should be changed on his school records and that he could use boys' restrooms.

46. In response, M.W. contacted A.W.'s pediatrician. The pediatrician faxed a letter to the school on or about March 11, 2016, confirming that A.W. is a transgender boy and recommending that A.W. be allowed to use male-designated facilities at school. At M.W.'s request, the pediatrician subsequently sent the school a second letter, reiterating her recommendation about A.W.'s restroom usage.

47. Despite the letters from A.W.'s doctor, Aiello emailed M.W. that the school would continue to deny boys' restroom access to A.W. because he had not completed a medical transition.

48.     A.W. continued to use the boys' restrooms when needed, but he mainly attempted to avoid using restrooms altogether by not drinking or eating while at school, in order to avoid the scrutiny, fear, and humiliation he faced when he had to use a restroom at school.  His anxiety and depression increased further.  He also experienced increased physical symptoms relating to his vasovagal syncope, including dizziness, nearly fainting, and migraines.  A.W. returned to see his pediatrician in late March 2016 to have his symptoms evaluated.  The pediatrician again instructed him to eat and drink regularly to avoid those symptoms.  Nonetheless, A.W. was unable to comply with those instructions, out of fear of using the restrooms at school.  Concerned about his physical health, his mother would regularly hand him a bottle of water and tell him to drink it to avoid dehydration, and he would refuse, saying that he did not want to have to use the restroom.

49.     On or about March 17, 2016, Geiger observed A.W. as he entered a boys' restroom, and reported that fact to Graf.  Minutes later, Graf insisted that A.W. leave his acting class and come to her office, and met with him alone for half an hour, lecturing him about his use of the boys' restrooms.

50.     During that same meeting, Graf asked A.W. why he was not using the girls' restroom or single-user restroom as directed.  He informed her that the school's policy violated his rights as a transgender student under Title IX.  When A.W. made clear he could not use girls' restrooms because he is not a girl, she again asked him to compromise and use the single-user restroom in the main office.  He again refused because of the humiliation, stigma, and lost class time that he would face using that bathroom.  Graf then reiterated her instruction that A.W. cease his use of boys' restrooms.

15

51.     During that March 17 meeting—as well as at virtually all other times—Graf consistently referred to A.W. using his traditionally female birth name and female pronouns, despite A.W.'s request that she use his new name and male pronouns.  In that meeting, when A.W. became upset by Graf's restroom directive and refusal to respect his male gender, Graf said, "S------, calm down," using his birth name.  A.W., angry and embarrassed, said, "No, I'm leaving," and left the office.

52.     During that meeting, Graf directly threatened that A.W. would be subject to disciplinary action if he continued to use the boys' restrooms.  Specifically, she indicated A.W. would have to "go down to 109 or 203"—referring to Room 109, the in-school suspension room, and Room 203, the school's disciplinary office.

53.     Following the meeting with Graf, A.W. began to cry in the hallway.  He had difficulty concentrating in his classes for the remainder of the day, holding back tears.  He skipped work that afternoon and did not do any homework.  Instead, he just went home after school and lay in bed feeling terrible.

54.     When he absolutely needed to use the restroom, A.W. continued to use the boys' restrooms exclusively through June 9, 2016, the final day of the school year.  As a result, Graf continued to call A.W., his mother, or both into her office for periodic meetings.  At those meetings, Graf would inquire about A.W.'s restroom use, and, when told he was still using the boys' restrooms, would repeat the school's policy that he must use the girls' restroom or a single-user restroom.  During these meetings, Graf continued to refer to A.W. by his birth name and female pronouns.

55.     A.W. grew increasingly embarrassed by Graf's repeated inquiries about his restroom use, which he felt to be an invasion of his privacy.  Since each meeting with

16

administrators occurred during class time, A.W. was also concerned about the effect of these repeated meetings on his academic performance and feared that he would face scrutiny from other students and teachers about why he was being removed from class so frequently. A.W., who continued to have no disciplinary record at the school, also became more worried about the increasingly real prospect of disciplinary consequences that might affect his ability to participate in extracurricular activities and negatively impact his college application process in the upcoming school year.

56. In April 2016, M.W. learned that school administrators had sent an email to all of the school's security guards, instructing them to notify administrators if they spotted any students who appear to be going into the "wrong" restroom. Individual security guards later told M.W. that they understood the directive to be targeted at A.W.

57. A.W. felt very uncomfortable and distressed knowing that security guards and administrators were actively monitoring his restroom use.

58. On April 5, 2016, M.W. was pulled out of her Tremper classroom and summoned to a meeting with two KUSD district-level administrators: Dr. Bethany Ormseth, KUSD's Chief of School Leadership, and Susan Valeri, KUSD's Chief of Special Education and Student Support.

59. In that meeting, M.W. asked Ormseth and Valeri whether KUSD had adopted any policy concerning transgender students and restroom use. They provided no answer to M.W.'s question, other than to say that a policy was in the process of being created by a committee of the school board. M.W. responded, "You don't need a policy—it's a federal law." Later in the school year, M.W. learned that Rebecca Stevens, a KUSD school board member, had

contradicted Ormseth and Valeri's account, stating to another board member that no committee had yet been formed and no policy was being written.

60.     In fact, despite repeated requests by M.W. to see the written policy about transgender students' restroom use during the course of the 2015-2016 school year, no Tremper or KUSD official has ever provided such a policy.  M.W. reasonably believes no such policy exists.  Rather, the Tremper administration developed and enforced a school "policy" in direct and specific response to those administrators' discomfort with the restroom usage of one student: A.W.

61.     The next day, on April 6, 2016, A.W. and M.W. attended a meeting with Aiello, Graf, and Valeri.  At that meeting, the administrators offered A.W. a further "accommodation" regarding his restroom use:  they informed him that he would also be allowed to use two single-user restrooms located on the far opposite sides of campus.  Those restrooms had previously been available for any student's use, but new locks had been installed and A.W. alone was given the key to open them.  The stigma of being assigned personal, segregated restrooms—to which he alone of all the 1,695 students in the building had a key—caused A.W. additional significant emotional distress.  In addition, neither of these single-occupancy restrooms was convenient to A.W.'s classes and would have required him to miss more class time than his peers if he used those restrooms during class.

62.     At the April 6 meeting, A.W. asked Valeri for KUSD's rationale for prohibiting his use of the boys' restrooms. Valeri replied with a statement to the effect of, "Well, we've never had a student who identifies as male but was born female."

63. A.W. replied by asserting that Title IX prohibits discrimination based on sex, which protects transgender students and requires schools to permit them to use restrooms consistent with the student's gender identity.

64. Valeri denied that Title IX protects transgender students' access to bathrooms consistent with their gender identity.

65. When A.W. asked Valeri to explain her understanding of Title IX, she refused to do so, stating words to the effect of, "I don't think I'm going to give you any reasons."

66. In order to avoid disciplinary sanctions from Tremper administrators for using boys' restrooms on the one hand, and the scrutiny and embarrassment that would result from using individually assigned restroom facilities on the other, A.W. continued to avoid using school restrooms as much as possible. He has never used the designated locked single-user restrooms, as doing so would call unwanted attention to himself by using a key to enter a restroom to which no other student has access, and because of his desire not to spend unnecessary time out of class traveling to those inconveniently located restrooms.

67. As a result of the stress caused by school's discriminatory actions, and his attempts to avoid using any restrooms at school, A.W.'s migraines and episodes of fainting and dizziness continued to worsen. His depression, anxiety, and dysphoria also deepened. He became severely depressed and lethargic, and no longer wanted to get out of bed in the morning.

68. Due to the serious consequences the school's actions were having on A.W.'s physical and psychological well-being, he considered withdrawing from Tremper and transferring to an online school to finish high school. He ultimately decided not to withdraw at that time, due to his involvement in activities like the school orchestra that would not be

19

available if he were enrolled in an online school instead, and because changing schools would put him further behind in his classwork.

### *School's Refusal to Permit A.W. to Be Considered for Junior Prom King*

69.     Tremper High's junior prom was scheduled for May 7, 2016.  In late March, the faculty advisor for the junior prom, Lorena Danielson, submitted the names of candidates for the prom court to Aiello.  Candidates for prom king and queen are required to earn volunteer hours in order to participate and whoever earns the most hours is selected for prom court.  Based on his community service hours, the junior prom advisor designated A.W. as a candidate for prom king and then met with Aiello to confirm the list.

70.     After meeting with the junior prom advisor, Aiello called M.W. in for a meeting with him and Graf on or about March 22, 2016, during which he told her that A.W. could be on the prom court, but could only be a candidate for prom queen, not prom king.  When A.W. learned about this, he was devastated.  He was humiliated at the prospect of running for prom queen, when all his classmates knew him to be a boy.  He felt deeply disrespected and angry that the administrators failed to recognize how hurtful and unfair this additional form of discrimination was.

71.     On April 4, 2016, A.W. and his friends presented a MoveOn.org petition to Tremper administrators demanding that A.W. be allowed to run for prom king and to use the boys' restrooms at school, which was signed by many members of the Tremper community and thousands of others around the country.  When administrators failed to respond, on April 5, 2016, 70 students participated in a sit-in at Tremper's main office to show their support for A.W. The students held signs expressing the view that transgender students should be treated equally,

and supporting A.W.'s right to be allowed to run for prom king and to use the boys' restrooms at school.

72. Following the sit-in and media attention about KUSD's treatment of A.W., in the April 6, 2016 meeting referenced above, Aiello, Graf, and Valeri informed A.W. and M.W. that A.W. would be permitted to run for prom king.

73. Although A.W. was pleased to have the opportunity to run for prom king and heartened by the outpouring of support from his classmates, he continued to feel deeply distressed as a result of the school administrators' initial decision that he could only run for prom queen and their continued pattern of refusing to recognize or respect his male gender identity.

### Name and Gender in School Records

74. KUSD has not changed A.W.'s name on his official records and other documents, including classroom attendance rosters used by his teachers. Although most of A.W.'s teachers refer to him by his male name, substitute teachers have frequently referred to him by his birth name in front of his classmates because that is the name that appears on the attendance rosters. In response, and in order to avoid embarrassment or discomfort from his classmates, A.W. has been compelled to approach all of his teachers at the beginning of each term to advise them of his preferred name and pronouns and request that they do not refer to him by his birth name. He similarly must approach substitute teachers before class every time a teacher is absent. Although some teachers note his correct name on the class roster, others have not documented that name on the roster, and occasionally substitute teachers still refer to him by his birth name in class. Being called a traditionally female name in front of all his classmates reveals that he is transgender to all of his peers and makes A.W. feel embarrassed and distressed. The practice has

resulted in A.W. experiencing increased symptoms of Gender Dysphoria, including anxiety and depression.

75.     In the meetings with administrators on March 6 and March 22, M.W. requested that the school change A.W.'s name and gender in its official records to avoid those problems. In both meetings, Graf told M.W. that in order to change A.W.'s name or gender in the school's official records, the school would need to see legal or medical documentation. The medical documentation A.W.'s pediatrician sent was deemed insufficient, although Graf and Aiello refused to specify what the contents of acceptable documentation would be, despite repeated requests for clarification. They also failed to specify what type of "legal documentation" would be necessary to update the school records.

76.     Even if KUSD is unable to change A.W.'s name or gender in its official school records because A.W. has not yet obtained a legal name change, KUSD can and should take steps to avoid intentional or inadvertent disclosure of A.W.'s birth name or sex assigned at birth to KUSD employees or students, including by modifying informal or public-facing documents, such as attendance rosters, to reflect A.W.'s male name and male gender.

### Other Harassing and Stigmatizing Treatment Faced by A.W. at School

77.     After news broke about the petition for A.W. to run for prom king and use boys' restrooms at school, some parents and other Kenosha residents began to speak out in opposition to A.W.'s right to use boys' restrooms. On May 10, 2016, shortly after the junior prom, at a meeting of the Board, several community members spoke in opposition to allowing transgender students to use restrooms in accordance with their gender identity. One parent told the Board that he was opposed to permitting transgender students to use gender-appropriate restrooms

because such a policy would permit sexual predators to enter women's restrooms and put his daughters at risk.

78.     That person's wife, who volunteers as a pianist with the school orchestra, has created and maintains a public Facebook group called "KUSD Parents for Privacy," which contains numerous posts critical of transgender students' rights.  Several posts on that page have mentioned A.W. and his mother by name, accompanied by their photographs.  One post, on May 14, 2016, linked to an article about A.W., contains a photograph of him and his mother, and describes him as a "pawn."

79.     At an orchestra rehearsal at the school on May 11, 2016, the day following the Board meeting at which her husband spoke, this woman approached A.W., put her hands on his shoulders, and said words to the effect of, "A----, honey, this isn't about you, this is bigger than you.  I'm praying for you."  A.W. was extremely uncomfortable and embarrassed, and did not respond.  M.W. and A.W. later brought this incident to Aiello's attention.  Aiello requested that Breitenbach-Cooper, the orchestra teacher, call the volunteer to advise her not to talk to students like that, but took no further action.  Nothing changed as a result.  She is still a regular volunteer with the school orchestra and has continued to attend every rehearsal.  Her constant presence substantially diminishes A.W.'s enjoyment of an extracurricular activity that has formed an important part of his educational experience at Tremper.

### Green Wristbands to Mark Transgender Students

80.     In May 2016, A.W.'s guidance counselor, Tronvig, showed M.W. a bright green wristband that the school intended to use to mark students who are transgender.

81.     Branding transgender students in this way would single them out for additional scrutiny, stigma, and potentially harassment or violence, and violate their privacy by revealing their transgender status to others.

23

82.     Upon learning about the school's proposed green wristband practice, A.W. felt sickened and afraid.  He was aware of the prevalence of violent attacks against transgender people nationwide, and grew very afraid that the school would attempt to force him to wear the wristband on penalty of discipline.  If he did wear the wristband, he knew that other students would likely ask him repeatedly why he was wearing it, and he would have to explain over and over that he is transgender.  He expected that some students would stare, and others would outright ridicule him.  He felt like his safety would be even more threatened if he had to wear this visible badge of his transgender status.

83.     To Plaintiff's knowledge, the green wristband practice adopted at the end of the school year is still in place, such that guidance counselors will be expected to provide these wristbands to transgender students in the upcoming school year.

### Overnight Accommodations at Summer Orchestra Camp

84.     A.W. participated in a five-day, school-sponsored summer orchestra camp from June 12-16, 2016.  The camp was held on the campus of the University of Wisconsin-Oshkosh, and students stayed in dormitories on campus.  The dorms used for the camp were suites with two to four bedrooms and a common living room, kitchenette, and two single-occupancy restrooms.  Each suite had either four separate, single-occupancy bedrooms, or two double-occupancy rooms.  During the evenings, school chaperones placed tape across each of the bedroom doorways to prevent students from leaving the bedrooms at night.  The suites were shared by students of the same sex.

85.     In advance of the camp, the school allowed students to sign up for dorm rooms with their friends.  A.W. had signed up to stay in a boys' suite with one of his best friends, a male student.

86.     Breitenbach-Cooper, the orchestra teacher, told Aiello about A.W.'s request to stay in the same suite as his friend and other male students.  Aiello replied that A.W. could not do so because, under Tremper's policy, he could not stay with other boys.  Aiello told Breitenbach-Cooper that A.W. would have to stay in a suite with girls or alone in a suite, segregated from all of his peers.

87.     In order to participate in the orchestra camp, A.W. reluctantly agreed to stay in double-bedroom suite all alone, with no other students sharing the suite.  He rejected the "option" to stay in a suite with girls because he is a boy and he felt uncomfortable staying with girls.

88.     This arrangement excluded A.W. from socializing with other students during the entire five-day camp.  Students were prohibited from entering other suites, and could only socialize within their own suite or in common areas of the building.  Since almost all the other students remained in their suites to socialize in the evenings, A.W. stayed in his room alone each evening while the other students enjoyed time to socialize with their friends.  He felt lonely and depressed, and disappointed that he was not able to have the same good memories of his final year at camp as all the other students.

89.     The school's decision to segregate A.W. from the other boys also left him feeling hurt and embarrassed.  He understood the school's decision to be based on a perception that he might engage in sexual activity with another boy, and he felt degraded and humiliated by the idea that administrators were thinking about him in those terms.

### *District's Failure to Change its Discriminatory Policies after Notice of Legal Obligations*

90.     A.W. and M.W. have repeatedly advised KUSD officials that their actions violate A.W.'s right to attend school free from sex discrimination, as required by Title IX and the Equal

Protection Clause. Despite being put on notice of the violations of A.W.'s statutory and constitutional rights, KUSD has refused to change its policies to date.

91. On April 19, 2016, through his attorneys, A.W. sent a letter to Superintendent Savaglio-Jarvis demanding that KUSD permit him to use boys' restrooms at school.

92. By letter of April 26, 2016, KUSD's attorneys responded, acknowledging their awareness of U.S. Department of Education guidance documents interpreting Title IX to protect students from discrimination based on their gender identity—as well as the Fourth Circuit's April 19, 2016 opinion in *G.G. v. Gloucester County School Board*, a Title IX case brought by a transgender high school student who was denied access to boys' restrooms at school, in which that appeals court deferred to the Department of Education's interpretation of Title IX and held that the plaintiff student was entitled to restroom access consistent with his gender identity. The letter nevertheless maintained that KUSD is not bound by these authorities and would not change its position on A.W.'s restroom use.

93. On May 12, 2016, A.W. filed an administrative complaint with the U.S. Department of Education Office for Civil Rights ("OCR"), alleging that KUSD's actions violated A.W.'s rights under Title IX. Shortly before filing this lawsuit, Plaintiff's attorneys contacted OCR and requested to withdraw that complaint, without prejudice.

94. On May 13, 2016, the U.S. Department of Education and U.S. Department of Justice issued a joint guidance letter to all public schools, colleges, and universities in the country receiving Federal financial assistance, reiterating the federal government's previously stated position that, pursuant to Title IX, all public schools are obligated to treat transgender students consistent with their gender identities in all respects, including regarding name and pronoun usage, restroom access, and overnight accommodations.

26

95.     Following the issuance of the federal guidance on May 13, 2016, KUSD officials publicly acknowledged the guidance but stated that they did not believe they were required to comply with it.  KUSD issued a statement declaring, "[t]he Department of Education's . . . letter is not law; it is the Department's interpretation of the law," suggesting that it would not change its policy absent a court order.

96.     To date, the Board has not articulated or adopted any formal policy regarding transgender students in KUSD's schools.

97.     Based on the statements and actions of KUSD officials, A.W. feels deep anxiety and dread about experiencing continued discrimination during his senior year and the effect that it will have on him during the college application process.

**INJURY TO PLAINTIFF**

98.     Through their actions described above, Defendants have injured and are continuing to injure Plaintiff.

99.     Defendants have denied A.W. full and equal access to KUSD's education programs and activities by denying him the full and equal access to student restrooms and overnight accommodations during school-sponsored trips offered to other male students.

100.    A.W. has experienced and continues to experience the harmful effects of being segregated from, and treated differently than, his male classmates at school and during school-sponsored events, including lowered self-esteem, embarrassment, social isolation, and stigma, as well as heightened symptoms of Gender Dysphoria, including depression and anxiety.

101.    When school administrators and staff intentionally used his birth name or female pronouns (or allowed others to do so), instructed him not to use the boys' restrooms, instructed security personnel to surveil his movements, and otherwise undermined his male identity and

singled him out as different from all other boys, he has felt deeply hurt, disrespected, and humiliated.

102.    Defendants' discriminatory actions, and the efforts A.W. has made to comply with the directive not to use the boys' restroom—limiting food and drink while at school—have led to a host of physical symptoms, including dehydration, dizziness, fainting, and migraines. All of those symptoms virtually disappeared once A.W. returned home from the orchestra camp and summer break began, and A.W. was no longer facing daily scrutiny and anxiety and could eat and drink at a healthy level.

103.    As a direct and continuing result of Defendants' discriminatory actions, A.W. has suffered increased and continuing emotional distress over the last six months.  He has experienced escalating symptoms of depression and anxiety, and his self-esteem has suffered, as a result of the discrimination he has experienced at school.  Although he cried very little in the past, he frequently cries and fights back tears.

104.    As a result of the depression and anxiety Defendants' actions caused, A.W. has also had difficulty eating and sleeping properly, and difficulty concentrating in classes and on his homework.

105.    As a result of Defendants' actions, and the feelings of fear and scrutiny he has grown used to, A.W. now feels unsafe being outside of the house, afraid that he will be targeted for an assault by someone who knows he is transgender.  He will typically only go out in groups of friends, and tries to avoid ever going out with only one other friend or alone.

106.    A.W. has also missed significant class time due to being compelled by KUSD officials to participate in repeated, lengthy meetings during class time to discuss his use of

restrooms, his name and gender in school records, and the school's determination that he would be prohibited from running for prom king.

107.    All of the above discriminatory treatment has undermined the efficacy of the social transition component of his gender transition and heightened his symptoms of Gender Dysphoria.

108.    If Defendants refuse to grant A.W. access to boys' restrooms by the time his senior year begins on September 1, 2016, he will likely experience the same social stigma, emotional distress, academic harm, and detrimental impediments to his gender transition resulting from Defendants' conduct that he experienced during his junior year.

## CAUSES OF ACTION

### First Cause of Action
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

109.    Plaintiff realleges and incorporates the facts and allegations contained in paragraphs 1 through 107 as fully set forth herein.

110.    Under Title IX and its implementing regulations, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.31 (Department of Education Title IX regulations); 7 C.F.R. § 15a.31 (Department of Agriculture Title IX regulations); 45 C.F.R. § 86.31 (Department of Health and Human Services Title IX regulations).  Title IX's prohibitions on sex discrimination extend to "any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient" of federal funding.  34 C.F.R. § 106.31; 7 C.F.R. § 15a.31; 45 C.F.R. § 86.31.

29

111.    Title IX's prohibition on discrimination "on the basis of sex" encompasses discrimination based on an individual's gender identity, transgender status, and gender expression, including nonconformity to sex- or gender-based stereotypes.

112.    Conduct specifically prohibited under Title IX includes, *inter alia*, treating one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; providing different aid, benefits, or services in a different manner; denying any person any such aid, benefit, or service; or otherwise subjecting any person to separate or different rules of behavior, sanctions, or other treatment.  34 C.F.R. § 106.31; 7 C.F.R. § 15a.31; 45 C.F.R. § 86.31.

113.    As a Federal funding recipient, Defendant Kenosha Unified School District No. 1 Board of Education, including the academic, extracurricular, and other educational opportunities provided by the Kenosha Unified School District and Tremper High School, is subject to Title IX's prohibitions on sex- and gender-based discrimination against any student.

114.    As set forth in paragraphs 28 to 98 above, Defendants, by adopting and enforcing a policy or practice of prohibiting Plaintiff, a transgender boy, from accessing male-designated restrooms at school, and requiring that he use female-designated restrooms or single-occupancy restrooms, have discriminated and continue to discriminate against Plaintiff in his enjoyment of KUSD's education program and activities by treating him differently from other male students based on his gender identity, the fact that he is transgender, and his nonconformity to male stereotypes, and thereby denying him the full and equal participation in, benefits of, and right to be free from discrimination in the educational opportunities offered by KUSD and Tremper High School, on the basis of sex, in violation of Title IX.

115.    Defendants, by adopting and enforcing a policy or practice of prohibiting Plaintiff, a transgender boy, from staying in male-designated overnight accommodations on school-sponsored trips, and requiring him to stay in female-designated overnight accommodations or segregated accommodations on those trips, has discriminated and continues to discriminate against Plaintiff in his enjoyment of KUSD's education program and activities by treating him differently from other male students based on his gender identity, the fact that he is transgender, and his nonconformity to male stereotypes, and thereby denying him the full and equal participation in, benefits of, and right to be free from discrimination in the educational opportunities offered by KUSD and Tremper High School, on the basis of sex, in violation of Title IX.

116.    Defendants have further violated Title IX by failing to recognize fully and respect Plaintiff, a transgender boy, as a male student, including through administrators' repeated and intentional use of Plaintiff's traditionally female birth name and female pronouns to address him and refer to him to others; the failure to take necessary and appropriate action to update or modify A.W.'s official and/or informal student records, including classroom attendance rosters, to prevent teachers, substitute teachers, and other school staff from referring to him by his female birth name and female pronouns in the presence of other students; Tremper administrators' initial refusal to permit A.W. to run for junior prom king and directive that he run for prom queen instead, withdrawn only after a student protest and media attention; and Tremper administrators' instruction to school guidance counselors to provide green wristbands to transgender students. Through these actions, individually and collectively, Defendants have and continue to exclude Plaintiff from participation in, deny him the benefits of, and subject him to discrimination in KUSD's education programs and activities, on the basis of sex, in violation of Title IX.

117.    Defendants, through instructing Tremper staff to report the restroom use of any student who "appears" to be using the "wrong" restroom, operates an unlawful policy or practice of profiling Plaintiff and other students who are transgender and/or do not conform to sex- or gender-based stereotypes, and thereby deprive Plaintiff and similarly situated students of their rights under Title IX to be free from discrimination on the basis of sex, including on the basis of gender identity, transgender status, and nonconformity to sex- or gender-based stereotypes, in further violation of Title IX.

118.    Plaintiff has been, and continues to be, injured by Defendants' discriminatory conduct and has suffered damages as a result.

**Second Cause of Action**
**Violation of 42 U.S.C. § 1983 Based on**
**Deprivation of Plaintiff's Rights under the**
**Equal Protection Clause of the Fourteenth Amendment to the United States Constitution**

119.    Plaintiff realleges and incorporate the facts and allegations contained in paragraphs 1 through 107 as fully set forth herein.

120.    Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, discrimination based on sex, including gender, gender identity, transgender status, and nonconformity to sex- or gender-based stereotypes, as well as discrimination based on transgender status alone, is presumptively unconstitutional and is therefore subject to heightened scrutiny.

121.    Defendants, by adopting and enforcing a policy or practice of prohibiting Plaintiff, a transgender boy, from accessing male-designated restrooms at school, and requiring that he use female-designated restrooms or single-occupancy restrooms, have discriminated and continue to discriminate against Plaintiff in his enjoyment of KUSD's education program and activities by treating him differently from other male students based on his gender identity, the

32

fact that he is transgender, and his nonconformity to male stereotypes, thereby denying him the full and equal participation in, benefits of, and right to be free from discrimination in the educational opportunities offered by KUSD and Tremper High School, on the basis of sex and transgender status, in violation of the Equal Protection Clause.

122.    Defendants, by adopting and enforcing a policy or practice of prohibiting Plaintiff, a transgender boy, from staying in male-designated overnight accommodations on school-sponsored trips, and requiring him to stay in female-designated overnight accommodations or segregated accommodations on those trips, has discriminated and continues to discriminate against Plaintiff in his enjoyment of KUSD's education program and activities by treating him differently from other male students based on his gender identity, the fact that he is transgender, and his nonconformity to male stereotypes, thereby denying him the full and equal participation in, benefits of, and right to be free from discrimination in the educational opportunities offered by KUSD and Tremper High School, on the basis of sex and transgender status, in violation of the Equal Protection Clause.

123.    Defendants have further violated Plaintiff's rights under the Equal Protection Clause by failing to recognize fully and respect Plaintiff, a transgender boy, as a male student, including through administrators' repeated and intentional use of Plaintiff's traditionally female birth name and female pronouns to address him and refer to him to others; the failure to take necessary and appropriate action to update or modify A.W.'s official and/or informal student records, including classroom attendance rosters, to prevent teachers, substitute teachers, and other school staff from referring to him by his female birth name and female pronouns in the presence of other students; Tremper administrators' initial refusal to permit A.W. to run for junior prom king and directive that he run for prom queen instead, withdrawn only after a student

33

protest and media attention; and Tremper administrators' instruction to school guidance counselors to provide green wristbands to any student who identified himself or herself as transgender. Through these actions, individually and collectively, Defendants have and continue to exclude Plaintiff from participation in, deny him the benefits of, and subject him to discrimination in KUSD's education programs and activities, on the basis of sex and transgender status, in violation of the Equal Protection Clause.

124.    Defendants, through instructing Tremper staff to report the restroom use of any student who "appears" to be using the "wrong" restroom, operates an unlawful policy or practice of profiling Plaintiff and other students who are transgender and/or do not conform to sex- or gender-based stereotypes, and thereby deprive Plaintiff and similarly situated students of their rights to be free from discrimination on the basis of sex, including on the basis of gender identity, transgender status, and nonconformity to sex- or gender-based stereotypes, in further violation of the Equal Protection Clause.

125.    Defendants' discrimination against A.W. is not substantially related to any important governmental interest, nor is it rationally related to any legitimate governmental interest.

126.    Defendants are liable for their violation of A.W.'s Fourteenth Amendment rights under 42 U.S.C. § 1983.

127.    Plaintiff has been, and continues to be, injured by Defendants' conduct and has suffered damages as a result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff A.W., by and through his mother and next friend, M.W., requests that this Court:

(a)      enter a declaratory judgment that the actions of Defendants complained of herein are in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

(b)      issue preliminary and permanent injunctions (i) directing Defendants to provide Plaintiff access to male-designated restrooms at school, and otherwise to treat him as a boy in all respects for the remainder of his time as a student in Defendants' schools or until resolution of this lawsuit, whichever is later; (ii) restraining Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly with them, from adopting, implementing, or enforcing any policy or practice at the school or District level that treats transgender students differently from their similarly situated peers (*i.e.*, treating transgender boys differently from other boys and transgender girls differently from other girls); (iii) directing Defendants to clarify that KUSD and Tremper's existing policies prohibiting discrimination on the basis of sex apply to discrimination based on gender identity, transgender status, and nonconformity to sex- and gender-based stereotypes; (iv) ordering Defendants to provide training to all district-level and school-based administrators in the Kenosha Unified School District on their obligations under Title IX and the Equal Protection Clause regarding the nondiscriminatory treatment of transgender and gender nonconforming students; and (v) ensuring that all district-level and school-based administrators responsible for enforcing Title IX, including Defendants' designated Title IX coordinator(s), are aware of the correct and proper application of Title IX to transgender and gender nonconforming students;

(c)      order all compensatory relief necessary to cure the adverse educational effects of Defendants' discriminatory actions on Plaintiff's education;

35

(d)     award compensatory damages in an amount that would fully compensate Plaintiff

for the emotional distress and other damages that have been caused by Defendants' conduct

alleged herein;

(e)     award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C.

§ 1988; and

(f)     order such other relief as this Court deems just and equitable.


Dated: July 19, 2016

Respectfully submitted,

/s Joseph J. Wardenski

Ilona Turner*                                   Michael Allen*
Alison Pennington*                              Joseph J. Wardenski
TRANSGENDER LAW CENTER                          RELMAN, DANE & COLFAX PLLC
1629 Telegraph Avenue, Suite 400                1225 19th Street, NW, Suite 600
Oakland, CA  94612                              Washington, DC  20036
Phone: (415) 865-0176                           Phone: (202) 728-1888
Fax:    (877) 847-1278                          Fax:    (202) 728-0848
ilona@transgenderlawcenter.org                  mallen@relmanlaw.com
alison@transgenderlawcenter.org                 jwardenski@relmanlaw.com

Robert (Rock) Theine Pledl
PLEDL & COHN, S.C.
1110 N. Old World Third Street, Suite 215
Milwaukee, WI  53203
Phone: (414) 225-8999
Fax:    (414) 225-8987
rtp@pledlcohn.com

*Application for admission to this Court to follow*