## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ASHTON WHITAKER, a minor, by his
mother and next friend, MELISSA
WHITAKER,

        Plaintiff,

    v.

KENOSHA UNIFIED SCHOOL DISTRICT
NO. 1 BOARD OF EDUCATION and SUE
SAVAGLIO-JARVIS, in her official capacity
as Superintendent of the Kenosha Unified
School District No. 1,

        Defendants.

Civ. Action No. 2:16-cv-00943-PP
Judge Pamela Pepper

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................ 1

OVERVIEW OF KEY TERMS ..................................................................................... 3

BACKGROUND ......................................................................................................... 4

LEGAL STANDARD .................................................................................................. 8

ARGUMENT .............................................................................................................. 9

I.   ASH MEETS THE THRESHOLD SHOWING FOR A PRELIMINARY INJUNCTION:
     HE WILL SUFFER CONTINUING IRREPARABLE HARM IF KUSD'S
     DISCRIMINATORY TREATMENT CONTINUES AND IS LIKELY TO SUCCEED ON THE
     MERITS OF HIS CLAIMS. ...................................................................................... 10

     A.   Ash will suffer irreparable educational, psychological, and physical harms
          if KUSD's discriminatory policies and practices are not enjoined immediately,
          and he has no adequate remedy at law for those harms. ................................... 10

     B.   Ash is likely to succeed on the merits of both his Title IX and
          Equal Protection Clause claims. ....................................................................... 12

          1.   KUSD is violating Ash's rights under Title IX by subjecting him
               to differential treatment based on his sex. ................................................ 12

               a.   Title IX prohibits discrimination against transgender students. ........... 14

               b.   This Court should defer to the U.S. Department of Education's
                    interpretation that Title IX requires schools to treat transgender
                    students consistently with their gender identity, including with
                    respect to restroom access at school. .................................................. 20

          2.   Plaintiff is likely to succeed on his Equal Protection Clause claim
               because KUSD is subjecting him to differential treatment based on his
               gender and transgender status with no justification. ................................. 24

               a.   KUSD has no valid basis, let alone an "exceedingly persuasive
                    justification," to treat Ash differently from other boys. ....................... 25

               b.   Even under rational basis review, KUSD's actions
                    are unconstitutional. ........................................................................ 27

i

3.  The balance of harms weighs heavily in Ash's favor and a
    preliminary injunction will further the public interest in equal
    educational opportunities for all students. ...................................................................28

CONCLUSION..................................................................................................................30

ii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) .........................................25, 26

*Auer v. Robbins*, 519 U.S. 452 (1997) ...................................................................20, 23

*Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014) ................................................26

*Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015).........................................23

*Biediger v. Quinnipiac Univ.*, 691 F.3d 85 (2d Cir. 2012) ............................................23

*Brunswick Corp. v. Jones*, 784 F.2d 271 (7th Cir. 1986) ................................................8

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).........................................................20

*Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011)...................................................23

*City of Belleville v. Doe*, 523 U.S. 1001 (1998) ....................................................15

*Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981 (8th Cir. 2002)................................................27

*Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326 (2013)...................................................24

*Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010) ....................................................9

*Doe v. City of Belleville*, 119 F.3d 563, 581 (7th Cir.1997) .....................................................15, 19

*E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*,
414 F.3d 700 (7th Cir. 2005) .........................................................29

*Exelon Generation Co. v. Local 15, Int'l Bhd. of Elec. Workers*,
AFL-CIO, 676 F.3d 566 (7th Cir. 2012)......................................................23

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) .......................................................11

*Fabian v. Hosp. of Cent. Conn.*, No. 3:12-cv-1154,
2016 WL 1089178 (D. Conn. Mar. 18, 2016) .......................................................16, 18

*Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011)................................................................28

*Flynn v. Doyle*, 630 F. Supp. 2d 987 (E.D. Wis. 2009)...................................................8

*G.G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016)............................................ *passim*

iii

*G.G. v. Gloucester Cty. Sch. Bd.*, No. 4:15CV54,
2016 WL 3581852 (E.D. Va. June 23, 2016) .........................................14

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA*,
 549 F.3d 1079 (7th Cir. 2008) .................................................9, 29

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ..................16, 18, 25, 27

*Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*,
No. 16A52, 2016 WL 4131636 (U.S. Aug. 3, 2016) .............................14

*Gloucester Cty. Sch. Bd. v. G.G.*, 136 S. Ct. 2442 (2016) ...........................3

*Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*,
743 F.3d 569 (7th Cir. 2014) ...................................................25

*Hively v. Ivy Tech Cmty. Coll.*, No. 15-1720,
2016 WL 4039703 (7th Cir. July 28, 2016)....................................19

*In re Arcadia Unified Sch. Dist.*, Resolution Agreement,
U.S. Dep't of Educ. Case No. 09-12-1020, U.S. Dep't of Justice Case
No. 169-12C-70 (July 24, 2013) ................................................24

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ......................14

*Joelner v. Vill. of Washington Park*, 378 F.3d 613 (7th Cir. 2004)..............29

*Konitzer v. Frank*, 711 F. Supp. 2d 874 (E.D. Wis. 2010) ...............19, 27, 28

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*
735 F.3d 735 (7th Cir. 2013) ...................................................10

*Lopez v. River Oaks Imaging & Diagnostic Grp. Inc.*,
542 F. Supp. 2d 653 (S.D. Tex. 2008) .........................................16

*Lusardi v. McHugh*, EEOC Appeal No. 012013395
(EEOC Apr. 1, 2015) ......................................................24, 27

*Macy v. Holder*, EEOC Appeal No. 0120120821, 2012 WL 1435995
(EEOC Apr. 20, 2012) .........................................................16

*McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014)..............22

*Mitchell v. Price*, No. 11-cv-260-wmc, 2014 WL 6982280
(W.D. Wis. Dec. 10, 2014) ....................................................26

iv

*N.K. v. St. Mary's Springs Acad. of Fond Du Lac Wisconsin, Inc.*,
965 F. Supp. 2d 1025 (E.D. Wis. 2013)................................................................15

*Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996) .....................................25, 28

*Norsworthy v. Beard*, 87 F. Supp. 3d 1104 (N.D. Cal. 2015).........................25

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ...............................14

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) ..............15, 17, 18

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) .........................15, 17, 18

*Rogers v. Windmill Pointe Village Club Ass'n,* 967 F.2d 525
(11th Cir. 1992)................................................................................................11

*Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008)........................16, 19

*Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000) ................................16, 18

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814
(9th Cir. 2001).................................................................................................11

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................20, 22

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004)........................16, 18, 28

*Starsurgical, Inc. v. Aperta, LLC*, 832 F. Supp. 2d 1000
(E.D. Wis. 2011) ................................................................................................8

*Sundstrom v. Frank*, No. 06-C-112, 2007 WL 3046240
(E.D. Wis. Oct. 15, 2007) ................................................................................20

*Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015) ........................8, 29

*Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167 (7th Cir. 1997)...................9

*Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984)..............15, 17, 18, 19

*United States v. Maricopa Cty.*, 915 F. Supp. 2d 1073 (D. Ariz. 2012).........22

*United States v. Mead*, 533 U.S. 218 (2001) ...............................................22

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................25

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)..........................................9

v

*Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840
(7th Cir. 1999).........................................................................................................11, 29

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ..............................................8

*Wolf v. Walker*, 986 F. Supp. 2d 982 (W.D. Wis. 2014) .............................................26

**Statutes**                                                                  **Page(s)**

20 U.S.C. § 1681 ..........................................................................................................13, 14

34 C.F.R. § 106.31 ........................................................................................................13, 14

34 C.F.R. § 106.33 ...............................................................................................21, 22, 23

45 C.F.R. § 86.31 ................................................................................................................13

45 C.F.R. § 92 *et seq.*.......................................................................................................13

7 C.F.R. § 15a.31 .........................................................................................................13, 14

72 Fed. Reg. 3432 .............................................................................................................20

81 F.R. 31375 *et seq.* ........................................................................................................13

Case 2:16-cv-00943-PP   Filed 08/15/16   Page 7 of 38   Document 11

# INTRODUCTION

Ashton Whitaker is a 16-year-old boy. He is about to start his senior year at Tremper High School in the Kenosha Unified School District ("KUSD").[1] Like many other boys, Ash wears his hair short, wears clothes typically favored by boys (like baggy shirts and a backward baseball cap), and will play on the boys' tennis team this year. Dec. of A. Whitaker (Mot. Ex. 1) ("A. Whitaker Dec.") ¶¶ 1-3

Ash is also transgender. Although he was designated "female" at birth and lived as a girl until early adolescence, in middle school Ash began to experience profound discomfort with his designated female gender. He came to understand that he has a male gender identity and that he is, in fact, a boy. For the past several years, Ash has lived as a boy in every aspect of his life. He outwardly expresses his male gender identity at both home and school, including adopting the traditionally male name Ashton (Ash, for short). He has asked his teachers and peers to use that name and male pronouns to refer to him. Ash's classmates recognize him as a boy, respect his male gender identity, and treat him as a boy in all respects. For the first seven months of the 2015-2016 school year, his junior year in high school, Ash used the boys' restrooms at school—just like other boys—without issue or incident, and without a single complaint from another student. A. Whitaker Dec. ¶¶ 4-10.

And then, in February 2016, the school administration suddenly prohibited Ash from using the boys' restrooms and required him to use girls' restrooms or one of a handful of single-occupancy restrooms unavailable to other students. When Ash—understanding it was his right to do so—continued to use boys' restrooms, school administrators repeatedly pulled him out of class, threatened him with disciplinary consequences, and instructed school security staff to

---

[1] This brief will collectively refer to Defendants Kenosha Unified School District No. 1 Board of Education and Superintendent Sue Savaglio-Jarvis, in her official capacity, as "KUSD."

1

monitor and report on his restroom use. A. Whitaker Dec. ¶¶ 11-12, 17, 20-25.

KUSD has not relented in its treatment of Ash, even after the U.S. Departments of Justice and Education issued guidance on May 13, 2016 to every school district in the country advising them that Title IX of the Education Amendments of 1972 ("Title IX") and its implementing regulations require schools to treat transgender students consistent with their gender identity in all respects. KUSD acknowledged that guidance but has refused to change its policy. After the guidance was issued, Ash and his mom, Melissa, learned that school administrators had directed guidance counselors to give green wristbands to Ash and other transgender students— presumably to help monitor their restroom use. A. Whitaker Dec. ¶ 10.

As a result of this and other discriminatory conduct alleged in his Complaint, Ash has suffered and continues to suffer educational, emotional, and physical harms. He has been pulled out of class; suffered loss of focus in class; avoided using the restroom at school to avoid discipline; experienced adverse health consequences from limiting his fluid intake; and experienced heightened symptoms of Gender Dysphoria, including depression and anxiety. He feels hurt, embarrassed, and stigmatized by the fact that his school does not respect his gender identity or consider him to be a "real" boy. A. Whitaker Dec. ¶¶ 13-14, 18, 23, 28-29, 39-41.

Ash is likely to prevail on the merits of his claims under Title IX and the Equal Protection Clause because KUSD has, without justification, treated him differently from other students on the basis of his sex and gender, including his gender identity and transgender status. The overwhelming weight of the case law—and the federal government's uniform interpretation that Title IX and other sex discrimination laws prohibit discrimination based on gender identity and gender stereotypes—is on Ash's side. In a case presenting nearly identical facts, the Fourth Circuit recently held that deference and controlling weight must be afforded to the federal

government's interpretation of Title IX: that schools are required to treat transgender students consistent with their gender identity, including allowing them to access restrooms consistent with their gender identity. *G.G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 715, 723 (4th Cir. 2016), *mandate recalled and stay issued by Gloucester Cty. Sch. Bd. v. G.G.*, 136 S. Ct. 2442 (2016).[2]

Unless enjoined, KUSD's continuing discrimination against Ash will subject him to irreparable injuries. Beyond interfering with his ability to learn and to enjoy the privileges and benefits of KUSD's education program and activities, living under the specter of disciplinary action for exercising his rights under federal law will disrupt the experience of being a high school senior and imperil his ability to focus on his studies and get into college. Allowing Ash to use boys' restrooms while this case proceeds on the merits will harm no one, nor has KUSD ever claimed that it would. For the reasons outlined below, the Court should grant his Motion for Preliminary Injunction ("Motion").

## OVERVIEW OF KEY TERMS

*Gender identity* refers to each person's innate understanding of belonging to a particular gender. Dec. of S. Budge (Mot. Ex. 2) ("Budge Dec.") ¶ 16; Dec. of N. Gorton (Mot. Ex. 3) ("Gorton Dec.") ¶ 11. There is broad consensus in the medical community that gender identity has a significant biological basis and is immutable. Budge Dec. ¶ 27; Gorton Dec. ¶¶ 22-25.

A *transgender* person is someone whose gender identity is different from the person's *sex assigned at birth*, a designation typically based on a cursory examination of an infant's external

---

[2] The Supreme Court issued a temporary stay of a preliminary injunction in *G.G.* "pending the timely filing and disposition of a petition for a writ of certiorari" by the school district. 136 S. Ct. at 2442. If certiorari is denied, the stay "shall terminate automatically." *Id.* The order does not affect the Fourth Circuit's analysis (or address how it will rule on the merits if certiorari is granted); indeed, the deciding vote from Justice Breyer was extended only as a "courtesy." *Id.* (Breyer, J., concurring). The record before this Court and the applicable law permit this Court to find the requisite likelihood of success and issue a preliminary injunction here.

3

genitalia. Budge Dec. ¶¶ 18-19; Gorton Dec. ¶ 14.

*Gender Dysphoria* is a condition recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition ("DSM-5"), and refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth.[3] Budge Dec. ¶¶ 20-22; Gorton Dec. ¶ 26. The internationally recognized treatment protocols for Gender Dysphoria are set forth by the World Professional Association for Transgender Health ("WPATH"). Budge Dec. ¶ 23.

A *gender transition* is the only ethical and effective treatment for Gender Dysphoria consistent with the WPATH Standards of Care. It consists of an individual "transitioning" to living and being accepted by others as the sex corresponding to the person's gender identity. *Id.* ¶¶ 23-24. A gender transition is an individualized process and may have social, legal, and medical components. *Id.* ¶ 24.

An essential component of a gender transition is a *social transition*, in which a transgender person begins to live outwardly in accordance with the person's gender identity. *Id.* ¶ 25. A social transition typically includes adopting a new name and pronouns, wearing clothing typically associated with their gender identity, and using restrooms that fit their gender identity. *Id.* ¶¶ 25, 29. Interfering with a social transition and failing to treat a transgender person in accordance with their gender identity can be deeply damaging, resulting in increased risk of depression, anxiety, self-harm, and thoughts of suicide. *Id.* ¶¶ 29, 31-33.

## BACKGROUND

During middle school, Ash began to experience increasing discomfort at being perceived by others as a girl and realized that he is actually a boy. A. Whitaker Dec. ¶ 5. At the end of

---

[3] DSM-5, published in 2013, replaced the term "Gender Identity Disorder" with "Gender Dysphoria" and updated the criteria for the diagnosis.

4

eighth grade, Ash told his immediate family that he is a transgender boy, and during his freshman year, Ash began to confide the same to close friends. *Id.* ¶ 6. At that point, Ash commenced his social transition, beginning to change his presentation and appearance to reflect his gender. *Id.* ¶ 7. At the beginning of his sophomore year, Ash began living fully as a boy. He asked his teachers and classmates to refer to him as "Ash" and use male pronouns. *Id.* ¶ 8. Around this time, he was diagnosed with Gender Dysphoria by a therapist. *Id.* ¶ 9. Ash is also under the care of an endocrinologist, who began administering hormone replacement therapy (testosterone) in July 2016. *Id.* ¶ 10. In August 2016, Ash filed a court petition, currently pending, to legally change his name to Ashton. *Id.*

Ash has been fully respected as a boy by his classmates since beginning his social transition. In the spring of 2015, in response to Ash's first request to use the boys' restrooms, KUSD informed Ash and his mother, Melissa, that the request was denied and that Ash had to use the girls' restrooms or a single-user restroom in the school's main office. *Id.* ¶ 12. Ash refused both options because as a boy, using the girls' restrooms would be inappropriate and unacceptable and he would face unwanted scrutiny from staff and students for using the main office restroom. *Id.* Seeing no other option, thereafter Ash began to avoid using the restrooms at school, and limited his liquid intake to make this possible. *Id.* ¶¶ 13-14. The subsequent dehydration exacerbated a medical condition, vasovagal syncope, which makes Ash susceptible to fainting, dizziness, seizures, and migraines. *Id.* ¶ 14. To control this condition, Ash's doctor mandates that he drink 6-7 glasses of water per day, but Ash will not do so at school to avoid having to use the restroom. *Id.* Ash also began to experience increased depression and anxiety related to his Gender Dysphoria. *Id.* ¶ 15.

5

After learning about Title IX's protections in the summer of 2015, Ash began exclusively using the boys' restrooms at school for the first seven months of his junior year, from September 2015 to March 2016, without incident. After a teacher inquired about the school's restroom policy, however, school administrators again told Ms. Whitaker that Ash could only use the girls' restrooms or the single-user restroom in the main office. *Id.* ¶ 18. Ash was devastated and humiliated at the prospect of being forced to use the girls' restroom, which he had not done since the previous school year. *Id.* ¶ 19. He returned to using the restroom as little as possible; when desperate, he used the boys' restrooms, despite fearing disciplinary action. *Id.* ¶¶ 19, 20.

On March 10, 2016, Ash and Ms. Whitaker again formally requested that Ash be allowed to use the boys' restroom. *Id.* ¶ 21. Assistant Principal Holly Graf told them that because Ash is listed as "female" in the school's official records, he would not be permitted to use the boys' restrooms and that the school needed legal or medical documentation to change those records. *Id.* During the meeting and generally, Ms. Graf referred to Ash exclusively by his birth name and with female pronouns. *Id.* ¶ 23. At Ms. Whitaker's request, Ash's pediatrician sent the school a letter confirming that he is a transgender boy and that he should be allowed to use boys' restrooms. Ms. Graf later told Ms. Whitaker that the letter was insufficient, but without saying what would suffice. Dec. of M. Whitaker (Mot. Ex. 4) ("M. Whitaker Dec.") ¶¶ 16-19. Because he continued to use boys' restrooms when necessary for the rest of the year, administrators repeatedly pulled Ash out of class, reprimanded him, and threatened him with disciplinary consequences. *Id.* ¶¶ 22, 25. Ash experienced these repeated meetings with school administrators as "invasive and embarrassing," as they drew unwanted attention, resulted in lost class time, and caused him to lose focus on his studies due to the stress and anxiety they caused. *Id.* ¶ 25.

School administrators subjected Ash to other discriminatory treatment. For instance, in March 2016, the principal decreed that Ash could not run for junior prom king and that he could only be a candidate for prom queen. *Id.* ¶ 31. Ash was devastated. *Id.* Ash and his friends created an online petition that generated thousands of signatures and 70 students attended a sit-in to demand that Ash be allowed to run for prom king and be allowed to use the boys' restrooms. *Id.* ¶ 32. School administrators subsequently conceded that he could run for prom king, but continued to deny him access to the boys' restrooms. *Id.* ¶ 33. Despite Ms. Whitaker's requests, KUSD has not changed Ash's official records or attendance rosters to reflect his male name and gender. *Id.* ¶ 34. Consequently, Ash has to correct all his teachers at the beginning of every term regarding his name and pronouns. *Id*. The suggestion that Tremper would require Ash and other transgender students to wear a green wristband caused Ash to fear increased scrutiny, invasive questioning, and even harassment or violence from being visibly marked as transgender. *Id.* ¶ 36.

In June 2016, for a five-day school orchestra camp at a local university, a KUSD administrator denied Ash's request to room with one of his best friends, a boy, and told him that he could only share a dorm suite with girls or stay in a room on his own. *Id.* ¶ 37. Of those choices, he opted to stay alone. Because students were forbidden from entering other suites, while his peers socialized with suitemates in the evenings, Ash went to bed early or practiced his violin, lonely and depressed that he was excluded from the full camp experience. *Id.* ¶ 38.

KUSD's actions have exacted a significant physical and emotional toll on Ash. M. Whitaker Dec. ¶ 34. Ash has difficulty getting out of bed and feels tired "all the time." Budge Dec. ¶ 50. He has lost interest in things he used to find enjoyable and has thoughts of suicide when he is feeling hopeless. *Id.* Ash has developed deep anxiety about being targeted for violence, and fears leaving the house alone. A. Whitaker Dec. ¶ 40. The summer break has been

7

something of a respite; his symptoms have subsided and his physical and emotional health has improved, as he no longer faces daily scrutiny and he can eat and drink as needed without having to fear using the restroom. M. Whitaker Dec. ¶ 35.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). In the Seventh Circuit, a district court undergoes a two-step analysis in determining whether a preliminary injunction should issue. *See Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015); *Flynn v. Doyle*, 630 F. Supp. 2d 987, 992 (E.D. Wis. 2009). First, the movant must make a threshold showing that (1) the party will likely suffer irreparable harm prior to the final resolution of the case without preliminary relief, (2) there is no adequate remedy at law, and (3) the party has a reasonable likelihood of success on the merits. *Turnell*, 796 F.3d at 662. For the third factor, a plaintiff "must demonstrate some probability of success on the merits," but "the threshold is low. It is enough that the plaintiff's chances are better than negligible." *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (internal quotation marks omitted); *see also Starsurgical, Inc. v. Aperta, LLC*, 832 F. Supp. 2d 1000, 1002 (E.D. Wis. 2011).

If a plaintiff makes this threshold showing, the court must then (1) weigh the irreparable harm to be faced by the plaintiff against the potential irreparable harm to defendants if the injunction is wrongly granted, and (2) consider the effects, if any, on the public interest. *Turnell*, 796 F.3d at 661-62. "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms

8

must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Id.* at 662 (internal citations omitted); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA*, 549 F.3d 1079, 1100 (7th Cir. 2008) ("The more likely it is that [movant] will win its case on the merits, the less the balance of harms need weigh in its favor.") Conversely, if a plaintiff has a lower likelihood of success but the balance of harms weighs heavily in his favor, a preliminary injunction may still issue. *Girl Scouts*, 549 F.3d at 1100.

"[G]iven the haste that is often necessary . . . a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010). At the preliminary injunction stage, a court may consider evidence inadmissible at trial, such as hearsay and declarations. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997).

## ARGUMENT

Because KUSD refuses to respect Ash's gender identity, he has suffered profound harm to his physical and psychological health, his emotional well-being, and his ability to learn. That harm is impeding his ability to take full advantage of the educational opportunities at school, and that harm will continue if KUSD is not enjoined from denying Ash equal access to boys' restrooms or from treating him as a girl in other respects. As demonstrated by Ash's use of boys' restrooms without incident for most of his junior year, allowing him to use those same restrooms this year will impose no hardship on KUSD or any KUSD student. Unsurprisingly, KUSD has offered no explanation for its actions. A. Whitaker Dec. ¶ 27. While an injunction would impose no irreparable harm to defendants, the permanent harm to Ash without preliminary relief would be profound. In short, the equities weigh heavily in Ash's favor.

For the reasons explained below, Ash's likelihood of success on both his Title IX and Equal Protection Clause claims is not only "better than negligible": it is strong. Federal agencies, including the U.S. Departments of Education and Justice, have reasonably interpreted Title IX and analogous laws to ban gender identity discrimination[4] as a form of sex discrimination and have stated that transgender students are entitled to use restrooms consistent with their gender identity. The Fourth Circuit recently concluded that the Department of Education's interpretation was reasonable and entitled to deference. This Court can and should do the same. For all these reasons, preliminary relief is needed to protect Ash from harm during the litigation of his claims.

I.     **ASH MEETS THE THRESHOLD SHOWING FOR A PRELIMINARY INJUNCTION: HE WILL SUFFER CONTINUING IRREPARABLE HARM IF KUSD'S DISCRIMINATORY TREATMENT CONTINUES AND IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.**

   **A. Ash will suffer irreparable educational, psychological, and physical harms if KUSD's discriminatory policies and practices are not enjoined immediately, and he has no adequate remedy at law for those harms.**

Ash will experience irreparable harm if Defendants' conduct is not enjoined before the school year begins. Budge Dec. ¶¶ 55-57; Dec. of J. McGuire (Mot. Ex. 5) ("McGuire Dec.") ¶ 37. He has already experienced harm based on the discrimination he is facing at school, which will certainly continue if the same conduct is allowed to persist. Budge Dec. ¶ 53. Time is of the essence for him: he has only one senior year of high school, and any judgment in his favor at the end of trial can never make up for that loss. Ash has no adequate remedy at law for that harm.

Irreparable harm is found where a final judgment would be insufficient to compensate for the harm caused by Defendants' actions. *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.* 735 F.3d 735, 740 (7th Cir. 2013). The Seventh Circuit has recognized the compelling and time-sensitive nature of harm to students alleging civil rights violations. For

---

[4] "Gender identity discrimination" is common shorthand for discrimination against someone whose sex is inconsistent with their sex assigned at birth—*i.e.*, a transgender person.

Case 2:16-cv-00943-PP   Filed 08/15/16   Page 17 of 38   Document 11

example, it upheld a finding of irreparable harm where a disabled student would suffer "diminished academic motivation" if he were unable to participate on his school basketball team. *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 853 (7th Cir. 1999). While the school argued that its policies would not directly *prohibit* the plaintiff from attending school, the court credited testimony that playing basketball "improved [plaintiff's] confidence in other areas of life, including education," the diminution of which, it held, would be irreparable.

Moreover, despite more than ample evidence of that concrete harm, there is a *presumption* of irreparable harm when a plaintiff's constitutional rights or civil rights have been violated. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (constitutional rights are "intangible and unquantifiable interests" that "cannot be compensated by damages"); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("where a defendant has violated a civil rights statute," "irreparable injury [may be presumed] from the fact of the defendant's violation"); *Rogers v. Windmill Pointe Village Club Ass'n,* 967 F.2d 525, 528 (11th Cir. 1992) (irreparable harm "may be presumed from the fact of discrimination").

Ash's emotional distress and symptoms of Gender Dysphoria, including depression, anxiety, and suicidal ideation, surge significantly after being instructed not to use boys' restrooms and after each instance in which KUSD personnel fail to respect his male gender identity. *See* Budge Dec. ¶ 44; M. Whitaker Dec. ¶ 33; A. Whitaker Dec. ¶ 29. Ash must live in constant fear of being stigmatized for using a restroom inconsistent with his gender identity and being referred to by his female birth name and pronouns—which could lead to involuntary disclosure of his transgender status to others, harassment, or even violence. A. Whitaker Dec. ¶¶ 12, 19. As a result of the untenable "options" prescribed by KUSD, Ash has felt compelled to choose a harmful alternative option: not using the restroom at all at school except when

11

absolutely necessary. As described above, *see supra* at 2, Ash has suffered consequent adverse health consequences and emotional distress.

Ash is ranked in the top five percent of his class and hopes to study biomedical engineering in college. *Id*. After being instructed not to use the boys' restroom, however, he began to experience difficulty concentrating on his school work and had to struggle through his depression and anxiety to maintain his grades. *Id*. ¶ 29. Absent injunctive relief, Ash will again have to struggle through the same depression, anxiety, sleeplessness, and difficulty concentrating that will unquestionably decrease his opportunities for success in his senior year. As Dr. Budge concluded based on her evaluation of Ash, if Defendants' exclusionary, isolating, and stigmatizing practices are allowed to continue, there will be "immediate and long-term significant consequences" for Ash's mental health and functioning that place Ash at risk for experiencing "life-long diminished well-being and life-functioning." Budge Dec. ¶¶ 55, 56.

Ash will unquestionably suffer serious and irremediable harm if the injunction is not granted. Final judgment at trial in his favor can never rectify the significant psychological, academic, and physical harm that Defendants' continued discriminatory actions will cause.

**B. Ash is likely to succeed on the merits of both his Title IX and Equal Protection Clause claims.**

**1. KUSD is violating Ash's rights under Title IX by subjecting him to differential treatment based on his sex.**

Ash has a strong likelihood of success on his Title IX claims. That is so, first, because KUSD's actions treated him differently from other students on the basis of sex (including his gender identity, nonconformity to gender stereotypes of what a "real" boy should be, and transgender status), denying him the full benefits of the academic and extracurricular opportunities offered by the school district. Second, even if it were ambiguous whether

discrimination "on the basis of sex" banned by Title IX includes discrimination against transgender students, this court should afford controlling deference to the interpretation of the U.S. Departments of Education and Justice that it does, as well as to those agencies' opinion that Title IX requires schools to give transgender students access to sex-segregated restrooms matching their gender identity.[5]

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Since KUSD receives federal funding from the U.S. Departments of Education ("ED") and Agriculture ("USDA") in support of its K-12 program, it must comply with Title IX and the implementing regulations of these agencies.[6] 34 C.F.R. § 106.31 (ED regulations); 7 C.F.R. § 15a.31 (USDA regulations). Ash can establish liability on his Title IX claims under at least two theories of discrimination recognized by federal courts and the Department of Education: (a) discrimination based on his gender identity and transgender status; and (b) discrimination based on gender stereotyping, since, as a transgender boy, he is being subjected to differential treatment at school because he does not conform to traditional notions of what a boy should be.

Based on the undisputed fact that KUSD is excluding Ash from boys' restrooms,

_____

[5] The pending petition for certiorari in *G.G.* is limited to plaintiff's Title IX claim. G.G.'s equal protection claims have not yet been addressed by the lower courts and are not before the Supreme Court. *G.G.*, 822 F.3d at 717 n.3.

[6] KUSD also receives federal funding from the U.S. Department of Health and Human Services ("HHS") for its Head Start program. HHS's Title IX regulations mirror the ED and USDA regulations. 45 C.F.R. § 86.31. In addition, on May 13, 2016, HHS promulgated a final rule implementing Section 1557, the nondiscrimination provision of the Affordable Care Act, which incorporates Title IX's sex discrimination prohibitions. 81 FR 31375 *et seq.*; 45 C.F.R. § 92 *et seq*. That rule defines discrimination based on sex to include differential treatment of a transgender person compared to non-transgender persons of the same gender identity. 45 C.F.R. § 92.206.

substantial evidence that KUSD has continually treated him as a girl, and the documented harms

he has suffered as a result, a preliminary injunction is warranted here. *See G.G. v. Gloucester

Cty. Sch. Bd.*, No. 4:15CV54, 2016 WL 3581852, at *1 (E.D. Va. June 23, 2016), mandate

stayed pending consideration of cert. petition by *Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*,

No. 16A52, 2016 WL 4131636, at *1 (U.S. Aug. 3, 2016).

### a. *Title IX prohibits discrimination against transgender students.*

To implement Title IX's prohibition on discriminating against any student "on the basis

of sex," 20 U.S.C. § 1681(a), the Title IX implementing regulations promulgated by ED, USDA,

and other agencies contain a broad general prohibition that "no person shall, on the basis of sex,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any academic, extracurricular, research, occupational training, or other education program

or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R.

§ 106.31(a) (ED); 7 C.F.R. § 15a.31(a) (USDA).[7] Title IX's prohibitions on sex discrimination

must be construed broadly. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005)

("'Discrimination' is a term that covers a wide range of intentional discrimination; by using such

a broad term, Congress gave the statute a broad reach."); *North Haven Bd. of Educ. v. Bell*, 456

U.S. 512, 521 (1982) ("[W]e must accord [Title IX] a sweep as broad as its language.").

It is by now well-established that Title IX, like other federal civil rights laws, prohibits a

broad range of discriminatory practices based both on sex and gender. Forbidden discrimination

---

[7] The regulations also specifically bar schools from, on the basis of sex, "[t]reat[ing] one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;" "[p]rovid[ing] different aid, benefits, or services or provide aid, benefits, or services in a different manner;" "[d]eny[ing] any person any such aid, benefit, or service;" "[s]ubject[ing] any person to separate or different rules of behavior, sanctions, or other treatment;" and "[o]therwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity." 34 C.F.R. § 106.31(b); 7 C.F.R. § 15a.31(b).

"based on sex" does not, as older cases suggested, include only "discriminat[ion] against women because they are women and against men because they are men." *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984).

In *Price Waterhouse v. Hopkins*, the Supreme Court held that the plaintiff, a woman denied a promotion because her colleagues perceived her to be too masculine, stated a claim under Title VII because that denial was based on gender stereotyping. 490 U.S. 228 (1989). Later, in *Oncale v. Sundowner Offshore Services, Inc.*, the Supreme Court found that a man could state a Title VII claim by alleging that he was sexually harassed by other men. 523 U.S. 75, 79 (1998). In a unanimous opinion authored by Justice Scalia, the Court rejected the view that Title VII's facially broad scope—banning discrimination "because of [] sex"—could be limited to those applications Congress might have imagined when it passed the law a generation earlier. *Id.* at 80-81. Instead, Title VII's reach extends beyond the "principal evils" that may have been contemplated by Congress when it passed the law to "reasonably comparable evils" that are, in some fashion, "because of sex." *Id.* at 79.

Following these decisions, the Seventh Circuit and other courts have recognized that Title IX, Title VII, and other federal civil rights laws prohibit a broad range of discriminatory practices based on both sex and gender, including sex stereotyping and discrimination based on a person's nonconformity to gender norms. *See Doe v. City of Belleville*, 119 F.3d 563, 581 (7th Cir.1997), *vacated on other grounds by* 523 U.S. 1001 (1998); *N.K. v. St. Mary's Springs Acad. of Fond Du Lac Wisconsin, Inc.*, 965 F. Supp. 2d 1025, 1034 (E.D. Wis. 2013).

While the Seventh Circuit has not decided a case involving a transgender plaintiff alleging sex-based discrimination since then, the overwhelming majority of courts and administrative agencies to consider the question have found that transgender individuals are

15

protected from discrimination under federal sex discrimination laws because of their inherent nonconformity to gender norms. *See Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 572-74 (6th Cir. 2004); *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000); *Fabian v. Hosp. of Cent. Conn.*, No. 3:12-cv-1154, 2016 WL 1089178, at *14 (D. Conn. Mar. 18, 2016) (finding "discrimination on the basis of transgender identity is cognizable under Title VII."); *Schroer v. Billington*, 577 F. Supp. 2d 293, 305, 308 (D.D.C. 2008); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 659-60 (S.D. Tex. 2008). In *Glenn*, the Eleventh Circuit observed that "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. . . . There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms." *Glenn*, 663 F.3d at 1316. Similarly, in *Schroer*, a federal court found that a Title VII claim brought by a transgender woman could arise from discrimination because she is "an inherently gender-nonconforming transsexual" or because discrimination based on gender identity or gender transition is "*literally* discrimination 'because of . . . sex." *Schroer*, 577 F. Supp. 2d at 305, 308. In other words, discrimination based on "sex," "sex stereotyping," "gender transition/change of sex," and "gender identity" are "simply different ways of stating the same claim of discrimination 'based on . . . sex.'" *Macy v. Holder*, EEOC Appeal No. 0120120821, 2012 WL 1435995, at *5 (EEOC Apr. 20, 2012).

Consistent with the weight of these decisions, Ash has a clear claim of discrimination "on the basis of sex." KUSD has treated him differently from other boys because he does not conform to their traditional notions of what a boy should be: one who was assigned the "male" at birth and who has certain physical characteristics, including male genitals and secondary sex

Case 2:16-cv-00943-PP Filed 08/15/16 Page 23 of 38 Document 11

characteristics. To them, Ash is not a boy because he was designated "female" at birth, has some female physical traits, and lacks unspecified "documentation" that he is a boy. KUSD's narrow conception of boyhood does not allow for the proposition that, despite these differences, Ash *is* a boy; is recognized by his family, doctors, friends, and others as a boy; and is entitled to be treated as one at school. Whether conceptualized as based on sex stereotyping, gender nonconformity, gender identity, or transgender status, KUSD's conduct comfortably fits within the plain language of Title IX: Ash has been discriminated against "on the basis of sex."

For all these reasons, Ash is likely to prevail on his claim that KUSD is discriminating against him based on his sex in a manner prohibited by Title IX. And even if that proposition were otherwise doubtful, as argued at greater length below, the Court could nevertheless find that Ash has a likelihood of success on his Title IX claims based on ED's controlling interpretation that gender identity discrimination is, itself, cognizable under Title IX.

The Seventh Circuit's 1984 decision in *Ulane*, a Title VII case, does not defeat the Title IX claim here. In *Ulane*, issued well before *Price Waterhouse* and *Oncale*, the Seventh Circuit found that Title VII does not protect "transsexuals" from discrimination based on their "transsexuality." 742 F.2d at 1084. Lacking the guidance of the Supreme Court's later clarifications, *Ulane* found that Title VII's prohibition of sex discrimination covers only "discriminat[ion] against women because they are women and against men because they are men." *Id.* at 1085. Because of its narrow construction of Title VII, *Ulane* did not address whether the plaintiff was discriminated against based on her sex or her nonconformity to defendants' idea of what a woman should be. *Id.* at 1087.

When the Seventh Circuit decided *Ulane*, our society's understanding of gender identity and transgender people was limited. Indeed, the court's definition of a "transsexual"—"a

17

biological male who takes female hormones, cross-dresses, and has surgically altered parts of her body to make it appear to be female"—bears little resemblance to the prevailing understanding of transgender people today. *Ulane* reflects an outdated and incorrect view that transgender people are *not* truly the sex identify with—but are only trying to "make it appear" so. This is simply inconsistent with our informed understanding of transgender people's lives now.

The *Ulane* court did not have the benefit of three more decades of medical, social science, and psychological research now available. Indeed, the first edition of the WPATH Standards of Care was published in 1980, only four years before *Ulane*. Since then, substantial research-based evidence confirms that gender identity is a core, immutable aspect of one's sex. Gorton Dec. ¶ 15. The medical consensus has evolved from viewing transgender people as a mental illness to recognizing that Gender Dysphoria is a condition resulting from the incongruence between transgender people's gender identity and the sex that was incorrectly assigned at birth, the only ethical and effective treatment for which is to transition to live fully and consistently in line with their true sex. Budge Dec. ¶¶ 28-29; Gorton Dec. ¶ 25. This scientific evidence and increased societal awareness compels a more nuanced examination of discrimination against transgender people than *Ulane* undertook.

Nearly every federal court in recent years has rejected *Ulane*'s narrow definition of "sex" as incompatible with *Price Waterhouse* and *Oncale*. Following the logic of those decisions, these courts have found that Title VII's protections against sex discrimination protect transgender people too. *See Glenn*, 663 F.3d at 1318 n.5 ("[S]ince the decision in *Price Waterhouse*, federal courts have recognized with near-total uniformity" that the approach in *Ulane* toward discrimination against transgender people was abrogated by *Price Waterhouse*); *Smith*, 378 F.3d at 573; *Schwenk*, 204 F.3d at 1201-01 (same); *Fabian*, 2016 WL 1089178, at *6.

18

The Seventh Circuit itself, in more recent decisions, has suggested that *Ulane*'s holding is now untenable. For example, in *Doe v. City of Belleville*, the Seventh Circuit observed that "we were confident [in *Ulane*] that Congress had nothing more than the traditional notion of 'sex' in mind when it voted to outlaw sex discrimination, but "[i]t is, ultimately, the plain, unambiguous language of the statute upon which we must focus." *Doe*, 119 F.3d at 573. It also noted that "an individual who is a transsexual may nonetheless bring suit when discriminated against on the basis of his or her sex." *Id.* at 593.

While the Seventh Circuit has yet to explicitly overrule *Ulane*, that is simply because it has not confronted the question.[8] With the benefit of substantially more robust research on gender identity and Gender Dysphoria—as well as modern Supreme Court jurisprudence—when again presented with the question of whether a transgender person suffering discrimination because of his gender identity or gender nonconformity, the Seventh Circuit is likely to find that Title IX, Title VII, and other nondiscrimination laws prohibit discrimination against transgender persons because of their transgender status and gender nonconformity.[9] That is precisely the

---

[8] In *Hively v. Ivy Tech Cmty. Coll.*, a Seventh Circuit panel affirmed the principle that discrimination based on "gender non-conformity" is actionable under Title VII, but found that it was powerless to overrule its numerous previous decisions holding that sexual orientation discrimination is not "because of sex." No. 15-1720, 2016 WL 4039703, at *4-5, 9 (7th Cir. July 28, 2016). As other courts have noted, a transgender person is "inherently gender non-conforming," *Schroer*, 577 F. Supp. 2d at 305; and so *Hively* is fully consistent with the position expressed in this brief. Although *Hively* referenced *Ulane*, as well as other cases more directly relevant to the question before it, it did not purport to decide whether or how *Ulane* would apply to a sex discrimination claim by a transgender plaintiff today.

[9] In the prisoners' rights context, courts in this district have recognized the legitimacy of transgender individuals' gender identity, the authoritativeness of the WPATH Standards of Care ("SOC"), the science supporting our present understanding that gender identity is a fundamental component of "sex," and the harm to transgender people when their social transition is impeded by public officials. *See Konitzer v. Frank*, 711 F. Supp. 2d 874, 908 (E.D. Wis. 2010) (finding a reasonable jury could find that a prison's refusal to allow plaintiff to undergo her "real-life experience," or social transition, like wearing makeup and using a female name, was inconsistent with the SOC and amounted to deliberate indifference to her serious medical needs under the

discrimination alleged here: Ash, as a transgender boy, was treated differently from other boys based on his sex and impermissible gender-based considerations, in violation of Title IX.

> **b.** *This Court should defer to the U.S. Department of Education's interpretation that Title IX requires schools to treat transgender students consistently with their gender identity, including with respect to restroom access at school.*

Even if it were otherwise unclear whether the discrimination is alleged here is "because of sex," any doubt would be removed by the authoritative interpretation of the federal agencies charged with administering the laws at issue here. The U.S. Department of Education ("ED"), which has the primary enforcement authority over Title IX, *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 706 (1979), construes Title IX's prohibitions on sex discrimination to encompass discrimination based on gender identity. That interpretation, which is shared by the other federal agencies charged with overseeing administration of the various laws prohibiting sex discrimination, is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and its progeny. Moreover, ED's construction of its own Title IX regulations—that schools must permit transgender students access to restrooms consistent with their gender identity—is binding on this Court pursuant to *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997).

On May 13, 2016, ED and the U.S. Department of Justice ("DOJ") jointly issued a Dear Colleague Letter ("DCL") (Mot. Ex. 6) addressing the application of Title IX to transgender students. The DCL is a "significant guidance document," which is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to," *inter alia*, "[r]aise novel legal or policy issues arising out of legal mandates." *See* Office of Management & Budget, Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432, 3439 (Jan. 25, 2007). Such guidance documents are subject to certain procedural requirements

---

Eighth Amendment); *Sundstrom v. Frank*, No. 06-C-112, 2007 WL 3046240, at *6 (E.D. Wis. Oct. 15, 2007) (recognizing that the SOC "are accepted worldwide, and represent the consensus of professionals regarding the . . . management of [gender dysphoria]."

that make them particularly authoritative statements of agency position. *Id.* at 3440.

The DCL reiterated ED's existing interpretation of its Title IX regulations, under which the prohibition of sex-based discrimination "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status," DCL at 1, a position which ED previously articulated in earlier Title IX guidance documents and opinion letters.[10] Accordingly, "[t]he Departments treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations. This means that a school must not treat a transgender student differently from the way it treats other students of the same gender identity." *Id.* at 2. The guidance explained that "there is no medical diagnosis or treatment requirement that students must meet as a prerequisite to being treated consistent with their gender identity." *Id.*

With respect to restrooms, the guidance states that, pursuant to 34 C.F.R. § 106.33, which allows schools to segregate bathrooms by sex, "[a] school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity." *Id.* at 3. With respect to name and pronoun usage, the guidance explains that "a school must treat students consistent with their gender identity even if their education records or identification documents indicate a different sex," which includes ensuring that school staff use a transgender student's chosen name and pronouns matching the student's gender identity. *Id.*

ED's construction of discrimination "because of sex" is entitled to considerable

---

[10] *See* Letter from J. Ferg-Cadima, Acting Ass't Sec'y for Policy, U.S. Dep't of Educ. Office for Civil Rights ("OCR"), to E. Prince (Jan. 7, 2015) ("[ED]'s Title IX regulations permit schools to provide sex-segregated restrooms . . . under certain circumstances. When a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity."); OCR, *Ques. & Ans. on Title IX & Single-Sex Elem. & Secondary Classes & Extracurricular Activities* (Dec. 1, 2014), at 25 ("Under Title IX, a recipient generally must treat transgender students consistent with their gender identity . . . ."); OCR, *Ques. & Ans. on Sexual Violence* (Apr. 29, 2014), at 5 (same).

deference. Under the *Skidmore* doctrine, agency statutory interpretation that is not promulgated through notice-and-comment rulemaking, and thus does not receive binding *Chevron* deference, nonetheless should receive considerable respect depending on its persuasive value. That value depends on factors such as the agency's care in crafting the position; the agency's consistency; the formality with which the position is crafted and announced; and the agency's expertise. *See United States v. Mead*, 533 U.S. 218, 228 (2001).

With regard to Title IX's application to transgender students, ED and DOJ have carefully crafted and consistently articulated their position, including the recent DCL, a widely distributed and publicly posted document. Taking into account ED's expertise in protecting the civil rights of all students, the successful practices of schools around the country, as well as the interests of students and others, ED and DOJ reasonably concluded that gender identity discrimination is a form of sex discrimination and have given school districts clear guidance on how to comply with that requirement.[11] Furthermore, DOJ coordinates enforcement of Title IX by executive agencies under Executive Order 12250, 45 F.R. 72,995, and its views are entitled to deference on that basis. *See United States v. Maricopa Cty.*, 915 F. Supp. 2d 1073, 1080 (D. Ariz. 2012) ("DOJ coordinates government-wide compliance with Title VI and its interpretation of Title VI is entitled to special deference."). This Court should defer to ED's and DOJ's reasonable view that the conduct at issue here is discrimination "because of sex" under Title IX. *Cf. McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1021 (7th Cir. 2014) (deferring to agencies' "research and expertise").

Meanwhile, ED's construction of its own regulation, 34 C.F.R. § 106.33, which

---

[11] Moreover, while it has not yet done so with respect to Title IX, ED has formally promulgated the same interpretation with respect to a federal program authorized by the analogous Title IV of the Civil Rights Act of 1964, amending the definition of "sex" to include both "transgender status" and "gender identity." 34 C.F.R. 270.7, 81 FR 137, 46812-16 (July 18, 2016).

authorizes educational institutions to segregate bathrooms by sex, but does not define "sex," should bind this Court. Under *Auer*, a federal court must defer to an agency's interpretation of its own ambiguous regulations when that interpretation is not "plainly erroneous or inconsistent with the regulation," is not a "*post hoc* rationalization advanced by an agency seeking to defend past agency action against attack," and "reflect[s] the agency's clear and considered judgment on the matter in question." 519 U.S. 452, 461-62 (1997); *see, e.g.*, *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97 (2d Cir. 2012) (concluding that ED's policy statements and letters interpreting a Title IX regulation were "entitled to substantial deference under *Auer*"); *accord Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 650 (7th Cir. 2015).

As the Fourth Circuit recently concluded, ED's interpretation of 34 C.F.R. § 106.33, under which every student must be permitted to use restrooms consistent with his or her gender identity, is plainly reasonable and thereby entitled to *Auer* deference. *See G.G.*, 822 F.3d at 723. In that case, as in this one, a transgender boy brought a Title IX challenge to a policy forbidding transgender students from using the restrooms matching their gender identity, limiting students' access to sex-segregated restrooms based on their so-called "biological sex." *Id.* at 719. The Fourth Circuit concluded that ED's interpretation that Title IX requires schools to permit transgender students to use single-sex restrooms consistent with their gender identity was entitled to *Auer* deference. *Id.* at 721. It found that ED's interpretation reasonably resolves an ambiguity in the meaning of "sex" under 34 C.F.R. § 106.33.[12] *See id.* at 720-21. The Fourth Circuit reached these conclusions even before ED articulated this interpretation in greater depth in the May 13, 2016 DCL, based primarily on a short opinion letter issued by ED. *See supra* at n.9.

---

[12] "A regulation is 'ambiguous' as applied to a particular dispute or circumstance when more than one interpretation is 'plausible' and 'the text alone does not permit a more definitive reading.'" *Exelon Generation Co. v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012) (quoting *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 207 (2011)).

23

As the Fourth Circuit correctly determined, the word "sex" is ambiguous. Even dictionary definitions of "sex"—both at the time Title IX was enacted and now—reveal that the term encompasses more than simple reference to external genitalia, but rather is defined by a range of factors that make one "male" or "female." *G.G.*, 822 F.3d at 721. ED's interpretation of that ambiguous term is patently reasonable. It is consistent with the prevailing medical consensus that one's sex is the sum of a variety of biological and psychological factors—internal and external genitalia and reproductive organs, chromosomal makeup, hormones, and gender identity— contrary to the now superseded notion that "male" and "female" can be defined only based on one's outward physical appearance or features. Gorton Dec. ¶ 10; Budge Dec. ¶ 18.

Finally, ED's interpretation is consistent with its enforcement efforts, its previous interpretations of its Title IX regulations, and other federal agencies' interpretations of Title IX and analogous sex discrimination laws like Title VII. *See G.G.*, 822 F.3d at 722-23.[13] ED's interpretation was not "invented as a *post hoc* justification developed response to litigation," *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013), but is wholly consistent with ED's longstanding interpretation of the term "sex" and the similar interpretations of other agencies.

> **2. Plaintiff is likely to succeed on his Equal Protection Clause claim because KUSD is subjecting him to differential treatment based on his gender and transgender status with no justification.**

KUSD has singled out Ash for discriminatory treatment based on his sex (including his

---

[13] *See Lusardi v. McHugh*, EEOC Appeal No. 012013395, at *14 (EEOC Apr. 1, 2015) (finding employer's ban on transgender woman's use of women's restrooms and refusal to refer to her using her new name and female pronouns to be actionable under Title VII); *see also* Dep't of Educ., Dear Colleague Letter: Harassment & Bullying, Oct. 26, 2010, at 8, *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf ("Title IX . . . protect[s] all students, including . . . transgender . . . students, from sex discrimination"); *In re Arcadia Unified Sch. Dist.*, Resolution Agreement, U.S. Dep't of Educ. Case No. 09-12-1020, U.S. Dep't of Justice Case No. 169-12C-70 (July 24, 2013) (resolving Title IX complaint by transgender boy denied access to boys' facilities, with district agreeing to treat him as a boy in all respects).

24

gender identity and gender nonconformity) and his transgender status, for no legitimate reason. By denying Ash access to boys' restrooms for no reason—or out of some speculative and hypothetical concern about student privacy—KUSD has engaged in "intentional, arbitrary discrimination" that cannot survive constitutional scrutiny under any standard of review. *See Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577 (7th Cir. 2014)).

> a.  *KUSD has no valid basis, let alone an "exceedingly persuasive justification," to treat Ash differently from other boys.*

"Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *United States v. Virginia ("VMI")*, 518 U.S. 515, 531 (1996); *Hayden*, 743 F.3d at 577; *Nabozny v. Podlesny*, 92 F.3d 446, 455-56 (7th Cir. 1996) (restoring gender-based equal protection claim for gay student who suffered harassment at school based, in part, on sex stereotyping); *Glenn*, 663 F.3d at 1316 (applying heightened scrutiny to equal protection claim brought by transgender woman in employment discrimination case). To survive a challenge, the state actor "must show at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 524 (internal quotation marks omitted). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* at 533.

Although the Seventh Circuit has not yet addressed the standard of review for discrimination based on transgender status, heightened scrutiny is also appropriate for that classification. In recent decisions, federal courts have recognized that discrimination against transgender people—even beyond its inherent connection to discrimination based on sex—must be evaluated under heightened scrutiny. *Adkins v. City of New York*, 143 F. Supp. 3d 134, 138-40

(S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *see also Mitchell v. Price*, No. 11-cv-260-wmc, 2014 WL 6982280, at *8 (W.D. Wis. Dec. 10, 2014) (on parties' agreement, applying heightened scrutiny to equal protection claims based on plaintiff's transgender status). As the *Adkins* court summarized, "transgender people have [inarguably] suffered a history of persecution and discrimination" and "are a politically powerless minority," and "transgender status bears no relation to ability to contribute to society" and "is a sufficiently discernible characteristic to define a discrete minority class." 143 F. Supp. 3d at 139-40.[14]

Under heightened scrutiny, KUSD's policy of excluding Ash from restrooms and failing to ensure the correct use of his chosen name and male pronouns must be found unconstitutional. Though repeatedly asked, KUSD has never offered a justification for its exclusion of Ash from boys' restrooms, its administrators' refusal to use his chosen name and male pronouns, or its failure to instruct faculty not to use his birth name or female pronouns. A. Whitaker Dec. ¶ 20, 22-27; M. Whitaker Dec. ¶ 13, 17-19. Its position has simply been that, in its view, it is not compelled to follow ED's guidance. And even *after* this lawsuit was filed, KUSD has publicly disputed some factual allegations but still gives no basis for its exclusionary policy. *See* "KUSD Response to Lawsuit," http://www.kusd.edu/kusd-response-lawsuit.

There is a simple explanation for this: KUSD has no legitimate reason to treat Ash differently from other boys. Ash's unremarkable and uneventful use of the boys' restroom for seven months is the best evidence that the school's decision to exclude him from those same restrooms later was purely arbitrary and based on discriminatory motives. Any justification that KUSD might proffer now would plainly be a *post hoc* response to litigation.

---

[14] The Western District of Wisconsin, using this analysis, applied heightened scrutiny to equal protection claim based on sexual orientation. *See Wolf v. Walker*, 986 F. Supp. 2d 982, 1011-14 (W.D. Wis. 2014), *aff'd on other grounds, Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014).

26

Even if KUSD were now to assert, for the first time, that its actions were genuinely motivated by a desire to ensure the "comfort" of other students or some generalized concerns about security, there is no evidence that excluding Ash from boys' restrooms implicated any of those concerns. As courts and federal agencies have correctly found, a transgender person's mere presence in a restroom does not violate the rights of non-transgender individuals in those spaces. *See G.G.*, 822 F.3d at 724 n.11 (rejecting school district's "amorphous safety concerns"); *Glenn*, 663 F.3d at 1321 (dismissing as pretext employer's "purported concern that other women might object to [transgender woman's] restroom use" and "speculative concern about lawsuits arising if [plaintiff] used the women's restroom"); *Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (rejecting a sexual harassment claim by a non-transgender woman based on her transgender colleague's use of the women's restrooms); *Lusardi*, 2015 WL 1607756, at *9 (finding "[e]qual access to restrooms is a significant, basic condition of employment" and that "[a]llowing the preferences of co-workers to determine whether sex discrimination is valid reinforces the very stereotypes and prejudices that Title VII is intended to overcome").

Furthermore, no conceivable basis or legitimate interest is furthered by failing to respect a transgender person's gender identity, such as by using the wrong name and pronouns, and KUSD has not claimed any. *See, e.g., Konitzer*, 711 F. Supp. 2d at 912 (finding defendants would not be harmed if required to refer to transgender inmate by her chosen name and female pronouns).

### b. Even under rational basis review, KUSD's actions are unconstitutional.

Even if the court applied rational basis review, KUSD's actions would not survive scrutiny. "[T]he Constitution prohibits intentional invidious discrimination between otherwise similarly situated persons based on one's membership in a definable minority, absent at least a

rational basis for the discrimination." *Nabozny*, 92 F.3d at 457. In *Nabozny*, the Seventh Circuit found that a school district's refusal to intervene in students' harassment of a gay student based on his sexual orientation was unjustified even under this more deferential standard. *Id.* at 458.

In this prison context, courts have found that denying a transgender person critical aspects of a gender transition—the ability to express one's gender, respect for the individual's chosen name and gender-appropriate pronouns, and access to medical treatments necessary under the Standards of Care—may be harmful enough to amount to deliberate indifference in violation of the Eighth Amendment. *See Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011); *Konitzer*, 711 F. Supp. 2d at 908. The Seventh Circuit put it bluntly: "Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to *torture*." *Fields*, 653 F.3d at 556 (emphasis added). A similar analysis applies here.

For transgender adolescents like Ash, a full social transition—including using facilities consistent with their gender identity and having their gender identity respected by their peers and teachers—is critical to their development, health, well-being, and ability to learn. Budge Dec. ¶¶ 25, 36. Just as refusing to provide transgender inmates with access to transition-related care "serves no valid penological purpose," a school's deliberate obstruction of a transgender student's ability to undergo a social transition serves no valid educational purpose. As established by the declarations in support of Ash's motion for preliminary injunction, school districts around the country have permitted transgender students to use bathrooms consistent with their gender identities and have done so without problems.

### 3. The balance of harms weighs heavily in Ash's favor and a preliminary injunction will further the public interest in equal educational opportunities for all students.

Ash has demonstrated a strong likelihood of success on the merits. "[T]he more likely

28

[he] is to win, the less the balance of harms must weigh in his favor." *Turnell*, 796 F.3d at 662. Regardless, a balancing of the equities here strongly favors a preliminary injunction. As discussed above, Plaintiff will suffer serious and irreparable harms without an injunction, including depression, anxiety, migraines, dizziness, fainting, decreased academic performance, and possibly disciplinary actions—all during his irreplaceable senior year of high school.

This court must weigh "any *irreparable* harm the nonmoving party would suffer if the court were to grant the requested relief" against the irreparable harm Ash *will* suffer if the injunction is not granted. *Girl Scouts,* 549 F.3d at 1086 (7th Cir. 2008) (emphasis added). Speculative harms are not enough. *See, e.g.*, *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700 (7th Cir. 2005). Further, "there can be no irreparable harm to a [defendant] when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect" constitutional rights. *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (internal quotations omitted).

KUSD has never asserted that treating Ash as a boy would "harm" the school district or any of its students. Any harms KUSD now points to would be not only speculative but entirely belied by Ash's use of the same boys' restrooms for many months without issue. A nearby district, Shorewood School District, similarly has experienced no issues in allowing its transgender students to use the restrooms matching their gender identity. Dec. of T. Kenney (Mot. Ex. 7) ("Kenney Dec.") ¶ 4; Dec. of B. Davis (Mot. Ex. 8) ("Davis Dec.") ¶ 6. The nation's second largest school district, Los Angeles Unified School District, implemented transgender-inclusive policies over a decade ago and has *never* experienced any problems. Dec.

of J. Chiasson (Mot. Ex. 9) ("Chiasson Dec.") ¶¶ 6-8, 12. Many other success stories exist.[15]

Indeed, the experiences of school districts with transgender-inclusive policies demonstrate that providing equal access for transgender students is best for *all* students: "[I]n schools with inclusive policies, the overall student average for safety is higher than schools without policies. This finding holds true even among students who do not know about the policy, are not LGBTQ, and don't directly experience other aspects of the environment." McGuire Dec. ¶ 29. In fact, non-transgender students are generally *more* comfortable when their transgender classmates use the restrooms matching their gender identity. *See* Chiasson Dec. ¶ 9.

For the above reasons, it is clear that a balance of the harms and the public interest in safe, inclusive schools for all students strongly favors issuing a preliminary injunction.

## CONCLUSION

Ash only has one senior year, one chance to apply to college, one more year to enjoy the extracurricular activities he loves like orchestra, tennis, and theatre, and one more year to benefit from the once-in-a-lifetime social and academic opportunities KUSD provides to its students. KUSD should not be allowed to take all that away from him and instead subject him to a year of scrutiny, stigma, and ever-increasing physical and psychological distress. Ash has the right to be treated as the boy that he is and to go to school on the same terms as all of his classmates. Therefore, Plaintiff respectfully requests that the Court enter a preliminary injunction by the first day of the 2016-2017 school year on September 1, 2016, or as soon afterward as possible, to avoid any further deprivation of his right to equal educational opportunities at school.

---

[15] On May 13, 2016, ED released a companion document to its DCL, *Examples of Policies and Emerging Practices for Supporting Transgender Students*, collecting examples of transgender-inclusive policies adopted by school districts and states around the country. Mot. Ex. 10.

Dated: August 15, 2016

Respectfully submitted,

<table>
<tr>
<td></td>
<td>/s Joseph J. Wardenski</td>
</tr>
</table>

Ilona M. Turner*
Alison Pennington*
Sasha J. Buchert*
Shawn Thomas Meerkamper*
TRANSGENDER LAW CENTER
1629 Telegraph Avenue, Suite 400
Oakland, CA  94612
Phone: (415) 865-0176
Fax:     (877) 847-1278
ilona@transgenderlawcenter.org
alison@transgenderlawcenter.org
sasha@transgenderlawcenter.org
shawn@transgenderlawcenter.org

Robert (Rock) Theine Pledl
PLEDL & COHN, S.C.
1110 N. Old World Third Street, Suite 215
Milwaukee, WI  53203
Phone: (414) 225-8999
Fax:     (414) 225-8987
rtp@pledlcohn.com

/s Joseph J. Wardenski
Joseph J. Wardenski
Michael Allen**
RELMAN, DANE & COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC  20036
Phone: (202) 728-1888
Fax:     (202) 728-0848
jwardenski@relmanlaw.com
mallen@relmanlaw.com

*  Application for admission to this Court to follow
** Application for admission to this Court pending

31