UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ASHTON WHITAKER, a minor, by his
mother and next friend,
MELISSA WHITAKER,

   Plaintiff,

               Civ. Action No. 2:16-cv-00943

KENOSHA UNIFIED SCHOOL DISTRICT
NO. 1 BOARD OF EDUCATION and SUE
SAVAGLIO-JARVIS, in her official capacity as
Superintendent of the Kenosha Unified School District
No. 1,

   Defendants.

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
THE AMENDED COMPLAINT**

## <u>INTRODUCTION</u>

   This case presents one central issue: Is a public school required by law to permit any student that identifies themselves as "transgendered" to use a bathroom designated for students of the opposite birth gender[1]?  In terms of this case, the issue presented is whether a biological female student has the unilateral right to use the men's bathroom simply by proclaiming an "identity" with the male gender.  The simple answer to this question must be no.

   Plaintiff, Ashton Whitaker is a minor.  This suit was filed by Ashton Whitaker's mother and next friend, Melissa Whitaker ("Plaintiff").[2]  Plaintiff filed suit against Defendants, Kenosha Unified School District No. 1 Board of Education and Dr. Sue Savaglio-Jarvis, in her official

---

[1] "Birth gender" or "biological sex" is meant to encompass what Plaintiff terms "sex assigned at birth" to the extent that it refers to the gender designation recorded on an infant's birth certificate.  *See* Pltf.'s Amended Comp. at ¶14.
[2] Plaintiff filed an Amended Complaint on August 15, 2016, designating Plaintiff as Ashton Whitaker, a minor, by his mother and next friend, Melissa Whitaker.

capacity as Superintendent of the Kenosha Unified School District No. 1 ("KUSD"), asking this Court to order KUSD to permit Plaintiff and any students that do not identify with their birth gender to decide for themselves which school bathroom, locker room, or overnight accommodations they will use, and to award damages.[3]

While Plaintiff's Amended Complaint presents an extensive narrative, the outcome of this case comes down to a pure question of law on two issues: (1) Does a public school's policy of requiring students to use the bathroom, locker room, or overnight accommodation that corresponds to their birth gender violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; and (2) Does this policy violate Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"). The answer to this question is that the policy does not violate Title IX or deny Equal Protection.

Even accepting every allegation of the Amended Complaint as true, Plaintiff's Amended Complaint fails as a matter of law because: (1) "transgender" is not a suspect classification and Plaintiff cannot overcome the legitimate and important rationale of respecting the constitutionally protected right to privacy of all KUSD's students; and (2) the plain language of Title IX does not encompass the status of being "transgendered." Plaintiff has failed to state a claim upon which relief can be granted, and as such, this Court should dismiss the Amended Complaint with prejudice.

---

[3] In addition to filing an Amended Complaint, Plaintiff also filed a Motion for Preliminary Injunction and Memorandum of Law in Support thereof on August 15, 2016. KUSD will be responding separately to Plaintiff's Motion for Preliminary Injunction.

2

Plaintiff, A.W., is a sixteen-year-old student at George Nelson Tremper High School in the Kenosha Unified School District No. 1 in Kenosha, Wisconsin. Pltf.'s Amended Comp. at ¶1. Plaintiff was born as a biological female with a birth certificate that designates gender as "female". Pltf.'s Amended Comp. at ¶1. Plaintiff identifies as being transgendered and currently identifies as male. Pltf.'s Amended Comp. at ¶1. Plaintiff lived as a female until middle school. Pltf.'s Amended Comp. at ¶21.

In Plaintiff's freshmen and sophomore years of high school, Plaintiff slowly began transitioning more publicly to identifying as male. During this time frame, Plaintiff began dressing more masculine, requesting to be referred to by male pronouns, and using a masculine name. *See* Pltf.'s Amended Comp. at ¶¶22-24. Plaintiff has not undergone any sex change surgeries. Pltf.'s Amended Comp. at ¶45.

KUSD requires its students to use the bathroom that corresponds with his or her birth gender or to a single user, gender neutral bathroom. Pltf.'s Amended Comp. at ¶27. KUSD also requires that when students travel on school-sponsored trips that students may only share rooms with other students who share the same birth gender. On a school sanctioned trip to Europe with the school orchestra group Plaintiff was required to room with female students. Pltf.'s Amended Comp. at ¶33. The same policy was enforced this year during a summer orchestra camp at a college campus where students used the college dormitories. Pltf.'s Amended Comp. at ¶¶84-86.

As a result of KUSD's policy, Plaintiff alleges to have suffered various injuries. Pltf.'s Amended Comp. at ¶¶98-108. Plaintiff brought two claims against KUSD challenging the legality of the policy of requiring students to use the bathroom that corresponds with their biological

---

[4] While the facts in the Amended Complaint must be relied upon in bringing this motion to dismiss, a brief overview is necessary. KUSD does not admit any of the allegations and reserves the right to contest the same in the future.

gender: Violation of equal protection under the Fourteenth Amendment of the United States Constitution; and Violation of Title IX. Pltf.'s Amended Comp. at ¶¶109-127. As will be more fully developed below, even accepting all of Plaintiff's allegations as true, the claims fail as a matter of law.

## MOTION TO DISMISS STANDARD

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A court, in examining a pleading under F.R.C.P. 12(b)(6), conducts a two-step inquiry. First, legal conclusions must be isolated and disregarded so as to uncover the pleading's purely factual allegations. Second, those factual allegations, presumed to be true, are then examined to determine whether each element of each claim presented is indeed plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. A complaint should be dismissed for failure to state a claim when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hardison v. Gen. Fin. Corp.*, 738 F.2d 893, 894 (7th Cir. 1984). Ultimately, whether a plaintiff has shown a "plausible claim for relief" is a "context specific" inquiry that requires the district court to "draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

A plaintiff fails to allege a plausible claim for relief when the claim is not cognizable under the law. *See Papasan v. Allain*, 478 U.S. 265, 283, 106 S. Ct. 2932, 2943, 92 L. Ed. 2d 209 (1986);

4

*Lewis v. Richards*, 107 F.3d 549, 555 (7th Cir. 1997). Such legally insufficient claims should be dismissed for failure to state a claim under F.R.C.P. 12(b)(6). *Id.*

## DISCUSSION

## I.   BEING "TRANSGENDERED" IS NOT A SUSPECT CLASSIFICATION, AND THEREFORE, ANY RATIONAL BASIS JUSTIFIES KUSD'S POLICIES.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendants deprived him or her of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law. *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1009 (7th Cir. 2000). The question presented here is whether Plaintiff can identify a constitutional right that has been denied by defendants.

To satisfy this burden Plaintiff invokes the Equal Protection Clause of the Fourteenth Amendment which declares that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend XIV. In order to establish an equal protection violation, a plaintiff must show that the defendants: (1) treated him or her differently from others who were similarly situated, and (2) intentionally treated him or her differently because of his or her membership in the class to which he or she belonged. *See Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 950-51 (7th Cir. 2002).

In analyzing such claims the level of scrutiny applied by a court varies based upon the classification that is invoked. For example, where a classification is based upon race, alienage, or national origin, courts have found that these factors are so seldom relevant to the achievement of any legitimate state interest that they are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *City of Cleburne v. Cleburne Living*

5

*Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). Conversely, where no fundamental right or suspect classification is at issue, the governmental action is presumed to be valid and is evaluated under the rational-basis standard of review. *Smith v. City of Chicago*, 457 F.3d 643, 650 (7th Cir. 2006).

> ### A. Being Transgendered Has Never Been Recognized As A Suspect Classification, And Therefore, It Is Not Entitled To Heightened Scrutiny.

Courts have been very reluctant to create new suspect classes. *See City of Cleburne,* 473 U.S. at 441. The United States Supreme Court has <u>never</u> recognized transgender as a suspect classification under the Equal Protection Clause. *See Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015). The Seventh Circuit has also never recognized transgender as a suspect classification. Because being transgendered has never been found to be a suspect classification, this Court should follow the Supreme Court's admonition that courts should not create new suspect classifications. *See City of Cleburne,* 473 U.S. at 441.

> ### B. Because Being Transgendered Has Never Been Recognized As A Suspect Classification, KUSD's Policy Is Presumed To Be Rational And Will Not Be Set Aside If Any Set Of Facts Reasonably May Be Conceived Of To Justify It.

Where no fundamental right or suspect classification is at issue, equal protection claims are evaluated under the rational-basis standard of review. *Smith*, 457 F.3d at 650. Under the rational basis standard, "courts presume the constitutionality of the government's classification and it will not be set aside if any state of facts reasonably may be conceived to justify it." *Patrick v. Raemisch*, 550 F. Supp. 2d 859, 864 (W.D. Wis. 2008) (citing *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir.1992)).

To state an equal protection claim governed by rational basis review, a plaintiff's factual allegations should suggest some basis "sufficient to overcome the presumption of rationality that

6

applies to government classifications." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 639 (7th Cir.2007) (citing *Wroblewski*, 965 F.2d at 460). If a rational basis for the government's actions remains "conceivable and plausible" in the face of plaintiff's allegations, plaintiff's equal protection claim should be dismissed for failure to state a claim. *Id.* The challenging party has the burden to "negative every conceivable basis which might support it." *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 2643, 125 L. Ed. 2d 257 (1993) (internal citations omitted).

## II. RESPECTING THE PRIVACY RIGHTS OF ALL STUDENTS IS CONCEIVABLE AND PLAUSIBLE, AND PLAINTIFF'S AMENDED COMPLAINT FAILS TO OVERCOME THIS PRESUMPTION OF RATIONALITY.

Under rational basis review, courts presume the constitutionality of the classification and it "will not be set aside if any state of facts reasonably may be conceived to justify it." *Patrick*, 550 F. Supp. 2d at 864. Here, KUSD's policy of requiring students to use restrooms, locker rooms, and overnight accommodations that correspond to their birth gender is justified by the need to provide privacy to all students. This reasoning is rational and cannot be overcome by Plaintiff.

### A. KUSD's Policy Of Requiring Students To Use Facilities That Correspond With Their Biological Gender Is Rationally Related To The Legitimate Interest Of Respecting The Privacy Rights Of Its Students.

The right to privacy is a longstanding fundamental right under the Constitution. *See Quilici v. Vill. of Morton Grove*, 695 F.2d 261, 280 (7th Cir. 1982) ("The right to privacy is one of the most cherished rights an American citizen has; the right to privacy sets America apart from totalitarian states in which the interests of the state prevail over individual rights."). The rationale of requiring students to use facilities that correspond to their birth gender in order to provide privacy to all students has also been upheld by multiple courts. *See Johnston*, 97 F. Supp. 3d at

669-70 (citing *Etsitty v. Utah Transit Authority*, 502 F.3d 1215, 1224 (10th Cir. 2007); *Causey v. Ford Motor Co.,* 516 F.2d 416 (5th Cir. 1975)). "Across societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 734 (4th Cir. 2016) ("*Grimm*") (Niemeyer, Circuit Judge, concurring in part and dissenting in part). "An individual has a legitimate and important interest in bodily privacy such that his or her nude or partially nude body, genitalia, and other private parts are not exposed to persons of the opposite biological sex" and "courts have consistently recognized that the need for such privacy is inherent in the nature and dignity of humankind." *Id.* at 734-35 (citing *Doe v. Luzerne Cnty.*, 660 F.3d 169, 176-77 (3d Cir. 2011); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005); *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)).

Here, KUSD acknowledges its students' constitutional right to perform personal bodily functions outside the presence of members of the opposite gender. Likewise, requiring students to room with students who have the same birth gender during an overnight school sanctioned event protects the same legitimate interest that students have in undressing and performing personal bodily functions outside the presence of the opposite gender. *See Johnston*, 97 F. Supp. 3d at 669-70. Students at KUSD have the right to use the bathroom to perform personal bodily functions without the presence of members who do not share their birth gender. This reason is presumptively constitutional and because this rational reason is "conceivable and plausible" in light of Plaintiff's

8

allegations, and Plaintiff's equal protection claim must be dismissed.  *See St. John's United Church of Christ*, 502 F.3d at 639.

> **B.** **Even Under A Heightened Intermediate Review The Result Is The Same; Requiring Students To Use The Bathroom That Corresponds To Their Birth Gender Is Substantially Related To The Important Interest In Respecting The Constitutionally Protected Right Of Privacy Of KUSD's Students.**

Even if a heightened standard of review were to apply in this case, Plaintiff's Amended Complaint must still be dismissed as the policy of segregating bathrooms, locker rooms, and overnight accommodations on the basis of birth gender is "substantially related to a sufficiently important government interest." *Johnston*, 97 F. Supp. 3d at 669.  The Court in *Johnston* aptly explained why segregating on the basis of birth gender does not violate the Equal Protection Clause:

> The Supreme Court has acknowledged that not all classifications based on sex are constitutionally impermissible: 'The heightened review standard our precedent establishes does not make sex a proscribed classification . . . Physical difference between men and women, however, are enduring: '[t]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'' *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting *Ballard v. United States*, 329 U.S. 187, 193, 67 S.Ct. 261, 91 L.Ed. 181 (1946)); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ('[T]he statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny. . .').  As such, **<u>separating students by sex based on biological considerations—which involves the physical differences between men and women—for restroom and locker room use simply does not violate the Equal Protection Clause</u>**.  Thus, 'while detrimental gender classifications by government often violate the Constitution, they do not always do so, for the reason that there are differences between males and females that the Constitution necessarily recognizes.' *Michael M. v. Superior Court of Sonoma Cnty.*, 450 U.S. 464, 478, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (Stewart, J., concurring).

*Id.* at 670 (emphasis added).

Case 2:16-cv-00943-PP   Filed 08/16/16   Page 9 of 26   Document 15

Simply put, KUSD is applying a policy that respects and protects the privacy rights of <u>all</u> students. All students are treated equally under the policy. No student may use a bathroom that does not correspond to his or her birth gender. Even if an intermediate standard of review applied, KUSD's policy, which does not permit students with a birth gender of female, like Plaintiff, to perform personal bodily function in the male bathroom, or cohabitate with men in overnight lodging during school sanctioned trips, serves the important purpose of respecting and protecting the privacy rights of all students.

As much as the Amended Complaint portrays that this policy is solely about Plaintiff, KUSD has the responsibility to consider the welfare, privacy, and protection of <u>all</u> of its students, not just Plaintiff. Plaintiff may truly believe that the male student body may not have any objections to Plaintiff using the men's bathroom, *see* Pltf.'s Amended Comp. at ¶36, but Plaintiff's requested relief stretches far beyond a personal request to use the men's bathroom. If Plaintiff's relief is granted, any student who <u>verbally</u> identifies being transgendered would be entitled to use any bathroom, locker room, or overnight accommodation, regardless of the other students' gender. Even without resorting to extreme hypotheticals regarding concerns of safety, it is a very realistic possibility that students will have their individualized sense of privacy violated by the presence of members of the opposite gender in their bathroom, locker room, or overnight accommodations. This invasion of privacy is enough to render the policy <u>substantially</u> related to an <u>important</u> policy. Therefore, even under intermediate scrutiny, Plaintiff's Equal Protection claim must be dismissed.

## III. PLAINTIFF'S TITLE IX CLAIM MUST BE DISMISSED BECAUSE TITLE IX DOES NOT ENCOMPASS TRANSGENDER STATUS.

### A. The Plain, Unambiguous Language Of Title IX Extends Only To Gender, Not To "Transgender" Status.

Title IX prohibits sex discrimination in educational programs that receive federal funding and states: "No person in the United States shall, **on the basis of sex**, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity[5] receiving Federal financial assistance."  20 U.S.C. § 1681(a) (emphasis added).  Plaintiff would have this Court conclude that the term "on the basis of sex" as used in Title IX encompasses "transgendered" status.  Such a conclusion, however, is not supported in the plain language of Title IX or its regulations.

First, it is clear that the term "on the basis of sex" as used in the statute does not include being transgendered.  "Title IX does not prohibit discrimination on the basis of transgender itself because transgender is not a protected characteristic under the statute."  *Johnston*, 97 F. Supp. 3d at 674.

Second, Title IX and the regulations implementing Title IX clearly suggest that "transgender" status is not protected because they specifically permit educational institutions subject to Title IX to provide separate bathrooms on the basis of gender: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33.  Additionally, the same regulations provide that nothing in the regulations "shall prevent a recipient from considering an employee's sex in relation to employment in a locker room or toilet facility used only by members of one sex."  34 C.F.R. § 106.61.  Specifically instructive in regard to overnight lodging for students, Title IX allows for

---

[5] At least one court has reasoned that prohibiting a transgender student from using a restroom consistent with his or her gender does not constitute discrimination under Title IX, because "it would be a stretch to conclude that a 'restroom,' in and of itself, is educational in nature and thus an education program" as required to state a prima facie case under the statute.  *Johnston*, 97 F. Supp. 3d at 682 (citing *Doe v. Clark Cnty. Sch. Dist.*, 2008 WL 4372872, at *3 (D.Nev. Sept. 17, 2008)).

sex-segregated living spaces: "Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686.

The clear language of Title IX shows that it applies to one's gender, i.e., being male or female, and, because the language of the statute specifically permits schools to provide students with gender-segregated spaces, i.e., one for men and another for women, there is no room for an interpretation that being transgendered is also protected under the law. *See Johnston*, 97 F. Supp. 3d at 678.

**B.**    **Case Law Under Title VII Supports The Conclusion That Title IX's Prohibition Of Discrimination "On The Basis Of Sex" Does Not Encompasses Transgendered Status.**

No court in the Seventh Circuit has yet to specifically address whether Title IX's prohibition of discrimination on the basis of sex encompasses transgender students. Nevertheless, courts have considered this issue in the context of Title VII of the Civil Rights Act of 1964 ("Title VII"), and it is appropriate and instructive to rely on those cases in interpreting Title IX. *See Johnston*, 97 F. Supp. 3d at 674 (providing that when there is a lack of controlling precedent on a question of Title IX, parties necessarily rely on cases in the Title VII context to construct the appropriate framework to answer the question); *see also Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012) (maintaining that "the legislative history of Title IX strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII").

The Seventh Circuit has found that Title VII's prohibition against employment discrimination based upon sex does not extend to transgender individuals. The Seventh Circuit

reached this conclusion in *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984). *Ulane* held that:

> The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men. **The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder**, *i.e.,* a person born with a male body who believes himself to be female, or a person born with a female body who believes herself to be male; a prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination based on an individual's sexual identity disorder or discontent with the sex into which they were born.

742 F.2d at 1085 (emphasis added). The Seventh Circuit has recently reaffirmed the precedential value of *Ulane* in this Circuit. *See Hively v. Ivy Tech Cmty. Coll., S. Bend*, 2016 WL 4039703, at *2 (7th Cir. July 28, 2016).

Other courts have followed *Ulane*'s proclamation that Title VII's prohibition against gender discrimination does not encompass transgender status. *See Etsitty*, 502 F.3d at 1222 ("In light of the traditional binary conception of sex, transsexuals may not claim protection under Title VII from discrimination based solely on their status as a transsexual."); *Creed v. Family Exp. Corp.*, 2009 WL 35237, at *6 (N.D. Ind. Jan. 5, 2009) ("Although discrimination because one's behavior doesn't conform to stereotypical ideas of one's gender may amount to actionable discrimination based on sex, harassment based on sexual preference or transgender status does not."); *Sweet v. Mulberry Lutheran Home*, 2003 WL 21525058, at *2 (S.D. Ind. June 17, 2003) (stating that "discrimination on the basis of sex means discrimination on the basis of the plaintiff's biological sex, not sexual orientation or sexual identity, including an intention to change sex").

Title VII and Title IX use identical language in prohibiting discrimination "because of sex." The Seventh Circuit has accepted that the definition of "sex" under Title VII is biological sex, not transgender status. *See Ulane*, 742 F.2d at 10. "The prohibition against discrimination based on an individual's sex **is not synonymous with a prohibition against discrimination based on an**

13

**individual's sexual identity disorder**." *Id.* The Tenth Circuit has also explained that "discrimination against a transsexual based on the person's status as a transsexual is not discrimination because of sex under Title VII" because "the plain language of the statute . . . guides our interpretation of Title VII." *Etsitty*, 502 F.3d at 1221. The plain meaning of "sex" does not encompass "anything more than male and female." *Id.* at 1222.

These cases from the Title VII context offer plain and simple support that the meaning of "sex" under Title IX does not encompass anything more than male and female. On "the basis of sex" means male or female, not transgender.

**C.    Only Congress Has The Power To Extend Title IX To Encompass "Transgender" Status.**

As explained above, the statutory language of Title IX and its implementing regulations says <u>nothing</u> about gender identity, gender expression, or any other concept related to transgender individuals. *See* 20 U.S.C. §§ 1681-1688; 34 C.F.R. §§ 106.33, 106.61. Courts are not vested with legislative power and it is their "duty to interpret and not change statutory law." *Zonolite Co. v. United States*, 211 F.2d 508, 513 (7th Cir. 1954). The Seventh Circuit has made this province clear:

> We as judges of the U.S. Court of Appeals have only the power to interpret the law; it is the duty of the legislative branch to make the law. We must refuse to infringe on the legislative prerogative of enacting statutes to implement public policy. The problems of public policy are for the legislature and our job is one of interpreting statutes, not redrafting them.

*Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1270-71 (7th Cir. 1993) (internal citations omitted); *see also Johnston*, 97 F. Supp. 3d at 683 n.22 (citing *Oiler v. Winn–Dixie Louisiana, Inc.*, 2002 WL 31098541, at *6 (E.D.La. Sept. 16, 2002)) ("The Court recognizes the changing perceptions in society concerning transgender individuals. 'However, the function of this Court is . . . to

14

construe the law in accordance with proper statutory construction and judicial precedent. The Court is constrained by the framework of the remedial statute enacted by Congress.").

The Seventh Circuit recently reaffirmed in *Hively* that it is not for courts to expand statutory rights. 2016 WL 4039703. The Court explained that its "holdings and those of other courts reflect the fact that despite multiple efforts, Congress has repeatedly rejected legislation that would have extended Title VII to cover sexual orientation." *Id.* at *3. "Moreover, Congress has not acted to amend Title VII even in the face of an abundance of judicial opinions recognizing an emerging consensus that sexual orientation in the workplace can no longer be tolerated." *Id.* The Court of Appeals maintained that "Congress' failure to act to amend Title VII to include sexual orientation is not from want of knowledge of the problem." *Id.* As a result, the Court of Appeals' "understanding in *Ulane* that Congress intended a very narrow reading of the term 'sex' when it passed Title VII of the Civil Rights Act, so far, appears to be correct." *Id.*

In ruling that it could not expand the statutory rights granted to potential plaintiffs in Title VII actions, the Seventh Circuit held that its:

> own precedent holds that Title VII provides no protection from nor redress for discrimination on the basis of sexual orientation. We require a compelling reason to overturn circuit precedent. Ordinarily this requires a decision of the Supreme Court or a change in legislation . . . It may be that the rationale appellate courts, including this one, have used to distinguish between gender non-conformity discrimination claims and sexual orientation discrimination claims will not hold up under future rigorous analysis . . . Perhaps the writing is on the wall. It seems unlikely that our society can continue to condone a legal structure in which employees can be fired, harassed, demeaned, singled out for undesirable tasks, paid lower wages, demoted, passed over for promotions, and otherwise discriminated against solely based on who they date, love, or marry. The agency tasked with enforcing Title VII does not condone it; many of the federal courts to consider the matter have stated that they do not condone it; and this court undoubtedly does not condone it. **But writing on the wall is not enough. Until the writing comes in the form of a Supreme Court opinion or new legislation, we must adhere to the writing of our prior precedent**.

*Id.* at \*14–15 (internal citations omitted) (emphasis added); *see also Matavka v. Bd. of Educ. of J. Sterling Morton High Sch. Dist. 201*, 2016 WL 4119949, at \*3 (N.D. Ill. Aug. 1, 2016) (following *Hively* in dismissing the plaintiff's Title VII claims for sexual orientation harassment).

The analysis undertaken by the Seventh Circuit in determining that it was without authority to expand the interpretation of "sex" in the Title VII context applies equally as forceful when deciding the issue under Title IX in this case.  As stated by the Seventh Circuit in *Ulane*:

> Although the maxim that remedial statutes should be liberally construed is well recognized, that concept has **reasonable bounds beyond which a court cannot go without transgressing the prerogatives of Congress** . . .  Congress had a narrow view of sex in mind when it passed the Civil Rights Act, and it has rejected subsequent attempts to broaden the scope of its original interpretation.  For us to now hold that Title VII protects transsexuals **would take us out of the realm of interpreting and reviewing and into the realm of legislating**.  This we must not and will not do.

742 F.2d at 1086 (internal citations omitted) (emphasis added).

Here too, for this Court to now hold that Title IX protects transgender status would take it out of the realm of interpreting a statute and into the realm of legislating.  The legislative history of the statute provides that "the intent of Congress in enacting Title IX was to open up educational opportunities for girls and women in education."  *Johnston*, 97 F. Supp. 3d at 672.[6]  Therefore, in

---

[6] The District Court in *Hoffman v. Saginaw Pub. Sch.*, 2012 WL 2450805, at \*5 (E.D. Mich. June 27, 2012), summarized the legislative history of Title IX stating that:

> The purpose of Title IX, as originally conceived, was 'banning discrimination against women in the field of education.'  *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982).  Summarizing the bill that would become Title IX, Senator Birch Bayh explained: 'Amendment No. 874 is broad, but basically it closes loopholes in existing legislation relating to general education programs . . . . [T]he heart of this amendment is a provision banning sex discrimination in educational programs receiving Federal funds.  The amendment would cover such crucial aspects as admissions procedures, scholarships, and faculty employment." *Id.* at 524 (emphasis omitted) (quoting 118 Cong. Rec. 5803 (1972)).  Responding to a fellow senator's question regarding the scope of the proposed protections, Senator Bayh elaborated: '[W]e are dealing with three basically different types of discrimination here.  We are dealing with discrimination in admission to an institution, discrimination of available services or studies within an institution once students are admitted, and discrimination in employment within an institution.' *N. Haven Bd. of Educ.*, 456 U.S. at 526 (emphasis omitted) (quoting 118 Cong. Rec. 5812); *see*

16

the absence of any binding precedent or legislatively enacted changes, this Court should not

expand the statutory rights of Title IX beyond the plain language of the statute and the accepted

definition of "on the basis of sex" in the Seventh Circuit as explained above. Regardless of any

changing perceptions, evolving norms, or societal pressures, this Court should not expand the

statutory rights under Title IX by changing the definition of "sex" to include transgender status,

absent direction from the Supreme Court or Congress. *See Gunnison v. Commissioner,* 461 F.2d

496, 499 (7th Cir. 1972) (maintaining that it is for the legislature, <u>not</u> the courts, to expand the

class of people protected by a statute).

## IV. THE 2016 DEAR COLLEAGUE LETTER CANNOT COMPEL THE COURT TO CONCLUDE THAT TRANSGENDERED STATUS FALLS WITHIN THE AMBIT OF TITLE IX.

Plaintiff cites the May 12, 2016, joint guidance letter to all public schools, colleges, and

universities from the U.S. Department of Education ("Dept. of Edu.") and the U.S. Department of

Justice ("Dept. of Justice") (the "Dear Colleague Letter") in the Amended Complaint to support

the position that Title IX permits transgender students to use any bathroom they choose.[7] *See*

Pltf.'s Amended Comp. at ¶94. This reliance is fatally flawed because (1) the Dear Colleague

---

*also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (discussing purpose of Title IX); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (same).

[7] The Fourth Circuit Court of Appeals utilized a similar Dept. of Edu. opinion letter in holding that the definition of "sex" under Title IX encompasses "gender identity" despite the fact that the Court cited no case to support this definition. *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 737 (4th Cir. 2016) (Niemeyer, Circuit Judge, concurring in part and dissenting in part). But *G.G.* came out as it did only because the panel majority (over a vigorous dissent) considered itself to be bound by Supreme Court precedent to defer to the Dept. of Edu. Such deference cannot be bootstrapped into a claim that the court offered an actual substantive endorsement of the Dept. of Edu.'s interpretation. In fact, the Supreme Court recalled and stayed the mandate of the Fourth Circuit granting a preliminary injunction pending the timely filing and disposition of a petition for a writ of certiorari. *Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, No. 16A52, 2016 WL 4131636, at *1 (U.S. Aug. 3, 2016). The Supreme Court's decision to stay the preliminary injunction calls into question the validity of the Fourth Circuit's decision and diminishes any persuasive value of the majority's opinion in *Grimm*.

Letter is <u>not</u> law; (2) agency guidelines do <u>not</u> warrant *Chevron* deference; and (3) the Dear Colleague Letter is <u>not</u> entitled to *Auer* deference.

### A. The "Dear Colleague Letter" Does Not Have The Force Of Law As It Was Not Passed By Formal Rulemaking Procedures.

The Administrative Procedures Act, 5 U.S.C. §§ 551-559 (the "APA") requires a regulatory agency to follow substantive rulemaking provisions in exercising its authority to set standards and prescribe conduct. *Cmty. Nutrition Inst. v. Butz*, 420 F. Supp. 751, 754 (D.D.C. 1976). Under the APA, an agency is required to give notice and invite comment before it exercises a delegated power to make law through rules. *Marshall v. W & W Steel Co.*, 604 F.2d 1322, 1325 (10th Cir. 1979) (citing 5 U.S.C. § 553).

The Dear Colleague Letter is <u>not</u> law. It was not passed by any formal rulemaking with a notice and comment period. It is merely the Dept. of Edu. and Dept. of Justice's interpretation of Title IX. Therefore, the Dear Colleague Letter cannot be relied upon as substantive law and it does not bind this Court.

### B. The Dear Colleague Letter Is Not Entitled To *Chevron* Deference As It Is Not A Regulation Passed Pursuant To The APA.

In *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82, 81 L. Ed. 2d 694 (1984), the Supreme Court held that a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute. On the other hand, interpretations contained in an opinion letter, policy statements, agency manuals, internal agency guidelines, interpretive guidelines, and interpretative rules and enforcement guidelines are not regulations that warrant *Chevron*-style deference. Those less formal directives are not arrived at after a formal adjudication or notice-and-comment rulemaking and therefore they

18

lack the force of law and do not warrant *Chevron*-style deference. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662-63, 146 L. Ed. 2d 621 (2000).

The Dear Colleague Letter is undisputedly not an agency regulation. It was not created under the APA, and there was no notice and no invitation to comment before it was issued. As a matter of law the Dear Colleague Letter it is not entitled to *Chevron* deference.

### C. The Dear Colleague Letter Is Not Entitled To *Auer* Deference Because Title IX Is Unambiguous On Its Face.

The Dear Colleague Letter is merely the Dept. of Edu. and Dept. of Justice's interpretation of Title IX. An agency's opinion letter interpreting its own regulation <u>may</u> be given deference under *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ("*Auer* deference"). Under *Auer* deference, an agency's interpretation of its own regulation is entitled to deference <u>only</u> when the language of the regulation is ambiguous and the interpretation is not plainly erroneous or inconsistent with the regulation. *Christensen*, 529 U.S. at 588; *Auer*, 519 U.S. at 461. When a regulation is not ambiguous, to defer to the agency's position "would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen*, 529 U.S. at 588.

The Supreme Court has been skeptical of federal agencies' interpretations of their own regulations, because by giving those interpretations *Auer* deference, the agency can make binding regulations without notice and comment. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1212, 191 L. Ed. 2d 186 (2015) (Scalia, J., concurring); *see also United States v. Raupp*, 677 F.3d 756, 765 (7th Cir. 2012) ("Indeed, there are signs on the horizon that the Supreme Court may be about to revisit *Auer* and endorse a more skeptical review of agency interpretations of their own regulations."). "Because the agency (not Congress) drafts the substantive rules that are the object of those interpretations, giving them deference allows the agency to control the extent of its notice-

19

and-comment-free domain." *Perez*, 135 S. Ct. at 1212. "To expand this domain, the agency need only write substantive rules more broadly and vaguely, leaving plenty of gaps to be filled in later, using interpretive rules unchecked by notice and comment. The APA does not remotely contemplate this regime." *Id.*

This skepticism is shared in the Seventh Circuit. *See Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 577 (7th Cir. 2012) (holding that *Auer* deference does not apply to guidance documents the agency itself has "disclaimed . . . as authoritative or binding interpretations of its own rules"); *Keys v. Barnhart*, 347 F.3d 990, 993 (7th Cir. 2003) (providing that in light of *Christensen*, *Auer* likely did not apply to agency determinations that do not have "the force of law" and that "[p]robably there is little left of *Auer*").

The first step in determining whether *Auer* deference is due is to determine whether the statutory language is ambiguous. To determine whether a statute is ambiguous, courts employ the first step in the cardinal cannons of statutory interpretation—look at the text of the statute. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says."); *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 543-44 (7th Cir. 2003) (providing that when addressing questions of statutory interpretation, courts begin with the text of the statute). When a statute is unambiguous, the inquiry "starts and stops" with the text. *United States v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607, 622 (7th Cir. 2015) ("*All Funds*"). In the ordinary case, "absent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity," a court's obligation is to apply a federal statute "as Congress wrote it." *United States v. Ranum*, 96 F.3d 1020, 1029 (7th Cir. 1996).

20

Title IX and its implementing regulations are not ambiguous. *Grimm*, 822 F.3d at 731 Although Title IX and its regulations provide generally that a school receiving federal funds may not discriminate on the "basis of sex," they also specify that a school does not violate the Title IX (i.e., discriminate on the basis of sex) by providing separate living facilities, restrooms, locker rooms, and shower facilities. *Id.* at 734. In recognition of physiological privacy and safety concerns, the statute and regulations allow schools to provide "separate living facilities for the different sexes," 20 U.S.C. § 1686, provided that the facilities are "proportionate" and "comparable," 34 C.F.R. § 106.32(b), and to provide "separate toilet, locker room, and shower facilities on the basis of sex," again provided that the facilities are "comparable," 34 C.F.R. § 106.33. *See id.*

The realities underpinning Title IX's recognition that separate living facilities, restrooms, locker rooms, and shower facilities do not discriminate on the basis of sex is reflected in the plain language of the statute and regulations. *Id.* at 736. Assigning restrooms and locker rooms on the basis of birth gender complies precisely with the unambiguous language of Title IX and its regulations. *Id.* at 737. More specifically,

> The text of Title IX and its regulations allowing for separation of each facility 'on the basis of sex' employs the term 'sex' as was generally understood at the time of enactment. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (explaining that courts should not defer to an agency's interpretation of its own regulation if an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent *at the time of the regulation's promulgation*' (emphasis added) (internal quotation marks and citation omitted)); *see also Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (discussing dictionary definitions of the regulation's 'critical phrase' to help determine whether the agency's interpretation was 'plainly erroneous or inconsistent with the regulation' (internal quotation marks and citation omitted)). Title IX was enacted in 1972 and the regulations were promulgated in 1975 and readopted in 1980, and during that time period, virtually every dictionary definition of 'sex' referred to the *physiological* distinctions between males and females, particularly with respect to their reproductive functions. *See, e.g., The Random House College Dictionary* 1206 (rev. ed.1980) ('either the male or female

division of a species, esp. as differentiated with reference to the reproductive functions'); *Webster's New Collegiate Dictionary* 1054 (1979) ('the sum of the structural, functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females'); *American Heritage Dictionary* 1187 (1976) ('The property or quality by which organisms are classified according to their reproductive functions'); *Webster's Third New International Dictionary* 2081 (1971) ('the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . .'); *The American College Dictionary* 1109 (1970) ('the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished . . .'). Indeed, although the contemporaneous meaning controls our analysis, it is notable that, *even today,* the term 'sex' continues to be defined based on the physiological distinctions between males and females. *See, e.g., Webster's New World College Dictionary* 1331 (5th ed.2014) ('either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions'); *The American Heritage Dictionary* 1605 (5th ed. 2011) ('Either of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions'); *Merriam–Webster's Collegiate Dictionary* 1140 (11th ed.2011) ('either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male esp. on the basis of their reproductive organs and structures'). Any new definition of sex that excludes reference to physiological differences . . . is simply an unsupported reach to rationalize a desired outcome.

*Id.* at 736–37; *see also Gose v. U.S. Postal Serv.*, 451 F.3d 831, 838 (Fed. Cir. 2006) (explaining that a factor against *Auer* deference is "evidence that the proffered interpretation runs contrary to the intent of the agency at the time of enactment of the regulation").

Any deviation from the generalized, common definition of "sex" would be contrary to the plain language of Title IX and counter to the definition of "sex" as used in the Seventh Circuit. *See Hively*, 2016 WL 4039703, at *3 (stating that the Seventh Circuit acknowledges that Congress in passing legislation targeted at gender discrimination intends a very narrow reading of the term "sex"). Here, "on the basis of sex" by its plain reading refers to birth gender, not a person's subsequent "gender identity." This reading is in accord with Seventh Circuit precedent—"The prohibition against discrimination **based on an individual's sex** is not synonymous with a

prohibition against discrimination **based on an individual's sexual identity**." *Ulane*, 742 F.2d at 1085.

Even though the Dept. of Edu. and Dept. of Justice may have good intentions in interpreting a greater breadth of protection into Title IX, an interpretation "no matter how noble or just, cannot defy the unambiguous and plain meaning of its text." *All Funds*, 783 F.3d at 612. The Seventh Circuit's conclusion that "to include transsexuals within the reach of Title VII far exceeds mere statutory interpretation" should apply equally to this Court's construction of Title IX. *See Ulane*, 742 F.2d at 1086. Therefore, the unambiguous and plain meaning of "sex" in Title IX can only be birth gender, not sexual identity.

### D. Even If Title IX Is Ambiguous, The Dear Colleague Letter Is Plainly Erroneous And Inconsistent With Title IX And Its Implementing Regulations, And Therefore Is Not Entitled To Deference.

Agency interpretations are not due deference when the interpretation is "plainly erroneous or inconsistent with the regulation." *L.D.G. v. Holder*, 744 F.3d 1022, 1029 (7th Cir. 2014). "Interpretations that are flatly at odds with the language of a regulation cannot be followed." *Id.* An agency's interpretation of its own regulation is not entitled to deference when the interpretation is erroneous or inconsistent with the regulation. *Christensen*, 529 U.S. at 588; *Auer*, 519 U.S. at 461.

Here, the Dept. of Edu. and Dept. of Justice's interpretation as set forth in the Dear Colleague Letter is erroneous and inconsistent with the statute and regulations. Specifically, the Dear Colleague Letter states that the agencies "treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations." With regard to sex-segregated restrooms and locker rooms, the Dear Colleague Letter maintains that a "school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities

23

consistent with their gender identity."  Moreover, the Dear Colleague Letter states that "a school must allow transgender students to access housing consistent with their gender identity."

These interpretations are completely at odds with the regulations implementing Title IX. Specifically, Title IX and its regulations, actually permit schools to provide separate living facilities, restrooms, locker rooms, and shower facilities "on the basis of sex," so long as the facilities are comparable.  *Grimm*, 822 F.3d at 730 (citing 20 U.S.C. § 1686; 34 C.F.R. §§ 106.32(b), 106.33).  By conflating the term "sex" with the concept of "gender identity", the Dear Colleague Letter's new interpretation blatantly ignores that Title IX expressly authorizes the provision of facilities and programs separated by "sex", including bathrooms.  *See* 34 C.F.R. §106.33.  Only by changing the definition of the statutory term "sex," can the Dear Colleague Letter advocate that public high schools may "not provide separate restrooms and locker rooms on the basis of biological sex."  *See Grimm*, 822 F.3d at 730.  Such an expanded definition requires schools to "allow a biological male student who identifies as female to use the girls' restrooms and locker rooms and, likewise, must allow a biological female student who identifies as male to use the boys' restrooms and locker rooms."  *See id.*  This interpretation "completely tramples on all universally accepted protections of privacy and safety that are based on the anatomical differences between the sexes."  *See id.*

The Dear Colleague Letter also seems to suggest that the term "sex" in Title IX refers only to gender identity, and the effect of this new definition of sex is illogical and unworkable.  *See id.* at 737.  "This construction would, in the end, mean that a school could never meaningfully provide separate restrooms and locker rooms on the basis of sex."  *Id.* at 738.  "Biological males and females whose gender identity aligned would be required to use the same restrooms and locker rooms as persons of the opposite biological sex whose gender identity did not align."  *Id.*  "With

such mixed use of separate facilities, no purpose would be gained by designating a *separate* use 'on the basis of sex,' and privacy concerns would be left unaddressed." *Id.* Moreover, "enforcement of any separation would be virtually impossible" as "[b]asing restroom access on gender identity would require schools to assume gender identity based on appearances, social expectations, or explicit declarations of identity, which . . . would render Title IX and its regulations nonsensical." *Id.* Finally, it is impossible to determine how the Dear Colleague Letter's interpretation would apply the provisions of Title IX and the implementing regulations that allow for the separation of living facilities, restrooms, locker rooms, and shower facilities "on the basis of sex" if "sex" means gender identity. *Id.* at 738.

Thus, the Dear Colleague Letter's expansion of the definition of "sex" in Title IX to now mean "gender identity" creates an impractical and unworkable situation in which any student who self identifies as the opposite sex could use the corresponding bathroom without any restriction. This result renders the Dear Colleague Letter's interpretation of Title IX erroneous and inconsistent with the regulations that permit separate bathroom and living facilities <u>on the basis of sex.</u>

Lastly, a simple exercise in logic shows the fallacy of the interpretation set forth in the Dear Colleague Letter. If the term "sex" in Title IX includes "transgender status" as the Dept. of Edu., Dept. of Justice, and Plaintiff advocate, and given that the statute and regulations specifically allow a school to provide separate restrooms, locker rooms, and living facilities on the basis of "sex," then the statute and regulations specifically allow a school to provide separate restrooms, locker rooms, and living facilities on the basis of transgender status. The Dept. of Edu., Dept. of Justice, and Plaintiff's interpretation of Title IX is actually self-destructive.

In sum, the Dept. of Edu. and Dept. of Justice's interpretation of Title IX in the Dear Colleague Letter is an attempt to impose the current Executive Administration's policy upon the public educational institutions of this Country, without any formal rulemaking or the passing of legislation. The Dept. of Edu. and Dept. of Justice are attempting this end-run around the legislative process and are using the threat of withholding federal funding to coerce schools, like KUSD, into accepting and complying with the Dept. of Edu. and Dept. of Justice's interpretation of Title IX without complaint. Therefore, the Dear Colleague Letter cannot be given deference to expand the definition of sex in abrogation of the plain language of Title IX and its implementing regulations.

## CONCLUSION

For the reasons stated above, KUSD respectfully request that the Court grant its motion to dismiss for failure to state a claim upon which relief can be granted and dismiss Plaintiff's Amended Complaint with prejudice, because transgender status is not actionable under Title IX or the Equal Protection Clause.

Dated this 16th day of August, 2016.

MALLERY & ZIMMERMAN, S.C.
Attorneys for Defendants

By:     s/Ronald S. Stadler
        Ronald S. Stadler
        State Bar No. 1017450
        Aaron J. Graf
        State Bar No. 1068924
        Jonathan E. Sacks
        State Bar No. 1103204

731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202-4697
telephone: 414-271-2424
facsimile: 414-271-8678
e-mail: rstadler@mzmilw.com
        agraf@mzmilw.com
        jsacks@mzmilw.com