# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ASHTON WHITAKER, a minor, by his
mother and next friend, MELISSA
WHITAKER,

        Plaintiff,

    v.

KENOSHA UNIFIED SCHOOL DISTRICT
NO. 1 BOARD OF EDUCATION and SUE
SAVAGLIO-JARVIS, in her official capacity
as Superintendent of the Kenosha Unified
School District No. 1,

        Defendants.

Civ. Action No. 2:16-cv-00943-PP
Judge Pamela Pepper

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ..................................................................................................................... 3

I.   ASH HAS SUFFICIENTLY PLEADED FACTS ALLEGING DISCRIMINATION
     IN VIOLATION OF THE EQUAL PROTECTION CLAUSE ........................................... 4

     A.   Discrimination against transgender people is cognizable
          sex discrimination under the Equal Protection Clause and
          is entitled to heightened scrutiny. ................................................................ 4

     B.   Discrimination against transgender people receives heightened
          scrutiny under the Equal Protection Clause. ................................................ 5

     C.   Discriminating against transgender students in order to address
          the hypothetical discomfort of other students is not substantially
          related to an important government interest. ............................................... 6

     D.   Even under a more permissive standard of review, the policy
          is not rationally related to a legitimate governmental interest. ................ 13

II.  ASH HAS PROPERLY PLEADED FACTS THAT CONSTITUTE SEX
     DISCRIMINATION UNDER TITLE IX. KUSD IS VIOLATING ASH'S
     RIGHTS UNDER TITLE IX BY SUBJECTING HIM TO DIFFERENTIAL
     TREATMENT BASED ON HIS SEX. ......................................................................... 16

     A.   The Seventh Circuit's *Hively* decision supports Plaintiff's
          Title IX claims. ............................................................................................ 18

     B.   Ash is asking the Court to apply, not "expand," Title IX
          and to adopt the reasonable interpretation of the federal government
          that Title IX's existing protections apply to Ash and other
          transgender students. ................................................................................... 21

CONCLUSION ................................................................................................................. 23

i

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ..................................................5

*Avila v. CitiMortgage, Inc.*, 801 F.3d 777 (7th Cir. 2015) ............................................................3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................................3

*Bloch v. Ribar,* 156 F.3d 673 (6th Cir. 1998) ..............................................................................11

*C.N. v. Wolf*, 410 F. Supp. 2d 894 (C.D. Cal. 2005)....................................................................13

*Carcaño v. McCrory*, 1:16-cv-236 (M.D.N.C. Aug. 26, 2016) ......................................................9

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)....................................................14

*Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981 (8th Cir. 2002).................................................15

*Doe v. Brimfield Grade Sch.*, 552 F. Supp. 2d 816 (C.D. Ill. 2008)..............................................19

*Eastwood v. Dep't of Corr. of the State of Okl.,* 846 F.2d 627 (10th Cir. 1988) ...........................11

*Geinosky v. City of Chicago*, 675 F.3d 743, 745 (7th Cir. 2012) ....................................................7

*G.G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016)........................................... *passim*

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ........................................................4, 5, 19, 20

*Gloucester Cty. Sch. Bd. v. G.G.*, 136 S. Ct. 2442 (2016) ..............................................................9

*Hively v. Ivy Tech Cmty. Coll.*, No. 15-1720,
2016 WL 4039703 (7th Cir. July 28, 2016)........................................................................... *passim*

*Huri v. Office of the Chief Judge of the Circuit Ct. of Cook Cty.,*
804 F.3d 826 (7th Cir. 2015) ....................................................................................................... 2-3

*Johnston v. Univ. of Pittsburgh*, 97 F. Supp. 3d 657 (W.D. Pa. 2015)...................................... 22-23

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998)....................................................12

*Kelo v. City of New London*, 545 U.S. 469 (2005) .......................................................................14

*Lawrence v. Texas*, 539 U.S. 558 (2003)....................................................................................14

Case 2:16-cv-00943-PP   Filed 08/26/16   Page 3 of 28   Document 19

*Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015) ............................................................11

*Lusardi v. McHugh*, EEOC Appeal No. 012013395 (EEOC Apr. 1, 2015) ..................................15

*Mathews v. Lucas*, 427 U.S. 495 (1976) .....................................................................................14

*Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996) ................................................................14, 19

*Norsworthy v. Beard*, 87 F. Supp. 3d 1104 (N.D. Cal. 2015) ........................................................5

*Powell v. Schriver,* 175 F.3d 107 (2d Cir. 1999) .........................................................................11

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ...................................................4, 20, 21, 23

*Romer v. Evans*, 517 U.S. 620 (1996) ..........................................................................................14

*Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000) ................................................20

*Rumble v. Fairview Health Servs.*,
No. 14-cv-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) .....................................................18

*Schroer v. Billington,* 577 F. Supp. 2d 293 (D.D.C. 2008) ..........................................................19

*Schwenk v. Hartford*, 204 F.3d 1187, 1199-1203 (9th Cir. 2000) ................................................20

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) ...............................................................4, 20

*State of Texas v. United States*,
No. 7:16-cv-00054-O, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016) ..........................................17

*Sterling v. Borough of Minersville,* 232 F.3d 190 (3d Cir. 2000) ................................................11

*Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984) .............................................20, 21

*United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ....................................................14

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................................................6, 7

*Whalen v. Roe*, 429 U.S. 589 (1977) ............................................................................................11

**Statutes**                                                                          **Page(s)**

81 FR 55148 (Aug. 18, 2016) ..........................................................................................................9

Case 2:16-cv-00943-PP   Filed 08/26/16   Page 4 of 28   Document 19

**Other Authorities**                                                                                     **Page(s)**

B. Sherouse, ed., *Schools In Transition: A Guide for Supporting Transgender Students in K-12 Schools* (2015) ..................................................................................5

D. Weatherby, *From Jack to Jill: Gender Expression As Protected Speech in the Modern Schoolhouse*, 39 N.Y.U. Rev. L. & Soc. Change 89 (2015) ...........................................................5

iv

## INTRODUCTION

In this lawsuit, Plaintiff Ashton (Ash) Whitaker seeks the same thing every other boy enjoys: to be treated by his school as a boy—nothing more, nothing less. That's because Ash, who is transgender, *is* a boy: he knows it, his family knows it, and his health care providers know it. At school, Ash's classmates know and recognize him to be a boy. But the Kenosha Unified School District ("KUSD")[1] thinks otherwise. As alleged in Plaintiff's Amended Complaint, KUSD has refused to treat Ash like other boys based on certain sex- and gender-related characteristics—the fact that his true sex and gender identity are incongruent with the sex he was assigned at birth, his transgender status, and his nonconformity to certain male sex stereotypes. In short, KUSD's policies and actions have subjected Ash to discrimination on the basis of sex, in violation of Title IX of the Education Amendments of 1972 ("Title IX"), and denied him the equal protection of the laws based on his sex and transgender status in violation of the Fourteenth Amendment's Equal Protection Clause.

Defendants argue that Ash has failed to state a claim under the Equal Protection Clause and Title IX. KUSD's Motion to Dismiss is premised on three flawed assumptions: (1) that Ash is not a boy, Defs' Mot. to Dismiss Br. [Dkt. No. 15] ("Defs' MTD Br.") at 1; (2) that treating Ash and other transgender students in accordance with their gender identity is at odds with KUSD's ability to maintain sex-segregated school restrooms for boys and girls, Defs' MTD Br. at 24-25; and (3) that judicial enforcement of Ash's rights would allow all students, transgender or not, to access restrooms designated for another gender simply by verbally "proclaiming" they identify with that gender, Defs' MTD Br. at 1, 10, 25. For the reasons detailed in Plaintiff's brief in support of his motion for preliminary injunction [Dkt. No. 11] ("Pl's PI Br.") and

---

[1] This brief collectively refers to Defendants Kenosha Unified School District No. 1 and Superintendent Sue Savaglio-Jarvis, in her official capacity, as "KUSD" or "Defendants."

1

supplemented here, these assumptions have no support in science, law, sound educational practice, or, most importantly, Ash's own experiences at school and his unique needs.

It is now scientifically established that one's sex is based on a combination of factors—including gender identity—rather than solely on external physical features. Pl's PI Br. at 3-4. Courts, including the Seventh Circuit, have recognized that prohibitions on sex discrimination under Title IX and analogous laws include discrimination based on sex- and gender-related characteristics, including an individual's nonconformity to gender norms. Pl's PI Br. at 15. Even before the federal government specifically interpreted Title IX to require schools to treat transgender students consistently with their gender identity, millions of students across the United States have attended school in a state or district with policies that made that requirement explicit. Put simply, transgender students across the country go to schools where they are treated in accordance with their gender identity (including, but not limited to, their access to restrooms consistent with that identity). The same is true here, where KUSD's newfound objections to permitting Ash from using restrooms consistent with his gender identity are contradicted by Ash's use of boys' restrooms for seven months last year without issue.

Ash has alleged sufficient facts in his Amended Complaint to state a claim of discrimination on the basis of sex under both the Equal Protection Clause and Title IX. This Court should give Ash the opportunity to prove his claims and, if he does, to award appropriate relief. Defendants' motion to dismiss should therefore be denied.

## LEGAL STANDARD

On a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "constru[e] all well-pleaded facts (and all reasonable inferences from them) in the light most favorable to the nonmoving party." *Huri v. Office of the Chief Judge of*

2

*the Circuit Ct. of Cook Cty.*, 804 F.3d 826, 829 (7th Cir. 2015). A complaint may proceed if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the…claim is and the grounds on which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotation marks omitted); *see also Huri*, 804 F.3d at 832. "A pleader's responsibility is to state a claim for relief that is plausible on its face." *Huri*, 804 F.3d at 832-33. Plaintiffs are not required to plead specific legal theories to survive a motion to dismiss. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015).

## ARGUMENT

Ash Whitaker has alleged facts more than sufficient to make out valid claims for violations of Title IX and the Equal Protection Clause. That is enough to survive a motion to dismiss. As explained in the brief supporting his motion for a preliminary injunction, Ash meets the standard for preliminary relief, including having shown that he has a strong likelihood of success on the merits of his claims. Pl's PI Br. at 10. His claims therefore easily survive the lower standard governing motions to dismiss.

Moreover, KUSD makes no attempt to justify or even respond to Ash's claims related to KUSD's proposal that transgender students wear green wristbands to identify them, its initial insistence that he could only run for prom queen, or teachers' and administrators' repeated use of female pronouns and Ash's traditionally feminine birth name to refer to him. Since it is plain that those policies and actions single Ash out for discriminatory treatment based on gender-based considerations, and that no compelling or even legitimate justification could support those actions, KUSD has effectively conceded that Ash's Title IX and Equal Protection Clause claims cannot be dismissed.

3

I.    **ASH HAS SUFFICIENTLY PLEADED FACTS ALLEGING DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE.**

KUSD has repeatedly and intentionally singled Ash out for discriminatory treatment because of his sex (including his gender identity and gender nonconformity) and his transgender status. Whether KUSD's treatment of Ash is viewed as based on Ash's gender, on his transgender status, or both, it is subject to heightened scrutiny. Regardless of the level of scrutiny applied, however, KUSD has no legitimate justification for its policies, much less a persuasive one. Its motion to dismiss his Equal Protection claim should therefore be denied.

### A.  Discrimination against transgender people is cognizable sex discrimination under the Equal Protection Clause and is entitled to heightened scrutiny.

KUSD's brief remarkably fails even to acknowledge the nearly three decades of case law holding that discrimination based on gender nonconformity—including discrimination against transgender people—is a form of sex discrimination that is prohibited under both statutory nondiscrimination laws and under the Fourteenth Amendment's Equal Protection Clause. *See* Pl's PI Br. at 12-20. For example, it makes no mention of the U.S. Supreme Court's seminal 1989 decision, *Price Waterhouse v. Hopkins*, which established beyond doubt that discriminating against an individual because of a perception that the person does not conform to gender stereotypes is a form of unlawful sex discrimination. 490 U.S. 228 (1989). Courts since then have repeatedly recognized that transgender people, just like everyone else, are protected against discrimination that is based on the perception that they do not conform to such stereotypes. *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) (transgender public employee fired for announcing intention to transition from male to female was discriminated against based on gender in violation of the Equal Protection Clause); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) (reversing dismissal of equal protection claim brought by transgender employee).

Indeed, as the Eleventh Circuit concluded in *Glenn*, discrimination against a transgender person is *always* rooted in discomfort with an aspect of the person's perceived gender nonconformity, and thus is inherently a form of gender discrimination. 663 F.3d at 1316.

### B. Discrimination against transgender people receives heightened scrutiny under the Equal Protection Clause.

Discrimination based on transgender status also qualifies as a suspect classification in its own right under the Equal Protection Clause. Defendants incorrectly assert that "being transgendered [sic] has never been found to be a suspect classification,"[2] before falling back to the position that the Supreme Court and Seventh Circuit have not yet done so. Defs' MTD Br. at 6. That is because the logic is unmistakable that transgender people are exactly the type of disfavored minority group likely to be subject to discrimination and to need the protection of the Fourteenth Amendment. *See*, *e.g.*, *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (holding that discrimination based on transgender status meets all of the indicia for "suspect" or "quasi-suspect status identified by the Supreme Court); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (holding that transgender people are a suspect class because they have suffered a history of persecution and discrimination, transgender status bears no relation to being able to contribute to society, transgender status is a sufficiently discernible

---

[2] Throughout its brief, KUSD uses the term "transgendered" to describe Ash. Plaintiff notes that the correct term to describe Ash and other transgender people is the term Ash uses to describe himself: transgender, not transgendered. *See* B. Sherouse, ed., *Schools In Transition: A Guide for Supporting Transgender Students in K-12 Schools* 3 (2015), *available at* https://www.nea.org/assets/docs/Schools_in_Transition_2015.pdf ("Th[e] term [transgender] is an adjective. Using this term as a verb (i.e., transgendered) or noun (i.e., transgenders) is offensive and should be avoided."); D. Weatherby, *From Jack to Jill: Gender Expression As Protected Speech in the Modern Schoolhouse*, 39 N.Y.U. Rev. L. & Soc. Change 89, 131 n.5 (2015) ("The socially accepted modifier for individuals whose gender identity differs from the sex designation they were assigned at birth is 'transgender,' not 'transgendered.'").

characteristic, and transgender people are a politically powerless minority). *See* Pl's PI Br. at 25-26.

To be sure, it is literally true that the Seventh Circuit and U.S. Supreme Court have not yet adopted this position. Nor have they foreclosed it. It is highly likely that they will adopt this position when presented with the opportunity. Indeed, Defendants make no attempt to argue the merits of their position that the discriminatory conduct at issue should receive only rational-basis scrutiny.

### C. Discriminating against transgender students in order to address the hypothetical discomfort of other students is not substantially related to an important government interest.

The Supreme Court has made clear that "all gender-based classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 518 (1996) (internal quotations omitted). The same is true for classifications based on transgender status under the heightened scrutiny standard. Under that "demanding" standard, where the burden of persuasion "rests entirely on the State," officials "must show at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Id.* at 533 (internal quotations and citations omitted). Here, KUSD has failed altogether to demonstrate that excluding Ash from restrooms—or otherwise treating him differently from other boys—substantially furthers an important government interest.

Prior to filing its motion to dismiss, KUSD had offered no justification for its discriminatory policies or its treatment of Ash. In particular, it had made no mention of the supposed policy of enforcing "birth genders" and "biological sexes" that it now claims to have adopted. In March 2016, school administrators told Ash he must provide "documentation" to use

Case 2:16-cv-00943-PP   Filed 08/26/16   Page 11 of 28   Document 19

boys' restrooms, but did not accept the medical documentation they were then provided. Pl's Corrected Amended Complaint [Dkt. No. 12] ("Am. Compl.") ¶ 45. On April 6, 2016, KUSD's Chief of Special Education and Student Support, Susan Valeri, told Ash, "I don't think I'm going to give you any reasons" for prohibiting his use of the boys' restrooms. Am. Compl. ¶¶ 62-65. Similarly, in an April 25, 2016, letter to Plaintiff's counsel confirming that prohibition (attached to Defs' Affidavit of Ronald S. Stadler as Exhibit 2 [Dkt. No. 18-2] ("Stadler Letter"),[3] KUSD's attorney made no mention of any justification, other than to express his view that Title IX does not prohibit discrimination against transgender students. Even a KUSD press statement following the filing of this lawsuit offers no justification for the policy. *See* KUSD Response to Lawsuit, http://www.kusd.edu/kusd-response-lawsuit (last viewed on Aug. 26, 2016).

For the very first time, in support of its motion, KUSD proffers highly speculative concerns about student privacy to attempt to justify its discriminatory treatment of Ash. Defs' MTD Br. at 7-10. Such a newfound rationalization, asserted solely for the purpose of defending against litigation, cannot constitute a legitimate basis. *See Virginia*, 518 U.S. at 533 (a "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation"). Moreover, it depends on facts—the existence of a generally applicable "policy" of enforcing all students' use of the bathrooms that conform to their "birth" or "biological" sex, as opposed to a policy imagined solely for litigation purposes to defend discrimination against one student—that has not been pleaded in the Amended Complaint and cannot be taken to be true.

In any event, even if it were appropriate to presume on a motion to dismiss that KUSD's purposes were genuinely rooted in concern for student privacy, its treatment of Ash fails to

---

[3] The Seventh Circuit has held that "a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove," not as evidence that would convert the motion to dismiss to a motion for summary judgment. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

7

advance that interest. To begin with, KUSD's position is largely based on disputing the factual premise—pleaded explicitly in the Complaint and presumed to be true for purposes of this motion—that Ash *is* a boy. Am. Compl. ¶¶ 1, 6, 21. It simply begs the question to assert, as KUSD does, that permitting Ash to use boys' restrooms or share overnight accommodations with other boys infringes on any student's right not to share such spaces with individuals of "the opposite gender," Defs' MTD Br. at 8, because they would be sharing that space with Ash—who is a boy. Am. Compl. ¶¶ 1, 6, 21. KUSD must prove that Ash is not a boy, not simply assert it.

KUSD's alleged reasoning is also undermined by the fact that Ash was using boys' restrooms for seven months without a single complaint from another student. Am. Compl. ¶ 36. That is not surprising, since transgender students across the country have been using restrooms consistent with their gender identity for many years without incident. Pl's PI Br. at 28. Thousands of schools and districts across the country treat transgender students in accordance with their gender identity, including permitting them to use restrooms consistent with their gender identity. Pl's PI Br. at 28-30.[4] None has reported problems related to transgender students or students pretending to be transgender allegedly violating the privacy rights of other students Pl's PI Br. at 28.[5]

---

[4] The U.S. Department of Education's recent publication, *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 16, 2016), attached to Plaintiff's Motion for Preliminary Injunction as Exhibit 10 [Dkt. No. 10-10], collects examples of transgender-inclusive policies adopted by school districts and states around the country.

[5] Similarly, 18 states and over 200 cities prohibit discrimination against transgender people in public accommodations, expressly permitting transgender people to use restrooms consistent with their gender identity. Even without such statutory protections, transgender people across the country used shared sex-segregated restrooms and other facilities in their daily lives. Just last week, the General Services Administration ("GSA") issued a Federal Management Bulletin clarifying that federal sex discrimination laws require all federal buildings operated by GSA to "allow individuals to use restroom facilities and related areas consistent with their gender identity." *See* GSA, Federal Management Regulation; Nondiscrimination Clarification in the Federal Workplace, 81 FR 55148 (Aug. 18, 2016).

8

If taken at face value, KUSD's policy of requiring students to use restrooms based on their "birth gender" actually defeats the reasonable privacy interests of all of its *female* students by insisting that transgender boys—who appear, behave, and act as boys (because they are boys)—use girls' bathrooms. Students who did not know Ash prior to his transition would not recognize that he is transgender. Am. Compl. ¶ 26. KUSD's policy would put female students in the uncomfortable position of having to share the girls' restroom with someone they know and recognize as a boy. Moreover, KUSD makes no attempt to explain how it would consistently and coherently administer such a policy of enforcing "birth" genders. Nor does KUSD attempt to explain why the supposed privacy concerns apply only to transgender students, and not to gay students. *Cf. G.G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 723 n.11 (4th Cir. 2016) (noting that the dissent's asserted concerns about students' "sexual responses prompted" by students' potential exposure to other students' bodies in restrooms "would seem to require segregated restrooms for gay boys and girls," a clearly unviable and unacceptable outcome) (quoting *G.G.*, 822 F.3d at 735 (Niemeyer, J., dissenting in part and concurring in part)), *mandate recalled and stay issued pending cert. petition by Gloucester Cty. Sch. Bd. v. G.G.*, 136 S. Ct. 2442 (2016).[6]

Even if KUSD had an interest in addressing non-transgender students' discomfort with transgender students, its actions would not satisfy heightened scrutiny as its discriminatory actions and policies are neither reasonably nor substantially tailored to advancing that interest. Numerous simple, common-sense options enhance privacy for all students: for example,

---

[6] Today, the Middle District of North Carolina enjoined North Carolina's Public Facilities Privacy & Security Bill, commonly known as HB2, which requires public agencies in that state to limit access to sex-segregated facilities, including restrooms, to so-called "biological sex," or the sex listed on their birth certificate. *Carcaño v. McCrory*, 1:16-cv-236 (M.D.N.C. Aug. 26, 2016) (attached as Ex. A). The court relied, in part, on the Fourth Circuit's decision in *G.G.*, writing, "despite the stay and recall of the mandate, the Supreme Court did not vacate or reverse the Fourth Circuit's decision" so "*G.G.* remains the law in this circuit." *Id.* at 35-36.

installing longer stall doors or other privacy partitions in restrooms, or offering access to a single-user restroom to any student who desires additional privacy for any reason. *See G.G.*, 822 F.3d at 709, 715-716, 723 (noting that the school had already made a "series of updates to the school's restrooms to improve general privacy for all students, such as adding or expanding partitions between urinals in male restrooms, adding privacy strips to the doors of stalls in all restrooms, and constructing single-stall unisex restrooms available to all students").

While treating Ash in accordance with his male sex would not harm any other students' privacy interests, failing to do so will have serious negative consequences for Ash's privacy. Compelling him to use girls' restrooms will necessarily raise scrutiny and questions from other students about why he is the only boy in the girls' restrooms. Am. Compl. ¶ 28. The same holds true for KUSD's other discriminatory actions and policies, such as allowing school administrators and staff to call Ash by a female name and pronouns; limiting him to running for prom queen rather than king; and proposing that transgender students wear green wristbands to visibly mark their transgender status. Each of those actions potentially "outs" Ash as transgender to students and teachers who do not otherwise know or need to know.

The Supreme Court has long recognized that the federal constitutional right to privacy protects an individual's right to control the release of information of a highly personal nature. *See Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). This right to informational privacy restricts a government agency's ability to disclose information about an individual's sexual orientation or

gender identity.[7] Because transgender people face such high rates of discrimination, harassment, and violence, courts have been particularly conscious of the danger of revealing a person's transgender status to others without the person's explicit and voluntary consent.

For example, the Second Circuit held that the nonconsensual disclosure to others of a prisoner's transgender status violated the prisoner's constitutional right to privacy, noting the widespread "hostility and intolerance" transgender people face, as well as the "excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, [which] is really beyond debate." *Powell v. Schriver,* 175 F.3d 107, 111 (2d Cir. 1999). Another federal court recently considered a state policy that prevented many transgender people from changing the gender marker on their driver's licenses, and thereby "outed" transgender people to others who could conclude that the person was transgender because their "lived sex" was inconsistent with the gender marker on the ID. *Love v. Johnson*, 146 F. Supp. 3d 848, 854 (E.D. Mich. 2015). The court recognized the fact that transgender people face widespread discrimination and violence, and held that "the Policy creates a very real threat to Plaintiffs' personal security and bodily integrity" and thereby implicated "their fundamental right of privacy." *Id.* at 856 (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1060 (6th Cir. 1998)).

As the Amended Complaint makes clear, Ash himself feels this danger acutely:

Upon learning about the school's proposed green wristband practice [to mark transgender students and monitor their restroom use], Ash felt sickened and

---

[7] *See, e.g.*, *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) ("It is difficult to imagine a more private matter than one's sexuality and a less likely probability that the government would have a legitimate interest in disclosure of sexual identity."); *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998) ("Publicly revealing information [about sexuality] exposes an aspect of our lives that we regard as highly personal and private."); *Eastwood v. Dep't of Corr. of State of Okl.*, 846 F.2d 627, 631 (10th Cir. 1988) (right to privacy "is implicated when an individual is forced to disclose information regarding personal sexual matters.").

> afraid. He was aware of the prevalence of violent attacks against transgender
> people nationwide, and grew very afraid that the school would attempt to force
> him to wear the wristband on penalty of discipline. If he did wear the wristband,
> he knew that other students would likely ask him repeatedly why he was wearing
> it, and he would have to explain over and over that he is transgender. He
> expected that some students would stare, and others would outright ridicule him.
> He felt like his safety would be even more threatened if he had to wear this visible
> badge of his transgender status.

Am. Compl. ¶ 82. He worries similarly about the impact of having his transgender status

revealed to others by virtue of KUSD's other discriminatory actions, including his

segregation into girls' restrooms or restrooms not used by any other students, Am.

Compl. ¶ 28, his frequent meetings with administrators, Am. Compl. ¶ 55, and failing to

take any action to prevent substitute teachers and other personnel from calling him by his

birth name in front of other students, Am. Compl. ¶ 74. He feels afraid even to leave his

house alone out of a fear that he will be targeted for assault by someone who has learned

that he is transgender. Am. Compl. ¶ 105.

　　　KUSD's attorney has dismissed these concerns by asserting that "Ashton has announced

to the school, and even to the world, that he is transgendered," and suggesting that Ash has

somehow abandoned his privacy interests. Stadler Letter at 2. That argument improperly evades

KUSD's responsibility for that outcome. Ash "came out" as transgender to many of his peers in

an effort to garner public support to convince KUSD to change its discriminatory policies. That

strategy proved successful: KUSD backed down on one prong of its discriminatory policies and

agreed to allow Ash to run for prom king only after a widely attended student sit-in and petition

garnered media attention. Am. Compl. ¶ 72. Ash has similarly revealed his identity in connection

with this lawsuit in hopes of further drawing attention to KUSD's unlawful discriminatory

treatment. KUSD cannot be permitted to argue that by pursuing the most effective avenues he

saw for compelling KUSD to cease its discrimination, he has forsaken his continuing right to privacy.

Indeed, courts have recognized in other contexts that students have the right to share or withhold information about their sexual orientation or gender identity, and it is against the law for school officials to disclose, or compel students to disclose, that information. Even when a student appears to be open about his or her sexual orientation or gender identity at school, it remains the student's right to limit the extent to which the information is further shared. *C.N. v. Wolf*, 410 F. Supp. 2d 894, 903 (C.D. Cal. 2005) ("[T]he fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of information."). Similarly, here, the mere fact that some—or even many—members of the school community have already learned that Ash is transgender does not compromise his interest in protecting him from unwanted disclosure of information about his identity to others.

Moreover, KUSD's actions do not simply announce that Ash is transgender. Rather, KUSD has attached stigma to that fact. It is one thing for Ash to state that he is transgender. It is another for a school district to deny him access to boys' restrooms, direct his guidance counselor to offer him a green wristband to identify himself as transgender, and otherwise treat him differently than every other boy. By calling attention to his transgender status in this way, KUSD has subjected Ash to unwelcome and distressing questions about his gender transition, medical treatment, and other private information about his life that further invade his privacy.

### D. Even under a more permissive standard of review, the policy is not rationally related to a legitimate governmental interest.

Even under the most deferential standard of review, KUSD must show that its actions "bear[] a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). That test is not "toothless." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). The Supreme Court has

13

made clear that review must be meaningful when the policy at issue targets a vulnerable group. *See Romer*, 517 U.S. at 634-35 (invalidating law that burdened the "politically unpopular group" of lesbian, gay, and bisexual people); *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause."); *Kelo v. City of New London*, 545 U.S. 469, 490-91 (2005) (Kennedy, J., concurring) (distinguishing between the rational basis test applied to "economic regulation" as opposed to classifications discriminating against a particular group of people). The Seventh Circuit has similarly recognized that "the Constitution prohibits intentional invidious discrimination between otherwise similarly situated persons based on one's membership in a definable minority, absent at least a rational basis for the discrimination." *Nabozny v. Podlesny*, 92 F.3d 446, 457-58 (7th Cir. 1996) (holding that school officials' refusal to protect gay student from harassment was unjustified even under rational basis review).

Here, KUSD's intentional policy of singling out transgender students for differential treatment serves no purpose other than to cater to imagined fears that other students or community members might be uncomfortable sharing spaces with transgender students or otherwise treating transgender students respectfully in accordance with their gender identities. Accommodating other people's potential discomfort with an unpopular group is not a legitimate basis for discriminatory treatment. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (intention to exclude a "politically unpopular group" from receiving benefits "cannot constitute a legitimate governmental interest"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable . . . are not permissible bases" for differential treatment of a vulnerable group).

Those who harbor irrational fears or discriminatory biases do not get a "heckler's veto" over others' exercise of their basic civil rights. *Cf. Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (rejecting discrimination claim by employee who did not want to use same restroom as a transgender employee, noting that she was free to use unisex restroom instead); *G.G.*, 822 F.3d at 723 n.11; *Lusardi v. McHugh*, EEOC Appeal No. 012013395 (EEOC Apr. 1, 2015) (holding that barring a transgender employee from using the same restroom as other employees violated Title VII and that coworkers' "confusion or anxiety" about sharing a restroom with transgender people could not justify such discrimination). Rather, to the extent that there are, in fact, any students at Tremper High School who are uncomfortable sharing the boys' restroom with Ash—and, once again, the Amended Complaint pleads the contrary—Ash should not bear the full brunt of those students' discomfort by having to use other facilities. The equal protection analysis here requires the same conclusion: a concern that other students might feel discomfort or anxiety about sharing space with Ash because he is transgender cannot constitute a legitimate basis for KUSD's discrimination.

KUSD also exaggerates the scope of the relief requested here by asserting, without any support, that applying sex discrimination laws to transgender students first "creates an impractical and unworkable situation in which any student who self identifies as the opposite sex could use the corresponding bathroom without any restriction" and eventually would compel schools to allow non-transgender boys and non-transgender girls to use the same sex-segregated facilities. Defs' Mot. at 24 (citing *G.G.*, 822 F.3d at 738 (Niemeyer, J., dissenting)). Nothing in Plaintiff's complaint requests or demands such a result. Plaintiff only asks that this Court order KUSD to treat him as a boy.

Schools across the country have successfully implemented policies that treat transgender students according to their gender identity. The sky has not fallen. The experience of many states and school districts has revealed no evidence supporting the pernicious myth that non-transgender students will capriciously "pretend" to identify as transgender in order to use sex-segregated facilities. Pl's PI Br. at 29-30. These experiences also reveal that non-transgender students are more comfortable when transgender students are *not* forced to use facilities corresponding to their birth sex. *Id.* at 30. KUSD's assertions that transgender-inclusive policies are "impracticable or unworkable," and that its discriminatory actions here serve the legitimate purpose of protecting student privacy, are patently false.

II.    **ASH HAS PROPERLY PLEADED FACTS THAT CONSTITUTE SEX DISCRIMINATION UNDER TITLE IX. KUSD IS VIOLATING ASH'S RIGHTS UNDER TITLE IX BY SUBJECTING HIM TO DIFFERENTIAL TREATMENT BASED ON HIS SEX.**

Plaintiff's brief in support of his motion for preliminary injunction discusses the basis for Ash's Title IX claims at length, addressing most of the arguments raised by Defendants in their motion to dismiss those claims. *See* Pl's PI Br. at 12-24. In short, Ash states a claim under Title IX because he has alleged sufficient facts to show that KUSD treats him differently from other boys on the basis of sex, including his gender identity, nonconformity to male sex stereotypes (*i.e.*, that he was not assigned male at birth and may have certain physical features different from other boys), and transgender status; and this differential treatment has resulted in ongoing educational, emotional, and physical harms, which have denied and continue to deny him the full benefits of the education program and activities offered by KUSD to its students. Those allegations alone are sufficient to survive a motion to dismiss. Ash's position is further supported by the interpretation of the U.S. Departments of Education and Justice, which share enforcement power over Title IX, that Title IX requires schools to treat transgender students consistent with

16

their gender identity. That longstanding interpretation, as most recently set forth in the Departments' May 13, 2016 Dear Colleague Letter, a significant guidance document issued to every school in the country, is entitled to deference.[8] *See* Pl's PI Br. at 20-24. As this Court is considering Plaintiff's motion for preliminary injunction and Defendants' motion to dismiss concurrently, Plaintiff incorporates by reference the Title IX arguments from that brief.

Plaintiff urges the Court here to reject Defendants' arguments advanced in their motion to dismiss: (1) that the Seventh Circuit's recent decision in *Hively v. Ivy Tech Community College*, No. 15-1720, 2016 WL 4039703 (7th Cir. July 28, 2016), *petition for rehearing and rehearing en banc petition filed* (Aug. 25, 2016), which reaffirmed the principle that sex-stereotyping discrimination is actionable, somehow defeats Ash's claims here; (2) that this Court is powerless to apply Title IX to the facts presented in this case, and should ignore the federal government's reasonable interpretation of Title IX based on a non-binding district court case and the *dissenting* opinion in the Fourth Circuit's *G.G.* decision; and (3) that the relief sought by Ash defeats his Title IX claim as a matter of law.

---

[8] On August 21, 2016, in a challenge by twelve states (including Wisconsin), two school districts, and a governor to the federal government's ability to enforce its interpretation of Title IX as applied to transgender students, a federal district court issued a preliminary injunction temporarily barring the Departments of Education and Justice from taking any enforcement action pursuant to the May 13, 2016 Dear Colleague Letter during the pendency of that case. *See State of Texas v. United States*, No. 7:16-cv-00054-O, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016). That order does not bind this Court or affect any court's ability to consider the Title IX claims of a transgender student brought in a private action like this one. The central issue in that case is whether the government's guidance to funding recipients is enforceable by the government under the Administrative Procedures Act, which is of no concern here. Furthermore, the district court's reasoning is inconsistent with the Fourth Circuit's majority opinion in *G.G.*, which is more persuasive. This Court may reach its own conclusion about the proper application of Title IX to the facts of this case. The Texas decision, which only enjoins the enforcement of the Dear Colleague Letter, does not affect the strong deference this Court must afford to the Department of Education's longstanding and considered interpretation of Title IX for the reasons explained in Plaintiff's preliminary injunction brief. *See* Pl's PI Br. at 20-24.

**A. The Seventh Circuit's *Hively* decision supports Plaintiff's Title IX claims.**

Defendants suggest that the Seventh Circuit's recent decision in *Hively v. Ivy Tech Community College*, bars Ash's Title IX claims. To the contrary, that decision supports, rather than undermines, the claims at issue here. *Hively* held that it was constrained by past precedent to find that discrimination based solely on *sexual orientation* is not covered by Title VII. 2016 WL 4039703, at *1. That question—whether Title VII prohibits discrimination on the basis of sexual orientation—is distinct from the one raised in this case. Ash's case does not arise from, or in any way involve, discrimination on the basis of sexual orientation.[9] Even assuming that *Hively* was correctly decided with respect to Title VII's application to sexual orientation discrimination,[10] that holding has no bearing on the outcome of this case. Rather, *Hively* reaffirms existing precedent supporting the conclusion that a transgender boy can state a sex discrimination claim under Title IX (whether on the basis of sex stereotyping, transgender status, gender identity, or all three) for being treated differently from other boys.

To begin with, *Hively* reaffirmed that discrimination based on gender nonconformity is squarely covered by sex discrimination laws like Title VII and Title IX. *Hively* reiterated the well-established proposition that the Seventh Circuit and other courts recognize gender-nonconformity claims under Title VII (and, by extension, Title IX and analogous constitutional

---

[9] Sexual orientation and gender identity are distinct concepts. "Sexual orientation" describes one's attraction to individuals of the same sex (gay or lesbian), the other sex (heterosexual), both sexes (bisexual), or neither sex (asexual). "Gender identity," as described above, refers to one's internal sense of gender. A transgender person may have any sexual orientation. *See Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015) ("[A]n individual's transgender status in no way indicates that person's sexual orientation.")

[10] Yesterday, the *Hively* plaintiff filed a petition with the Seventh Circuit seeking rehearing and rehearing *en banc*, arguing, *inter alia*, that the precedents cited in the panel decision conflict with more recent Supreme Court precedent and case law in other jurisdictions. *See Hively*, Dkt. No. 46 (7th Cir. Aug. 25, 2016).

claims). *Hively*, 2016 WL 4039703, at *1; *see also Doe v. City of Belleville*, 119 F.3d 563, 580 (7th Cir. 1997) ("[T]he fact that [plaintiff] was singled out for this abuse because the way in which he projected the sexual aspect of his personality (and by that we mean his gender) did not conform to his coworkers' view of appropriate masculine behavior supplies that proof" of sex discrimination); *Nabozny*, 92 F.3d at 455-56 (recognizing that gender-based equal protection claim by a student can arise from impermissible sex stereotyping); *Doe v. Brimfield Grade Sch.*, 552 F. Supp. 2d 816 (C.D. Ill. 2008) (recognizing that gender stereotyping claims are actionable under Title IX). *Hively* expressly recognized that "Title VII protects persons, not classes" and that "anyone can pursue a claim under Title VII no matter what her gender or sexual orientation" based on gender nonconformity. *Id.* at *6. That same principle applies with equal force to transgender plaintiffs.

Transgender people are, by definition, "gender nonconforming," as the vast majority of federal courts to address the question have found. *See, e.g., Glenn*, 663 F.3d at1316; *Schroer v. Billington*, 577 F. Supp. 2d 293, 305, 308 (D.D.C. 2008). Even if this Court or the Seventh Circuit were to find that Title VII or Title IX do not prohibit discrimination based on one's transgender status or gender identity *alone*, Ash has nevertheless pleaded sufficient facts to show that KUSD's discrimination was rooted in actionable sex stereotyping discrimination. The fact that Ash is *also* transgender does not deny him the right to pursue these claims under that theory. *See Hively*, 2016 WL 4039703, at *6.

Defendants also cite *Hively* for their assertion that the Seventh Circuit's 1982 decision in *Ulane v. Eastern Airlines*, 742 F.2d 1081 (7th Cir. 1984), has precedential value here. Defs' MTD Br. at 12-13. For the reasons explained in Plaintiff's preliminary injunction brief, *Ulane* does not defeat Ash's Title IX claims. Pl's PI Br. at 17-20. In *Hively*, the Seventh Circuit cited

19

*Ulane* (as well as other more recent cases) for the sole proposition that "Title VII does not redress sexual orientation discrimination" in this Circuit. *Hively*, 2016 WL 4039703, at \*2. In so concluding, it also found significant the holdings of other federal courts that sexual orientation discrimination is not protected under Title VII. It did not suggest that *Ulane* bars claims by transgender plaintiffs under modern Title VII and Title IX jurisprudence, because, as Plaintiff already has explained, the weight of Title IX and Title VII case law holds that *Price Waterhouse* overruled *Ulane*'s application to transgender plaintiffs. *See* Pls' PI Br. at 17-20. Indeed, *five* federal appeals courts have held that discrimination against transgender individuals is prohibited as a form of sex discrimination. *See G.G.*, 822 F.3d at 723 (4th Cir. 2016); *Glenn*, 663 F.3d at 1316 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d at 570; *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1199-1203 (9th Cir. 2000).

For these reasons, to the extent *Ulane* has any precedential value on the question of Title VII's application to sexual orientation discrimination, it has no bearing here. *Ulane*'s ruling with respect to discrimination against transgender people has been overruled by the Supreme Court's ruling in *Price Waterhouse* and intervening decades of development of both case law and scientific and social understanding of who transgender people are. *See* Pls' PI Br. at __. Most importantly, neither *Hively* nor *Ulane* address the central issue here: whether a transgender boy has the right to be treated as a boy, including with respect to sex-segregated facilities like restrooms. Neither of those decisions should bar this Court from concluding that under contemporary legal standards, Ash is protected from discrimination under Title IX and is entitled to be treated in accordance with his gender identity, just like all other boys.

20

**B. Ash is asking the Court to apply, not "expand," Title IX and to adopt the reasonable interpretation of the federal government that Title IX's existing protections apply to Ash and other transgender students.**

In asserting that Ash has failed to state a Title IX claim, Defendants argue, in part, that Title IX "does not encompass transgender status," that this Court cannot "expand" statutory rights afforded by Title IX, and that the federal government's interpretation of Title IX to protect transgender students is "plainly erroneous." These arguments are easily rebutted.

Defendants ignore the fact that Ash's Title IX claim arises from discrimination based on his *sex*. Ash has advanced three plausible theories of relief under Title IX: (1) discrimination based on his gender identity as a form of sex discrimination, (2) discrimination based on his transgender status as a form of sex discrimination, and (3) discrimination based on his nonconformity to sex stereotypes, based on traits KUSD believes distinguish him from other boys, including the fact that, unlike most boys, he is a boy but was assigned the "female" gender designation at birth. Ash is not asking this Court to "expand" Title IX but to apply it to the sex-based discrimination he has faced as a transgender student. Applying a federal nondiscrimination law to a specific plaintiff and his factual allegations is well within the province of this Court.

In arguing that Ash has failed to state a Title IX claim, Defendants have placed undue reliance on the dissenting opinion in the Fourth Circuit's decision in *G.G. v. Gloucester County School Board*, and wholly ignored the majority opinion in that case and every other federal case finding that transgender individuals are protected by federal sex discrimination laws. In Section IV of their brief, which addresses Plaintiff's Title IX claims, Defendants misleadingly cite Judge Niemeyer's dissent as authority *fifteen times*, identifying the citations as a dissenting opinion

only once in that section—in a footnote. Defs' MTD Br. at 17 n.7, 21, 22, 24, 25.[11] Ironically, Defendants are asking this Court to defer to a dissenting opinion to find that the comprehensive, reasonable interpretation of Title IX by the federal agencies charged with enforcing that law should be accorded no such deference. The Court should reject this invitation and afford the interpretation of Title IX by the Department of Education and Department of Justice their due deference.

Similarly, Defendants place heavy yet undue reliance on *Johnston v. University of Pittsburgh*, 97 F. Supp. 3d 657 (W.D. Pa. 2015), a district court opinion from the Western District of Pennsylvania that dismissed a Title IX claim by a transgender student. This reliance is inappropriate for several reasons. First, *Johnston* is not binding precedent on this or any other court.[12] Second, *Johnston* applied a "narrow view of the meaning of the statutory term 'sex,'" to mean only one's status as male or female." *Id.* at 677. *Johnston* ignored the impact on that narrow construction arising from *Price Waterhouse* and its progeny, and thereby failed to analyze plaintiff's Title IX claims under a sex-stereotyping theory. Third, as the *G.G.* majority opinion noted in summarily rejecting *Johnston*'s relevance to *G.G.*, the *Johnston* court did not consider the Department of Education's interpretation of its Title IX regulations as applied to transgender students. *G.G.*, 822 F.3d at 723 n.9. "Because the *Johnston* court did not grapple with the questions of administrative law implicated here, we find the Title IX analysis to be

[11] Every single one of Defendants' citations to *G.G.* is to the dissent. Judge Niemeyer's partial concurrence was on a question unrelated to the merits of the case and not relevant here.

[12] Moreover, any persuasive value that *Johnston* might otherwise have is limited by the fact that the parties settled the case after the plaintiff docketed his appeal to the Third Circuit but prior to that Circuit's review of the case. The case settled after the school voluntarily changed its policies to permit transgender students to use restrooms consistent with their gender identity, removing any dispute between the parties. *See* Joint Statement from the University of Pittsburgh and Seamus Johnston (Mar. 29, 2016), http://www.news.pitt.edu/news/joint-statement-university-pittsburgh-and-seamus-johnston.

unpersuasive." *Id.* For each of these reasons, *Johnston* is similarly unpersuasive here and should be afforded little weight in this Court's analysis.

## CONCLUSION

For the reasons stated herein, Plaintiff Ash Whitaker has stated a claim for relief under both Title IX and the Equal Protection Clause. Defendants' Motion to Dismiss should be denied.

Dated: August 26, 2016

Respectfully submitted,

/s Joseph J. Wardenski

Ilona M. Turner*                          Joseph J. Wardenski
Alison Pennington*                      Michael Allen
Sasha J. Buchert*                        RELMAN, DANE & COLFAX PLLC
Shawn Thomas Meerkamper*        1225 19th Street, NW, Suite 600
TRANSGENDER LAW CENTER      Washington, DC  20036
1629 Telegraph Avenue, Suite 400   Phone: (202) 728-1888
Oakland, CA  94612                      Fax:     (202) 728-0848
Phone: (415) 865-0176                   jwardenski@relmanlaw.com
Fax:     (877) 847-1278                  mallen@relmanlaw.com
ilona@transgenderlawcenter.org
alison@transgenderlawcenter.org
sasha@transgenderlawcenter.org
shawn@transgenderlawcenter.org

Robert (Rock) Theine Pledl
PLEDL & COHN, S.C.
1110 N. Old World Third Street, Suite 215
Milwaukee, WI  53203
Phone: (414) 225-8999
Fax:     (414) 225-8987
rtp@pledlcohn.com

*Application for admission to this Court to follow*

Case 2:16-cv-00943-PP   Filed 08/26/16   Page 28 of 28   Document 19