UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ASHTON WHITAKER, a minor, by his mother and next friend, MELISSA WHITAKER,<br><br>                  Plaintiff,<br><br>   v.<br><br>KENOSHA UNIFIED SCHOOL DISTRICT NO. 1 BOARD OF EDUCATION and SUE SAVAGLIO-JARVIS, in her official capacity as Superintendent of the Kenosha Unified School District No. 1,<br><br>                  Defendants. | Civ. Action No. 2:16-cv-00943-PP<br>Judge Pamela Pepper |

**PLAINTIFF'S REPLY TO DEFENDANTS' BRIEF IN OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION .................................................................................................................1

ARGUMENT ........................................................................................................................2

I. PLAINTIFF MEETS THE THRESHOLD REQUIREMENTS OF
SOME LIKELIHOOD OF SUCCESS ON THE MERITS AND A SHOWING
OF IRREPARABLE HARM IF HE REMAINS SUBJECTED TO KUSD'S
DISCRIMINATORY POLICIES REMAIN IN THE NEW SCHOOL YEAR. ..........................................2

    A. KUSD misstates Plaintiff's burden of showing some likelihood of success. ................2

    B. Ash's claims under Title IX and the Equal Protection Clause are
    likely to succeed under each of several theories of discrimination
    "on the basis of sex." ...................................................................................................2

    C. The federal government's interpretation of Title IX is entitled to deference. ...............7

II. KUSD WILL SUFFER NO HARM, IRREPARABLE OR OTHERWISE, IF THIS
COURT GRANTS THE PRELIMINARY RELIEF REQUESTED IN THIS CASE. ..................................7

    A. In response to this lawsuit, KUSD has invented a policy that it has
    never enforced before and is now applying to just one student:
    Ash Whitaker. ...............................................................................................................7

    B. The requested injunction here is necessary to prevent irreparable
    harm to Ash..................................................................................................................9

    C. KUSD's speculative assertions of harm to KUSD and the public
    are unfounded............................................................................................................12

        1. *Referring to Ash by his chosen name and male pronouns
        will not harm KUSD.*...........................................................................................12

        2. *Ash's use of boys' restrooms will harm neither KUSD or any
        other student.*........................................................................................................13

CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Auer v. Robbins,* 519 U.S. 452 (1997) ...............................................................................................7

*Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015)..............................................................7

*Brunswick Corp. v. Jones*, 784 F.2d 271 (7th Cir. 1986) ...................................................................2

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974) ...........................................9

*Carcaño v. McCrory*, No. 1:16-CV-236, 2016 WL 4508192
(M.D.N.C. Aug. 26, 2016)..............................................................................................................3, 13

*Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008)................................................................4

*G.G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016).........................................................3

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
549 F.3d 1079 (7th Cir. 2008) ...............................................................................................................2

*Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ...............................................................5, 6

*Gloucester Cty. Sch. Bd. v. G.G.*, 136 S. Ct. 2442 (2016) .........................................................3, 4, 7

*Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010)....................................................5

*Kastl v. Maricopa Cty. Cmty. Coll. Dist.*,
No. Civ. 02-1531PHX-SRB, 2004 WL 2008954 (D. Ariz. June 3, 2004) .......................................6

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).......................................................4

*Plyler v. Doe*, 457 U.S. 202 (1982).....................................................................................................14

*Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*,
123 F. Supp. 2d 470, 473 (E.D. Wis. 2000)..................................................................................9, 11

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ..........................................................................4

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) .......................................................................5

**Statues**                                                                                             **Page(s)**

34 C.F.R. § 106.33 ...................................................................................................................................7

**Other Authorities** **Page(s)**

Michael C. Dorf, *Justice Breyer Uses Trans Restroom Case to
Revive "Courtesy Fifth Vote,"* Verdict (Aug. 10, 2016) ................................................................4

# INTRODUCTION

Through his motion for preliminary injunction, Plaintiff Ash Whitaker seeks targeted relief to prevent Defendants Kenosha Unified School District Board of Education No. 1 and Superintendent Sue Savaglio-Jarvis, in her official capacity (collectively, "KUSD"), from inflicting further irreparable educational, physical, and emotional harms on him while litigation on the merits of this lawsuit proceeds. Ash asks this Court to temporarily enjoin KUSD from enforcing—*against him alone*—any policy, practice, or custom: (1) denying him access to boys' restrooms at school, including disciplining him for using those restrooms; and (2) stigmatizing his transgender status and revealing private information related to his gender transition to students and staff—who know and recognize Ash as a boy—through the use of his female birth name, feminine pronouns, or visible badges such as wristbands that mark him as transgender.

Ash is not, as KUSD suggests in its opposition brief, asking this Court at this juncture to order KUSD to implement systemic policy changes or grant any broader relief that may be appropriate at the conclusion of this case. Defs' Opp. Br. [Dkt. No. 17] ("Defs' Opp Br."). And, despite KUSD's assertion to the contrary, the requested relief would have no impact whatsoever on any other school district. A temporary injunction would impose no harm on KUSD, any of its students or staff, or any member of the public—nor has KUSD offered *any* evidence to suggest that the speculative harms it identifies in its brief would materialize. In fact, KUSD has not filed a single declaration, or any other piece of evidence, to rebut Ash's allegations or the conclusions of multiple expert and fact witnesses who submitted declarations in support of this motion.

Ash faces certain irreparable harm if KUSD's conduct is not enjoined and is likely to succeed on the merits of his claims. In contrast, neither KUSD nor the public will be harmed by the temporary relief sought here. The Court should therefore grant Plaintiff's motion.

1

# ARGUMENT

I. **PLAINTIFF MEETS THE THRESHOLD REQUIREMENTS OF SOME LIKELIHOOD OF SUCCESS ON THE MERITS AND A SHOWING OF IRREPARABLE HARM IF HE REMAINS SUBJECTED TO KUSD'S DISCRIMINATORY POLICIES REMAIN IN THE NEW SCHOOL YEAR.**

**A. KUSD misstates Plaintiff's burden of showing some likelihood of success.**

A party moving for a preliminary injunction in the Seventh Circuit must only demonstrate "*some* probability of success on the merits" (*i.e.*, a "better than negligible" chance), to meet the threshold showing. *See Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (emphasis added). In an apparent attempt to hold Plaintiff to a higher standard here, KUSD cites a D.C. Circuit case requiring a showing of a "substantial likelihood" of success on the merits. Defs' Opp. Br. at 7. That higher bar is not the standard in this Circuit and is inapplicable to this motion. For the reasons explained in Plaintiff's opening brief, Ash greatly exceeds the low threshold showing of "some" likelihood of success on the merits on both of his causes of action. Mem. in Support of Pl's Mot. for Prelim. Inj. [Dkt. No. 11] ("Pl's PI Br.") at 12-28.[1]

**B. Ash's claims under Title IX and the Equal Protection Clause are likely to succeed under each of several theories of discrimination "on the basis of sex."**

Plaintiff has shown a likelihood of success on his sex discrimination claims, whether those claims arise because (1) Ash's "sex" is properly understood to include his male gender identity, such that it is *per se* sex-based discrimination to treat him differently merely because his gender identity is incongruent with his assigned sex at birth; or (2) it is actionable gender discrimination arising from sex stereotyping to treat Ash differently from other boys because he

---

[1] KUSD also questions the well-established "sliding scale" approach to preliminary injunction motions, citing a concurring opinion from a 1986 Seventh Circuit decision. Defs' Opp. Br. at 5 n.5. The Seventh Circuit has applied the sliding-scale approach time and again since then. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). KUSD's suggestion that some other standard applies here is incorrect.

2

Case 2:16-cv-00943-PP   Filed 08/31/16   Page 6 of 20   Document 21

does not conform to certain gender norms, including that all boys were assigned the male sex at birth or have the same physical features. Because many courts have found that transgender plaintiffs state valid sex discrimination claims on one or both of these theories, Ash easily meets the threshold burden of showing "some" likelihood of success on the merits.

KUSD is simply wrong to assert that Ash has "no likelihood" of succeeding under the theory that Title IX's prohibition on sex-based discrimination encompasses discrimination based on gender identity. Defs' Opp. Br. at 8-14. KUSD's argument depends on the illogical premise that there is no chance that this Court and the Seventh Circuit will adopt the same interpretation of Title IX that the federal government and many federal courts already have adopted.

Whether through the formal regulatory process or administrative guidance, a number of federal agencies charged with interpreting statutes banning discrimination "on the basis of sex" have interpreted such statutes to include discrimination based on gender identity and transgender status. *See* Pl's PI Br. at 20-24. The two departments with primary enforcement authority over Title IX—the Department of Education ("ED") and the Department of Justice ("DOJ")—share this interpretation. That interpretation, previously stated in informal opinion letters, amicus briefs filed in private Title IX cases, and enforcement actions dating back to 2013, *id.* at 20-24 & n.13, was most recently and thoroughly articulated in the Departments' May 13, 2016 Dear Colleague Letter on Transgender Students, a "significant guidance document" issued by the senior officials heading ED's Office for Civil Rights and DOJ's Civil Rights Division. *Id.* at 20-21.

Meanwhile, federal courts have adopted those agencies' reasonable interpretation of the term "sex." *G.G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 719-23 (4th Cir. 2016), *mandate recalled and stay issued by Gloucester Cty. Sch. Bd. v. G.G.*, 136 S. Ct. 2442 (2016); *Carcaño v. McCrory*, No. 1:16-CV-236, 2016 WL 4508192, at *1 (M.D.N.C. Aug. 26, 2016) (attached as

Ex. A); *see also Schroer v. Billington*, 577 F. Supp. 2d 293, 301 (D.D.C. 2008) (adopting analogous reasoning to conclude gender identity discrimination is *per se* sex discrimination). All of this is consistent with Supreme Court jurisprudence, which has clarified the scope of Title VII and analogous sex discrimination laws, including Title IX, to broadly prohibit discrimination beyond the "principal evil" Congress might have had in mind in enacting those laws to include gender-based discrimination. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)

KUSD argues that the Supreme Court's stay of the Fourth Circuit's decision in *G.G.*, a case presenting facts similar to this one, is "significant." Defs' Opp. Br. at 8. But all the Supreme Court did was temporarily stay a preliminary injunction in that case pending an anticipated petition for writ of certiorari by the defendant school district. *Gloucester Cty. Sch. Bd.*, 136 S. Ct. 2442. Notably, the stay will "terminate automatically" and the injunction will be restored if the Court denies the writ. *Id.* The stay serves only to permit the Court to consider that writ; it says nothing as to whether the Court will grant certiorari or, if it does, how it may ultimately rule. *Id.* Indeed, Justice Breyer, who cast the deciding vote for the stay, said he did so because the Court was in recess and his vote was only a "courtesy."[2] Indeed, as a federal court recognized just last week in enjoining North Carolina's enforcement of its anti-transgender "bathroom bill" pursuant to Title IX, *G.G.* is controlling law in the Fourth Circuit. *Carcaño*, 2016 WL 4508192, at *13.

Moreover, Ash independently has a likelihood of success pursuant to the well-established principle that Title IX bans discrimination based on "sex-stereotyping." That principle readily

---

[2] Legal scholars have suggested Justice Breyer's vote had more to do with preserving capital defendants' ability to obtain stays pending certiorari in death penalty cases, not an indication of his views on the merits in *G.G.*. See Michael C. Dorf, *Justice Breyer Uses Trans Restroom Case to Revive "Courtesy Fifth Vote,"* Verdict (Aug. 10, 2016), http://bit.ly/2c6NKJo.

4

applies here, since KUSD is treating Ash differently from other boys based on his nonconformity to stereotypical expectations that all boys were assigned the male sex at birth and have the same physical features. Federal courts have repeatedly applied the sex-stereotyping theory in finding that transgender plaintiffs stated sex discrimination claims. *See* Pl's PI Br. at 2.[3]

KUSD misreads the cases it relies on to assert, first, that a sex-stereotyping claim can *only* arise from a limited subset—which it calls "behaviors, mannerisms, and appearances"—of the ways people can be perceived as failing to conform to gender stereotypes, and second, that Ash's claim does not fall within that category. Defs' Opp. Br. at 11. Those cases actually hold that discrimination against transgender people is inherently based on sex stereotypes. In *Glenn v. Brumby*, the Eleventh Circuit found "congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms," concluding that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination." 663 F.3d 1312, 1317 (11th Cir. 2011). Far from limiting actionable sex discrimination to the examples listed in KUSD's brief, *Glenn* found that the bases for the employer's discrimination—his "perception of Glenn as 'a man dressed as a woman and made up as a woman'" and "the sheer fact of the transition" were actionable sex stereotypes. *Id.* at 1320-21. Similarly, in *Smith v. City of Salem*, the Sixth Circuit concluded that the transgender plaintiff, who was discriminated against when she began to assert her female gender identity at

---

[3] KUSD curiously asserts that the Amended Complaint "is utterly devoid of any allegations of sex-stereotyping" and that Ash, through this motion, is making an "eleventh-hour sex-stereotyping claim." Defs' Opp. Br. at 10 & n.12. The stereotyping theory is not a stand-alone "claim"; rather, it is one of several forms of sex discrimination under which this Court can grant relief under the same Title IX or Equal Protection Clause claim. Notwithstanding the fact that a plaintiff is not required to plead his legal theories, *see Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010), Ash refers to the sex-stereotyping theory throughout his Amended Complaint. *See* Am. Compl. [Dkt. No. 12] ¶¶ 3, 111, 114, 115, 117, 120, 121, 122, 124.

5

work, stated a claim under a sex-stereotyping theory. 378 F.3d 566, 571 (6th Cir. 2004). *Smith* noted the faulty logic of "superimpos[ing] classifications such as 'transsexual' on a plaintiff, and then attempting to legitimize discrimination based on the plaintiff's gender non-conformity by formalizing the gender non-conformity into an ostensibly unprotected classification." *Id.* at 574. That is precisely what KUSD is urging this Court to do here.

At least one court has specifically concluded that a transgender person states a sex stereotyping claim under Title VII and Title IX based on the fact that the person does not have genitalia associated with his gender identity. *See Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, No. Civ. 02-1531PHX-SRB, 2004 WL 2008954, at *2 (D. Ariz. June 3, 2004) (attached as Ex. B). In that case, where a college prohibited a transgender woman from using the women's restroom, the court denied the school district's motion to dismiss the plaintiff's Title IX claims, finding that "neither a woman with male genitalia nor a man with stereotypically female anatomy . . . may be deprived of a benefit or privilege of employment by reason of that nonconforming trait." *Id.*

KUSD is plainly treating Ash differently from other boys—irrespective of whether that's because KUSD does not consider him to be a boy, because it considers him a boy only *some* of the time because of certain gender nonconforming characteristics,[4] because he is a boy who is also transgender, or because he is a boy undergoing a gender transition—and *Glenn*, *Smith*, and other cases stand for the principle that such treatment is based on impermissible sex stereotypes.

---

[4] KUSD admits it "has permitted [Ash] to live in conformance with the male gender identity in all material respects, with the one exception of the policy regarding bathrooms and overnight accommodations." Defs' Opp. Br. at 13. But treating Ash differently from other boys in *any* way for not conforming to KUSD's idea of what a boy should be is, by definition, gender nonconformity discrimination.

6

### C. The federal government's interpretation of Title IX is entitled to deference.

For the reasons stated in Plaintiff's opening brief, the interpretation of the term "sex" in Title IX and its implementing regulations by ED and DOJ is entitled to deference. Pl's PI Br. at 13-24. Furthermore, under *Auer v. Robbins,* 519 U.S. 452 (1997), this Court must defer to the Departments' considered interpretation that 34 C.F.R. § 106.33—which permits schools to maintain sex-segregated restrooms without violating Title IX—requires schools to treat transgender students according to their gender identity if they choose to operate separate restrooms. *Id.* at 22-23. Although KUSD hopes the principle of *Auer* deference may change in the future, Defs' Opp. Br. at 19-23, *Auer* is good law. In fact, the Seventh Circuit recently afforded *Auer* deference to another ED guidance letter. *See Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 651 (7th Cir. 2015), *cert. denied*, 136 S.Ct. 1607 (2016). *Auer* is binding on this Court, which must defer to the ED/DOJ Title IX interpretation unless and until the law changes in the manner KUSD desires.

## II. KUSD WILL SUFFER NO HARM, IRREPARABLE OR OTHERWISE, IF THIS COURT GRANTS THE PRELIMINARY RELIEF REQUESTED IN THIS CASE.

### A. In response to this lawsuit, KUSD has invented a policy that it has never enforced before and is now applying to just one student: Ash Whitaker.

The student restrooms at Tremper High School, where Ash will begin his senior year tomorrow, have signs on the door that say either "Boys" or "Girls." When Ash, a transgender boy, began to use the boys' restrooms at the beginning of his junior year, KUSD had no policy limiting access to those restrooms to students whose "biological sex" was male. Nor did KUSD have any policy defining "boys" or "girls" for purposes of restroom use or otherwise.

Only after Ash's seven, unremarkable months of using the boys' restrooms last year, did Tremper administrators concoct a new policy: Ash had to use girls' restrooms or segregated,

7

single-occupancy restrooms to which only he had access. Pl's PI Br. at 1-2. Only after being pressed on the issue by Ash's mother did a Tremper assistant principal—several weeks later—announce that Ash could not use the boys' restrooms because the gender marker in his official school records had not been changed from "female" to "male." Pl's PI Br. at 6. That administrator told Ms. Whitaker that KUSD could change Ash's records—thus allowing him to use boys' restrooms—if the school received some kind of medical documentation confirming Ash's gender transition. Pl's PI Br. at 6. Ms. Whitaker promptly provided such documentation from Ash's physician, but KUSD nevertheless refused to change the records or permit Ash access to boys' restrooms. Pl's PI Br. at 6. Instead, KUSD administrators refused to give any reason at all. M. Whitaker Decl. [Dkt. No. 10-4] ¶¶ 16-17, 24.

Now, months later and only after Ash filed this lawsuit, KUSD claims its policy is even more restrictive, "requiring the use of sex-segregated bathroom and locker room facilities based on a students' [sic] birth sex, rather than their gender identity." Defs' Opp. Br. at 3. KUSD treats "birth gender" as synonymous with "biological sex," defining those terms to mean "the gender designation recorded on an infant's birth certificate." Defs' Opp. Br. at 1.[5] This new formulation is at odds with KUSD's earlier directive that Ms. Whitaker provide documentation of Ash's gender transition to allow him to use boys' restrooms. Now, Ash could *never* satisfy KUSD's purported prerequisites for being treated like any other boy.

---

[5] Plaintiff disputes KUSD's assertion that "biological sex" and assigned sex at birth mean the same thing. Plaintiff has submitted evidence that biological sex refers to the sum of physical, hormonal, chromosomal, psychological, and other factors, including gender identity, which do not always match an infant's external genitalia—typically a doctor's only reference point for designating an infant male or female. *See* Gorton Decl. [Dkt. No. 10-3] ¶¶ 12-21; Budge Decl. [Dkt. No. 10-2] ¶¶ 17-18. Tellingly, KUSD has submitted no evidence—or even argument—to support its conclusory assertion that "biological sex" means assigned sex at birth.

8

Whatever KUSD's actual policy toward transgender students is (a question that may only be answered definitively after discovery in this case), one thing is clear: it is *not* a longstanding policy that would be disrupted if a preliminary injunction is granted here. Rather, KUSD recently created its discriminatory policy for the specific purpose of excluding Ash Whitaker from boys' restrooms. In its briefing, KUSD now describes an even harsher policy—albeit one that has not been formally adopted by KUSD's school board—that would wholly deny Ash the ability to use boys' restrooms, or even be called by his chosen name and masculine pronouns, at school. That is the very definition of unlawful gender-based discrimination that violates Ash's civil rights.

### B. The requested injunction here is necessary to prevent irreparable harm to Ash.

KUSD narrowly defines the purpose of a preliminary injunction as preserving the status quo. Defs' Opp. Br. at 5. Not so. Rather, the core purpose of a preliminary injunction is to prevent irreparable injury to the moving party until a decision on the merits can be reached. *See Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 123 F. Supp. 2d 470, 473 (E.D. Wis. 2000). "It often happens that this purpose is furthered by preservation of the status quo, but not always." *Id.* (quoting *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). "If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Id.* (quoting same). "The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Id.* (quoting same).

Through this motion, Ash is asking this Court for targeted relief that would restore him and KUSD to their "last uncontested status" before their dispute began in February 2016: Ash's

9

use of boys' restrooms without issue and without any interference from KUSD. To the extent some of the requested relief is "mandatory," it is only with respect to Ash's request to be referred to uniformly by his chosen name and male pronouns. Many of Ash's teachers already do this. Regardless of the label, that additional relief is appropriate here given the irreparable harm Ash will suffer by being misgendered by his school. As described below, KUSD has not shown what interest is served by staff disrespecting Ash's gender identity and stigmatizing him in this way.

In response to this motion, KUSD has offered no evidence to rebut Ash's showing of irreparable harm. In its brief, KUSD simply ignores the expert declarations submitted in support of Ash's motion. KUSD does not offer any evidence to dispute the conclusion of Dr. Nicholas Gorton, M.D., that gender identity is an immutable part of one's sex and that permitting transgender young people to live in accordance with their gender identity promotes their health and well-being. Gorton Decl. ¶ 29. Nor does it dispute the conclusion of Dr. Stephanie Budge, a University of Wisconsin professor and clinical psychologist specializing in transgender youth, that Ash is a transgender boy whose gender dysphoria and related conditions, including anxiety and depression, have worsened as a direct and proximate result of KUSD's actions, "causing significant psychological distress and plac[ing] [Ash] at risk for experiencing life-long diminished well-being and life-functioning." Budge Decl. ¶¶ 40-56. Nor does KUSD quarrel with the parallel conclusions of Dr. Jenifer McGuire, a University of Minnesota professor and youth development expert, who confirmed that the harms Ash is suffering are consistent with research regarding transgender students whose schools refuse to respect their gender identity. McGuire Decl. [Dkt. No. 10-5] ¶¶ 10-37.

In the absence of *any* contrary evidence, KUSD instead attempts to defeat this motion by arguing that Ash's so-called "delay" in seeking a preliminary injunction undermines his showing

of irreparable harm. Defs' Opp. Br. at 20-21. This argument has no merit. Plaintiff filed this lawsuit just weeks after KUSD's most recent act of discrimination against Ash: its refusal to permit him to stay in a suite with boys during an off-campus, school-sponsored orchestra camp in mid-June. He had already taken swift action to enforce his rights by filing a complaint with the U.S. Department of Education Office for Civil Rights on May 12, 2016, just two weeks after KUSD's attorney advised Ash's attorney that KUSD would not grant Ash's formal request for boys' restroom access.[6] Ash's original complaint in this litigation specifically requested, *inter alia*, a preliminary injunction. Compl. [Dkt. No. 1] at 35. Twenty days later, Plaintiff filed his amended complaint, containing the same prayer for relief, and the present motion.

It is hard to understand how KUSD thinks this compressed timeline amounts to a delay, let alone an "excessive" one. A party's delay in seeking a preliminary injunction may be relevant to a court's consideration of the party's claim of irreparable harm. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001). But a delay is only material "if the defendant has been lulled into a false sense of security or had acted in reliance on the plaintiff's delay." *Id.* (internal quotation omitted). Where, as here, only a few months passed between the injurious conduct and the preliminary injunction motion—and where school was not in session for nearly three months of that time, so Ash's use of boys' restrooms was not an issue—the delay is not unreasonable. *See Praefke*, 123 F. Supp. 2d at 478 ("[Plaintiff's] delay here—four months before filing suit and demanding a temporary injunction, and another two-and-a-half months before formally moving for a preliminary injunction—is not excessive, nor is it inconsistent with irreparable harm.").

---

[6] Given the emotional toll KUSD's discrimination took on Ash in the final months of the school year, and his desire to focus on final exams, Ash and his mother, Melissa Whitaker, waited until the beginning of summer break to make a final decision on whether to pursue their claims through that existing administrative complaint or to litigate their claims in federal court.

11

**C. KUSD's speculative assertions of harm to KUSD and the public are unfounded.**

KUSD offers no evidentiary support—not a single declaration from a KUSD official or anyone else—to support its speculation that KUSD or the broader public somehow will suffer harm if this Court permits Ash to use boys' restrooms (as he already has done, without issue) or requires KUSD to refer to him by his chosen name and male pronouns (as many teachers and students already do, without issue). On the other hand, Ash has provided declarations showing that many school districts—including in Wisconsin—treat their transgender students in accordance with their gender identity, and that treating Ash as a boy pending a merits determination in this case will impose no harm on KUSD or its other students.

*1. Referring to Ash by his chosen name and male pronouns will not harm KUSD.*

KUSD does not even attempt to explain how it would be harmed by requiring staff to refer to Ash by his name and male pronouns. Whereas misgendering Ash at school causes him serious harm—by violating his privacy, stigmatizing him for being transgender, and undermining a critical component of his gender transition, Budge Decl. ¶¶ 53-56; McGuire Decl. ¶¶ 13-18; Gorton Decl. ¶ 24—it is not obvious, and KUSD makes no attempt to explain, what injury would be caused by personnel using his name and male pronouns this year. This is not complicated. Other Wisconsin school districts have adopted policies and procedures under which transgender students may request to be called by a name other than their legal name and by pronouns matching their gender identity.[7] Other districts around the country adopt this same common-sense approach. Pl's PI Br. at 29-30. KUSD could readily do the same.

---

[7] *See* Sch. Dist. of Shorewood, 411 (2) Guideline (reviewed Feb. 25, 2014) ("Shorewood Policy") (attached as Ex. C) (same); Monona Grove Sch. Dist., Admin. Rule 411 (2) (Aug. 26, 2015) ("Monona Grove Policy") (attached as Ex. D) (same); Middleton-Cross Plains Area Sch. Dist., Admin. Pol. & Proc. Manual 411.2, at 2 (attached as Ex. E) ("Middleton Policy") (same); Menasha Joint Sch. Dist., Bd. Pol. 2260 ("Menasha Policy") (attached as Ex. F) (same).

### 2. *Ash's use of boys' restrooms will harm neither KUSD or any other student.*

KUSD asserts, also without any support, that giving Ash access to the same boys' restrooms he used without incident in the past would harm KUSD or other students. KUSD relies on the same speculative harms that other courts have already rejected, correctly, in similar cases.

For example, KUSD claims other students' privacy rights would be violated if Ash is allowed to use the boys' restroom. It does not explain how Ash's use of boys' restrooms, which have private stalls and locking doors, would affect anyone else's privacy. As the court in *Carcaño* found just last week, the "uncontested evidence" shows that the transgender plaintiffs used "bathrooms and other facilities consistent with their gender identity for an extended period of time without causing any known infringement on the privacy rights of others." *Carcaño*, 2016 WL 4508192, at *27. "In fact, rather than protect privacy, it appears at least equally likely that denying an injunction will create privacy problems, as it would require the individual transgender Plaintiffs, who outwardly appear as the sex with which they identify, to enter facilities designated for the opposite sex . . . , thus prompting unnecessary alarm and suspicion." *Id.* The potential for similar problems exists here if Ash were required to use girls' restrooms.

Many school districts permit transgender students to use restrooms consistent with their gender identities, without incident or any effect on other students' privacy. Chiasson Decl. [Dkt. No. 10-9] ¶¶ 8-12; Kenney Decl.[Dkt. No. 10-7] ¶¶ 5-6; Davis Decl. [Dkt. No. 10-8] ¶¶ 6-7. Other Wisconsin districts already recognize that it is harmful and inappropriate to require a transgender student to use gender-neutral restrooms or the restrooms designated for their assigned sex, and have adopted policies that consider the rights of all students, including transgender students. For example, Monona Grove's policy provides that:

13

> In most cases, students shall have access to the restroom or locker room that correspond to the gender identity that the student consistently asserts at school and in other social environments. . . . In any gender-segregated facility, any student who is uncomfortable using a shared facility, regardless of the reason, shall, upon the student's request, be provided with a safe and non-stigmatizing alternative. . . . However, requiring a transgender or gender nonconforming student to use a separate, nonintegrated space threatens to publicly identify and marginalize the student as transgender and should not be done unless requested by a student. Under no circumstances may students be required to use sex segregated facilities that are inconsistent with their gender identity.

Monona Grove Policy at 2-3. Other Wisconsin districts have adopted comparable policies.[8]

KUSD's purported interest in its "birth sex" requirement for restroom access is undermined by its inability to enforce that requirement in any consistent or meaningful way. To enroll at KUSD, a student may, but is not required to, produce a birth certificate as one way to establish of his or her age. *See* KUSD, Registration, http://www.kusd.edu/registration (attached as Ex. G). New students may also present a passport for this purpose.[9] *Id.* Indeed, a student's gender is self-reported on KUSD's Student Enrollment Form (attached as Ex. H). Thus, in reality, KUSD does not require, and could not require, all students to demonstrate their "birth sex"; rather, it relies in most cases on parents' representations of their child's sex at the time of enrollment. Even if KUSD's policy were based on proof of appropriately "conforming" external genitalia, it is impossible to imagine that such a policy could be workable or enforceable in a nondiscriminatory manner that respects all students' rights to bodily privacy.

And even if KUSD required all students to submit birth certificates, it would not necessarily learn from that document the gender designation assigned to the student at birth, as

---

[8] *See, e.g.*, Shorewood Pol. at 4; Middleton Pol. at 5; Menasha Pol. at 2. Without endorsing any particular policy as a model, Plaintiff offers these examples to show that providing appropriate restroom access to transgender students is not novel or impossible.

[9] Moreover, to comply with *Plyler v. Doe*, 457 U.S. 202 (1982), "[a] school district may not bar a student from enrolling in its schools because he or she lacks a birth certificate" and may "accept a variety of documents" to confirm a student's age. U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter: School Enrollment Procedures, at 2 (May 8, 2014) (attached as Ex. I.)

some transgender people may be able to obtain amended birth certificates or passports reflecting their gender identity. KUSD does not explain how it would, or could, identify the "birth gender" of a transgender student presenting an amended birth certificate or passport reflecting their correct sex for purposes of regulating that student's restroom access.

       3. *KUSD's other asserted harms are not credible or, in any event, irreparable.*

None of the other harms KUSD asserts—that a preliminary injunction "will have the effect of forcing policy changes, imposing financial consequences, and stripping KUSD of its basic authority to enact polices [sic] that the [sic] accommodate the need for privacy of all students"—are supported by evidence or logic. KUSD further complains of having "no time to make changes to KUSD facilities or to develop new policies to safeguard the privacy rights of all of its students." Defs' Opp. Br. at 26. It is unclear (and unexplained) why any modifications to Tremper's existing boys' restrooms would be needed for Ash to resume his use of them. The existing partitions and stall doors should suffice to protect all students' privacy in those restrooms—including Ash's.

In sum, KUSD has offered no evidence to show it will suffer any harm at all. The experience of other school districts shows that the relief sought here can be implemented easily and without any harm to others. The balancing of harms weighs heavily in Ash's favor.

## CONCLUSION

For the reasons stated herein, Plaintiff Ash Whitaker respectfully requests that the Court grant his motion enjoining KUSD from enforcing any policy denying him access to boys' restrooms or requiring him to wear a visible marker of his transgender status such as a green wristband, and directing KUSD personnel to refer to him by his name, Ash Whitaker, and male pronouns, during the pendency of this lawsuit.

15

Dated: August 31, 2016

Respectfully submitted,

| | |
|---|---|
| Ilona M. Turner* | /s Joseph J. Wardenski |
| Alison Pennington* | Joseph J. Wardenski |
| Sasha J. Buchert* | Michael Allen |
| Shawn Thomas Meerkamper* | RELMAN, DANE & COLFAX PLLC |
| TRANSGENDER LAW CENTER | 1225 19th Street, NW, Suite 600 |
| 1629 Telegraph Avenue, Suite 400 | Washington, DC  20036 |
| Oakland, CA  94612 | Phone: (202) 728-1888 |
| Phone: (415) 865-0176 | Fax:    (202) 728-0848 |
| Fax:    (877) 847-1278 | jwardenski@relmanlaw.com |
| ilona@transgenderlawcenter.org | mallen@relmanlaw.com |
| alison@transgenderlawcenter.org | |
| sasha@transgenderlawcenter.org | |
| shawn@transgenderlawcenter.org | |

Robert (Rock) Theine Pledl
PLEDL & COHN, S.C.
1110 N. Old World Third Street, Suite 215
Milwaukee, WI  53203
Phone: (414) 225-8999
Fax:    (414) 225-8987
rtp@pledlcohn.com

*Application for admission to this Court to follow*