# EXHIBIT A

***Carcaño v. McCrory***, **1:16-CV-236, 2016 WL 4508192**
**(M.D.N.C. Aug. 26, 2016)**

2016 WL 4508192

United States District Court,
M.D. North Carolina.

JOAQUÍN CARCAÑO, et al., Plaintiffs,

v.

PATRICK MCCRORY, in his official capacity as Governor of North Carolina, et al., Defendants,

and

PHIL BERGER, in his official capacity as President Pro Tempore of the
North Carolina Senate; and TIM MOORE, in his official capacity as Speaker
of the North Carolina House of Representatives, Intervenor-Defendants.

1:16cv236
|
August 26, 2016

## MEMORANDUM OPINION, ORDER AND PRELIMINARY INJUNCTION

Thomas D. Schroeder United States District Judge

**\*1**  THOMAS D. SCHROEDER, District Judge.

This case is one of three related actions in this court concerning North Carolina's Public Facilities Privacy & Security Act, 2016 N.C. Sess. Laws 3, commonly known as House Bill 2 ("HB2"). Although Plaintiffs challenge multiple portions of HB2, they presently seek preliminary relief only as to Part I, the so-called "bathroom bill" portion of the law, which requires public agencies to ensure that multiple occupancy bathrooms, showers, and other similar facilities are "designated for and only used by" persons based on their "biological sex," defined as the sex listed on their birth certificate. 2016 N.C. Sess. Laws 3 §§ 1.2–1.3. Plaintiffs include two transgender [1] students and one employee (collectively, the "individual transgender Plaintiffs") of the University of North Carolina ("UNC"), as well as the American Civil Liberties Union of North Carolina ("ACLU-NC"), which sues on behalf of its transgender members. (Doc. 9 ¶¶ 5–7, 10.) The individual transgender Plaintiffs (in their individual capacities) claim that Part I violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"). (Doc. 9 ¶¶ 235–43.) In addition, the individual transgender Plaintiffs and ACLU-NC claim that Part I violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. [2] (Id. ¶¶ 186–200, 220–34.)

---

[1]  Transgender individuals are persons who do not identify with their birth sex, which is typically determined on the basis of external genitalia. (Doc. 22-1 ¶¶ 12, 14; see also Doc. 9 ¶ 26.) According to the latest edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, some transgender individuals suffer from a condition called gender dysphoria, which occurs when the "marked incongruence between one's experienced/expressed gender and assigned gender" is associated with "clinically significant distress or impairment in social, occupational, or other important areas of functioning." (Doc. 22-5 ¶¶ 12–13.) In other words, gender dysphoria occurs when transgender individuals experience emotional, psychological, or social distress because "their deeply felt, core identification and self-image as a particular gender does not align" with their birth sex. (See Doc. 22-1 ¶ 19.) For purposes of the present motion, the court accepts Plaintiffs' unrebutted evidence that some transgender individuals form their gender identity misalignment at a young age and exhibit distinct "brain structure, connectivity, and function" that does not match their birth sex. (Id. ¶¶ 18, 22.)

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

[2]   After the preliminary injunction hearing, ACLU-NC moved to file a second amended complaint to allege a Title IX representational claim. (Doc. 116.) Briefing on that motion is incomplete, so the court only considers Title IX relief for the individual transgender Plaintiffs at this time.

It is important to note what is (and is not) in dispute. All parties agree that sex-segregated bathrooms, showers, and changing facilities promote important State privacy interests, and neither Plaintiffs nor the United States contests the convention. Further, no party has indicated that the pre-HB2 legal regime posed a significant privacy or safety threat to anyone in North Carolina, transgender or otherwise. The parties do have different conceptions, of how North Carolina law generally operated before March 2016, however, and whether "sex" includes gender identity.

**\*2**  Plaintiffs contend that time is of the essence, as HB2's impact will be most felt as educational institutions across the State begin a new academic year. As a result, the court has endeavored to resolve Plaintiffs' motion for preliminary relief as quickly as possible.

Ultimately, the record reflects what counsel for Governor McCrory candidly speculates was the status quo ante in North Carolina in recent years: some transgender individuals have been quietly using bathrooms and other facilities that match their gender identity, without public awareness or incident. (See Doc. 103 at 70 (speculating that, even if Part I remains in force, "some transgender individuals will continue to use the bathroom that they always used and nobody will know.").) This appears to have occurred in part because of two factors. First, the record suggests that, for obvious reasons, transgender individuals generally seek to avoid having their nude or partially nude bodies exposed in bathrooms, showers, and other similar facilities. (See Doc. 103 at 140.) Second, North Carolina's decades-old laws against indecent exposure, peeping, and trespass protected the legitimate and significant State interests of privacy and safety.

After careful consideration of the limited record presented thus far, [3] the court concludes that the individual transgender Plaintiffs have made a clear showing that (1) they are likely to succeed on their claim that Part I violates Title IX, as interpreted by the United States Department of Education ("DOE") under the standard articulated by the Fourth Circuit; (2) they will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities weighs in favor of an injunction; and (4) an injunction is in the public interest. Accordingly, the court will enjoin UNC from enforcing Part I against the individual transgender Plaintiffs until the court reaches a final decision on the merits in this case. Plaintiffs have not made a clear showing they are likely to succeed on their Equal Protection claim, and the court will reserve ruling on their Due Process claims pending additional briefing from the parties.

[3]   In response to Plaintiffs' motion for preliminary injunction, Governor McCrory, Senator Berger, and Representative Moore requested a several-month delay. (Doc. 53 at 9–11; Doc. 61 at 27–29.) These Defendants claimed the need for extensive factual discovery to adequately address the issues presented in Plaintiffs' motion. (Id.) They collectively submitted only six exhibits, however, each of which consists of a short news article or editorial. (See Docs. 55-1 through 55-6.) Moreover, during a scheduling conference held on July 1, 2016, they indicated that they did not intend to offer additional exhibits or live testimony and that any preliminary injunction hearing could be limited to oral argument. As a result, nearly the entire factual record in this case is derived from materials submitted by Plaintiffs.

It is important to emphasize that this injunction returns the parties to the status quo ante as it existed in Title IX facilities prior to Part I's passage in March 2016. On the current record, there is no reason to believe that a return to the status quo ante pending a trial on the merits will compromise the important State interests asserted.

## I. BACKGROUND

**\*3**  Based on the record thus far, the court makes the following findings for the limited purpose of evaluating Plaintiffs' motion for preliminary injunction.

### A. North Carolina Law Before 2016

Case 2:16-cv-00943-PP   Filed 08/31/16   Page 3 of 29   Document 21-1

Like most States, North Carolina has long enforced a variety of public decency laws designed to protect citizens from exposing their nude or partially nude bodies in the presence of members of the opposite sex, as well as from being exposed to the nude or partially nude bodies of members of the opposite sex. With regard to the former, North Carolina's peeping statute, enacted in 1957, makes it unlawful for any person to "peep secretly into any room occupied by another person," N.C. Gen. Stat. § 14-202(a), including a bathroom or shower, and penalties are enhanced if the offender does so for the purpose of sexual gratification, id. § 14-202(d). With regard to the latter, North Carolina's indecent exposure statute, enacted in 1971, makes it unlawful for any person to "willfully expose the private parts of his or her person in any public place and in the presence of any other person or persons." Id. § 14-190.9(a). Traditionally, the indecent exposure statute applied only to individuals who exposed themselves to members of the opposite sex. See State v. Fusco, 136 N.C. App. 268, 270, 523 S.E.2d 741, 742 (1999) (interpreting an earlier version of § 14-190.9(a)). In 2005, North Carolina removed the language that had previously limited the statute's application to situations in which individuals exposed themselves in the presence of members of the opposite sex. 2005 N.C. Sess. Laws 226 § 1 (modifying N.C. Gen. Stat. § 14-190.9). That same amendment, however, created an exception for situations in which "same sex exposure" occurs in a "place[] designated for a public purpose" and is "incidental to a permitted activity." Id.

In addition to these statutes, public agencies in North Carolina have also traditionally protected privacy through the use of sex-segregated bathrooms, locker rooms, showers, and similar facilities. Although this form of sex discrimination has a long history in the State and elsewhere, the parties offer differing ideas of the justification for the practice. Plaintiffs acknowledge, as Defendants contend, that such segregation promotes privacy and serves important government interests, particularly with regard to minors. (See, e.g., Doc. 103 at 15–21.) Arguably, segregating such facilities on the basis of sex fills gaps not addressed by the peeping and indecent exposure statutes – for example, a situation in which a man might inadvertently expose himself to another while using a facility that is not partitioned. It is also possible that sex-segregated facilities protect against embarrassment from engaging in intimate bodily functions in the immediate vicinity of the opposite sex, regardless of whether one's body is subject to view.

Whatever the justification, the segregation of these facilities has traditionally been enforced through voluntary compliance, social mores, and, when necessary, criminal trespassing law. See In re S.M.S., 196 N.C. App. 170, 675 S.E.2d 44 (2009). For example, in S.M.S., a fifteen year old boy was adjudicated delinquent of second degree trespass after he was caught in the girls' locker room at his high school. Id. at 170–71, 675 S.E.2d at 44–45. Pursuant to N.C. Gen. Stat. § 14-159.13, it is a second degree trespass to enter the premises of another when reasonably conspicuous signs are posted to give the intruder "notice not to enter the premises." In upholding the boy's conviction, the North Carolina Court of Appeals concluded, "The sign marked 'Girl's Locker Room' was reasonably likely to give respondent notice that he was not authorized to go into the girls' locker room." S.M.S., 196 N.C. App. at 173, 675 S.E.2d at 46.

 **\*4** For most, the application of the peeping, indecent exposure, and trespass laws to sex-segregated bathrooms and showers is straightforward and uncontroversial. For transgender users, however, it is not clearly so. While there are no reported cases involving transgender users, at the preliminary injunction hearing Governor McCrory, Senator Berger, and Representative Moore indicated their assumption that this was so because transgender users have traditionally been excluded (or excluded themselves) from facilities that correspond with their gender identity. The evidence in the current record, however, suggests the opposite. At least in more recent years, transgender individuals who dress and otherwise present themselves in accordance with their gender identity have generally been accommodated on a case-by-case basis, with educational institutions generally permitting them to use bathrooms and other facilities that correspond with their gender identity unless particular circumstances weigh in favor of some other form of accommodation.

For example, Plaintiffs submitted an affidavit from Monica Walker, the Diversity Officer for public schools in Guilford County, North Carolina, the State's third largest school district, with over 72,000 students in 127 school campuses. (Doc. 22-19 ¶¶ 2–3.) Over the last five years, Ms. Walker has developed a protocol for accommodating transgender students as they undergo the social transition from male to female, or vice versa. (Id. ¶¶ 8–11.) This protocol emphasizes the importance of developing a "tailored" plan that addresses the unique needs and circumstances of each case. (See id.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

¶ 11.) Based on her experience with four transgender students, Ms. Walker indicates that these students typically use bathrooms that correspond with their gender identity. (Id.) Ms. Walker has not received any complaints about this arrangement from students or parents, and although every school in Guilford County has single occupancy bathrooms available for any student with privacy concerns, no student has ever requested such an accommodation. (Id. ¶¶ 13–16.) This may be because all multiple occupancy bathrooms in Guilford County schools have separate stalls or privacy partitions, such that students are not exposed to nudity in bathrooms. (See id.) Although Ms. Walker has yet to deal with questions concerning access to locker rooms, she is confident that the privacy interests of transgender and non-transgender students alike could be accommodated through the same means used to accommodate any student with body image or shyness issues. (See id.) In sum, Ms. Walker reports that the practice of tailoring specific accommodations for transgender students on a case-by-case basis in Guilford County has been "seamless." (Id. ¶ 12.) And according to an amicus brief filed by school administrators from nineteen States plus the District of Columbia – including Durham County Schools in North Carolina, another large school district – Guilford County's experience is typical of many school districts from across the country. (See Doc. 71.)

This conclusion is also consistent with the experiences of the individual transgender Plaintiffs in this action. All three submitted declarations stating that they used bathrooms, locker rooms, and even dormitory facilities corresponding with their gender identity beginning as early as 2014. (Doc. 22-4 ¶ 15; Doc. 22-8 ¶ 19; Doc. 22-9 ¶¶ 15, 19–20.) No one has reported any incident or complaint from their classmates or the general public. (See Doc. 22-4 ¶ 30; Doc. 22-8 ¶ 25; Doc. 22-9 ¶ 20.)

This evidence is admittedly anecdotal. It is possible that before Part I, some transgender individuals in North Carolina were denied accommodations and completely excluded from facilities that correspond with their gender identity due to privacy or safety concerns. Also, minors may have received different types of accommodations than adults, and practical considerations may have led to different arrangements for bathrooms as opposed to showers and other facilities. And, it may be that the practice of case-by-case accommodation is a more recent phenomenon, such that other norms prevailed for most of North Carolina's history until the last few years. But Defendants have not offered any evidence whatsoever on these points, despite having four months between the filing of this lawsuit and the hearing on this motion to do so. Indeed, the court does not even have a legislative record supporting the law to consider. [4]

[4]    Defendants have since filed transcripts of the legislative record in a separate case. (Docs. 149-5 through 149-8 in case no. 1:16cv425.)

 **\*5**  As a result, the court cannot say that the practices described by Ms. Walker, the school administrators, and the individual transgender Plaintiffs represent an aberration rather than the prevailing norm in North Carolina, at least for the five or more year period leading up to 2016. Rather, on the current record, it appears that some transgender individuals have been quietly using facilities corresponding with their gender identity and that, in recent years, State educational institutions have been accommodating such students where possible.

### B. The Charlotte Ordinance and the State's Response

In November 2014, the Charlotte City Council began considering a proposal to modify that city's non-discrimination ordinances to prohibit discrimination on the basis of marital status, familial status, sexual orientation, gender identity, and gender expression. [5] (Doc. 23-3 at 2.) [6] On March 2, 2015, the proposed ordinance was amended to include the following language: "Notwithstanding the forgoing [sic], this section shall not, with regard to sex, sexual orientation, gender identity, and gender expression, apply to rest rooms, locker rooms, showers, and changing facilities." (Id.) Shortly thereafter, the proposed ordinance failed by a vote of six to five. (Id.)

[5]    Charlotte's existing non-discrimination ordinances prohibited discrimination on the basis of race, gender, religion, national origin, ethnicity, age, disability, and sex. (See Doc. 23-2 at 1, 6.)

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

[6]    Not all of the exhibits in the record contain internal page numbers, and many include cover pages that were not part of the original documents. For clarity, all record citations in this opinion refer to the pagination in the CM/ECF version of the document.

On February 22, 2016, the Charlotte City Council considered a new proposal to revise its non-discrimination ordinances. (Doc. 23-5 at 2–3.) Like the prior proposal, the new proposal added "marital status, familial status, sexual orientation, gender identity, [and] gender expression" to the list of protected characteristics. (Doc. 23-2 at 1.) Unlike the prior proposal, however, the new proposal did not contain any exceptions for bathrooms, showers, or other similar facilities. (See id. at 1–6.) In addition, the new proposal repealed prior rules that exempted "[r]estrooms, shower rooms, bathhouses and similar facilities which are in their nature distinctly private" from Charlotte's prohibitions against sex discrimination. (Id. at 5.) The new proposal, which regulated places of public accommodation and businesses seeking to contract with Charlotte (id. at 2–6), passed by a vote of seven to four (Doc. 23-5 at 3) [7] and set an effective date of April 1, 2016 (Doc. 23-2 at 6).

[7]    All seven votes in favor of the ordinance were cast by Democrats, while two Democrats and two Republicans voted against the ordinance. (See Doc. 23-5 at 4–8.)

The Charlotte ordinance provoked a swift response from the State. Governor McCrory and several members of the General Assembly strongly condemned the ordinance, which they generally characterized as an affront to both privacy and public safety, and they indicated their desire to see a legislative response to Charlotte's actions. (See, e.g., Doc. 23-7 at 2; Doc. 23-8 at 2.) The General Assembly was not scheduled to reconvene until April 25, 2016, however, and despite his opposition to the Charlotte ordinance, Governor McCrory declined to exercise his authority to call a special legislative session. (See Doc. 23-16 at 2–3; Doc. 23-18 at 4.) As a result, the General Assembly only reconvened after three-fifths of the members of the House of Representatives requested a special session. (Docs. 23-17 at 2.) [8]

[8]    The Governor may call special sessions of the General Assembly in response to unexpected or emergency situations. (See Doc. 23-18 at 4.)

**\*6**  On March 23, 2016, the General Assembly convened for the special session and moved quickly. (See Doc. 23-19 at 2.) The parties have offered little information on the legislative process, but it appears that members of the House Judiciary Committee were given only a few minutes to read HB2 before voting on whether to send the bill back to the House for a full debate. (See id.) That afternoon, the House passed HB2 by a vote of eighty-four to twenty-five after three hours of debate. (Doc. 23-21 at 3.) All Republicans and eleven of the thirty-six Democrats present voted for the bill, while twenty-five Democrats voted against it. (Id.) HB2 then passed with unanimous support in the Senate after Democrats walked out in protest. (Id.) Governor McCrory signed the bill into law later that day. (Id.) The law became effective immediately. HB2 § 5.

### C. HB2's Effect on North Carolina Law

Despite sweeping rhetoric from both supporters and opponents, a few basic contours of HB2 are apparent.

### 1. Nondiscrimination Standards Under State Law

First, HB2 modified the State's nondiscrimination laws. Previously, the State had prohibited discrimination on the basis of race, religion, color, national origin, age, sex, and handicap. See id. §§ 3.1. Part III of HB2 modified this language to prohibit discrimination on the basis of "biological sex," rather than simply "sex." Id. (modifying N.C. Gen. Stat. § 143-422.2). It also extended these nondiscrimination protections, which had previously applied only to the State, to cover private employers and places of public accommodation. See id. §§ 3.1-3.3.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Part III also eliminated State common-law causes of action for violations of non-discrimination laws. See id. § 3.2 (modifying N.C. Gen. Stat. 143-422.3). This appeared to eliminate the State cause of action for wrongful termination in violation of public policy, although it did not prevent North Carolinians from filing actions under federal non-discrimination laws, whether in State or federal court. This provision has since been repealed. 2016 N.C. Sess. Laws 99 § 1(a).

### 2. Preemption of Local Ordinances

Parts II and III of HB2 preempt all local ordinances that conflict with the new Statewide nondiscrimination standards, including the Charlotte ordinance that prompted HB2's passage. [9] Specifically, Part II preempts local non-discrimination requirements for public contractors to the extent that such requirements conflict with State law. HB2 §§ 2.1–2.3. Similarly, Part III preempts local nondiscrimination ordinances for places of public accommodation to the extent that such ordinances conflict with State law. Id. §§ 3.3. Collectively, Parts II and III effectively nullified the prohibitions in Charlotte's ordinance against discrimination on the basis of marital status, familial status, sexual orientation, gender identity, and gender expression. [10]

[9] Part II also preempted local minimum wage standards. HB2 §§ 2.1–2.3. This portion of HB2 has not been challenged in these cases.

[10] These are apart from the law's effect, if any, on the Charlotte ordinance's protections against discrimination on the basis of "gender," "ethnicity," and "handicap."

### 3. Public Bathrooms and Changing Facilities

As discussed above, Parts II and III effectively nullified the controversial portions of the Charlotte ordinance, including its regulation of bathrooms, showers, and other similar facilities among contractors and in places of public accommodation. Part I goes a step further, however, explicitly setting rules for the use of similar facilities operated by State agencies.

Part I provides that all public agencies, including local boards of public education, shall "require" that every "multiple occupancy bathroom or changing facility" [11] be "designated for and only used by persons based on their biological sex." [12] Id. §§ 1.2–1.3. Part I defines "biological sex" as "[t]he physical condition of being male or female, which is stated on a person's birth certificate." [13] Id. Although Part I allows public agencies to provide separate, single occupancy facilities as an accommodation for individuals who are uncomfortable with their assigned facility, the law does not require the option. See id. (stating that public agencies may provide "accommodations such as single occupancy bathroom or changing facilities upon a person's request due to special circumstances" (emphasis added)). In addition, Part I prohibits agencies from accommodating individuals by permitting them to access multiple occupancy facilities that do not match the sex listed on their birth certificates. Id. ("[I]n no event shall [any] accommodation result in the public agency allowing a person to use a multiple occupancy bathroom or changing facility designated ... for a sex other than the person's biological sex."). Because the law is limited to State agencies, there is no dispute that private businesses, places of public accommodation, and other persons throughout the State remain free to define "sex" and regulate bathroom and other facility usage as they please, subject to other applicable law.

[11] The statute defines a "multiple occupancy bathroom or changing facility" as a "facility designed or designated to be used by more than one person at a time where [persons] may be in various states of undress in the presence of other persons. A

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

multiple occupancy bathroom or changing facility may include, but is not limited to, a [restroom], locker room, changing room, or shower room." Id. §§ 1.2-1.3.

12    This rule is subject to various exceptions that are not pertinent here. For example, Part I does not apply when individuals enter bathrooms for custodial or maintenance purposes, or to assist other individuals in using the facility. See id. §§ 1.2–1.3.

13    Notwithstanding the reference to "the physical condition of being male or female," all parties agree that the law defines "biological sex" as the sex listed on the individuals' current birth certificate. (See Doc. 22 at 6 (Plaintiffs, stating that Part I restricts access to facilities "based on the gender marker on one's birth certificate"); Doc. 50 at 15 (UNC, stating that Part I requires individuals to use bathrooms corresponding with their "biological sex, as listed on their birth certificates"); Doc. 55 at 1 (Governor McCrory, stating that Part I "notes that ['biological sex'] is 'stated on a person's birth certificate' "); Doc. 61 at 6 (Senator Berger and Representative Moore: "HB2 determines biological sex based on the person's <u>current</u> birth certificate.").) Notably, the law's reliance on birth certificates necessarily contemplates that transgender individuals may use facilities consistent with their gender identity - notwithstanding their sex at birth and regardless of whether they have had gender reassignment surgery - as long as their current birth certificate has been changed to reflect their gender identity, a practice permitted in some States.

**\*7** At the hearing for this motion, the parties offered differing interpretations of how Part I affects North Carolina law. As discussed below, UNC argues that, at least on its campuses, Part I means only that public authorities must maintain signs on their multiple occupancy bathrooms designated "men" or "women." Senator Berger and Representative Moore suggested that Part I functions as "a directive" to public agencies that they must "implement policies" on bathroom use. (Doc. 103 at 112.) Ultimately, the United States, Senator Berger, and Representative Moore all agree that, at a minimum, Part I dictates how the trespassing statute applies to transgender individuals' use of bathrooms.

Before Part I became law, North Carolina had no prohibition against public agencies determining on a case-by-case basis how best to accommodate transgender individuals who wished to use particular bathrooms, showers, or other similar facilities. In addition, transgender individuals who used facilities that did not match the sex listed on their birth certificate could presumably argue that they believed they had permission to enter facilities that matched their gender identity; indeed, as discussed above, a number of transgender students had actual permission from the agencies with authority over the facilities in question.

Part I forecloses these possibilities. Now, public agencies may not provide any accommodation to transgender individuals other than the provision of a separate, single-user facility – though they are not required to do so. Thus, unless the agency that controls the facility in question openly defies the law, any person who uses a covered facility that does not align with his or her birth certificate commits a misdemeanor trespass. Similarly, unless school administrators like Ms. Walker wish to openly defy the law, they cannot give students permission to enter facilities that do not correspond with the sex on their birth certificates and presumably must discipline or punish students who disobey this directive.

### D. Procedural History

Almost immediately, HB2 sparked multiple overlapping federal lawsuits. On March 28, 2016, ACLU-NC, Equality North Carolina, and the individual transgender Plaintiffs filed this action against Governor McCrory (in his official capacity), UNC, [14] and Attorney General Roy Cooper, alleging that various parts of HB2 discriminate against transgender, gay, lesbian, and bisexual individuals on the basis of sex, sexual orientation, and transgender status in violation of Title IX and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. (Doc. 1.) [15]

14    Plaintiffs named UNC, the UNC Board of Governors, and W. Louis Bissette, Jr., in his official capacity as Chairman of the UNC Board of Governors, as Defendants. For convenience and clarity, the court refers to these and other related entities collectively as "UNC," except where otherwise indicated.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.     7

[15]    Plaintiffs dropped Equality North Carolina and Attorney General Cooper in their first amended complaint on April 21, 2016. (Doc. 9.)

On May 9, 2016, the United States filed a separate action against the State, Governor McCrory (in his official capacity), the North Carolina Department of Public Safety ("NCDPS"), and UNC, seeking a declaration that compliance with Part I constitutes sex discrimination in violation of Title IX, the Violence Against Women Reauthorization Act of 2013, 42 U.S.C. § 13925(b)(13) ( "VAWA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). (Doc. 1 in case no. 1:16cv425 (the "425 case").)

That same day, State officials filed two separate declaratory judgment actions in the United States District Court for the Eastern District of North Carolina. Governor McCrory and Frank Perry, Secretary of NCDPS, filed an action in their official capacities against the United States and the United States Department of Justice ("DOJ"), seeking a declaration that HB2 does not violate Title VII or VAWA (case no. 5:16cv238 (the "238 case")). Meanwhile, Senator Berger and Representative Moore filed a separate lawsuit against DOJ on behalf of the General Assembly, seeking a declaration that HB2 does not violate Title VII, Title IX, or VAWA, as well as declarations that DOJ had violated both the Administrative Procedure Act and various constitutional provisions (case no. 5:16cv240 (the "240 case")). Finally, on May 10, 2016, an organization called North Carolinians for Privacy filed its own action in support of HB2 in the Eastern District, seeking declaratory and injunctive relief against DOJ and DOE related to Title IX, VAWA, the Administrative Procedure Act, and the Religious Freedom Restoration Act (case no. 5:16cv245 (the "245 case")).

**\*8**   The 240 and 245 cases were subsequently transferred to this court and renumbered 1:16cv844 and 1:16cv845, respectively. This court also granted Senator Berger and Representative Moore's motion to intervene permissively in both this action (Doc. 44) and the 425 case (Doc. 64 in the 425 case). As a result, Senator Berger and Representative Moore dismissed their separate declaratory action as duplicative of the claims and defenses presented in the 236 and 425 cases, (Doc. 33 in case no. 1:16cv844), leaving three HB2 cases pending before this court. The 238 case remains pending in the Eastern District.

In the midst of all of this procedural fencing, Plaintiffs filed the instant motion for preliminary injunction on May 16, 2016. (Doc. 21.) The motion was fully briefed as of June 27, 2016 (see Doc. 73), and the court began discussions with the parties regarding an appropriate schedule for a hearing on and consideration of this motion. However, on July 5, 2016 – two months after filing its complaint and over three months after the passage of HB2 [16] – the United States filed its own motion for preliminary injunction in the 425 case. (Doc. 73 in the 425 case.) The United States' motion would not be fully briefed until mid-August 2016, and in light of the Defendants' request for preliminary discovery, consolidation of United States' motion with Plaintiffs' motion would likely delay a hearing on the present motion until at least September 2016.

[16]    The United States also announced that it would not cut off Title IX funding during the pendency of its lawsuit and asked this court for relief from a provision in VAWA that requires it to suspend funding forty-five days after filing suit. (See Doc. 53 in the 425 case.)

As a result, despite the court's strong preference to avoid piecemeal litigation of the HB2 cases, the court held a hearing on Plaintiffs' motion on August 1, 2016, and the court permitted the United States to participate in light of the fact that the 425 case also contains a Title IX claim. [17] The motion is now ready for determination.

[17]    Defendants sought leave to conduct up to six months of discovery before responding to the United States' motion for preliminary injunction. (See Docs. 53, 61.) In response to these and other concerns, the court exercised its authority under Federal Rule of Civil Procedure 65(a)(2) to advance the trial in the United States' action and consolidate it with the hearing on the United States' motion for preliminary injunction, which is scheduled to begin November 14, 2016. (Doc. 104.)

## II. ANALYSIS

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                                                                              8

Plaintiffs ask this court to enjoin Defendants from enforcing Part I until the court issues a final ruling on the merits. (Doc. 22 at 44–45.) Before reaching the merits of Plaintiffs' motion, however, the court must first address threshold defenses raised by UNC.[18]

[18]  UNC has also filed a motion to dismiss the claims against it. (Doc. 89.) The motion to dismiss raises similar issues, as well as additional issues not addressed in the briefing on the present motion. (See Doc. 90.) The court will issue a separate ruling on the motion to dismiss at a later date.

### A. Justiciability and Ripeness

As UNC Board of Governors Chairman Louis Bissette has noted, "[UNC] is in a difficult position," in this case, "caught in the middle between state and federal law." (Doc. 23-28 at 2.) Neither embracing nor repudiating Part I, UNC argues that while it intends to comply with the law, it does not intend to enforce the law because Part I contains no mechanism to do so. UNC argues that Part I therefore has essentially no effect on its campuses and that this court should not consider the individual transgender Plaintiffs' Title IX claim for jurisdictional and prudential reasons.[19] For the reasons that follow, the court disagrees.

[19]  UNC also argues that it is immune from the individual transgender Plaintiff's constitutional claims and that Chairman Bissette is not a proper party under Ex Parte Young, 209 U.S. 123 (1908). Because Plaintiffs have since moved to amend their complaint to drop Chairman Bissette and substitute UNC President Margaret Spellings as a Defendant (see Doc. 116-1 ¶¶ 11–12), and because the court will not grant relief on their constitutional claims at this time, see infra Section II.B.1.b, the court does not reach these issues.

 *9  "Federal courts are principally deciders of disputes, not oracular authorities. We address particular cases or controversies and may not arbitrate abstract differences of opinion." Doe v. Duling, 782 F.2d 1202, 1205 (4th Cir. 1986) (citations and internal quotation marks omitted). This requirement stems from Article III, Section 2 of the United States Constitution and presents both jurisdictional and prudential limits on the exercise of federal judicial power. Warth v. Seldin, 422 U.S. 490, 498–99 (1975). As a jurisdictional matter, a plaintiff complaining about State conduct must show "some threatened or actual injury resulting from the putatively illegal action." Id. at 499 (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617 (1973)). For example, where the dispute concerns the validity of a criminal statute, the challenger must show a credible threat of prosecution in order to establish a live case or controversy. Duling, 782 F.2d at 1205–06.

Similarly, the prudential ripeness requirement is designed to prevent courts from "entangling themselves in abstract disagreements over administrative policies" until "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 732–33 (1998) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148–49 (1967). A case is ripe and fit for judicial decision when the "rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." Franks v. Ross, 313 F.3d 184, 195 (4th Cir. 2002). In determining whether a case is ripe, the court must consider both "the fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." Ohio Forestry Ass'n, 523 U.S. at 733 (quoting Abbott Labs., 387 U.S. at 149).

Here, UNC points to numerous statements from UNC President Margaret Spellings, including a guidance memorandum sent to the chancellors of all UNC constituent institutions, that Part I "does not contain provisions concerning enforcement" and that the university's non-discrimination policies, which generally prohibit discrimination on the basis of gender identity, "remain in effect." (See, e.g., Doc. 38-5 at 1–2.) The guidance memorandum also notes, however, that UNC must "fulfill its obligations under the law unless or until the court directs otherwise." (Id. at 2.) UNC therefore acknowledges that "University institutions must require every multiple occupancy bathroom and changing facility to be designated for and used only by persons based on their biological sex." (Id. at 1 (emphasis added).) President Spellings directed constituent institutions to take three specific actions under the law: (1) maintain existing single-sex signage

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

on multiple occupancy bathrooms and other similar facilities, (2) provide notice of HB2 to campus constituencies as appropriate, and (3) share information about the locations of single occupancy bathrooms on campus. (See id. at 1–2.)

Despite the assertion that UNC does not intend to "enforce" Part I, UNC's pronouncements are sufficient to establish a justiciable case or controversy. The university has repeatedly indicated that it will – indeed, it must – comply with State law. (Id. at 1–2.) Although UNC has not changed the words and symbols on its sex-segregated facilities, the meaning of those words and symbols has changed as a result of Part I, and UNC has no legal authority to tell its students or employees otherwise. In light of Part I, the sex-segregated signs deny permission to those whose birth certificates fail to identify them as a match. UNC can avoid this result only by either (1) openly defying the law, which it has no legal authority to do, or (2) ordering that all bathrooms, showers, and other similar facilities on its campuses be designated as single occupancy, gender-neutral facilities. Understandably, UNC has chosen to do neither.

 **\*10**  As a result, although President Spellings promises to "investigate" instances in which individuals are excluded from bathrooms "to determine whether there has been a violation of the University nondiscrimination policy and applicable law" (Doc. 38-1 ¶ 15), this does not help UNC because it has not expressly given any student or employee permission to the use bathrooms, showers, and other facilities consistent with his or her gender identity. To the contrary, UNC has explicitly acknowledged that Part I "remains the law of the State" and that neither UNC nor its nondiscrimination policies has "independent power to change that legal reality." (Doc. 23-27 at 2–3.) Unless and until UNC openly defies the law, the signs that UNC posts on its bathrooms, showers, and other similar facilities render transgender individuals who use facilities that match their gender identities trespassers, thus exposing them to potential punishment (certainly by other authorities, if not by UNC). In addition, if the trespasser is a student, he or she is subject to discipline under one of UNC's student codes of conduct, which generally prohibit students from violating federal, State, or local laws. (See, e.g., Doc. 67-8 at 3.)

Thus, contrary to UNC's characterizations, this is not a case in which an arcane criminal law lingers on the books for decades with no threat of enforcement. See, e.g., Duling, 782 F.2d at 1206 (finding no justiciable case or controversy surrounding a fornication and cohabitation statute when there had been no arrests or prosecutions pursuant to the law for several decades). Nor is this a case in which public agencies do nothing more than "stand ready to perform their general duty to enforce laws." See id. Instead, UNC currently instructs the individual transgender plaintiffs that Part I is in effect on UNC's campuses. (See, e.g., Doc. 67-5 at 3 (memorandum from UNC Chancellor Carol Folt stating, "The memo from UNC General Administration also confirms that the law relating to public restrooms and changing facilities does apply to the University.").) That UNC has not articulated plans for administering a specific punishment for transgender individuals who violate its policy does not undermine the existence of a justiciable case or controversy. See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 716–17 (4th Cir. 2016) (evaluating the merits of a Title IX claim involving transgender bathroom use without discussing whether the school board had threatened the student with any specific punishment for disobeying the policy), stay and recall of mandate granted, 136 S. Ct. 2442.

These considerations also dictate the ripeness analysis. President Spellings has indicated that she does not intend to take any further action, including promulgating any further guidelines or regulations with regard to Part I, until after this lawsuit concludes. (Doc. 38-1 ¶ 16.) As a result, a delay will not render this case more fit for judicial review. See Ohio Forestry Ass'n, 523 U.S. at 733. In addition, for reasons discussed below, UNC's exclusion of the individual transgender Plaintiffs from sex-segregated facilities that match their gender identity causes them substantial hardship each day the policy is in effect. See infra Section II.B.2. As a result, this case is prudentially ripe.

## B. Preliminary Relief

In order to obtain a preliminary injunction, a party must make a "clear showing" that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 21 (2008). All four requirements must be satisfied in order for relief to be granted. Real Truth About Obama, Inc. v. Fed. Election

Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010). A preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (citations and internal quotation marks omitted). Plaintiffs must show more than a grave or serious question for litigation; they must "clearly" demonstrate that they are "likely" to succeed on the merits. Real Truth About Obama, 575 F.3d at 346-47.

### 1. Likelihood of Success on the Merits

### a. Title IX

 **\*11** To establish a claim under Title IX, the individual transgender Plaintiffs must show that (1) they were excluded from participation in an education program because of their sex; (2) the educational institution was receiving federal financial assistance at the time of their exclusion; and (3) the improper discrimination caused them harm. G.G., 822 F.3d at 718. UNC and its constituent institutions receive federal financial assistance under Title IX. (See Doc. 23-27 at 2.) In addition, for the reasons explained below, UNC's enforcement of Part I has caused medical and other harms to the individual transgender Plaintiffs. See infra Section II.B.2. Thus, the primary question for the court is whether the individual transgender Plaintiffs are likely to show that Part I unlawfully excludes them from certain bathrooms, showers, and other facilities on the basis of sex.

Title IX provides: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This prohibition against sex discrimination protects employees as well as students. N. Haven Bd. of Educ. v. Bell, 456 U.S. 512, 530 (1982). As a result, covered institutions may not "limit any person in the enjoyment of any right, privilege, advantage, or opportunity" on the basis of sex. 34 C.F.R. § 106.31(b)(7); see also id. § 106.31(b)(2) (prohibiting discrimination in the provision of "aid, benefits, or services"). Access to bathrooms, showers, and other similar facilities qualifies as a "right, privilege, advantage, or opportunity" for the purposes of Title IX. G.G., 822 F.3d at 718 n.4.

"Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 175 (2005). Thus, "[n]ot all distinctions on the basis of sex are impermissible under Title IX." G.G., 822 F.3d at 718. For example, the statute itself contains an exception that permits covered institutions to "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686. In addition, a DOE regulation states that covered institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Until very recently, little to no explicit authority existed regarding the application of Title IX and its related regulations to transgender students and employees. Around 2013, however, DOE began taking the position that covered institutions must treat transgender individuals consistent with their gender identity. (See Doc. 23-29 at 3 (citing Letter from Anurima Bhargava, Chief, U.S. Dep't of Justice, and Arthur Zeidman, Director, U.S. Dep't of Educ. Office of Civil Rights, to Dr. Joel Shawn, Superintendent, Arcadia Unified Sch. Dist. (July 24, 2013), available at https://www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadialetter.pdf).)

On April 19, 2016, the Fourth Circuit concluded that courts must defer to DOE's relatively recent position in the context of sex-segregated bathrooms. G.G., 822 F.3d at 723. In G.G., a high school sophomore in eastern Virginia transitioned from female to male, living as a boy in all aspects of life. Id. at 715. School officials initially supported G.G.'s transition and took steps to ensure that teachers and staff treated the student as a boy. Id. School officials also gave G.G. permission to use the boys' bathrooms, although they made no decision with regard to locker rooms or showers because G.G. did

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

not participate in physical education. Id. & n.2. G.G. used the boys' bathrooms without incident for several weeks. Id. at 715–16. At some point, however, parents and community members began contacting the local school board to complain about G.G.'s use of the boys' bathrooms. Id. at 716. In response, the school board implemented a policy limiting access to sex-segregated bathrooms and locker rooms based on "biological gender" and requiring its schools to provide "an alternative appropriate private facility" to accommodate students with "gender identity issues." Id. The school board also mandated a series of steps designed to improve privacy for all students, including adding partitions and privacy strips in bathrooms and constructing additional single occupancy bathrooms. Id.

**\*12** Shortly after the school board adopted its new policy, G.G. requested an opinion letter from DOE regarding the application of Title IX to transgender students. See id. at 732 (Niemeyer, J., dissenting in part). On January 7, 2015, DOE responded with an opinion letter that states,

> The Department's Title IX regulations permit schools to provide sex-segregated restrooms, locker rooms, shower facilities, housing, athletic teams, and single-sex classes under certain circumstances. When a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity.

(Doc. 23-29 (the "DOE opinion letter").) On June 11, 2015, G.G. sued the school board, claiming that the policy of excluding students from bathrooms on the basis of "biological gender" violated Title IX. G.G., 822 F.3d at 717.

The district court dismissed G.G.'s Title IX claim, concluding that the DOE opinion letter is not entitled to deference under the doctrine announced in Auer v. Robbins, 519 U.S. 452 (1997). See G.G., 822 F.3d at 717. [20] The district court concluded that 34 C.F.R. § 106.33, which permits schools to "provide separate toilet, locker room, and shower facilities on the basis of sex," unambiguously refers to a student's "birth or biological sex." 822 F.3d at 719. The district court also reasoned that, even if the meaning of the phrase "on the basis of sex" were ambiguous in this regulation, then DOE's interpretation would be clearly erroneous and inconsistent with the regulation because " 'on the basis of sex' means, at most, on the basis of sex and gender together, [so] it cannot mean on the basis of gender alone." Id.

[20]   Under Auer, an agency's interpretation of its own ambiguous regulation is "controlling unless plainly erroneous or inconsistent with the regulation." 519 U.S. at 461 (citations and internal quotation marks omitted).

The Fourth Circuit reversed. Id. at 727. The court first concluded that the phrase "on the basis of sex" in § 106.33 is ambiguous because the regulation "is silent as to how a school should determine whether a transgender individual is a male or female." Id. at 720. The court then determined that DOE's interpretation, while "novel" and "perhaps not the intuitive one," is not clearly erroneous because a dictionary from 1971 defined the word "sex" as encompassing "morphological, physiological, and behavioral" characteristics. Id. at 721–22. [21] Finally, the court concluded that the DOE opinion letter reflects the agency's fair and considered judgment on policy formulation, rather than a convenient litigating position. Id. at 722–23. As a result, the court remanded with instructions for the district court to give the DOE opinion letter "controlling weight" with regard to the meaning of § 106.33. Id. at 723, 727.

[21]   The court noted that another dictionary defined "sex" as "the sum of those anatomical and physiological differences with reference to which the male and female are distinguished." Id. at 721. Neither of the dictionaries cited by the majority included gender identity as a component of "sex." See id. at 721–22.

On remand, the district court entered a preliminary injunction requiring the school board to allow G.G. to use the boys' bathrooms. G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., No. 4:15cv54, 2016 WL 3581852, at \*1 (E.D. Va. June 23, 2016). The Fourth Circuit denied the school board's request to stay that injunction pending appeal. G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., No 16-1733, 2016 WL 3743189, at \*2 (4th Cir. July 12, 2016). However, on August 3, 2016 – two days after the hearing on Plaintiffs' motion in the present case – the Supreme Court stayed the Fourth Circuit's mandate and the district court's preliminary injunction until it could rule on the school board's forthcoming petition for

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

a writ of certiorari. Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm, 136 S. Ct. 2442 (2016). Such intervention is granted where a lower court "tenders a ruling out of harmony with [the Supreme Court's] prior decisions, or [raises] questions of transcending public importance, or [presents] issues which would likely induce [the] Court to grant certiorari." See Russo v. Byrne, 409 U.S. 1219, 1221 (1972) (Douglas, J.).

**\*13** In light of the foregoing, the fate of G.G. is uncertain. But, despite the stay and recall of the mandate, the Supreme Court did not vacate or reverse the Fourth Circuit's decision. See G.G., 136 S. Ct. at 2442. Thus, while other courts may reach contrary decisions, see Texas v. United States, No. 7:16cv54, 2016 WL 4426495, at \*14–15, (N.D. Tex. Aug. 21, 2016) (adopting the view advanced in Judge Niemeyer's dissenting opinion from G.G.), [22] at present G.G. remains the law in this circuit. See United States v. Collins, 415 F.3d 304, 311 (4th Cir. 2005) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court."); Friel Prosthetics, Inc. v. Bank of America, No. CIV.A.DKC 2004-3481, 2005 WL 348263, at \*1 & n.4 (D. Md. Feb. 9, 2005) (noting that a stay of a Fourth Circuit mandate in a separate case would not "prevent the Fourth Circuit decision from having precedential value and binding authority" in the present case); see also Abukar v. Ashcroft, No. 01-242, 2004 WL 741759, at \*2–3 (D. Minn. Mar. 17, 2004) (assuming that an Eighth Circuit opinion in a separate case retained its precedential value despite the Eighth Circuit's subsequent decision to recall and stay its own mandate in light of impending Supreme Court review).

---

[22]  The court also concluded that DOE's guidance violated the Administrative Procedure Act, and the court preliminarily enjoined DOJ from using or asserting DOE's position on gender identity in any litigation initiated after the entry of its order. Id. at \*11–\*14, 17. Because Texas is a district court opinion from outside the Fourth Circuit, however, and because the court's order was issued after the initiation of this case, this court remains bound by G.G. and the Texas order has no direct effect on this litigation.

Consequently, to evaluate the individual transgender Plaintiffs' Title IX claim, the court must undertake a two-part analysis. First, the court must determine whether Part I violates Title IX's general prohibition against sex discrimination. See 20 U.S.C. § 1681(a). Second, if Part I violates Title IX's general prohibition against sex discrimination, the court must then determine whether an exception to that general prohibition applies. See Jackson, 544 U.S. at 175 ("Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition."). The only potentially applicable exception cited by the parties comes from a DOE regulation that allows schools to "provide separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. However, in light of G.G., this court must give controlling weight to the DOE opinion letter, which states that schools "generally must treat transgender students consistent with their gender identity" (Doc. 23-29 at 3), when considering the scope of this exception during the second stage of the analysis.

Under this framework, the Title IX analysis in this case is relatively straightforward. Part I requires schools to segregate multiple occupancy bathrooms, showers, and other similar facilities on the basis of sex. HB2 § 1.2–1.3. Because the provision of sex-segregated facilities necessarily requires schools to treat individuals differently depending on their sex, Part I falls within Title IX's general prohibition against sex discrimination. The only potentially applicable exception comes from § 106.33, which permits sex-segregated bathrooms and other facilities. But G.G. and the DOE opinion letter teach that, for the purposes of this regulation, a school generally must treat students consistent with their gender identity. (See 822 F.3d at 723; Doc. 23-29 at 3.) Part I, by contrast, requires schools to treat students consistent with their birth certificates, regardless of gender identity. HB2 §§ 1.2–1.3. Thus, although Part I is consistent with the DOE opinion letter when applied to most students, it is inconsistent with the DOE opinion letter as applied to the individual transgender Plaintiffs, whose birth certificates do not align with their gender identity. As a result, Part I does not qualify for the regulatory exception - as interpreted by DOE - and therefore appears to violate Title IX when applied to the individual transgender Plaintiffs.

**\*14** Defendants raise a number of objections to the application of G.G. in this case, but none is sufficient at this time.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Defendants first argue that the Fourth Circuit's holding in G.G. is limited to bathrooms and does not extend to showers or other similar facilities. True, G.G. concluded that "the [DOE's] interpretation of its own regulation, § 106.33, as it relates to restroom access by transgender individuals, is entitled to Auer deference and is to be accorded controlling weight." 822 F.3d at 723. Further, the court noted that because G.G. did not seek access to other facilities, "[o]nly restroom use is at issue in this case." Id. at 715 n. 2. And as to the objections raised, the court commented, "We doubt that G.G.'s use of the communal restroom of his choice threatens the type of constitutional abuses present in the cases cited by the dissent." Id. at 723 n.10. Consequently, the district court only ordered the school board to allow G.G. to use boys' bathrooms. G.G., 2016 WL 3581852, at *1.

But the indispensable foundation of G.G.'s holding is that DOE's interpretation of "sex" in § 106.33, as outlined in the DOE opinion letter, is entitled to controlling weight. 822 F.3d at 723. As the dissent in G.G. aptly noted, "acceptance of [G.G's] argument would necessarily change the definition of 'sex' for purposes of assigning separate living facilities, locker rooms, and shower facilities as well. All are based on 'sex,' a term that must be construed uniformly throughout Title IX and its implementing regulations." Id. at 734 (Niemeyer, J., dissenting in part). In fact, the majority also agreed with this point. Id. at 723 ("In many respects, we are in agreement with the dissent. We agree that 'sex' should be construed uniformly throughout Title IX and its implementing regulations."). Moreover, the passage of the DOE opinion letter – which G.G. requires be accorded controlling weight – explicitly includes "locker rooms" and "shower facilities" among the "situations" in which students must be treated consistent with their gender identity. (Doc. 23-29 at 3.) [23]

[23]    Indeed, DOE has continued to issue expanded guidance well after the filing of this lawsuit and the 425 case against the State. DOE's newest guidance explicitly mandates transgender access to all facilities that are consistent with their gender identity. (E.g., Doc. 23-30 at 4 ("Restrooms and Locker Rooms. A school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity.").) This guidance does not include the qualifier "generally," which was included in the DOE opinion letter. (Id.) Plaintiffs contend that this document, which was not available at the time of G.G., is also entitled to Auer deference. (See Doc. 22 at 14.) The Texas court, which was not bound by G.G., concluded that this guidance is not entitled to Auer deference. 2016 WL 4426495, at *15.

To be sure, the G.G. court did note that the bathrooms at the Virginia school were separately partitioned. 822 F.3d at 716. But it is difficult to find any articulation of how that fact was important to the court's reasoning. Although showers and changing rooms clearly present obvious practical concerns that differ from bathrooms, both the logic and holding of G.G. make no distinction between facilities. The court made this point clear by noting that in applying its analytical framework it would not weigh "privacy interests or safety concerns – fundamentally questions of policy" which it said was "a task committed to the agency, not the courts." Id. at 723-24. [24]

[24]    Nor does it appear that the court or DOE considered the potentially significant costs associated with retrofitting some facilities to ensure privacy.

**\*15** While district courts are often said to be the "front line experimenters in the laboratories of difficult legal questions," Hively v. Ivy Tech Comm. Coll., South Bend, --- F.3d ---, 2016 WL 4039703, at *4 (7th Cir. 2016), they are bound to follow circuit precedent. To accept Defendants' argument – which is more an attack on G.G.'s reasoning than a legal distinction – would violate that obligation. Therefore, at this early stage on a motion for preliminary relief pending trial, it is enough to say that G.G. requires Title IX institutions in this circuit to generally treat transgender students consistent with their gender identity, including in showers and changing rooms. (Doc. 23-29 at 3.) Defendants do not deny that Part I bars Title IX institutions from attempting to accommodate such students in any fashion, except in the limited form of a separate facility that is optional in the State's discretion. See HB2 §§ 1.2–1.3. Thus, G.G. indicates that the individual transgender Plaintiffs are likely to succeed on the merits of their Title IX claim.

Even Plaintiffs accept that the State's interests are legitimate and seem to acknowledge that there may be practical limits to the application of DOE's guidance, especially where minors are involved. (See Doc. 103 at 15–21.) [25] At the hearing, counsel for the amici school administrators represented that public school showers and changing rooms - facilities in

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    14

which students are likely to be partially or fully nude – today often contain partitions, dividers, and other mechanisms to protect privacy similar to bathrooms. (See Doc. 103 at 137–38.) This suggests that, as in G.G., other forms of accommodation might be available to protect privacy and safety concerns. See G.G., 822 F.3d at 723 (agreeing that " 'an individual has a legitimate and important interest in bodily privacy such that his or her nude or partially nude body, genitalia, and other private parts' are not involuntarily exposed" and concluding that "[i]t is not apparent to us, however, that the truth of these propositions undermines the conclusion we reach" to grant DOE's interpretation of its regulations controlling weight). [26] Ultimately, the question of determining the full scope of transgender users' rights to these more intimate facilities under DOE's interpretation – as to which the State has significant legitimate interests –is not before the court. For now, it suffices to say that Part I's blanket ban that forecloses any form of accommodation for transgender students other than separate facilities likely violates Title IX under G.G.

[25]    DOJ, however, argues that DOE's guidance makes no such allowance and that G.G.'s holding requires controlling weight across all facilities. (Doc. 103 at 54-57.)

[26]    For example, Part I excludes some transgender users from showers and changing rooms that match their gender identity even if such facilities are fully partitioned or otherwise unoccupied.

Defendants also note that the school board policy in G.G. did not include any criteria for determining the "biological gender" of particular students. See 822 F.3d at 721–22. By contrast, Part I includes a simple, objective criterion – the sex listed on the individual's birth certificate – for determining an individual's "biological sex." HB2 §§ 1.2–1.3. Defendants are correct on this point. But the holding of G.G. did not turn on any supposed ambiguity in the school board's policy. Instead, G.G. rested on the Fourth Circuit's determination that the DOE opinion letter is entitled to controlling weight under Auer. 822 F.3d at 723. The DOE opinion letter does not even remotely suggest that schools may treat students inconsistent with their gender identity so long as the school has clear criteria for determining an individual's "biological sex."

Defendants next argue that G.G. did not involve any constitutional challenges to DOE regulations or the DOE opinion letter. True, the Fourth Circuit noted the absence of such challenges in G.G., see id. at 723–24, whereas Defendants did raise such issues in their answer and counterclaims (see Doc. 54 ¶¶ 120–25). But Defendants have not raised any constitutional defenses in their responses to the individual transgender Plaintiffs' motion for preliminary injunction, and Plaintiffs therefore have not yet responded to these issues. [27] The court cannot ignore G.G. and simply assume that Defendants will prevail on constitutional defenses that they may or may not develop at some point in the future. See Native Ecosystems Council & All. for the Wild Rockies v. U.S. Forest Serv., No. 4:11-cv-212, 2011 WL 4015662, at *10 n.10 (D. Idaho Sept. 9, 2011) (declining to consider claims not raised in a party's brief for the purposes of a preliminary injunction but preserving those claims for the remainder of the case); see also Carter v. Lee, 283 F.3d 240, 252 n.11 (4th Cir. 2002) (contentions not raised in a party's opening brief are generally considered to be waived). Of course, Defendants may ultimately develop successful constitutional defenses at a later stage of the proceedings.

[27]    In fact, although Senator Berger and Representative Moore's brief incorporates some portions of their answer by reference, it does not incorporate the constitutional claims or defenses to the Title IX claim. (See Doc. 61 at 13 (referencing defenses to Plaintiffs' Equal Protection and Due Process claims).) At the hearing on Plaintiffs' motion, the legislators first raised the argument that enforcing DOE's interpretation of "sex" would constitute a Spending Clause violation under Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 15-16 (1981). (Doc. 103 at 81-85.) As Defendants have yet to develop this defense, it does not rise to the level of undermining the individual transgender Plaintiffs' showing of a likelihood of success on the merits.

**\*16** Finally, Defendants argue that this case differs from G.G. because that case involved no major complaints or safety concerns from students. Defendants are correct, though community members certainly raised these kinds of objections. See G.G., 822 F.3d at 715–16. But on this record, Defendants have not offered sufficient evidence to distinguish Plaintiffs' factual circumstances, or those pertaining to anyone else in North Carolina for that matter, from those in G.G. [28] To the contrary, the current record indicates that the individual transgender Plaintiffs used bathrooms and locker rooms

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    15

corresponding with their gender identity without complaint for far longer than G.G. used the boys' bathrooms at his school. (Compare Doc. 22-4 ¶¶ 15, 30 (approximately five months), and Doc. 22-8 ¶¶ 19, 25 (approximately eighteen months), and Doc. 22-9 ¶¶ 15, 19–20 (same), with G.G., 822 F.3d at 715–16 (seven weeks). Moreover, as noted above and like the situation in G.G., bathroom, shower, and other facilities are often separately partitioned to preserve privacy and safety concerns. (See Doc. 103 at 138; Doc. 22-19 ¶ 14.) Finally, the Fourth Circuit's analysis in G.G. did not rest on the specific circumstances of that case or the wisdom of DOE's position, but rather on the deference owed to the DOE opinion letter. Id. at 723-24 ("[T]he weighing of privacy interests or safety concerns — fundamentally questions of policy — is a task committed to the agency, not the courts. ... To the extent the dissent critiques the result we reach today on policy grounds, we reply that, our Auer analysis complete, we leave policy formulation to the political branches.").

[28]    Defendants did present two news articles describing men in Seattle and Virginia who entered women's bathrooms or showers. (Docs. 55-1, 55-52.) Neither man claimed to be transgender; one was apparently protesting a local ordinance, while the other was arrested for peeping. (See id.) North Carolina's peeping and indecent exposure statutes continue to protect the privacy of citizens regardless of Part I, and there is no indication that a sexual predator could successfully claim transgender status as a defense against prosecution under these statutes.

* * *

G.G. compels the conclusion that the individual transgender Plaintiffs are likely to succeed on the merits of their Title IX claim. Part I's wholesale ban on access to facilities is inconsistent with DOE's guidance on Title IX compliance under G.G. and precludes educational institutions from attempting to accommodate particular transgender individuals who wish such accommodation in bathrooms and other facilities. [29]

[29]    Plaintiffs argue in supplemental briefing that "broad relief" equivalent to a facial ban of HB2 is necessary to ensure protection of the individual transgender Plaintiffs' rights. (Doc. at 13.) But there is no class-wide claim presently pending, and ACLU-NC did not allege a Title IX claim. In light of UNC's insistence that it will not take any further action in response to Part I, broader relief is not necessary to ensure that the individual transgender Plaintiffs receive effective preliminary relief. Cf. Nat'l Org. for Reform of Marijuana Laws (NORML)v. Mullen, 608 F. Supp. 945, 964 (N.D. Cal. 1985) (ordering broad relief on individual claims where the individual plaintiffs were at "significant risk for repeated rights violations" because government actors could not effectively "distinguish the parties from the nonparties").

### b. Constitutional Claims

In addition to their Title IX claim, Plaintiffs also seek access to sex-segregated facilities at public rest stops and other entities not covered by Title IX. As a result, despite granting relief under Title IX, the court must also consider Plaintiffs' constitutional claims. The constitutional claims in this case raise novel and difficult questions in a context underdeveloped in the law. As a practical matter, therefore, Plaintiffs' task of presenting the kind of "clear showing" necessary to justify preliminary relief, Winter, 555 U.S. at 22, is even more difficult in this case. Thus, this court is more cautious to act where the application of existing principles of law to new areas is uncertain and novel, particularly in the context of a preliminary injunction. See Capital Associated Indus. v. Cooper, 129 F. Supp. 3d 281, 288–89 (M.D.N.C. 2015) ("Where, as in this case, 'substantial issues of constitutional dimensions' are before the court, those issues 'should be fully developed at trial in order to [e]nsure a proper and just resolution.' " (quoting Wetzel v. Edwards, 635 F.2d 283, 291 (4th Cir. 1980))); see also Gantt v. Clemson Agr. Coll. of S.C., 208 F. Supp. 416, 418 (W.D.S.C. 1962) ("On an application for preliminary injunction, the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact.").

### i. Equal Protection

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    16

**\*17** The Fourteenth Amendment provides that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. However, this broad principle "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." Romer v. Evans, 517 U.S. 620, 631 (1996). As a result, the Supreme Court has "attempted to reconcile the principle with the reality" by prescribing different levels of scrutiny depending on whether a law "targets a suspect class." Id. Laws that do not target a suspect class are subject to rational basis review, and courts should "uphold the legislative classification so long as it bears a rational relation to some legitimate end." Id. By contrast, laws that target a suspect class, such as race, are subject to strict scrutiny. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989).

It is well settled that classifications based on sex are subject to intermediate scrutiny. See United States v. Virginia, 518 U.S. 515, 532–33 (1996). Under intermediate scrutiny, the State must demonstrate that the challenged law serves " 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " Id. at 533 (quoting Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)). Unlike strict scrutiny, the government is not required to show that the law is the "least intrusive means of achieving the relevant government objective." United States v. Staten, 666 F.3d 154, 159 (4th Cir. 2011) (citations and internal quotation marks omitted). "In other words, the fit needs to be reasonable; a perfect fit is not required." Id. at 162. Nevertheless, "[t]he burden of justification is demanding and it rests entirely on the State." Virginia, 518 U.S. at 533. In addition, the justification must be "genuine, not hypothesized or invented post hoc in response to litigation." Id. Finally, the justification "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." Id.

Here, Part I classifies citizens on the basis of "biological sex" and requires that each sex use separate multiple occupancy bathrooms, showers, and other similar facilities. HB2 §§ 1.2–1.3. Because Part I facially classifies and discriminates among citizens on the basis of sex, intermediate scrutiny applies. [30] See Virginia, 518 U.S. at 532–33.

[30] The parties have devoted substantial time and energy to arguments regarding (1) whether transgender individuals qualify as a suspect class for Equal Protection purposes, and (2) whether Plaintiffs have established a sex stereotyping claim under the line of cases beginning with Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (construing Title VII). As Plaintiffs acknowledge, however, success on either of these theories in the context of their Equal Protection claim would result in the court applying the same intermediate level of scrutiny applied to laws that facially classify citizens on the basis of sex. (Doc. 103 at 35–36.) Thus, the court declines to consider these issues at this stage because Part I facially classifies individuals on the basis of sex.

There is no question that the protection of bodily privacy is an important government interest and that the State may promote this interest by excluding members of the opposite sex from places in which individuals are likely to engage in intimate bodily functions. See, e.g., Faulkner v. Jones, 10 F.3d 226, 232 (4th Cir. 1993) ("The point is illustrated by society's undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation and the differences between the genders demand a facility for each gender that is different."); Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1989) ("Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating."); see also Doe v. Luzerne Cty., 660 F.3d 169, 176–77 (3d Cir. 2011) (observing that several circuits have recognized "a constitutionally protected privacy interest in [one's] partially clothed body"); Sepulveda v. Ramirez, 967 F.2d 1413, 1416 (9th Cir. 2012) (stating that "[t]he right to bodily privacy is fundamental" and noting that "common sense" and "decency" protect a parolee's right not to be observed by an officer of the opposite sex while producing a urine sample); York v. Story, 324 F.2d 450, 455 (9th Cir. 1963) ("The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity."). This interest is particularly strong with regard to minors. See, e.g., Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies."); Doe v. Renfrow, 631 F.2d 91, 92–93 (7th Cir. 1980) (stating that it "does not take a constitutional scholar" to conclude that a strip search invades a student's privacy rights). At the hearing on this motion, Plaintiffs acknowledged that the practice of segregating bathrooms and other similar facilities on the basis of sex promotes this government interest. (See Doc. 103 at 15–19.)

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**\*18** All parties agree that bodily privacy qualifies as an important State interest and that sex-segregated facilities are substantially related to that interest. [31] But the relevant authorities do not define "sex" or explicitly explain which differences between men and women give rise to the State's interest in separating the sexes for privacy purposes; generally, these cases simply observe that individuals of one sex have a privacy interest in being separated from "the other sex." See, e.g., Lee, 641 F.2d at 1119. Not surprisingly, then, the parties disagree about which definition of "sex" promotes the State's interest in bodily privacy. Defendants contend that bodily privacy interests arise from physiological differences between men and women, and that sex should therefore be defined in terms of physiology for the purposes of bathrooms, showers, and other similar facilities. Plaintiffs, by contrast, implicitly contend that bodily privacy interests arise from differences in gender identity, and that sex should therefore be defined in terms of gender identity for the purposes of these facilities.

[31]   Despite this concession, many of Plaintiffs' arguments in this case would, if accepted and taken to their logical conclusion, suggest that the time-honored practice of sex-segregated bathrooms and showers is unconstitutional. At the hearing on this motion, counsel speculated that sex-segregated bathrooms are justified, if at all, (1) by virtue of the long history of providing such facilities, (2) to express society's belief that "the two sexes, the two genders ... should be separated except in marriage," and (3) because no one has bothered to challenge the practice of providing sex-segregated facilities which, while separate, tend to be roughly equal in quality. (See id. at 16–21.)

To support their position, Plaintiffs submitted expert declarations stating that, from a "medical perspective," gender identity is the only "appropriate" characteristic for distinguishing between males and females. (See, e.g., Doc. 22-1 ¶ 23.) Defendants have indicated their strong disagreement with this position, though they have not yet offered any evidence on this point in this case. [32] But regardless of the characteristics that distinguish men and women for "medical" purposes, Supreme Court and Fourth Circuit precedent supports Defendants' position that physiological characteristics distinguish men and women for the purposes of bodily privacy.

[32]   As with legislative history, however, Defendants recently offered medical evidence in the 425 case. (See Docs. 149-9 through 149-12 in the 425 case.)

Although the Supreme Court has never had an occasion to explicitly explain which differences between men and women justify the decision to provide sex-segregated facilities, the Court has generally assumed that the sexes are primarily defined by their differing physiologies. In Virginia, for example, the Court rejected the notion that women were not suited for education at the Virginia Military Institute ("VMI"). See 518 U.S. at 540–46; see also id. at 533 (stating that laws "must not rely on overbroad generalizations about the different talent, capacities, or preferences of males and females."). Even while rejecting stereotypical assumptions about supposed "inherent differences" between men and women, the Court acknowledged, "Physical differences between men and women ... are enduring," adding that the "two sexes are not fungible." Id. The Court then linked these physiological differences to privacy considerations, adding, "Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." Id. at 550 n.19.

Virginia is not the only Equal Protection case to distinguish between the sexes on the basis of physiology. In Tuan Anh Nguyen v. Immigration and Naturalization Serv., 533 U.S. 53 (2001), the Court upheld an Immigration and Naturalization Service ("INS") policy that imposed "a set of requirements on the children of citizen fathers born abroad and out of wedlock to a noncitizen mother that are not imposed under like circumstances when the citizen parent is the mother." Id. 59–60. The Court held that the government's "use of gender specific terms" is constitutionally permissible when the relevant law "takes into account a biological difference" between men and women. Id. at 64. The Court rejected the argument that the INS policy reflected stereotypes about the roles and capacities of mothers and fathers, stating that "the difference does not result from some stereotype, defined as a frame of mind resulting from irrational or uncritical analysis." Id. at 68. Instead, the Court found, "There is nothing irrational or improper in the recognition that at the

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

moment of birth ... the mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father. This is not a stereotype." Id. Finally, the Court concluded:

**\*19** To fail to acknowledge even our most basic biological differences ... risks making the guarantee of equal protection superficial, and so disserving it. Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real. The distinction embodied in the statutory scheme here at issue is not marked by misconception and prejudice, nor does it show disrespect for either class. The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific to each gender.

Id. at 73.

The Court's decisions in Virginia (1996) and Nguyen (2001) are not merely relics of an earlier, less enlightened time when courts did not have the benefit of modern medical science. Rather, as recently as January 2016, the Fourth Circuit cited Virginia approvingly while concluding that physiological differences justified treating men and women differently in some contexts. See Bauer v. Lynch, 812 F.3d 340, 350 (4th Cir. 2016). In Bauer, a male applicant "flunked out of the FBI Academy after falling a single push-up short of the thirty required of male Trainees." Id. at 342. The applicant sued, noting that his performance would have qualified him under the different physical fitness standards applied to female applicants. Id. The Fourth Circuit found that different standards for men and women arose from the FBI's efforts to "normalize testing standards between men and women in order to account for their innate physiological differences," such that an approximately equal number of men and women would pass the tests. Id. at 343. In light of this, the Fourth Circuit concluded that the FBI's policy was permissible because "equally fit men and women demonstrate their fitness differently." Id. at 351. In concluding that the FBI could distinguish between men and women on the basis of physiology, the court explained:

Men and women simply are not physiologically the same for the purposes of physical fitness programs. ... The Court recognized [in Virginia] that, although Virginia's use of 'generalizations about women' could not be used to exclude them from VMI, some differences between the sexes were real, not perceived, and therefore could require accommodations.

Id. at 350. [33]

[33] Bauer involved Title VII rather than the Equal Protection Clause. Id. Nevertheless, the Fourth Circuit stated that the same principles "inform [its] analysis" of both types of claims. Id.

In light of the foregoing, it appears that the privacy interests that justify the State's provision of sex-segregated bathrooms, showers, and other similar facilities arise from physiological differences between men and women, rather than differences in gender identity. See Virginia, 518 U.S. at 533; Nguyen, 533 U.S. at 73; Bauer, 812 F.3d at 350. The Fourth Circuit has implicitly stated as much, albeit in dicta, noting:

When ... a gender classification is justified by acknowledged differences [between men and women], identical facilities are not necessarily mandated. Rather, the nature of the difference dictates the type of facility permissible for each gender.

The point is illustrated by society's undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation and the differences between the genders demand a facility for each that is different. Therefore, any analysis of the nature of a specific facility provided in response to a justified purpose, must take into account the nature of the difference on which the separation is based ....

**\*20** Faulkner, 10 F.3d at 232. In fact, even Plaintiffs' counsel acknowledged the State's interest in, for example, ensuring that "12-year-old girls who are not familiar with male anatomy" are not exposed to male genitalia by "somebody older

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

who's showing that to them, a mature adult." (Doc. 103 at 24–25.) As a result, it appears that the constitutionality of Part I depends on whether the law's use of birth certificates as a proxy for sex is substantially related to the State's privacy interest in separating individuals with different physiologies.

There is little doubt that Part I is substantially related to the State's interest in segregating bathrooms, showers, and other similar facilities on the basis of physiology. By Plaintiffs' own allegations, "The gender marker on a birth certificate is designated at the time of birth generally based upon the appearance of external genitalia." (Doc. 9 ¶ 26; see also Doc. 22-1 ¶ 14.) Plaintiffs contend that birth certificates are an "inaccurate proxy for an individual's anatomy" because some transgender individuals have birth certificates that do not reflect their external physiology, either because (1) they were born in a State that permits them to change the sex on their birth certificates without undergoing sex reassignment surgery, or (2) they were born in a State that does not permit them to change the sex on their birth certificates, regardless of whether they undergo sex reassignment surgery. (Doc. 22 at 32-33.) But even if the court assumes (contrary to the evidence in the record) that no transgender person possesses a birth certificate that accurately reflects his or her external physiology, Part I would still be substantially related to the State's interest because, by Plaintiffs' own estimate, only 0.3% of the national population is transgender. (Doc. 23-37 at 2.) For the remaining 99.7% of the population, there is no evidence that the sex listed on an individual's birth certificate reflects anything other than that person's external genitalia. Without reducing the "reasonable fit" requirement to a numerical comparison, it seems unlikely that a law that classifies individuals with 99.7% accuracy is insufficient to survive intermediate scrutiny. See Staten, 666 F.3d at 162 ("In other words, the fit needs to be reasonable; a perfect fit is not required.").

Finally, the privacy interests discussed above do not appear to represent a post hoc rationalization for Part I. See Virginia, 518 U.S. at 533 (requiring that a justification be "genuine, not hypothesized or invented post hoc in response to litigation"). Plaintiffs contend that Part I "effectively seeks to define transgender individuals out of existence and shut them out from public life." [34] (Doc. 22 at 35.) As a preliminary matter, it is hard to infer legislative intent based on the current record which, as noted above, contains little information about the legislative process leading to HB2's passage. The preliminary record does contain a few examples of objectionable statements by some legislators in media outlets, though these statements generally express hostility toward "the liberal agenda" and the "homosexual community" rather than transgender individuals. (See, e.g., Doc. 23-7 at 2; Doc. 23-15 at 2.) But the record also contains many statements, some by these same legislators and others by legislative leaders and Governor McCrory, reflecting an apparently genuine concern for the privacy and safety of North Carolina's citizens. (See, e.g., Doc. 23–7 at 2 (stating that the Charlotte ordinance "has created a major public safety issue"); Doc. 23-15 at 2 ("The Charlotte ordinance just violates, to me, all basic human principles of privacy and it just has so many unintended consequences."); Doc. 23–16 at 2 ("While special sessions are costly, we cannot put a price tag on the safety of women and children."); id. at 3 ("We need to respect the privacy of women and children and men in a very private place, and that's our restrooms and locker rooms.").) In light of the many contemporaneous statements by State leaders regarding privacy and the substantial relationship between Part I and the State's privacy interests, Plaintiffs have not clearly shown that privacy was an afterthought or a pretext invented after the fact solely for litigation purposes. Nor does the court infer improper motive simply from the fact that Part I negatively impacts some transgender individuals. [35] See Romer, 517 U.S. at 631 ("[M]ost legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons.").

[34]  It should go without saying that Part I, which regulates access to public bathrooms, showers, and other similar facilities, neither defines transgender individuals "out of existence" nor prevents them from participating in public life.

[35]  Of course, not all transgender individuals are negatively impacted by Part I because some may be able to change the sex on their birth certificates, with or without sex reassignment surgery, and others may choose to use bathrooms or other facilities that accord with their biological sex, whether or not they suffer dysphoria as a result.

**\*21**  In sum, Supreme Court and Fourth Circuit precedent support the conclusion that physiological differences between men and women give rise to the privacy interests that justify segregating bathrooms, showers, and other similar facilities on the basis of sex. In addition, Plaintiffs admit that the vast majority of birth certificates accurately reflect an individual's

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   20

external genitalia. Although the correlation between genitalia and the sex listed on a person's birth certificate is not perfect in every case, there is certainly a reasonable fit between these characteristics, which is what the law requires. See Staten, 666 F.3d at 162 ("In other words, the fit needs to be reasonable; a perfect fit is not required."). At this preliminary stage, and in light of existing case law, Plaintiffs have not made a clear showing that they are likely to succeed on their Equal Protection claim.

### ii. Due Process

The Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has long held that, in addition to requiring the government to follow fair procedures when taking certain actions, the Due Process Clause also "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331 (1986). As a result, a law that burdens a fundamental right is subject to strict scrutiny and cannot be upheld unless the State demonstrates that it is narrowly tailored to serve a compelling interest. See Carey v. Population Servs. Int'l, 431 U.S. 678, 686 (1977); Walls v. City of Petersburg, 895 F.2d 188, 192 (4th Cir. 1990). By contrast a law that does not burden a fundamental right is subject only to rational basis review, and a court must uphold such a law "so long as it bears a rational relation to some legitimate end." Romer, 517 U.S. at 631.

For the reasons explained above, the court concludes that Part I is substantially related to an important government interest. Because Part I passes intermediate scrutiny, the law necessarily clears the lower hurdle of rational basis review. See Outdoor Media Grp., Inc. v. City of Beaumont, 506 F.3d 895, 907 (9th Cir. 2007); Contest Promotions, LLC v. City and Cty. of San Francisco, 100 F. Supp. 3d 835, 849 (N.D. Cal. 2015). As a result, in order to warrant preliminary relief, Plaintiffs must make a clear showing that Part I burdens a fundamental right and therefore triggers strict scrutiny.

Plaintiffs argue that Part I burdens two separate fundamental rights. First, they argue that Part I burdens a fundamental right to informational privacy by forcing transgender individuals to use bathrooms in which they will appear out of place, thereby disclosing their transgender status to third parties. Second, they argue that Part I violates a right to refuse unwanted medical treatment because many States, including North Carolina, require transgender individuals to undergo sex reassignment surgery before changing the sex on their birth certificates. Each argument will be addressed in turn.

### (a) Informational Privacy

The constitutional right to privacy protects, among other things, an individual's "interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599 (1977). "The right to privacy, however, is not absolute." Walls, 895 F.2d at 192. Instead, the constitutional right to privacy is only implicated when State action compels disclosure of information of a "fundamental" nature. Id. "The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." Id. The Fourth Circuit has held that, as a "first step" in determining whether a particular category of information is entitled to constitutional protection, courts should examine whether the information "is within an individual's reasonable expectations of confidentiality." Id.

**\*22** Plaintiffs contend that a person's transgender status constitutes sensitive medical information and that this type of information is subject to constitutional protection. They cite various cases in which courts held that information qualifies for constitutional protection when it is of a sexual, personal, or humiliating nature, or when the release of the information could subject the person to a risk of bodily harm. See Powell v. Schriver, 175 F.3d 107, 111 (2d Cir. 1999) ("[T]he right to confidentiality includes the right to protection regarding information about the state of one's health.") (quoting Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994)); Love v. Johnson, 146 F. Supp. 3d 848, 853 (E.D. Mich. 2015). These courts concluded that an individual's transgender status qualifies for constitutional protection

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

because such information is of a private, sexual nature and disclosure of this information could subject a transgender person to ridicule, harassment, or even bodily harm. See Powell, 175 F.3d at 111 ("Like HIV status ... transsexualism is the unusual condition that is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others."); Love, 146 F. Supp. 3d at 856; see also K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05341, 2012 WL 2685183, at *6 (Alaska Super. Ct. Mar. 12, 2012) (concluding that an individual's transgender status qualifies for privacy protection under Alaska law). In Love, for example, the court considered a Michigan law that prevented individuals from changing the sex on their driver's license. [36] 146 F. Supp. 3d at 856–57. The court concluded that this policy burdened Due Process privacy interests because it forced transgender individuals to tacitly reveal their transgender status whenever they displayed their driver's licenses to others. Id.; see also K.L., 2012 WL 2685183 at *4–7 (same).

[36] Notably, the policy in Love only applied to individuals who sought to change the sex on an existing driver's license; Michigan apparently did not require individuals to present a birth certificate to support their claimed sex when initially obtaining a license. Id. at 851–52 & n.2.

None of these cases applied Fourth Circuit law, however, and the Fourth Circuit's decision in Walls casts doubt on the validity of these cases in this circuit. In Walls, a public employee was fired after refusing to complete a background check that included questions about her prior marriages, divorces, debts, criminal history, and sexual relationships with same-sex partners. 895 F.2d at 190. The employee brought an action under 42 U.S.C. § 1983 against her employer, claiming that the questionnaire violated her right to privacy. Walls, 895 F.2d at 189–92. The Fourth Circuit explained that the "right to privacy protects only information with respect to which the individual has a reasonable expectation of privacy." Id. at 193. The court therefore concluded that the right to privacy did not protect the information sought in the agency's questionnaire, including questions about prior marriages, divorces, and children, "to the extent that this information is freely available in public records." Id.

Walls suggests that Part I does not burden a fundamental privacy interest, at least under current Fourth Circuit law. Plaintiffs argue that Part I discloses an individual's transgender status to third parties by revealing the sex on their birth certificates through their choice of bathroom; when a stereotypically-feminine appearing individual uses a men's bathroom, Plaintiffs argue, third parties will know that the individual has a male birth certificate and infer that the person is transgender. (See Doc. 9 at ¶¶ 223–24.) But pursuant to Walls, individuals have no constitutionally-protected privacy interest in information that is freely available in public records. 895 F.2d at 193. And although the parties have not addressed this issue, the sex listed on an individual's birth certificate appears to be freely available in public records, at least if the individual was born in North Carolina. See N.C. Gen. Stat. § 130A-93(b) (providing that all birth data collected by the State qualifies as public records except for the names, addresses, and social security numbers of children and parents); see also id. § 132-1(b) (providing that all public records "are the property of the people" and requiring that the public be given access to such information "free or at minimal cost unless otherwise specifically provided by law").

**\*23** As a result, regardless of whether the court finds the reasoning in Love and K.L. persuasive, the sex listed on a person's birth certificate does not appear to qualify for constitutional protection under Walls. Plaintiffs cite general statements about privacy from Walls, but they overlook the obvious question of why the rule the court actually applied in that case should not govern this case as well. (See Doc. 22 at 36–38; Doc. 73 at 36–37.) It is possible that, with further development, Plaintiffs may be able to sufficiently distinguish Walls and demonstrate that the rule from that case should not apply outside of the employment context. For example, the policies at issue in Love and K.L. arguably have more in common with Part I than Walls, which dealt with an employment background check – a situation in which a third party can reasonably be expected to know the individual's name, address, and other identifying information that would make a public records search more practicable. Walls, 895 F.2d at 193–95.

On the other hand, there are also significant distinctions between this case and the cases cited by Plaintiffs. Unlike Part I, most of Plaintiffs' cases involved State actors who intentionally revealed or threatened to reveal private information. See, e.g., Powell, 175 F.3d at 109–11 (prison guard openly discussed an inmate's transgender status in the presence of other

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

inmates); Sterling v. Borough of Minersville, 232 F.3d 190, 192, 196 (3d Cir. 2000) (police officer threatened to tell an arrestee's family that the arrestee was gay). Even Love and K.L., Plaintiffs' most factually-analogous cases, challenged policies governing the modification of State documents rather than the circumstances in which a State may rely on those documents. Love 146 F. Supp. 3d at 856; K.L., 2012 WL 2685183 at *4–8. Love held that Michigan must allow transgender individuals to change the sex on their driver's license so that they would not have to reveal their transgender status during traffic stops; plaintiffs did not argue, and the court did not hold, that the State should be enjoined from asking drivers for identification during traffic stops. See 146 F. Supp. 3d at 856; see also K.L., 2012 WL 2685183 at *4–8 (same).

Unlike the plaintiffs in Love and K.L., Plaintiffs challenge North Carolina's ability to use birth certificates as an identifying document in the context of bathrooms, showers, and other facilities, rather than its rules for altering the information contained in the birth certificate itself. This highlights a potential conceptual difficulty with Plaintiffs' Due Process theories. Even under Part I, an individual's choice of bathroom does not directly or necessarily disclose whether that person is transgender; it merely discloses the sex listed on the person's birth certificate. Part I does not disclose medical information about any persons whose gender identity aligns with their birth certificate, either because they are not transgender or because they have successfully changed their birth certificate to match their gender identity (with or without sex reassignment surgery). Nor does Part I disclose medical information about transgender individuals whose name, appearance, or other characteristics do not readily identify their gender identity. Part I could only disclose an individual's transgender status inasmuch as third parties are able to infer as much in light of the person's birth certificate and appearance. Thus, it is not readily apparent to what extent any Due Process concerns are attributable to Part I as opposed to the laws that govern the modification of birth certificates.

In light of the foregoing, Plaintiffs have not clearly shown that they are likely to succeed on the merits of their informational privacy claim. See Winter, 555 U.S. at 20–22 (stating that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" (emphasis added)). The law in this area is substantially underdeveloped, however, and the parties devoted relatively little attention to this claim both in their briefs and at the hearing on this matter. Although Plaintiffs have not demonstrated that they are entitled to preliminary relief on this claim, their arguments and authorities raise substantial questions that merit additional consideration. As a result, the court will reserve ruling on Plaintiffs' informational privacy claim at this time so that the parties may submit additional briefing according to the schedule outlined in Section III below.

### (b) Unwanted Medical Treatment

**\*24** Plaintiffs also contend that Part I violates transgender individuals' constitutional right to refuse unwanted medical treatment because North Carolina and many other States require sex reassignment surgery before the sex on a person's birth certificate may be changed. (Doc. 9 ¶¶ 228–34; Doc. 22 at 39.)

The parties' arguments on this issue are even less developed than those pertaining to informational privacy, with just three paragraphs devoted to the issue in the parties' principal briefs combined. (See Doc. 22 at 38–39; Doc. 55 at 18.) Plaintiffs rely almost exclusively on United States v. Charters, 829 F.2d 479 (4th Cir. 1987). In Charters, the Fourth Circuit held that a mentally ill prisoner had a Due Process interest in refusing the State's efforts to medicate him with antipsychotic drugs against his will. Id. at 490–500. In reaching this decision, the court applied principles derived from the "rights to freedom from physical invasion and freedom of thought as well as the right to privacy protected by the Constitution and the common law." Id. at 490. From these principles, the court observed, "The right to refuse medical treatment has been specifically recognized as a subject of constitutional protection." Id. at 491.

Governments assuredly must meet heightened scrutiny before forcibly medicating prisoners, or any citizens for that matter, against their will. But Plaintiffs have not shown how this holding applies to Part I, which does not address

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

medical treatment at all. True, Part I may require some transgender individuals (who otherwise do not benefit from the court's injunction as to Title IX facilities) to undergo potentially unwanted medical treatment if they wish to access public bathrooms, showers, and other similar facilities that align with their gender identity. But they are free to use facilities that align with their biological sex, and they may have access to single-user facilities. As much as one sympathizes with the plight of these transgender individuals, this degree of "compulsion" is far removed from the situation in Charters, where a captive prisoner was strapped down and forced to submit to medication against his will. See Charters, 829 F.2d at 482–84. If the Due Process Clause were implicated any time an individual must undergo medical treatment in order to access a desired benefit or service, it would cast serious doubts on a wide variety of laws. See, e.g., N.C. Gen. Stat. § 130A-155 (requiring schools and child care facilities to ensure that children have received appropriate vaccines before accepting them as students); 19A N.C. Admin. Code § 3B.0201(a)(3) (requiring some individuals to wear corrective lenses in order to obtain a driver's license). [37]

[37]   Here, too, as with the informational privacy claim, Plaintiffs' real problem appears to be various States' inflexible rules for changing one's sex on a birth certificate, in so far as Part I permits transgender users who did not have any surgery to use facilities matching their gender identity as long as their birth certificate has been changed – an issue the parties have not adequately addressed.

At a minimum, further development of Plaintiffs' argument is necessary before the court can determine whether Charters prevents the State from enforcing Part I. As with Plaintiffs' informational privacy claim, the court will reserve ruling to give the parties an opportunity to submit additional briefing on this claim in accordance with the schedule outlined in Section III below.

## 2. Irreparable Harm

 *25   A party seeking a preliminary injunction must also show that it is likely to suffer irreparable harm in the absence of preliminary relief. Winter, 555 U.S. at 20. Irreparable injury must be both imminent and likely; speculation about potential future injuries is insufficient. See id. at 22.

On the current record, the individual transgender Plaintiffs have clearly shown that they will suffer irreparable harm in the absence of preliminary relief. All three transgender Plaintiffs submitted declarations stating that single occupancy bathrooms and other similar facilities are generally unavailable at UNC and other public agencies. (See Doc. 22-4 ¶¶ 18–20; Doc. 22-8 ¶ 27; Doc. 22-9 ¶¶ 24–25.) In fact, two of the individual transgender Plaintiffs indicate that they are not aware of any single occupancy facilities in the buildings in which their classes are held. (Doc. 22-8 ¶ 27; Doc. 22-9 ¶¶ 24–25.) Part I therefore interferes with these individuals' ability to participate in their work and educational activities. (See Doc. 22-4 ¶ 21; Doc. 22-8 ¶ 27; Doc. 22-9 ¶ 24.) As a result, some of these Plaintiffs limit their fluid intake and resist the urge to use a bathroom whenever possible. (Doc. 22-4 ¶ 21; Doc. 22-8 ¶ 32.) Such behavior can lead to serious medical consequences, such as urinary tract infections, constipation, and kidney disease. (Doc. 22-16 at 3–4.) This concern is not merely speculative; there is evidence that one of the individual transgender Plaintiffs has already begun to suffer medical consequences from behavioral changes prompted by Part I. (Doc. 73-1 at 1–2.)

In their response to Plaintiffs' motion, Defendants suggest that the individual transgender Plaintiffs' claims of irreparable harm are speculative and exaggerated, but Defendants have not presented any evidence to contradict Plaintiffs' evidence. (See Doc. 61 at 22–26.) Therefore, on this record, the court has no basis for doubting Plaintiffs' assertions that they cannot use multiple occupancy facilities that match their birth certificates for fear of harassment and violence, that single occupancy facilities are not reasonably available to them, and that they are at a serious risk of suffering negative health consequences as a result.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Defendants also argue that Plaintiffs delayed in filing their motion for preliminary injunction seven weeks after the passage of HB2. (Doc. 61 at 23.) In some circumstances, a delay in requesting preliminary relief can be relevant to the irreparable harm inquiry. See, e.g., Static Control Components, Inc. v. Future Graphics, LLC, No. 1:06cv730, 2007 U.S. Dist. LEXIS 36474, at *7–9 (M.D.N.C. May 11, 2007) (finding that an employer's eight-week delay in seeking to prevent a former employee from working for a competitor weighed against a finding of irreparable harm); Fairbanks Capital Corp. v. Kenney, 303 F. Supp. 2d 583, 590–91 (D. Md. 2003) (finding an eleven-month delay in bringing a trademark infringement suit to be reasonable under the circumstances). Here, however, HB2 was passed on an expedited schedule, and Plaintiffs doubtlessly needed some time to compile the more than sixty documents they submitted to support their motion, including exhibits, declarations from fact witnesses, and the opinions of expert witnesses. In addition, the legal landscape regarding HB2's enforcement remained in flux immediately after the laws' passage. (See, e.g., Doc. 23-24; Doc. 23-28.) Under these circumstances, Plaintiffs' minimal delay in seeking preliminary relief does not undermine their claims regarding irreparable harm.

 **\*26** Finally, the court notes that similar facts were deemed sufficient to support a finding of irreparable harm in G.G. See G.G., 2016 WL 3581852 at *1; G.G., 822 F.3d at 727–29 (Davis, J., concurring). The court therefore concludes that the individual transgender Plaintiffs have made a clear showing that they are likely to suffer irreparable harm in the absence of preliminary relief.

### 3. Balance of Equities and the Public Interest

In addition to likelihood of success on the merits and irreparable harm, those seeking preliminary relief must also demonstrate that the balance of equities tips in their favor and that an injunction is in the public interest. Winter, 555 U.S. at 20. On the current record, both favor entry of an injunction.

The balance of equities favors the entry of an injunction. One noteworthy feature of this case is that all parties claim that they want to preserve North Carolina law as it existed before the law was enacted; they simply disagree about the contours of that pre-HB2 legal regime. (See Doc. 103 at 6, 15–21, 65–71, 74–90, 96–102; Doc. 9 ¶¶ 166–68.) For the reasons discussed above, the court concludes that Part I does not accurately restore the status quo ante in North Carolina, at least as it existed in the years immediately preceding 2016. While Part I reiterates the male/female distinction for the vast majority of persons, it imposes a new restriction that effectively prohibits State agencies from providing flexible, case-by-case accommodations regarding the use of bathrooms, showers, and other similar facilities for transgender individuals where feasible.[38] See HB 2 §§ 1.2–1.3. Because Defendants do not claim to have had any problems with the pre-2016 regime (Doc. 103 at 65–71, 74–90, 96–102), the entry of an injunction should not work any hardship on them. By contrast, the failure to enjoin Part I would cause substantial hardship to the individual transgender Plaintiffs, disrupting their lives.

[38]    For this reason, the preliminary injunction in this case is a prohibitory injunction and is not subject to the heightened standard that applies to mandatory injunctions. See Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013) ("Prohibitory preliminary injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.").

For similar reasons, the court concludes that an injunction is in the public interest. Of course, every individual has "a legitimate and important interest in [ensuring] that his or her nude or partially nude body, genitalia, and other private parts are not involuntarily exposed." G.G., 822 F.3d at 723 (citations and internal quotation marks omitted). The dispute in this case centers on facilities of the most intimate nature, and the State clearly has an important interest in protecting the privacy rights of all citizens in such facilities. See, e.g., Virginia, 518 U.S. at 550 n.19 (stating that separate facilities in coeducational institutions are "necessary to afford members of each sex privacy from the other sex"); Faulkner, 10 F.3d at 232 (noting "society's undisputed approval of separate public restrooms for men and women based on privacy concerns"). The privacy and safety concerns raised by Defendants are significant, and this is particularly so as they pertain to the protection of minors. See, e.g., Beard, 402 F.3d at 604 ("Students of course have a significant privacy

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

interest in their unclothed bodies."). At the hearing on the present motion, Plaintiffs acknowledged that the State has a legitimate interest in protecting the privacy of its citizens, particularly minors and students, and that sex-segregated bathrooms, showers, and other similar facilities serve this interest. (See Doc. 103 at 15–19.)

**\*27** But transgender individuals are not exempted from such privacy and safety rights. The current record indicates that many public agencies have become increasingly open to accommodating the interests of transgender individuals as society has evolved over time. (See, e.g., Doc. 22-19 ¶¶ 8–9.) This practice of case-by-case accommodation, while developing, appears to have gained acceptance in many places across North Carolina over the last few years. (See, e.g., Doc. 22-4 ¶ 15; Doc. 22-8 ¶ 19; Doc. 22-9 ¶¶ 15, 19–20.) And the preliminary record contains uncontested evidence that these practices allowed the individual transgender Plaintiffs to use bathrooms and other facilities consistent with their gender identity for an extended period of time without causing any known infringement on the privacy rights of others. (See Doc. 22-4 ¶ 30; Doc. 22-8 ¶ 25; Doc. 22-9 ¶ 20.)

In fact, rather than protect privacy, it appears at least equally likely that denying an injunction will create privacy problems, as it would require the individual transgender Plaintiffs, who outwardly appear as the sex with which they identify, to enter facilities designated for the opposite sex (e.g., requiring stereotypically-masculine appearing transgender individuals to use women's bathrooms), thus prompting unnecessary alarm and suspicion. (See, e.g., Doc. 22-9 ¶ 28 (describing one student's experiences being "screamed at, shoved, slapped, and told to get out" when using bathrooms that did not match the student's gender identity.) As counsel for Governor McCrory candidly acknowledged, even if Part I remains in effect, "some transgender individuals will continue to use the bathroom that they always used and nobody will know." (Doc. 103 at 70.)

Finally, the argument for safety and privacy concerns proffered by the State as to transgender users are somewhat undermined here by the structure of Part I itself. Unlike the policy in G.G., which contained no exceptions, Part I permits some transgender individuals to use bathrooms, showers, and other facilities that do not correspond with their external genitalia. This is so because some States do not permit transgender individuals to change their birth certificates even after having sex reassignment surgery, see, e.g., Tenn. Code Ann. § 68-3-203(d), while others allow modification of birth certificates without such surgery, see, e.g., Md. Code, Health-Gen § 4-211. In this regard, Part I's emphasis on birth certificates elevates form over substance to some degree as to some transgender users.

As for safety, Defendants argue that separating facility users by biological sex serves prophylactically to avoid the opportunity for sexual predators to prey on persons in vulnerable places. However, the individual transgender Plaintiffs have used facilities corresponding with their gender identity for over a year without posing a safety threat to anyone. (See Doc. 22-4 ¶¶ 15, 30; Doc. 22-8 ¶¶ 19, 25; Doc. 22-9 ¶¶ 15, 19–20.) Moreover, on the current record, there is no evidence that transgender individuals overall are any more likely to engage in predatory behaviors than other segments of the population. In light of this, there is little reason to believe that allowing the individual transgender Plaintiffs to use partitioned, multiple occupancy bathrooms corresponding with their gender identities, as well as UNC to seek to accommodate use of similar showers and changing facilities, will pose any threat to public safety, which will continue to be protected by the sustained validity of peeping, indecent exposure, and trespass laws. And although Defendants argue that a preliminary injunction will thwart enforcement of such safety laws by allowing non-transgender predators to exploit the opportunity to cross-dress and prey on others (Doc. 55 at 4–5), the unrefuted evidence in the current record suggests that jurisdictions that have adopted accommodating bathroom access policies have not observed subsequent increases in crime, (see Doc. 22-10 at 6–10; Doc. 22-13.)

**\*28** Finally, the court acknowledges that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). In this case, however, this concern lessened by the continued validity of Parts II and III of HB2, which serve the State's ostensible goal of preempting the Charlotte ordinance and

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

maintaining the law as it existed before March 2016. The State acknowledges that it had no problems with that pre-2016 legal regime. (Doc. 103 at 65–71, 74–90, 96–102.)

In sum, the court has no reason to believe that an injunction returning to the state of affairs as it existed before March 2016 would pose a privacy or safety risk for North Carolinians, transgender or otherwise. It is in the public interest to enforce federal anti-discrimination laws in a fashion that also maintains long-standing State laws designed to protect privacy and safety. On this record, allowing UNC to permit the transgender Plaintiffs to use multiple occupancy, partitioned restrooms corresponding to their gender identity, and to seek flexible accommodation for changing rooms and other facilities, therefore serves the public interest.

### III. CONCLUSION

Plaintiffs' motion seeks to preliminarily enjoin Defendants "from enforcing Part I of House Bill 2." (Doc. 21 at 3; see also Doc. 22 at 44–45.) As a result, the issue currently before the court is whether Title IX or the Constitution prohibits Defendants from enforcing HB2's exclusion of transgender individuals from multiple-occupancy bathrooms, showers, and other similar facilities under all circumstances based solely on the designation of "male" or "female" on their birth certificate.

For the reasons stated, applicable Fourth Circuit law requires that DOE's guidance defining "sex" to mean gender identity be accorded controlling weight when interpreting DOE's Title IX regulations. Because Part I of HB2 prevents transgender individuals from using multiple-occupancy bathrooms and similar facilities based solely on the gender listed on their birth certificate, it necessarily violates DOE's guidance and cannot be enforced. As for Plaintiffs' constitutional claims, Plaintiffs have not made a clear showing they are likely to succeed on their Equal Protection claim, and the court reserves ruling on the Due Process claims pending further briefing from the parties.

The Title IX claim currently before the court is brought by the individual transgender Plaintiffs on their own behalf; the current complaint asserts no claim for class relief or any Title IX claim by ACLU-NC on behalf of its members. (Doc. 9 ¶¶ 235–243.) [39] Consequently, the relief granted now is as to the individual transgender Plaintiffs.

[39]    Although Plaintiffs moved to amend their complaint after the hearing on the present motion (Doc. 116), the motion to amend has not been resolved.

The individual transgender Plaintiffs have not sought an order guaranteeing them access to any specific facility. The court's order will return the parties to the status quo ante existing immediately before the passage of Part I of HB2, wherein public agencies accommodated the individual transgender Plaintiffs on a case-by-case basis, rather than applying a blanket rule to all people in all facilities under all circumstances. Plaintiffs have no complaint with UNC's pre-HB2 policy; Defendants, in turn, do not contend that it caused any significant privacy or safety concerns. Such an order is also consistent with the DOE opinion letter, which states that schools "generally" must treat students consistent with their gender identity. (Doc. 23-29 at 3.) As a result, the court does not decide how Defendants should apply DOE's guidance in all situations and circumstances. Suffice it to say that for the time being, UNC is not constrained from accommodating the individual transgender Plaintiffs through appropriate means that accord with DOE guidance and recognize the unique circumstances of each case, just as it apparently did for several years prior to HB2. In doing so, UNC should be mindful of North Carolina's trespass, peeping, and indecent exposure laws, which protect the privacy and safety of all citizens, regardless of gender identity. In short, UNC may not apply HB2's one-size-fits-all approach to what must be a case-by-case inquiry. [40]

[40]    To the extent the individual transgender Plaintiffs assert an unqualified right to use all multiple occupancy bathrooms, showers, and changing rooms under all circumstances (see Doc. 9 at 56), that issue is not currently before the court. Whether

Case 2:16-cv-00943-PP    Filed 08/31/16    Page 28 of 29    Document 21-1

it will be at a later stage in this case, or as part of the United States' motion for preliminary injunction in the 425 case, remains for later determination.

**\*29** IT IS THEREFORE ORDERED that Plaintiffs' motion for preliminary injunction (Doc. 21) is GRANTED IN PART and DENIED IN PART, as follows:

(1) The individual transgender Plaintiffs' motion for preliminary injunction on their Title IX claim is GRANTED. The University of North Carolina, its officers, agents, servants, employees, and attorneys, and all other persons acting in concert or participation with them are hereby ENJOINED from enforcing Part I of HB2 against the individual transgender Plaintiffs until further order of the court.

(2) Plaintiffs' motion for preliminary injunction on their Equal Protection claim is DENIED without prejudice to a final determination on the merits.

(3) The court reserves ruling on Plaintiffs' motion for preliminary injunction on their Due Process claims. If Plaintiffs wish to submit additional briefing on these claims, they must do so no later than September 9, 2016. Any response briefs must be filed no later than September 23, 2016, and any reply briefs must be filed no later than October 7, 2016. Although the parties may address any matter relevant to the Due Process claims in their briefs, the court is particularly interested in the following questions: (1) whether the sex on an individual's birth certificate is freely available in public records in North Carolina and other States and, if so, whether individuals have a Due Process privacy interest in such information; and (2) the degree to which a law in general, and Part I in particular, must burden a fundamental right in order to warrant strict scrutiny. Plaintiffs' initial brief and any response briefs may not exceed twenty pages per side, and Plaintiffs' reply may not exceed ten pages. If the parties desire additional oral argument regarding Plaintiffs' Due Process claims, any hearing will be combined with the consolidated preliminary injunction hearing and trial on the merits in the 425 case.

**All Citations**

--- F.Supp.3d ----, 2016 WL 4508192

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.