# EXHIBIT A

1996 WL 459853
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.

Charles T. O'BRIEN, Plaintiff,

v.

OMNI PRO ELECTRONICS, INC., Defendant.

No. 96 C 50043.
|
Aug. 13, 1996.

**Attorneys and Law Firms**

Joseph J. Perkoski, Carl E. Metz, II, R. Mark Gummerson, Campion, Curran, Rausch, Crystal Lake, IL, for plaintiff.

Michael F. O'Brien, Donald Q. Manning, McGreevy, Johnson & Williams, Rockford, IL, Gregory J. Schroedter, Bell, Boyd & Lloyd, Chicago, IL, for defendant.

*MEMORANDUM OPINION AND ORDER*

REINHARD, District Judge.

INTRODUCTION

*\*1* Plaintiff Charles T. O'Brien filed an eleven-count complaint in the Circuit Court of McHenry County, Illinois, against defendant Omni Pro Electronics, Inc., based on defendant's hiring and termination of plaintiff. Defendant subsequently removed the case to this court.

Jurisdiction is based on diversity, as plaintiff is a resident of Illinois, defendant is a Texas corporation with its principal place of business in Texas, and the amount in controversy exceeds $50,000. Venue is proper as the alleged conduct occurred in this district and division. Defendant has moved to dismiss all counts of plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(6).

FACTS

The following facts are taken from the allegations of the complaint. In January 1994, plaintiff answered an advertisement for an accounts manager position with defendant. After several interviews between plaintiff and defendant concerning the position, defendant's president sent plaintiff a letter on March 16, 1994, offering employment. The letter provided:

Dear Terry:

I am pleased to offer you the position of Account Manager based in our Chicago office. The territory includes the states of Illinois [sic], and the adjoining states. You are also free to pursue unassigned customers in other areas of the country. Inside sales support for your efforts will be provided.

The salary and compensation package include a base salary of $12,000 annually plus a commission of 7 percent of adjusted gross profit of billings generated by your assigned accounts. The commission rate on the total monthly adjusted gross profit is paid according to the following table:

| MONTHLY ADJUSTED GROSS PROFIT | COMMISSION RATE |
| --- | --- |
| < $20,000 | 7.0% |
| > $20,000 | 9.0% |
| > $40,000 | 11.0% |

Adjustments to gross profit include discounts offered to customers, incoming duties or similar items. Commissions will be subtracted for any billings determined to be bad debt. Bad debt may include billings greater than 60 days delinquent. You will receive a guaranteed commission of $2,000 per month for the six months. During the second six months, you

Case 2:16-cv-00943-PP Filed 08/31/16 Page 2 of 90 Document 22-1

are eligible for a minimum commission of $2,400 per month if your gross profit is greater than $12,000 and your backlog is growing at a rate of 15% monthly.

You will also be compensated an auto allowance of $400.00 per month plus gas and oil. For this you are to provide a car suitable for limited customer entertainment. The compensation package also includes two weeks of paid vacation per year. Additionally, medical and $15,000 of term life insurance are provided for a small fee. In the event that the costs of insurance increases, this increase may be passed on to you or benefits may be decreased.

The North Central region is a new market and Omni Pro would like you to manage our sales efforts in this market.

Omni Pro is a young and growing company with the philosophy of filling customers' needs and doing whatever it takes to make it easy for customers to do business with us. Your potential earnings are limited only by your creativity and ambition. As Omni Pro grows, there will be opportunities to grow professionally. Use our growth to pursue your goals.

Sincerely,

/s/

Jim Kasle, President

**\*2** Plaintiff accepted defendant's employment offer. At the time defendant made the offer, plaintiff was considering another offer of employment. Plaintiff rejected the first offer and began work with defendant on or about March 21, 1994. Defendant terminated plaintiff's employment approximately ninety days after he started. Pursuant to his duties as an account manager, plaintiff prepared a list of potential customers and those potential customers' contacts. Plaintiff submitted the customer list to defendant shortly before he was terminated.

Plaintiff's complaint alleges numerous theories of recovery. In Count I, he claims that the letter created an employment contract which was breached by defendant's failure to pay him for the remainder of his annual salary and commissions. Count II alleges that plaintiff was "wrongfully and without cause discharged" and that he has been damaged by not being paid the remainder of his annual salary and commissions and by being unable to obtain new employment. In Count III, he seeks recovery

under the Illinois Sales Representative Act, 820 ILCS 120/3, alleging that defendant has not paid him all the commissions due him under the contract. Count IV alleges, under quantum meruit, that plaintiff is entitled to be compensated for the value to defendant of preparing the customer list. Count V seeks punitive damages based on plaintiff's claims for breach of contract and quantum meruit. Count VI asks for punitive damages for plaintiff's wrongful discharge. In Count VII, a fraud claim, plaintiff alleges that defendant's president, James Kasle, made the following false representations to plaintiff, knowing they were false and intending that plaintiff be induced and deceived: (1) defendant was a franchised distributor of electronic components; (2) defendant would supply plaintiff with a fully operating office with all necessary equipment and support; and (3) defendant was prepared to stay in the Chicago-area market for one year. Count VII further alleges that plaintiff believed and relied on the misrepresentation and was thereby induced to accept the offer of employment which he would not have otherwise accepted. Plaintiff alleges he was damaged as a result of the fraudulent conduct by being deprived of just compensation for the customer list and being unable to obtain new employment. Count VIII seeks punitive damages for the fraud claim. In Count IX, plaintiff claims that defendant breached the "covenant of good faith and fair dealing" in his employment contract by terminating plaintiff prior to the time in which it expected its business to be profitable in the Chicago area, prior to the time it expected any sales and subsequent to the time plaintiff submitted the customer list. He further alleges he was damaged by losing wages and commissions and not being compensated for the customer list.

Plaintiff alleges in Count X that prior to and during his employment with defendant, he had existing business relationships with current, former and potential customers and the contact persons of those customers. It is further alleged that defendant knew or should have known of those business relationships at the time it terminated plaintiff. By fraudulently inducing plaintiff to accept employment and by terminating plaintiff without any basis, defendant intentionally interfered with plaintiff's business relationship by harming his professional reputation. In Count XI, plaintiff alleges that at the time of his termination he had a reasonable expectation of forming new business relationships with potential customers and that defendant knew or should have known of those expectations at the time it terminated

Case 2:16-cv-00943-PP Filed 08/31/16 Page 3 of 90 Document 22-1

him. Defendant intentionally interfered with plaintiff's prospective economic advantage and future business relationships when it fraudulently induced him to accept employment and then terminated him.

## CONTENTIONS

*3 Defendant has moved to dismiss all counts of plaintiff's complaint contending that: (1) the employment contract alleged in Count I is terminable at will because it specifies no duration of employment; (2) Count II fails to allege a violation of public policy, an element necessary for the tort of wrongful discharge; (3) because plaintiff has alleged he is an employee, the Sales Representative Act does not apply; (4) because there was an express contract governing plaintiff's employment and the customer list was prepared as part of that employment, plaintiff cannot recover in quantum meruit for work performed under the contract; (5) the prayer for punitive damages in Count V must be stricken because Illinois law precludes recovery of punitive damages for breach of contract or quantum meruit on an express contract; (6) the prayer for punitive damages in Count VI must be stricken because Count II fails to state a cause of action; (7) two of the three allegations of misrepresentation in Count VII are not actionable, as they relate to future intent or conduct of defendant, and the third allegation is unsupported by any allegation of actionable harm; (8) because Count VII fails to state a claim, the prayer for damages in Count VIII must be stricken; (9) Count IX fails to state a claim because an employer's right to terminate an at-will employment contract is not limited by a covenant of good faith and fair dealing; and (10) Counts X and XI fail to state causes of action because, contrary to Illinois law, plaintiff alleges that defendant's interference was directed at him and not at a third party.

Plaintiff responds to defendant's various contentions in the following manner: (1) the letter of offer constituted a contract because it contained language "guaranteeing" plaintiff a salary of a specific amount for a period of twelve months; (2) Count II states a claim for wrongful discharge because the employment contract was for a fixed term; (3) plaintiff's remaining remedy due to the contractual nature of the issues is the Sales Representative Act; (4) because the customer list was not specifically covered by the express contract, plaintiff is entitled to recover under an implied contract; (5) plaintiff is entitled to recover punitive

damages for breach of contract and quantum meruit where, as here, the breach amounts to an independent tort; (6) punitive damages for wrongful discharge, as sought in Count VI, are proper because Count II states a cause of action; (7) the allegations of fraudulent future conduct set forth in Count VII are actionable as an intended scheme to defraud; (8) Count VII cannot be dismissed as fraud is a question of fact; (9) because Count VII states a claim for fraud, Count VII's claim for punitive damages should not be dismissed; (10) because plaintiff was fired without cause, defendant has breached the covenant of good faith and fair dealing by acting arbitrarily and capriciously in preventing plaintiff from obtaining the benefits of his contract; and (11) plaintiff has alleged all of the elements for a claim of interference with existing business relations and interference with prospective economic advantage.

## DISCUSSION

*4 A Rule 12(b)(6) motion to dismiss should be granted only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chaney v. Suburban Bus Div.*, 52 F.3d 623, 627 (7th Cir.1995). The court examines all allegations in the light most favorable to the plaintiff. *Id.* at 626.

The court will first address plaintiff's breach of contract claim, as that issue affects several counts of plaintiff's complaint. Under Illinois law, an employee is generally considered to be terminable at will, meaning that an employer can fire an employee at any time for any reason or for no reason. *Paris v. Cherry Payment Sys.*, 265 Ill.App.3d 383, 638 N.E.2d 351, 353 (1st Dist.1994). Even where parties have entered into an employment contract, as has occurred here, an employee is terminable at will unless the contract specifies a duration of employment. *Berutti v. Dierks Foods, Inc.*, 145 Ill.App.3d 931, 496 N.E.2d 350, 352 (2d Dist.1986). In *Berutti*, the court found that the language "Guaranteed salary for twelve months of $750 per week" specified a one-year duration of employment, to which the employer was bound. *Id.* at 354.

Plaintiff emphasizes Omni Pro's use of the term "guarantee" in the employment contract. However, naming a salary rate for a specific period of time does not automatically state a duration of employment. *Berutti*, 496 N.E.2d at 352 (citing *Kepper v. School Directors*

of Dist. No. 120, 26 Ill.App.3d 372, 325 N.E.2d 91 (3d
Dist.1975); see also Jago v. Miller Fluid Power Co., 245
Ill.App.3d 876, 615 N.E.2d 80, 82 (2d Dist.1993) (fact
that bonus is to be calculated yearly does not indicate an
intention to establish an employment term of one year).

The letter to O'Brien states that O'Brien will receive "a
guaranteed commission of $2,000 per month for the next
six months." Unlike the language in Berutti, this statement
relates to the rate of compensation, not to the term of
employment. Instead of guaranteeing the period for which
a salary will be paid, the language specifies the amount
that plaintiff's monthly commission will not fall below.
Therefore, because the contract fails to specify a duration
of employment, plaintiff and defendant entered into an
at-will employment situation, and defendant was free to
terminate plaintiff at any time.

Illinois law provides that at-will employees cannot bring
suit for breach of the implied covenant of good faith and
fair dealing. Spann v. Springfield Clinic, 217 Ill.App.3d
419, 577 N.E.2d 488, 492 (4th Dist.1991); Foy v. City
of Chicago, 194 Ill.App.3d 611, 551 N.E.2d 310, 313
(1st Dist.1990); Harrison v. Sears, Roebuck & Co., 189
Ill.App.3d 980, 546 N.E.2d 248, 255 (4th Dist.), appeal
denied, 128 Ill.2d 663 (1989). Implying such a covenant
defies the basic concept of at-will employment, which
provides employers the ability to terminate employees at
any time. Foy, 551 N.E.2d at 313; Harrison, 546 N.E.2d at
256. Plaintiff thus cannot bring a claim under the covenant
of good faith and fair dealing.

*5 Plaintiff's status as an employee of defendant
also defeats plaintiff's claim under the Illinois Sales
Representative Act ("Act"), 820 ILCS 120/1 et seq. To be
protected under the Act, plaintiff must have contracted
with defendant to solicit orders and must be compensated
by commission. However, the Act specifically precludes
recovery by those who qualify as "employees of the
principal (the employer) pursuant to the Illinois Wage
Payment and Collection Act." 820 ILCS 120/1. Section 2
of the Wage Payment and Collection Act excludes from
the definition of "employee" those (1) "free from control
or direction over performance of his work, both under
his contract of service with his employer and in fact," (2)
whose work is "outside the usual course of business or
is performed outside the usual course of business or is
performed outside all of the places of business of the

employer," and (3) who is an "independently established
trade, occupation, profession or business."

In reviewing plaintiff's complaint, the court finds no
terms which indicate that plaintiff would not be free
from defendant's control over performance of his work,
and plaintiff has not alleged such facts. Plaintiff also
has failed to allege that he meets clauses (2) and (3)
of the provision. Therefore, for purposes of the Illinois
Sales Representative Act, the court finds plaintiff has not
alleged his non-employee status. [1]

An at-will employee may bring a wrongful discharge
claim only if the termination violates "clearly mandated
public policy." Shearson Lehman Bros., Inc. v. Hedrich,
266 Ill.App.3d 24, 639 N.E.2d 228, 233 (1st Dist.1994)
(citing cases which held that being fired after filing a
workers' compensation claim, serving on a jury, and
refusing to violate a statute or law were proper grounds for
wrongful discharge claims). Plaintiff's complaint merely
alleges that defendant "wrongfully and without cause
terminated plaintiff." Plaintiff's claim cannot survive on
this allegation alone.

In his quantum meruit claim, plaintiff argues that he
is entitled to the value of preparing a list of potential
customers and contacts for defendant. Quantum meruit
is allowed where there is no contract under which
plaintiff can hold defendants liable. Cruz v. Stapleton, 251
Ill.App.3d 833, 622 N.E.2d 1253, 1256 (2d Dist.1993); see
also Murray v. ABT Assoc. Inc., 18 F.3d 1376, 1379 (7th
Cir.1994) (Illinois does not permit recovery on theory of
quasi-contract when a real contract governs the parties'
relations). Because the court has found the existence of an
express employment contract, plaintiff cannot recover in
quantum meruit. [2]

Plaintiff also charges defendant with interfering
with plaintiff's "existing business relationships" and
"prospective economic advantage." Regarding the first
claim, plaintiff states that defendant's termination of
plaintiff's employment caused "irreparable damage to his
business relationships which existed prior to plaintiff's
employment, during plaintiff's employment, and at the
time Omni Pro terminated plaintiff." Regarding the
second claim, plaintiff alleges that he had a "reasonable
expectancy to forge new business relationships in the
immediate and indefinite future with potential customers
and the contacts within each potential customer."

**\*6** To state a claim for tortious interference with existing business relationships, plaintiff must plead the existence of a valid business relationship or expectancy, defendant's knowledge of that relationship or expectancy, intentional interference by the defendant to induce or cause the breach or termination of the relationship or expectancy, and resulting damage to the plaintiff. *Sullivan's Wholesale Drug v. Faryl's,* 214 Ill.App.3d 1073, 573 N.E.2d 1370, 1374–75 (5th Dist.), *appeal denied,* 141 Ill.2d 561 (1991). To state a claim for intentional interference with prospective economic or business advantage, plaintiff must show a reasonable expectation of entering into a valid business relationship with a third party, defendant's knowledge of that expectancy, defendant's purposeful or intentional interference that prevents plaintiff's expectancy from evolving into a valid business relationship, and resulting damage to the plaintiff. *Soderlund Bros., Inc. v. Carrier Corp.,* 278 Ill.App.3d 606, 663 N.E.2d 1, 7–8 (1st Dist.1996).

In both causes of action, plaintiff must allege that the defendant interfered in relations between plaintiff and a third party with whom plaintiff expected to do business. *See Sullivan's,* 573 N.E.2d at 1375 (stating that "there is no evidence that [either defendant] induced or caused either the residents of the nursing home or the nursing home itself to sever the business relationships they had with [plaintiff] ); *Schuler v. Abbott Lab.,* 265 Ill.App.3d 991, 639 N.E.2d 144, 147 (1st Dist.1993) (plaintiff must allege business expectancy with a specific third party and action by the alleged interfering party directed toward the party with whom the plaintiff expects to do business).

Here, plaintiff's complaint merely refers to interaction between plaintiff and defendant. Plaintiff alleges that defendant's act of terminating plaintiff has harmed plaintiff's business relationships and interfered with future relationships, while failing to allege any action that defendant took toward third parties. Nor does plaintiff allege any specific third party for which he expected to do business. Accordingly, the court dismisses Counts X and XI.

Plaintiff alleges that defendant made three fraudulent statements while interviewing plaintiff: defendant was a franchised distributor of electronic components, defendant would supply plaintiff with a fully operating office with all necessary equipment and support staff, and

defendant was prepared to remain in the Chicago-area market for one year.

Fed.R.Civ.P. 9(b) requires plaintiffs bringing actions in federal court to plead fraud allegations with specificity.[3] *In Re Healthcare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir.1996). The complaint must provide details including the time, place and content of the communications that supposedly led to the fraud. *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.,* 927 F.2d 988, 992 (7th Cir.1991). The Seventh Circuit has remarked that the plaintiff "must provide enough detail about the underlying facts which illustrate that ... statements were fraudulent to allow a court to evaluate the claim in a meaningful way." *Arazie v. Mullane,* 2 F.3d 1456, 1465 (7th Cir.1993).

**\*7** Under Illinois law, to state a cause of action for fraud, plaintiff must allege that defendant made a false statement of material fact, knowing that statement to be false and making the statement to induce plaintiff to act. *People ex rel. Peters v. Murphy–Knight,* 248 Ill.App.3d 382, 618 N.E.2d 459, 463 (1st Dist.1993). Plaintiff also must allege that he or she relied on the statement's truth and was damaged as a result of that reliance. *Id.* The statement must represent fact, as opposed to mere opinion. *Id.*

Count VII fails to allege what damage plaintiff suffered as a result of his reliance on all the above-described statements. Plaintiff alleges that he has been damaged by being deprived of his salary under the employment contract, by being deprived of just compensation for the customer list and by being unable to subsequently obtain gainful employment. None of these alleged damages are connected to any statements made by defendant to induce plaintiff to take the job with defendant. Rather, they are, at best, all related to, or arise out of, plaintiff's being terminated. That termination had nothing to do with any statements made to induce plaintiff to accept the employment offer, at least not as alleged. Consequently, the court dismisses Count VII in its entirety on that basis alone. Count VIII, for punitive damages, is therefore also dismissed.

Furthermore, Illinois does not provide a remedy for fraudulent promises. *Desnick v. ABC,* 44 F.3d 1345, 1354 (7th Cir.1995). Alleged misrepresentation which are statements of future action fail to state a cause of action. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,* 131

Ill.2d 145, 545 N.E.2d 672, 682 (1989); *Board of Trustees v. First Nat'l Bank of Chicago,* 263 Ill.App.3d 108, 636 N.E.2d 840, 845 (1st Dist.), *appeal denied,* 157 Ill.2d 496 (1994). The only exception is if the plaintiff alleges the fraudulent promises are part of a scheme to defraud *HPI,* 545 N.E.2d at 682. *Desnick,* 44 F.3d at 1354.

In this case, defendant's statements that the company would supply plaintiff with office equipment and support staff and that defendant would stay in the Chicago-area market for one year are statements relating to defendants' future conduct. Those allegations are insufficient to state a fraud claim under Illinois law. Plaintiff therefore states a claim only if he alleges a scheme to defraud. Plaintiff, however, has failed to state specific factual allegations regarding any such scheme. Therefore, the court also dismisses Counts VII and VIII to the extent they rely on the above two allegations.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss plaintiff's complaint is granted with respect to Counts I through XI. Plaintiff is given 21 days from the date of this order to file an amended complaint as to Counts VII and VIII only to the extent he can replead those claims consistent with the responsibilities under Rule 11. Failure to file an amended complaint within that time will result in dismissal of the entire case with prejudice and without further notice.

**All Citations**

Not Reported in F.Supp., 1996 WL 459853

Footnotes

1    The court could find no case interpreting or applying the Illinois Sales Representative Act in this context. *See Kennebrew v. Connecticut Gen. Life Ins. Co.,* 882 F.Supp. 749, 754 n. 3 (N.D.Ill.1995) (noting dearth of cases interpreting the Act).

2    Plaintiff, in stating his quantum meruit claim for relief, seeks to recover the cost of producing a customer list for defendant. Recovery under this theory "requires a reasonable expectation that the other party would pay for the services rendered." *Cruz,* 622 N.E.2d at 1256–57. The employment contract in this case does not indicate that defendant intended to compensate plaintiff separately for the customer list, apart from his salary and commissions, and preparing a customer list could be seen as part of plaintiff's duties as an accounts manager.

3    While plaintiff is bringing his fraud claim under Illinois law, he must comply with federal pleading standards.

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 6982280
Only the Westlaw citation is currently available.
United States District Court,
W.D. Wisconsin.

Roy MITCHELL, Plaintiff,
v.
Sheriff Sergeant Mr. Pat PRICE, Sergeant Mr.
Koehler, Sheriff Officer Timothy Algiers, Officer
Mr. James Wilson, Officer Mr. Nathan Johnson
and Officer Mr. Daniel Werkheiser, Defendants.

No. 11–cv–260–wmc.
|
Signed Dec. 10, 2014.

**Attorneys and Law Firms**

Roy Mitchell Madison, WI, pro se.

Laura Elizabeth McFarlane Timothy J. Yanacheck Bell,
Moore & Richter, SC Madison, WI, for Defendant.

OPINION and ORDER

WILLIAM M. CONLEY, District Judge.

**\*1** Plaintiff Roy Mitchell was granted permission
to proceed on claims that: (1) certain employees at
the Dane County Jail violated her equal protection
rights because of her transgender status; (2) defendant
James Wilson used excessive force against her; and
(3) defendant Carl Koehler defamed her by calling
her a "hermaphrodite."[1] The parties have completed
briefing on defendants' motion for summary judgment,
and Mitchell has submitted several other motions. After
considering the documents submitted by the parties,
the court will grant defendants' motion for summary
judgment on all of Mitchell's claims, except for her equal
protection claim regarding defendant Koehler's decision
to transfer her back to a housing pod in which she had
previously been taunted and threatened. Additionally, all
of Mitchell's motions will be denied, except for her motion
for the court's assistance in recruiting counsel.

PRELIMINARY MATTERS

**I. Motions to Reinstate Defendants**

In the court's January 20, 2012 screening order, defendants
David Mahoney and Wisconsin Mutual Insurance
Company ("WIMIC") were dismissed from the case
because the complaint contained no allegations suggesting
that they were personally involved in the violations of
her rights. Mitchell has filed motions to add both of
these defendants back into the case. (Dkts.# 40, 56.)
In her "Motion for Reconsideration Reinstatement of
Defendant Mr. David Mahoney," Mitchell asserts that
Dane County Sheriff Mahoney was aware of the county
jail staff's conduct and "turned a blind eye to it." In
support of this assertion, Mitchell attaches a copy of a
February 9, 2011, email addressed to Mahoney from the
executive assistant to the Dane County executive, which
states that the county executive was forwarded a letter
from Mitchell to then-Congresswoman Tammy Baldwin
regarding Mitchell's mistreatment at the jail.

Setting aside the third-party hearsay and unsupported
inferences, there is an even more fundamental problem
with Mitchell's reliance on this email to prove that
Mahoney was informed of jail staff's conduct toward her:
by the time Mahoney received this email, Mitchell had
long ago been transferred out of the Dane County Jail.
Indeed, Mitchell's financial statements show that she was
transferred to the New Lisbon Correctional Institution
no later than October 6, 2010. Because Mitchell's own
allegations contradict (or at least fail to support) an
inference that Mahoney was personally aware of (much
less personally involved in) the claimed misconduct at
the jail, Mitchell's motion to reinstate Mahoney as a
defendant will be denied.

As for WIMIC, Mitchell states that it is the defendants'
insurer. The court understands Mitchell to be saying that
she should be allowed to include WIMIC as a defendant
under the Wisconsin Direct Action Statute, which states
as follows:

> Direct action against insurer. Any
> bond or policy of insurance covering
> liability to others *for negligence*
> makes the insurer liable, up to
> the amounts stated in the bond or
> policy, to the persons entitled to
> recover against the insured for the
> death of any person or for injury
> to persons or property, irrespective

of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured.

**\*2** Wis. Stat. § 632.24 (emphasis added). As an initial matter, Mitchell's *only* state law claim is for defamation, not negligence. Even if § 632.24 applied to a defamation claim, WIMIC has no place in this lawsuit going forward. As discussed further below, the court will be granting defendants' motion for summary judgment on the defamation claim. Accordingly, the motion to reinstate WIMIC as a defendant has been rendered moot.

## II. Motion to Amend Complaint

Mitchell also filed a motion to amend the complaint to add claims for violations of the United Nations' Universal Declaration of Human Rights. (Dkt. # 81.) However, this document is "simply a statement of principles and not a treaty or international agreement that would impose legal obligations." *Konar v. Illinois,* 327 F. App'x 638, 640 (7th Cir.2009) (citing *Sosa v. Alvarez–Machain,* 542 U.S. 692, 734 (2004)). Since the Declaration creates no enforceable rights, Mitchell cannot bring claims under it, and her motion to amend the complaint will be denied.

## III. Motion for Sanctions

Mitchell has filed a motion to sanction defendants under Fed.R.Civ.P. 11 for submitting false responses in their answer. (Dkt.# 115.) When a litigant suspects that the opposing party has violated Rule 11, the litigant is required to give the opposing party formal notice of the conduct alleged to violate Rule 11 *and* offer the party an opportunity to withdraw or correct its actions to avoid imposition of sanctions. Fed.R.Civ.P. 11(c)(1) (A); *Divane v. Krull Electric Co., Inc.,* 200 F.3d 1020, 1026 (7th Cir.1999). Mitchell does not aver that she did either. Having provided no evidence that she satisfied the notice requirement of Rule 11(c)(1)(A), Mitchell's Rule 11 motion will also be denied.

## IV. Motion for Temporary Restraining Order

Mitchell has filed a motion for temporary restraining order (dkt.# 141), which will be denied for two reasons. First, she is no longer incarcerated at the Dane County Jail, so the motion is moot. *See Lehn v. Holmes,* 364 F.3d 862, 871–72 (7th Cir.2004) (discussing the

"uncontroversial proposition that when a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot"). Second, her motion fails to comply with this court's procedures to be followed on motions for injunctive relief. Under these procedures, a plaintiff must file with the court and serve on defendants proposed findings of fact supporting her claim, along with any evidence she has to support those findings and her request for relief. In her motion for TRO, Mitchell states that she is being discriminated against at the jail, but provides almost no detail about these events. Nor does Mitchell explain whether the events discussed in her motion have any connection to the defendants or her claims in this case (as stated above, years had passed between the events mentioned and the filing of her complaint, much of that time *after* she had been moved out of the jail itself). Accordingly, it is uncertain, at best, whether there is *any* need for the requested injunctive relief at this (or any) stage of the lawsuit.

## V. Motion to Amend Request for Relief

**\*3** Finally, Mitchell filed a motion to amend the portion of her complaint containing her request for relief to a larger amount to reflect "up-to-date retaliatory unethical imposed dehumanizative abuses." (Dkt.# 149.) Since Mitchell has neither sought nor been granted leave to amend her complaint to add claims for these new, alleged *abuses,* and no such leave is likely to be granted at this stage, these claims will remain outside this case, meaning she cannot amend the relief she requests to encompass them. [2]

## SUMMARY JUDGMENT

### I. Undisputed Facts [3]

#### A. The Parties

This lawsuit arises out of events that occurred while plaintiff Roy Mitchell was an inmate at the Dane County Jail, located in Madison, Wisconsin. [4] At all times relevant to this lawsuit, defendants Pat Price, Carl Koehler, Timothy Algiers, James Wilson, Nathan Johnson and

Daniel Werkheiser [5] were employed at the Dane County Sheriff's Office.

Mitchell is biologically a male. Mitchell lives as a "[t]ransgendered American" and describes herself as "a female trapped in a male's body." Mitchell has always been housed in male facilities, and does not disagree with that practice because she was biologically born a male.

### B. Transfers and Discipline

On July 21, 2006, Mitchell was removed from administrative confinement and moved to the Public Safety Building. The decision was made by defendant Price based on "Mental Health's" recommendation, but also supported by Mitchell. Mitchell was initially placed in the "front bunk row area" or "pod" so that she could be observed from the deputy station. Because other inmates "had a problem" with her feminine appearance, Mitchell was quickly moved from that pod. Mitchell was then placed in the "3G special needs" pod, apparently based on a staff member's opinion that "it may be a better environment for [Mitchell] than the other pods." Pod 3G was also a "front row bunk" where she could be observed by staff, although this placement left open the possibility that Mitchell would be considered for movement to general population if her space was needed for another inmate.

For three days after placement in pod 3G, some of the inmates taunted and threatened Mitchell. The basis for this undisputed proposed finding of fact is Mitchell's deposition, in which she stated:

A: For like three days, they just was taunting me. They kept calling me faggot, and they was making threats at me. Because I was like brushing it off, they was getting mad because I wouldn't feed back into it. So I went to an officer in the morning, and I told him, I said, Could you please move me? I can't take it no more, they keep bothering me. So he moved me. He moved me over to another pod in the front bunk row. And when I got over there, it was a lot better for me. The guys kind of warmed up to me. You know, they didn't pretty much bother me.

Q: Was that Sergeant Koehler you're talking about who moved you?

**\*4** A: No, another officer.

Q: Okay. Go ahead.

A: He moved me. He said he moved me to keep the peace. And I was thankful to him.

The report of these events entered onto the "Jail Event Summary Report" by officer Brian Grafton stated as follows:

Inmate came up and stated he was having problems with inmates in his bunk row. Inmate stated a few inmates in his bunk row have been picking on him because he won't talk to them or interact with anyone in the pod. Inmate stated he was also threatened yesterday afternoon but could not give any other details pertaining to the incident or names.

Inmate is in a special needs pod but according to Traci Roberts (classification) he can be moved to g-pop....

Inmate moved to keep the peace.

Mitchell was moved to another pod, 3I, where the inmates did not bother her. Three days later, on July 26, 2006, Mitchell was told that she would be moved back to pod 3G. An incident report created by Deputy Isaacson in connection with the jail disciplinary process stated that Koehler called Isaacson and "informed [him] Mitchell is a hermaphrodite and would be better suited for the G side." Mitchell objected to being moved, telling Deputy Isaacson that she had been bothered by the other inmates there. The deputy went back to double-check the order, then told Mitchell she was still being moved. Mitchell refused to go, saying that she would rather be placed in administrative confinement than go back. The deputy told Mitchell she was going to the "timeout room" for refusing the order to move. Mitchell said that she was not going to the timeout room, and asked to be sent back to the old jail.

Isaacson called for a movement team to extract Mitchell and "briefed" the team. Deputy Isaacson handcuffed Mitchell. (At her deposition, Mitchell stated that defendant Wilson "snapped" the handcuffs on her "really rough," causing soreness and a knot on her wrist. Deputy Isaacson's report, however, states that "Deputy Wilson assisted me in placing Mitchell in handcuffs. I checked for tightness and double locked the handcuffs."

In his affidavit, defendant Wilson agrees with the report, stating that Isaacson was the officer who put the handcuffs on Mitchell. In her response, Mitchell does not dispute defendants' account, now stating that because she was handcuffed behind her back, she could not see which deputy handcuffed her.) Mitchell was given pain medication and the knot went away after about three weeks. Mitchell occasionally feels soreness. (Mitchell now states that she suffered pain for a longer period of time and that the knot was a cyst, but to the extent her summary judgment responses contradict the testimony above from her deposition, they will be disregarded under the sham affidavit rule. *Russell v. Acme–Evans Co.,* 51 F.3d 64, 67–68 (7th Cir.1995) (party may not defeat summary judgment by submitting affidavit that contradicts his or her prior deposition testimony).) Mitchell was then moved to segregation without further incident.

**\*5** Isaacson issued a report stating that Mitchell violated prison rules by not following staff directions, refusing housing re-assignment and having more linens than issued. Mitchell's "Jail Event Summary Report" shows an entry by Isaacson stating that she could "remain in Seg until [her] hearing or space is needed." Mitchell was found guilty (the summary report shows a "Melissa Zielke" as the staff member who made this entry) and was disciplined with two days in lock-down segregation for these violations. Mitchell was kept in segregation for two extra days while jail officials considered where to place her. (According to the "Jail Event Summary Report," Koehler was one of the officials involved in this decision.) Mitchell was provided with her hygiene items, legal materials and writing materials, and was allowed to use the shower and phone during this extra two-day period. (Mitchell attempts to dispute this but does not cite to evidence stating otherwise.)

On July 30, 2006, Mitchell was placed in administrative confinement on "7 West" as she had wanted. (Mitchell purports to dispute this fact as well, but does not cite to evidence calling this finding into question. Moreover, any contrary testimony she would now give also violates the sham affidavit rule. In her previous deposition, Mitchell testified that she was placed on administrative confinement, as she had wanted.)

### C. Defendant Algiers

On November 19, 2009, Mitchell was placed in the "bullpen" while waiting to be booked into the Dane County Jail. Mitchell had to wait a couple of hours to be booked, which upset her. While waiting for her booking photo to be taken, Algiers allegedly stared at her. Mitchell asked Algiers why he was staring, but he did not respond. After asking Algiers again why he was staring, Mitchell told him it was rude to stare at people like that. Algiers then told Mitchell that he was stopping the booking process and taking her to "male segregation." Mitchell finished the booking process the next day with no problems.

A few days later, defendant Algiers was passing out mail to inmates while Mitchell was eating breakfast. As Mitchell set down her tray and got up to get her mail, Algiers threw her mail on the floor. (Defendants state that the response to Mitchell's grievance regarding this incident indicates that a sergeant reviewed the video footage of the incident and found that Algiers waited at Mitchell's cell for thirty seconds before "placing" her mail in the cell. However, the grievance is inadmissible hearsay. *Williams v. Blagojevich,* No. 06–cv–0772–mjr, 2010 WL 456761, at \*5 n. 4, (S.D.Ill. Feb. 4, 2010).)

### D. Defendants Johnson and Werkheiser

At one point during her time at the Dane County Jail, Mitchell was housed in the 7 West wing in the City–County Building. Mitchell had requested housing in that wing because she felt safer there. Mitchell wore a padded bra while at the Dane County Jail. Mitchell alleges that one time when she was wearing her padded bra, defendant Deputy Nathan Johnson walked past her cell and commented to defendant Deputy Werkheiser, "Look at the tits," and they laughed at Mitchell. (Johnson denies that he said this, noting that Mitchell filed a grievance about defendant laughing at her, but did not mention this remark. Johnson does admit that he laughed while working with Werkheiser, but he was not laughing "at or near" Mitchell.) This is the only comment Johnson or Werkheiser are alleged to have made regarding Mitchell's gender.

**\*6** In early February 2010, when Mitchell was in the shower, defendant Johnson told her to hurry up or he would take away her hour out of administrative confinement for the following day. Inmates do not control

the shower, and Mitchell was waiting for the water to turn off to get dressed. (Defendants dispute Mitchell's characterization of the events, but point only to their own inadmissable hearsay in response to her internal grievance about the incident.) Mitchell was allowed her daily hour out of administrative segregation the following day.

Mitchell normally received graham crackers for lunch because she was on a low-sodium diet. On March 8, 2010, an inmate worker gave her saltine crackers instead of graham crackers. Mitchell spoke to the inmate worker about the crackers (the parties dispute whether Mitchell was "giving the inmate worker a hard time"). Defendant Werkheiser came over and saw that Mitchell had been given the wrong type of crackers.

The parties dispute what happened next. Defendants assert that Werkheiser told Mitchell that she was not allowed both types of crackers, that Mitchell "snapped, 'fine, take these then' " handed back the saltines, and Werkheiser gave her the graham crackers. Mitchell states that she asked for graham crackers, that Werkheiser "stuck his unsanitary fingers into [her] lunch meal tray in a hostile, disrespectful, degrading, humiliating manner," and then walked away when Mitchell asked for a new tray.

Another inmate on the same wing of the Jail, Alphonso Randall, would engage in "gay bashing" (which the court understands to mean verbal insults and threats). Sometimes, Mitchell would argue back with Randall. In this wing, inmates were allowed out of their cells only one hour a day. At that time, Randall and Mitchell were not formally authorized to be kept separate. One day in early March 2010 (the parties dispute whether it was March 5 or 6), while Mitchell was out of her cell making a phone call, defendant Werkheiser let Randall out so that he could go to a court proceeding. Randall said something to Mitchell like, "I can get you if I want to now," but he kept walking toward the visiting area. Randall was under observation by Werkheiser the whole time. (Mitchell purports to dispute this by stating that Werkheiser was "present outside of the cell block in the ... hallway," but does not directly dispute the assertion that Werkheiser could observe Randall from that location.)

Ultimately, Randall did not physically attack Mitchell. After Mitchell complained of not getting along with Randall, Mitchell and Randall were marked to be kept

separate. Deputy Werkheiser believed that Mitchell was "an equal participant" in the altercations with Randall.

### E. Defendant Price

Mitchell filed multiple complaints against deputies while she was incarcerated at the Dane County Jail, and defendant Sergeant Pat Price was charged with investigating all of them. In February and March 2010, Mitchell had to wait a month for a response to a complaint because Price was not in the office. After Mitchell complained about the delay to the Office of Detention and Facilities at the Wisconsin Department of Corrections, Price apologized to Mitchell and said that her issues were difficult to handle.

**\*7** Price did not find that any of Mitchell's complaints were substantiated (other than the complaint that Price had not handled a grievance within the proper timeframe). Price did not say anything to Mitchell about her gender, other than to comment, "I'm aware that you live an alternative lifestyle."

### OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For any basis on which the nonmoving party bears the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324. If the party fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.' " *Id.* at 323. On this basis, plaintiff Mitchell's proof falls short on almost all of her

Case 2:16-cv-00943-PP Filed 08/31/16 Page 12 of 90 Document 22-1

claims, and so with one exception, defendants are entitled to summary judgment.

### I. Excessive Force

Mitchell was allowed to proceed on a claim that defendant Wilson used excessive force against her, injuring her wrist. Based on the summary judgment submissions, this alleged incident occurred on July 26, 2006, when a "movement team" came to move Mitchell from her cell assignment and Mitchell was handcuffed.

As an initial note, the parties have not definitely established whether Mitchell was a pretrial detainee or prisoner serving a sentence on that date. Generally, excessive force claims in the prison setting involve the Eighth Amendment, while such a claim by a pretrial detainee arises under the Fourteenth Amendment's due process guarantee. *Graham v. Connor,* 490 U.S. 386, 395 n. 10 (1989); *Dorsey v. St. Joseph Cnty. Jail Officials,* 98 F.3d 1527, 1528 (7th Cir.1996). Since the standards governing excessive force claims under the Fourteenth and Eighth Amendments are roughly the same, *Wilson v. Williams,* 83 F.3d 870, 875 (7th Cir.1996), the question of Mitchell's status does not materially alter the court's analysis.

In determining whether an officer has used excessive force against a prisoner under the Eighth Amendment, the question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers,* 475 U.S. 312, 320 (1986). The factors relevant to making this determination include:

**\*8** • the need for the application of force;

• the relationship between the need and the amount of force that was used;

• the extent of injury inflicted;

• the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and

• any efforts made to temper the severity of a forceful response. *Id.* at 321. Under the Fourteenth Amendment, the question is whether defendant's actions amount to "a deliberate act intended to chastise or deter," or at least to

"reckless disregard for [plaintiff's] rights." *Wilson,* 83 F.3d at 875 (citations omitted).

Regardless of which of these largely overlapping standards is applied, defendants are entitled to summary judgment on plaintiff's excessive force on two grounds. First, Mitchell fails to show that Wilson was the person who handcuffed her tightly. A defendant's liability under § 1983 must be based on that individual's *personal* involvement in the constitutional violation. *See Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir.2003); *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995). Mitchell initially claimed that Wilson applied the handcuffs, while defendants maintain that it was Deputy Isaacson. Now, Mitchell states that she could not see who was applying the handcuffs. Since Mitchell has acknowledged having *no* personal knowledge of who applied the handcuffs, and offers no other witness or evidence implicating Wilson, defendants' version remains undisputed.

Second, even if Wilson applied the handcuffs, Mitchell fails to show that the application of handcuffs violated either the Eighth or Fourteenth Amendments. Although the handcuffs may have been tight, there is nothing in the record supporting a finding Wilson deliberately made them so, or acted "maliciously and sadistically" or with "reckless disregard" for Mitchell's rights. In addition, the minor nature of the injury—some pain and a short-lived "knot"—while not by itself dispositive of an excessive force claim, *see Wilkins v. Gaddy,* 559 U.S. 34, 39–40 (2010), suggests that the force used was not so significant as to evince the wanton infliction of harm, much less the "knowing willingness that it occur." *See Hudson v. McMillian,* 503 U.S. 1, 7 (1992); *Outlaw v. Newkirk,* 259 F.3d 833, 840 (7th Cir.2001) (minor injury "supports the conclusion that the incident was 'at most ... a *de minimis* use of force not intended to cause pain or injury' "). Not every malevolent touch by a prison guard gives rise to a constitutional violation. *See Hudson,* 503 U.S. at 9 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")).

### II. Equal Protection

Although the issue has yet to be settled in this circuit, the parties agree that Mitchell's Fourteenth Amendment equal protection claims based on her transgender status receive heightened scrutiny, meaning that Mitchell must

Case 2:16-cv-00943-PP Filed 08/31/16 Page 13 of 90 Document 22-1

show that: (1) she has been intentionally treated differently from others who are similarly situated; and (2) there is a substantial relationship between this difference and a sufficiently important government interest. *Glenn v. Brumby,* 663 F.3d 1312 (11th Cir.2012) (collecting cases and holding that heightened scrutiny applies to transgendered plaintiff's equal protection claims).

**\*9** The Seventh Circuit further explained the standard for equal protection claims as follows:

> The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Nabozny v. Podlesny,* 92 F.3d 446, 453–54 (7th Cir.1996) (quoting *Shango v. Jurich,* 681 F.2d 1091, 1104 (7th Cir.1982)).

Therefore, "[a] showing that the defendants were negligent will not suffice." *Nabozny,* 92 F.3d at 454. The requisite intent is that defendants "acted either intentionally or with deliberate indifference" toward Mitchell because of her transgender status. *Schroeder v. Hamilton Sch. Dist.,* 282 F.3d 946, 951 (7th Cir.2002) (quoting *Nabozny,* 92 F.3d at 454).

### A. Defendant Price

Mitchell was allowed to bring an equal protection claim against Price for failing to investigate her complaints properly. In her brief in opposition to summary judgment, she argues that Price failed to respond to her grievances within the 10 days called for by prison policy. The only proposed finding of fact supporting this argument states that Mitchell had to wait a month for a response to a complaint because Price was not in the office. After Mitchell complained about the delay, Price allegedly apologized to Mitchell and said that her issues were difficult to handle.

None of the proposed findings of fact support a finding that Price acted with the requisite discriminatory intent; at most, they show that Price failed to respond sooner because he was out of the office, rather than because he intended to hurt Mitchell due to her transgender status. Notably, Mitchell fails to show that other, non-transgendered prisoners were treated any better by Price. Mitchell attempts to argue that Price's delay violated administrative rules, but this is irrelevant to the equal protection calculus. *Thompson v. City of Chicago,* 472 F.3d 444, 454 (7th Cir.2006) ("[T]he violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established.").

Mitchell also states in her brief that Price's ultimate response to her complaints came on March 11, 2010, when he brought her "in front of the other named defendants," who "stood by while Defendant Price vindictively, humiliati [ng]ly non-chalantly, blew off my numerous [complaints]...." Mitchell does not, however, provide findings of fact detailing these events, so the court will not consider them. *See Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 361 (7th Cir.1992) ("Argument is not evidence upon which to base a denial of summary judgment."). In any event, because Mitchell fails to set forth facts entitling her to a trial on her claim against Price, the court will grant defendants' motion for summary judgment on this claim.

### B. Defendant Algiers

**\*10** Mitchell was also allowed to proceed on an equal protection claim against defendant Algiers for throwing Mitchell's mail at her in a degrading manner. Despite making this claim, however, Mitchell again fails to provide any evidence permitting a reasonable inference that Algiers intentionally discriminated against her because of her transgender status. Instead, the parties' proposed findings of fact state that Algiers stared at Mitchell during the booking process, and a few days later threw her mail

at the floor. As with the equal protection claim against Price, Mitchell offers no proof that Algiers acted the way she did because of Mitchell's transgender status, nor that she treated other inmates better. Moreover, Algiers' alleged actions are simply not of sufficient import to raise constitutional questions. *See, e.g., Antoine v. Uchtman,* 275 F. App'x 539, 541 (7th Cir.2008) ("the Constitution does not compel guards to address prisoners in a civil tone using polite language"); *Bell v. Duperrault,* 367 F.3d 703, 709 (7th Cir.2004) ("downright rudeness" not sufficient to support "class of one" equal protection claim); *DeWalt v. Carter,* 224 F.3d 607, 612 (7th Cir.2000) ("Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws.").

### C. Defendants Johnson and Werkheiser

Mitchell states that: (1) defendant Johnson said "look at the tits" while Mitchell was wearing a padded bra; (2) Johnson and defendant Werkheiser laughed at her; (3) Johnson threatened to take away Mitchell's free time for delaying in the shower; (4) Werkheiser stuck his fingers into her lunch; and (5) Werkheiser allowed a dangerous inmate to threaten her.

Unlike Mitchell's allegations against Price and Algiers, allegations that Johnson said "look at the tits" and that Johnson and Werkheiser laughed at Mitchell appear to be related to Mitchell's transgender status, or so a reasonable trier of fact might infer. Even if true, verbal harassment, even mocking her transgender status, does not violate the Constitution in and of itself. *DeWalt,* 224 F.3d at 612. ("The use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution.") However contemptible such behavior may be, therefore, it cannot support an equal protection claim.

Mitchell also alleges that defendant Johnson threatened to take away Mitchell's free time for delaying in the shower. This claim, too, must also be dismissed since Mitchell presents no evidence suggesting that she was treated differently than other inmates who are thought to have spent more than their allotted time in the shower. There is also no indication that Mitchell was, in fact, punished. Similarly, while defendant Werkheiser's alleged misconduct involving sticking his fingers into her food

tray after she asked for graham crackers is boorish and thoroughly unprofessional, it does not rise to a Constitutional violation without more.

*11 Finally, Mitchell alleges that Werkheiser left her alone with an abusive inmate. As an initial matter, this assertion is a misleading characterization of the proposed factual findings. The other inmate was let out of his cell only for purposes of being transported to a court hearing, so there is no reason to believe that he was in the common area for anything other than a brief time. Also, the undisputed facts indicate that Werkheiser observed this process from outside the cell block, and only after that threat were Mitchell and the other inmate marked for separation. In short, there is no evidence in the record that would support a finding that Werkheiser was cavalier with respect to Mitchell's safety, nor that he acted the way he did because of Mitchell's transgender status. In fact, there is no evidence to support a finding that Werkheiser diverged from what he would normally do under standard prison protocol. Thus, summary judgment must also be granted to Werkheiser regarding this equal protection claim.

### D. Defendant Wilson

The court next allowed Mitchell leave to proceed on an equal protection claim against defendant Wilson for forcibly removing her from pod 3I. On the record on summary judgment, however, this court has already concluded (as noted above) that Mitchell failed to show Wilson was the person who handcuffed her tightly. This dooms Mitchell's equal protection claim against Wilson because she must produce evidence of Wilson's *personal* involvement in the deprivation of Mitchell's rights. The incident report shows that Wilson likely knew of Koehler's "hermaphrodite" classification of Mitchell, but there is no indication that the force used on Mitchell was different than what officers would have used otherwise. Absent evidence supporting this finding, or at least allowing for a reasonable inference of discriminatory intent, Mitchell's claim cannot proceed.

### E. Defendant Koehler

In the court's screening order, Mitchell was allowed to proceed on one last equal protection claim for being

"placed in segregation by defendant Koehler, who falsely classified [her] as a hermaphrodite." (Dkt. # 14, at 2–3.) After summary judgment briefing, the parties agree that there are actually three components to this claim: Koehler (1) labeled her as a "hermaphrodite," (2) ordered her to be moved back to cell 3G, even though she had been taunted there, and (3) ordered her placed in segregation after she resisted the transfer and then kept her there longer than necessary.

Regarding the "hermaphrodite" classification, defendants argue that the term is technically accurate. Even assuming that defendants are incorrect, however, this mislabeling is at most akin to instances of racially derogatory language, which the court has already held do not violate the Constitution. *See DeWalt*, 224 F .3d at 612.

Mitchell's next claim regarding Koehler's decision to transfer Mitchell from 3I, where she states that the inmates did not bother her, back to pod 3G, where she states that she had encountered taunts and threats. On the face of it, the decision to move Mitchell *back* to 3G and likely taunts, rather than keep her in the pod in which she seemed to be accepted by the other inmates, is puzzling.

**\*12** Defendants counter that "[d]irecting her to be moved back to the 'special needs cell,' 3G, could not be discrimination as Sergeant Koehler was treating Mitchell the same way as other inmates with special circumstances." This makes some sense regarding Mitchell's original assignment to pod 3G, but by the time Koehler ordered her back to 3G, he was not operating on a clean slate. Mitchell had already encountered problems in 3G. Plus, the various efforts made by staff to find a suitable place for Mitchell permits an inference that staff would generally attempt to move inmates away from taunting and threats. [6] To the extent that the decision to place Mitchell back in 3G was a departure from that practice, or at least counterintuitive, the trier of fact might reasonably infer that Mitchell was treated differently from other similarly-situated prisoners.

As noted above, for Mitchell's claim to withstand summary judgment, she must also show that there is a genuine issue of material fact as to whether Koehler "acted either intentionally or with deliberate indifference" to her complaints of harassment because of her transgender status. *Schroeder v. Hamilton Sch. Dist .,* 282 F.3d 946, 951 (7th Cir.2002) (quoting *Nabozny*, 92 F.3d at 454). The

extent of Koehler's knowledge about Mitchell's problems is unclear. Defendants argue that "there is no evidence to suggest that Sergeant Koehler knew of any such risk when ordering Mitchell to be moved back to the special needs cell." Neither side has offered any testimony indicating that Koehler knew about the problems. [7]

Even so, the trier of fact might reasonably infer that Koehler, as the staff member making decisions about an inmate known to have special needs because of her transgender status, would have seen the "Jail Event Summary Report," which discusses the various problems Mitchell had in different cell assignments. For example, the report on Mitchell's stay in 3G states that she complained about inmates "picking on [her] because [s]he won't talk to them or interact with anyone in the pod" and that she "was threatened yesterday afternoon but could not give any other details pertaining to the incident or names," along with a note that a classification staff member said that she could be moved to general population, and the conclusion that she was moved "to keep the peace." In contrast, the summary report contains *no* entries noting Mitchell complaining about harassment in 3I.

Based on the facts adduced by the parties, there appear to be material issues of disputed fact. For example, it can be reasonably inferred from the summary reports and other evidence in this case that Koehler knew Mitchell was faring much better in 3I than she had in 3G, yet he ordered her moved back to 3G anyway for no good reason. Defendants try to frame this claim as amounting to a claim regarding Mitchell's "right to a safe environment," something akin to an Eighth Amendment conditions of confinement claim, in which there must be a substantial risk of serious harm. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 837, 114 (1994). They then argue that the facts known to Koehler preclude a finding that he was aware Mitchell faced a serious risk at that time. [8]

**\*13** However, this is an equal protection claim, not an Eighth Amendment claim. The *magnitude* of the harm faced is generally not an element of the claim. *Cannon v. Burkybile,* 2002 WL 448988 (N.D.Ill. Mar. 22, 2002) ("To the extent § 1983 contains a *de minimis* injury requirement, it is a very low threshold.") (citing *Billings v. Madison Metro. Sch. Dist.,* 259 F.3d 807, 814 (7th Cir.2001) (claim of race conscious seating of elementary school students for short duration, even if it had minimal effect, could

not be dismissed as *de minimis* )). Even in the absence of any showing of compensable damages, persons whose constitutional rights are violated may sue for vindication of those rights and obtain awards of nominal damages. *Carey v. Piphus,* 435 U.S. 247 (1978).

This is distinct from the question of whether a defendant's *actions* are sufficiently significant to implicate the Constitution, as discussed above: while some *acts* simply do not rise to the level of a Constitutional violation, *see Antoine,* 275 F. App'x at 541; *Bell,* 367 F.3d at 709; *DeWalt,* 224 F.3d at 612, the same is not true of the *harm* that discriminatory acts might cause. Intentionally placing an inmate in a situation where she will be taunted or threatened for her transgender status, despite evidence suggesting the defendant knew there to be a better placement readily available, would seem sufficient to prove an equal protection violation, at least where the decision bears no relation to a sufficiently important government interest. Here, it may be reasonable to infer from the facts that Koehler moved Mitchell back into 3G in the face of a markedly better option, despite knowing that it was unsuitable for her "special needs" as a transgender prisoner. Accordingly, defendants' motion for summary judgment on this claim will be denied.

In contrast, Mitchell's transfer to segregation following her refusal to move to 3G does not violate Mitchell's right to equal protection on its face, as there is no evidence suggesting that other prisoners who break prison rules by resisting transfer evade discipline for those violations. In any event, there is no indication that defendant Koehler was personally responsible for disciplining Mitchell: Deputy Isaacson issued the disciplinary report, and another staff member appears to have made the guilty finding. That the act of transfer to segregation does not itself rise to a Constitutional violation is again not to rule its impacts could not be a harm reasonably foreseeable by Koehler in originally (and wrongfully) returning her to 3G, should the jury so find.

Finally, with regard to Mitchell's claim that she served two extra days in segregation, the evidence before the court suggests that Koehler played a role in that determination. Mitchell also cites to several cases to bolster her claim, such as *Meriwether v. Faulkner,* 821 F.2d 408 (7th Cir.1987), in which the Seventh Circuit observed, "Whether a prisoner may be subjected to the restrictive and necessarily harsh conditions of

administrative segregation, not resulting from his own misconduct, for such a long period of time is a very difficult question." *Id.* at 416. Even so, the extra time Mitchell served in segregation—two days—is far from "a long period of time." Moreover, the *stated* rationale for the extra segregation time was to give prison officials time to consider where best to place Mitchell given her transgender status and worries about abuse at the hands of other inmates, both of which bear a substantial relation to the obviously important government interest in keeping inmates safe. This is particularly so where the evidence shows that: (1) Mitchell had already been the subject of mistreatment by other inmates; (2) prison officials tried to improve the conditions of her confinement from that ordinarily afforded in disciplinary segregation by allowing her hygiene items, legal materials and writing materials, and use of the shower and phone; and (3) officials ultimately gave her the assignment she wanted, in administrative confinement on "7 West." In other words, defendants made the best of a difficult situation, and there is nothing in the record to permit a reasonable inference that the decision to keep her in segregation for two days was done for "the purpose of causing ... adverse effects" on her because of her transgender status. If anything, all of the evidence is to the contrary.

### III. Defamation

**\*14** Mitchell also claims that defendant Koehler defamed her by calling her a "hermaphrodite." To prove a claim of defamation under Wisconsin law, a plaintiff must adduce evidence showing that an allegedly defamatory statement (1) was spoken to someone other than the person defamed, (2) is false, (3) is unprivileged, and (4) tends to harm the defamed person's reputation so as to lower her in the estimation of the community or to deter third persons from associating or dealing with her. *Torgerson v. Journall Sentinel, Inc.,* 210 Wis.2d 524, 534; 563 N.W.2d 472, 477 (1997); *Hart v. Bennet,* 2003 WI App 231, ¶ 21; 267 Wis.2d 919; 672 N.W.2d 306.

Defendants argue that summary judgment should be granted on this claim because Koehler's label of "hermaphrodite" is technically accurate. Truth is a complete defense to a defamation claim. *Ladd v. Uecker,* 2010 WI App 28, ¶ 8, 323 Wis.2d 798, 780 N.W .2d 216. They cite to a dictionary definition defining *hermaphrodite* as "[a] person or animal having both male and female sex organs *or other sexual characteristics,* either abnormally or (in the case of some organisms)

as the natural condition," http://oxforddictionaries.com/definition/english/hermaphrodite (last visited February 27, 2014) (emphasis added), and to a Tenth Circuit case in support of this position. *See Estate of Dimarco v. Wyoming Dept. of Corrections, Div. of Prisons,* 473 F.3d 1334, 1336 n. 1 (10th Cir.2007) (Prisoner "liv[ing] her life as a woman even though she was anatomically male" termed a hermaphrodite based on district court's defining hermaphrodite as person having "both male and female characteristics, including in varying degrees reproductive organs, secondary sexual characteristics, and sexual behavior") (interior quotations omitted).

The court is unwilling to adopt Koehler's truth defense. As Mitchell points out (and supports, albeit with improperly authenticated documents appearing to come from a dictionary and a scientific encyclopedia), the common understanding of the term "hermaphrodite" is an organism with both male and female reproductive organs.

Even so, Mitchell fails to show that she was harmed by Koeler's statement, at least in a way recognized by the law of slander. Koehler's allegedly defamatory statement falls under the rubric of "slander," because it is defamation by oral statement,[9] rather than by written statement, or "libel." As such, Mitchell's claim is not actionable unless (1) the slander is "actionable per se"; or (2) she proves "special damages." *Freer v. M & I Marshall & Ilsley Corp.,* 2004 WI App 201, ¶ 9, 276 Wis.2d 721 688 N.W.2d 756 (citing *Martin v. Outboard Marine Corp.,* 15 Wis.2d 452, 459, 113 N.W.2d 135, 138–39 (1962)). Mitchell's claim fails in both respects.

*First,* only certain types of slander are "actionable without proof of damages" because damages are "presumed from the character of the defamatory language." *Martin,* 15 Wis.2d at 459, 113 N.W.2d at 139. Such defamation, known as "slander per se," is limited to the following four circumstances: (1) "imputation of certain crimes" to the plaintiff; (2) "imputation ... of a loathsome disease"; (3) "imputation ... of unchastity to a woman plaintiff"; or (4) "defamation affecting the plaintiff in his business, trade, profession, or office."[10] *Freer,* 2004 WI App 201, ¶ 11 (quoting *Martin,* 15 Wis.2d at 459, 113 N.W.2d at 139) (internal quotations omitted); *see also* Restatement (Second) of Torts §§ 570–574 (1977) (section titled "Liability Without Proof of Special Harm—Slander" and following sections defining each of the four

categories). However arcane some of these categories[11] have become, none apply to Mitchell.[12]

**\*15** Of course, the court takes seriously Mitchell's claim that she was defamed by Koehler's statement. Despite the strides in acceptance that transgender and intersex persons have made in American society, it is unfortunately true that they have been unfairly stigmatized, and that someone publically labeled a hermaphrodite could, however unjustly, face a loss of reputation. Even so, disparaging persons who are transgender or intersex does not fit into the particular categories recognized by the Restatement and Wisconsin law. Indeed, one might hope that it will become no disparagement at all, just as the third per se category may fall away.

*Second,* Mitchell fails to show "special damages," also known as "special harm," which is the loss of something having economic or pecuniary value. Restatement (Second) of Torts § 575, cmt. b; see also *Martin,* 15 Wis.2d at 459, 113 N.W.2d at 139. If special harm is shown, damages for emotional disturbance, bodily harm and harm to reputation may also be recovered. Restatement (Second) of Torts § 575, cmt. c, § 623, cmt. a; *see also Martin,* 15 Wis.2d at 459, 113 N.W.2d at 139 ("Having proven such special harm of a pecuniary nature resulting from the action of third persons affected by the slander, the plaintiff may also recover general compensatory damages ... for damages to the invasion of his interest in his reputation and good name including his own injured feelings."). However, if a plaintiff cannot show special harm, the slander claim is not actionable and she may not recover for these other types of damages. *Id.*

Mitchell asserts that all of the above-mentioned abuse she has faced at the hands of prison staff (and concomitant emotional distress she has suffered) is related to Koehler's statement. This is a dubious assertion on its face because Mitchell fails to show how the staff members would have known about Koehler's statement and thus acted they way they did because of it.[13] In any case, because Mitchell does not show any type of pecuniary harm from the slander, her other damages are irrelevant under Wisconsin law for purposes of maintaining her slander claim.

## MOTION FOR RECRUITMENT OF COUNSEL

Finally, Mitchell has renewed her motion for appointment of counsel, dkt. # 161, which the court has denied several times previously. First, Mitchell should be aware that civil litigants have no constitutional or statutory right to the appointment of counsel. *E.g., Ray v. Wexford Health Sources, Inc.,* 706 F.3d 864, 866 (7th Cir.2013); *Luttrell v. Nickel,* 129 F.3d 933, 936 (7th Cir.1997). The court may exercise its discretion in determining whether to recruit counsel *pro bono* to assist an eligible plaintiff who proceeds under the federal *in forma pauperis* statute. *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent an indigent civil litigant *pro bono publico.*"); *Luttrell,* 129 F.3d at 936. The court cannot, however, "appoint" counsel to represent an indigent civil litigant; it merely has the discretion to recruit a volunteer in an appropriate case. *Ray,* 706 F.3d at 867.

***16** To date, Mitchell has represented herself relatively capably, and her efforts have at least been sufficient to survive summary judgment on her equal protection claim against defendant Koehler. Given Mitchell's inexperience and the relative difficulty she will have in showing at trial that Koehler intended to discriminate against her, however, the court nevertheless concludes that this case meets the criteria for recruiting volunteer counsel, particularly now that her case will proceed to trial. To that end, the court will grant Mitchell's request to recruit counsel to represent her through the end of this matter.[14]

Mitchell is advised that it may take time to locate an attorney who is willing to represent her on a *pro bono* basis. Once counsel has been recruited and a notice of appearance has been entered designating an attorney of record for Mitchell, the court will schedule a status conference in this case. Further proceedings in this case will remain stayed until that time.

ORDER

IT IS ORDERED that

(1) Plaintiff Roy Mitchell's motions to reinstate David Mahoney and Wisconsin Mutual Insurance Company as defendants (dkt.# 40, 56), are DENIED.

(2) Plaintiff's motion to amend her complaint (dkt.# 81) is DENIED.

(3) Plaintiff's motion to sanction defendants under Fed.R.Civ.P. 11 (dkt. # 115) is DENIED.

(4) Plaintiff's motion for temporary restraining order (dkt.# 141) is DENIED.

(5) Plaintiff's motion to amend her request for relief (dkt.# 149) is DENIED.

(6) Defendants' motion for summary judgment (dkt.# 94) is GRANTED in all respects except plaintiff's equal protection claim regarding defendant Koehler's decision to transfer her back to the 3G pod.

(7) The request for recruitment of legal counsel by plaintiff (dkt.# 161) is GRANTED.

(8) Once counsel has been recruited and a notice of appearance has been entered designating an attorney of record for plaintiff, the court will schedule a status conference in this case. Further proceedings in this case remain STAYED until such time.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6982280

Footnotes

1 At Mitchell's request, the court will refer to her using female pronouns.

2 This is not the only defect in Mitchell's motion to amend. For example, similar to the problems with her motion for a temporary restraining order, Mitchell does not describe these new abuses in any kind of detail, so the court cannot construe her motion as an attempt to supplement her complaint.

3 Based on defendants' proposed findings of fact, Mitchell's responses and defendants' reply, the following facts appear to be material and undisputed, unless otherwise noted. Mitchell purports to have filed her own proposed findings of fact (dkt.# 106), but this rambling, unnumbered document does not comply with the court's procedures for filing proposed findings of fact and will generally be disregarded. Moreover, as best of the court can tell, Mitchell's version of events described therein does not materially differ from Mitchell's responses to defendants' proposed findings.

4   At the time Mitchell filed the lawsuit, she was incarcerated at the New Lisbon Correctional Institution, but was reincarcerated at the Dane County Jail at least once during the pendency of these proceedings. The court understands that Mitchell is currently incarcerated at Dodge Correctional Institution.

5   Defendants have identified defendant Daniel "Werkherse" as Daniel Werkheiser. The caption has been amended accordingly.

6   Surely defendants do not mean to argue that it is a common practice to consciously move vulnerable or special needs prisoners into cells where they will face a higher level of taunts or threats.

7   Defendants also point out that Mitchell's admission that she did not meet Koehler until *after* he made the decision to move her back to 3G, but whether they met is irrelevant because it is undisputed that he was aware of her transgender status, at least insofar as he characterized her as a "hermaprodite."

8   The version of events contained in Mitchell's deposition is more detailed and inarguably worse—that inmates "kept calling [her] faggot," and "making threats"—but Mitchell has not shown that *Koehler* knew or should have known of these events.

9   The only evidence of Koehler's alleged defamatory statement about Mitchell being a "hermaphrodite" is from Isaacson's report, in which Isaacson states that Koehler made the remark.

10  Although the wisdom of giving these four categories special status is questionable, it is the standard in Wisconsin and so it is the standard the court follows here. *Freer,* 2004 WI App 201, ¶ 11 ("Whether, as the Concurrence/Dissent opines, these categories "make sense" in this era ... they are universal in our jurisprudence.") (citing Restatement (Second) of Torts § 570).

11  Mitchell cites to an 1846 Ohio case for the proposition that calling a woman a hermaphrodite is per se slander, *Malone v. Stewart,* 1846 WL 107 (Ohio Dec. 1846), but this court is not bound by Ohio law and, as noted above, the law in Wisconsin has developed around the four categories articulated in the Restatement.

12  For example, it would be outright offensive to categorize hermaphroditism as a "disease." Indeed, the Restatement makes clear that the category is meant to cover "an existing venereal disease or other loathsome *and communicable* disease," and there is no dispute that hermaphroditism is not communicable. Restatement (Second) of Torts § 572 (emphasis added); *see also id.* cmts. b and c (suggesting that leprosy and typhoid would also be counted as "loathsome diseases").

13  Defendant Wilson may have known about Kohler's statement, because he was "briefed" on Mitchell's situation by Isaacson before extracting her. As stated above, however, Mitchell does not have personal knowledge of who applied the handcuffs. Even if Mitchell knew that Wilson applied the handcuffs, it would be pure speculation that he did so harshly out of animus based on Koehler's statement.

14  Mitchell should be aware that this means that counsel will assist her with the trial on her claim against defendant Koehler; the court does not intend at this late date to expand the case to include claims regarding later acts of discrimination Mitchell may believe occurred.

---

**End of Document**                     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:16-cv-00943-PP   Filed 08/31/16   Page 20 of 90   Document 22-1

2012 WL 3911910
Only the Westlaw citation is currently available.
United States District Court,
E.D. California.

Troyce BRANINBURG, Plaintiff,
v.
COALINGA STATE HOSPITAL, et al., Defendants.

No. 1:08–CV–01457–MHM.
|
Sept. 7, 2012.

**Attorneys and Law Firms**

Troyce Braninburg, Coalinga, CA, pro se.

Jesse M. Rivera, Rivera & Associates, Sacramento, CA, for Defendants.

### ORDER

MARY H. MURGUIA, District Judge.

*1 Currently before the Court is Defendants' Motion for Summary Judgment. (Doc. 31). After reviewing the motions, the responses and replies thereto, as well as the applicable law, the Court issues the following order.

### MOTION FOR SUMMARY JUDGMENT

Plaintiff Troyce "Tabitha" Braninburg is a transgender female patient in the custody of Coalinga State Hospital ("CSH"). Plaintiff, proceeding *pro se,* filed the present civil rights complaint pursuant to 42 U.S.C, § 1983 for acts that she[1] alleged took place at CSH. In Counts One and Two, Plaintiff claims that Defendants were deliberately indifferent to Plaintiff's safety and security needs by taking no remedial action to stop other patients from sexually and verbally harassing her. Plaintiff further alleges, in Count Four, that two California Department of Corrections and Rehabilitation ("CDCR") officers fondled her breasts outside CSH before transporting her for medical treatment and placed metal restraints on her legs so tightly that they cut her skin. Finally, in Count Six, Plaintiff alleges that Defendants have segregated her and discriminated against her in her housing placement.

Defendants Avila, Adams, Singh, Reed, and Meek seek summary judgment on all of Plaintiffs claims.

### I. PROCEDURAL HISTORY

In a February 13, 2009 Order, the Court dismissed Plaintiff's Complaint for failure to state a claim, and gave Plaintiff 30 days to file an amended complaint. (Doc. 8). On March 10, 2009, Plaintiff filed a Motion for 30 Days Expansion of Time, which the Court granted in a March 19, 2009 Order. (Doc, 9),

On April 24, 2009, Plaintiff filed a First Amended Complaint. (Doc.11), In a May 14, 2009 Order, the Court dismissed Plaintiff's First Amended Complaint, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, because Plaintiff failed to comply with the Court's Order requiring Plaintiff to submit her First Amended Complaint on the form provided with the Februaiy 13, 2009 Order. (Doc. 12). The Court granted Plaintiff's motion, giving her 30 days to file a second amended complaint on the form provided with the Order. (Doc, 12),

On June 15, 2009, Plaintiff filed a Second Amended Complaint, (Doc, 13), and on July 8, 2009, Plaintiff filed a motion for leave to amend the Second Amended Complaint. (Doc. 14), In an August 17, 2009 Order, the Court granted Plaintiff 30 days to file a third amended complaint, (Doc. 15).

On September 14, 2009, Plaintiff filed a seven-count Third Amended Complaint. (Doc. 16). In an October 20, 2009 Order, the Court dismissed Counts Three, Five, and Seven, and dismissed Defendants Jova, Walters, Pachardo, Woods, Taylor, Fletcher, and Does 1–99, (Doc. 17). The Court concluded that, liberally construed, Plaintiff stated a claim in Count One against Defendant Avila, for deliberate indifference by failing to stop a CSH patient from sexually harassing Plaintiff; a claim in Count Two against Defendant Reed, for deliberate indifference in not pressing the emergency alarm when a CSH patient attacked Plaintiff; a claim in Count Four against Defendants Two Unidentified CDCR Officers, for fondling Plaintiff's breasts before transporting her for medical treatment and placing excessively tight metal restraints on Plaintiff's legs, causing her legs to bleed; and a claim in Count Six against Defendants Adams, Singh, and Meek, for refusing to assign her to different housing after a patient threatened to kill or hurt her. (*Id.*). The

Case 2:16-cv-00943-PP  Filed 08/31/16  Page 21 of 90  Document 22-1

Court did not direct that service be made on Defendants Two Unidentified CDCR Officers, as the Court was unable to identify them. (*Id.*). The Court, however, did not dismiss the claims against those Defendants and stated that Plaintiff could use the discovery process to obtain their names and amend her Third Amended Complaint to name them, (*Id.*).

**\*2** On December 28, 2009, Plaintiff sent a letter to the Clerk of Court requesting to make corrections and changes to the Third Amended Complaint. (Doc. 20). On February 25, 2010, the Court denied Plaintiff's request to file a Fourth Amended Complaint, stating that Plaintiff improperly communicated directly with court personnel, and that Plaintiff had ample opportunities to include such changes in her prior amended complaints. (Doc. 21).

On May 7, 2010, Defendants filed a motion requesting a 45-day extension to file responsive pleadings to Plaintiff's complaint, (Doc. 23), and the Court granted the extension in a May 19, 2010 Order. (Doc. 24). On June 21, 2010, Defendants filed an answer to Plaintiff's Third Amended Complaint. (Doc. 25). On March 21, 2011, the Court issued a Rule 16 Scheduling and Discovery Order. (Doc, 26). On January 13, 2012, Defendants filed a motion requesting a 90-day extension on the deadline to file dispositive motions. (Doc. 27). The Court granted in part and denied in part Defendants' motion, ordering that dispositive motions be filed by February 20, 2012, and stating that no further extensions would be granted. (Doc. 28).

On February 17, 2012, Defendants filed a motion requesting a one-week extension to file dispositive motions, (Doc. 29), which the Court granted for good cause on Februaiy 21, 2012. (Doc. 30). On Februaiy 27, 2012, Defendants filed the instant motion for Summary Judgment. (Doc. 31). On March 12, 2012, the Court issued an Order alerting Plaintiff to Defendant's motion. (Doc. 32). On March 15, 2012, Plaintiff filed a motion requesting a 90-day extension to respond to Defendant's summary judgment motion. (Doc. 33). The Court granted this motion on March 19, 2012. (Doc. 34).

On May 17, 2012, Plaintiff filed a motion objecting to summary judgment. (Doc. 35). Defendants filed a reply to Plaintiff's opposition on June 18, 2012. (Doc, 36).

## II. FACTUAL BACKGROUND

CSH is a maximum security psychiatric facility in Coalinga, California, offering therapeutic treatment for sex offenders and individuals with mental illnesses. (Defendants Statement of Facts ("DSOF"), p. 3, ¶ 7). Plaintiff is civilly committed at CSH as a sexually violent predator, (Id at 110), and is a self-described "male-to-female pre-op transgendered female." (*Id.* at ¶ 13). She alleges that Defendants, employees of CSH, acted with deliberate indifference as she was sexually and verbally harassed by other patients on several occasions. (*Id.* at ¶ 15). She further alleges that she has been segregated and discriminated against in her housing placement.

### A. Facts relevant to Defendants Avila

Plaintiff alleges in Count I that Defendant Avila was deliberately indifferent to her safety and security needs by failing to stop CHS patients from sexually harassing her. In 2007, Defendant Avila was the Unit Supervisor for Unit 5, the unit in which Plaintiff was housed. (*Id.*, p. 4, ¶ 1). The duties of a Unit Supervisor include overseeing the functions of the unit, giving directions to staff, consulting with clinicians, and supervising the needs of patients. (*Id.* at ¶ 5). Plaintiff resided in a single room in Unit 5, where Defendant Avila observed Plaintiff generally socializing well with her peers without any significant behavior problems. (*Id.* at ¶ 17). If patients at CSH have conflicts with each other, staff will consult with each patient and may separate their room locations by placing the individuals in different hallways. (*Id.* at ¶ 13). If the conflict continues, staff will relocate a patient to a different unit in CSH. (*Id.* at ¶ 15).

**\*3** On one occasion, Plaintiff alerted Defendant Avila to a non-threatening note left in Plaintiff's room and a suggestive cartoon placed on her window anonymously.[2] (*Id.* at ¶ 21). In her Third Amended Complaint, Plaintiff contends that she informed Defendant Avila that patient Mr. M was sexually harassing her, and that Defendant Avila took no remedial action to stop the harassment. (Doc. 16, p. 3). Conversely, Defendant Avila contends that, apart from the incident involving the anonymous note, she never spoke with Plaintiff regarding harassment by Mr. M, never witnessed patients threaten Plaintiff, and never refused to intervene if Plaintiff was under a threat of harm. (DSOF, p. 5, ¶ 17).

### B. Facts Relevant to Defendant Reed

Case 2:16-cv-00943-PP Filed 08/31/16 Page 22 of 90 Document 22-1

In Count II, Plaintiff asserts that Defendant Reed was deliberately indifferent to Plaintiff's safety and security by standing idly by while a CSH patient physically attacked her. Defendant Reed was a Senior Psychiatric Technician at CSH from January 2008 to December 2010. (DSOF, p. 5, ¶ 19). Defendant Reed asserts that he never witnessed Plaintiff in a physical altercation with another patient, and that he was not working on July 4, 2008, one of the days on which Plaintiff alleges she was physically attacked. (*Id.* at ¶ 21). CSH administration and Hospital Police conducted an investigation of the alleged attacks, but hospital records indicate staff could not complete the investigation due to Plaintiff's failure to cooperate. (*Id.*, p. 6, ¶ 1).

On one occasion, Defendant Reed physically intervened between Plaintiff and another patient, Mr. R., as they exchanged verbal insults. (*Id.* at ¶ 6). Defendant Reed quieted Plaintiff and Mr. R, and physically intervened between them to avoid any escalation. (*Id.*). Defendant Reed did not feel the situation required activation of the emergency alarm, which he is trained to use when someone is in physical danger. (*Id.* at ¶9). In her complaint, Plaintiff asserts that Defendant Reed witnessed a patient attack her and "merely stood by, doing nothing." (Doc. 16, p. 4). [3]

**C. Facts Relevant to Defendants Singh, Meek, and Adams**
In Count Six, Plaintiff contends that Defendants Singh, Meek, and Adams did not promptly reassign her housing placement after Plaintiff was housed with a patient who threatened to kill her. She additionally alleges that, while CSH staff ultimately moved her to a different dorm, she has been "segregated and discriminated" against by Defendant Meek. (Doc, 16, p. 5c).

During the time of Plaintiff's complaints in 2009, Defendant Singh was the Medical Director at CSH, where his duties included: acting as the primary physician of the hospital, developing policies for clinical practice, and directing treatment programs. (DSOF, p. 6–7). He neither made the patient housing placements in 2009, nor made any decisions regarding moving a patient from one room to another based upon their preferences. (*Id.* at 7, ¶ 34). Defendant Meek was the acting Program Director at CSH in 2009. (*Id.*, ¶ 15). [4]

*4 In February of 2009, Plaintiff was at court and thus out of the facility for several days. (DSOF, p. 8, ¶

10). After she returned, Plaintiff complained that other residents in her dorm, particularly Mr. P, did not want her there and harassed her. (*Id.* at ¶ 12). The first report to staff about Mr, P was on February 17, 2009, regarding a verbal threat, and staff prepared an Incident Report according to hospital protocol. (*Id.* at ¶ 18). Following this complaint, staff increased their supervision of Plaintiff. (*Id.* at ¶ 14), Defendant Meek contends that he never saw patients harass or assault Plaintiff, but that he nevertheless conducted an investigation into Plaintiff's complaints of harassment from dormmates in February 2009. (*Id.*, p. 8, ¶ 17). On or about March 5, 2009, Plaintiff was transferred from unit 8 to unit 11 and into a single room, (*Id.* at ¶ 16). Plaintiff does not deny that CSH staff ultimately rehoused her, but alleges that Defendant Meek has segregated her and discriminated against her in the new housing placement.

### III. STANDARD OF REVIEW
A motion for summary judgment may be granted only if the moving party shows "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact; the moving party must present the basis for its summary judgment motion and identify those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Chelates Corp. v. Citrate,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001).

A material fact is one that might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, in order to preclude summary judgment, a dispute about a material fact must also be "genuine," such that a reasonable jury could find in favor of the non-moving party. *Id* . In determining whether the moving party has met its burden, the Court views the evidence in the light most favorable to the nonmovant. *Allen v. City of L.A.,* 66 F.3d 1052, 1056 (9th Cir.1995). The Court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). Further, the Court must draw all reasonable inferences in favor of the nonmovant. *Gibson v. Cnty. of Washoe,* 290 F.3d 1175, 1180 (9th Cir.2002).

If the moving party meets its burden with a properly supported motion for summary judgment, then the burden shifts to the nonmoving party to present specific facts that show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Elec, Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," *Anderson,* 477 U.S. at 250. The party opposing summary judgment "may not rest upon mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Elec.,* 475 U.S. at 586–87. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

**\*5** The question on motion for summary judgment is thus whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 447 U.S. at 251–52. A court is not required to probe the record in search of a genuine issue of triable fact. *Keenan v. Allen,* 91 F.3d 1275, 1279 (9th Cir.1996). The nonmovant has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *See Carmen v. S.F. Unified Sch. Dist.,* 237 F.3d 1026, 1028–29 (9th Cir.2001) (holding that even if there is evidence in the record that creates a genuine issue of material fact, a district court may grant summary judgment if the opposing party's papers do not include or conveniently refer to that evidence). The mere existence of a scintilla of evidence supporting the nonmovant's petition is insufficient; there must be evidence from which a trier of fact could reasonably find for the nonmovant. *Anderson.* 447 U.S. at 252; *see Matsushita Elec.,* 475 U.S. at 586 (holding that nonmovant's showing of "some metaphysical doubt" as to material facts is insufficient to defeat summary judgment).

## IV. DISCUSSION

### A. Alleged Due Process Violations

Throughout her Third Amended Complaint and opposition motion, Plaintiff characterizes Defendants' conduct as "deliberately indifferent" to her safety and security needs.[5] However, in Paragraph 1 of each count, Plaintiff states that Defendants violated her Due Process rights, not her Eighth Amendment rights. Her claims will thus be analyzed under the 14th Amendment Due Process Clause. Moreover, this is the proper standard in light of the fact that Plaintiff does not allege a denial of medical treatment, but instead challenges her conditions of confinement,

The Due Process Clause of the 14th Amendment protects a civil detainee's right to adequate conditions of confinement, including the right to "adequate food, shelter, clothing, and medical care" as well as "reasonably safe conditions of confinement." *See Youngberg v. Romeo,* 457 U.S. 307, 314–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In determining whether the state has met its Constitutional duty of providing reasonably safe conditions, "decisions made by the appropriate professional are entitled to a presumption of correctness." *Id.* at 324. To incur liability, a professional must make a decision that "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment," *Id.* at 323; *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992). The Court's inquiry is thus limited to "two questions: (1) whether the decisionmaker is a qualified professional entitled to deference, and (2) whether the decision reflects a conscious indifference amounting to gross negligence, so as to demonstrate that the decision was not based upon professional judgment." *Id.* at 1535.

**\*6** After careful consideration of Plaintiff's Third Amended Complaint and the instant motion, the Court finds that Plaintiff has failed to marshal enough evidence to create a triable issue of material fact with respect to her allegations against Defendants Avila, Reed, Singh, Meek, and Adams.

### 1. Defendant Avila

Defendants contend that Plaintiff fails to raise an issue of material fact regarding Defendant Avila, because Defendant Avila neither witnessed Plaintiff being threatened, nor spoke with Plaintiff regarding the alleged harassment by patient Mr, M. At most, Defendant Avila states that she knew of a non-threatening note and cartoon placed in Plaintiff's room. (Doc. 31, p. 2, ¶ 7).

Defendant Avila's conduct did not violate Plaintiff's Due Process rights, as it does not come close to being a substantial departure from accepted professional judgment. *Youngberg.* 457 U.S. at 323. In one case of failed professional judgment, a hospital superintendent received multiple complaints that a male staff member had sexually assaulted female patients, and nevertheless allowed that staff member to continue working in seclusion with a female patient until he ultimately molested her. *Neely v. Feinstein,* 50 F.3d 1502 (9th Cir.1995). In another instance, a detainee was repeatedly raped by his cellmate, and challenged prison policies which integrated sexually violent prisoners into the general population. *Redman v. Cnty. of San Diego,* 942 F.2d 1435 (9th Cir.1991). The 9th Circuit held that these policies exposed inmates to known dangers, jeopardized their personal security, and thus the defendants' "conduct was so reckless as to be tantamount to a desire to inflict harm." *Id.* at 1447–48.

In contrast, Plaintiff puts forth no evidence that Defendant Avila failed to exhibit professional judgment. She does not state with any specificity when the alleged incidences of threats and sexual harassment occurred while residing in Unit 5, or put forth any evidence suggesting Defendant Avila knew about the alleged harassment, She also fails to show that Defendant Avila's conduct led to any ensuing harm. In short, even when viewed in the light most favorable to Plaintiff, Defendant Avila's conduct does not create a triable issue of material fact regarding her professional judgment, Accordingly, her conduct is presumed valid and summary judgment must be granted. *Youngberg,* 457 U.S. at 324.

### 2. Defendant Reed

Defendant Reed similarly contends that there is no question of material fact as to the adequacy of his professional judgment in maintaining Plaintiff's safety. He contends that his decision not to activate an emergency alarm during one particular incident does not represent a "substantial departure" from professional standards of hospital psychiatric technicians, who are trained to use the alarm only in the event of physical danger. (Doc. 31, p. 19, ¶ 11).

Defendant Reed's conduct did not violate Plaintiffs Due Process rights. *Youngberg,* 457 U.S. at 321 ("[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of

several professionally acceptable choices should have been made"). During the July, 2008 incident at issue, Defendant Reed witnessed a verbal altercation between Plaintiff and patient Mr. R, and physically intervened to prevent Mr. R, from grabbing or touching Plaintiff. (Doc. 31, ex, A, p. 29–32), As a result of Defendant Reed's intervention, Plaintiff exited the altercation and avoided physical harm. (*Id.*). Plaintiff presents no evidence indicating that Defendant Reed's decision to physically intervene is a departure from accepted professional standards. Moreover, Plaintiff was not harmed during this encounter. (*Id.*). Accordingly, even when viewed in the light most favorable to Plaintiff, no question of material fact exists as to whether Defendant Reed's decision to diffuse the altercation through physical intervention, instead of activating the personal alarm, was a substantial departure from accepted professional judgment. *Youngberg,* 457 U.S. at 314.

### 3. Defendants Singh, Meek, and Adams

*7 With regard to Defendants Singh, Meek and Adams, Plaintiff claims that Defendants refused to change her housing placement after her cellmate threatened, intimidated, and taunted Plaintiff in February 2009. Plaintiff was ultimately rehoused, where she asserts that she is now "segregated and discriminated" against by Defendant Meek.

Defendants contend that they are entitled to summary judgment because Plaintiff's complaint that she was not rehoused quickly enough simply does not rise to the level of a constitutional violation. Defendants contend that CSH responded appropriately and comprehensively to Plaintiff's complaints of verbal threats by increasing supervision of Plaintiff and removing Plaintiff from that unit. (Doc. 31, p. 20).

Defendants did not violate Plaintiff's Due Process rights in their handling of Plaintiff's housing complaints. First, while Plaintiff's right to be protected and confined in a safe institution is clearly established, *see Youngberg,* 457 U.S. at 319–22, "[v]erbal harassment or abuse ... is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983." *Oltarzewski v. Rugeiero,* 830 F.2d 136 (9th Cir.1987) (internal citation omitted). Second, Plaintiff puts forth no evidence persuasive or authority that Defendants' failure to rehouse Plaintiff more expeditiously constitutes a substantial departure from professional standards. She additionally provides no explanation or support for her claim that Defendant

Meek has segregated her in her new housing placement. In contrast, Defendants submit records and internal memos indicating that CSH indeed documented Plaintiff's complaints of threats in February 2009, subsequently increased supervision of her, investigated the alleged harassment, and ultimately rehoused her in March 2009.

In the absence of any apparent errors in professional judgment or evidence of discriminatory treatment in handling Plaintiff's housing complaints, Plaintiff has failed to raise a genuine issue of material fact as to unconstitutional living conditions. [6]

### B. Alleged Equal Protection Violations

Plaintiff alleges in paragraph 1 of each Count that she was denied Equal Protection when Defendants failed or refused to protect her from the harm of other inmates as a result of Plaintiff's status as an HIV positive, pre-operative transgender female. (Doc. 35, p. 23, ¶ 6).

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (internal quotations omitted). An equal protection claim may be established in two ways, The first requires a plaintiff to "show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class," *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998), *cert. denied,* 525 U.S. 1154, 119 S.Ct. 1058, 143 L.Ed.2d 63 (1999).

*8 Plaintiff has not put forth any evidence of discrimination, or discriminatory intent, based on Plaintiff's status as an HIV positive, transgender female, beyond merely pointing out that she has HIV and is a transgender female. Moreover, it is not apparent that transgender individuals constitute a "suspect" class. *See Jamison v. Davue,* No, CIVS–11–2056 WBS DAD P., 2012 WL 996383, at *3 (E.D.Cal. Mar.21, 2012) ("transgender individuals do not constitute a 'suspect' class").

If the action in question does not involve a suspect classification, a plaintiff may establish an equal protection claim by showing that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). To state an equal protection claim under this theory, a plaintiff must allege that: (1) she is a member of an identifiable class; (2) she was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. *Id.* at 564.

Plaintiff has not alleged facts to satisfy any of these three factors. Her conclusory statements of discriminatory treatment are insufficient to demonstrate a material issue of fact as to the denial of Equal Protection. *Matsushita Elec.,* 475 U.S. at 586–87,

### C. Plaintiff's State Law Claims

In her opposition to Defendant's motion for summary judgment, Plaintiff alleges for the first time that, in addition to violations of the federal Constitution, Defendants violated mandatory reporting provisions under California Welfare and Institution Code § 15600. (Doc. 35, p. 2).

FRCP Rule 15(a)(2) enables a party to supplement pleadings and thereby introduce a new cause of action not alleged in the original complaint, "**only** with the opposing party's written consent or the court's leave." Fed. R, Civ. P. 15(a)(2) (emphasis added). In the Court's February 25, 2010 Order, the Court specifically informed Plaintiff of this fact. Because Plaintiff has not provided a proper motion and notice to add a state law claim, any new claim not raised in the Third Amended Complaint is considered waived,

### D. Claims Against Two Unidentified CDCR Officers

In Count Four, Plaintiff alleges that Defendants Two Unidentified CDCR Officers fondled her breasts before transporting Plaintiff for medical treatment outside CSH and placed excessively tight metal restraints on Plaintiff's legs, causing her legs to bleed, (Doc. 16, p. 5a). To enable Plaintiff to utilize discover) to identify the unknown defendants, the Court did not previously dismiss these claims. Because Plaintiff has not served these defendants, the claim is dismissed for failure to prosecute.

### E. Qualified Immunity

Case 2:16-cv-00943-PP Filed 08/31/16 Page 26 of 90 Document 22-1

Because the Court finds that summary judgment should be granted in favor of Defendants, the Court does not reach Defendants' arguments regarding qualified immunity.

### IV. CONCLUSION

*9 Plaintiff's Opposition does not place any material fact in dispute.

**Accordingly,**

**IT IS HEREBY ORDERED** granting Defendants Avila, Adams, Singh, Reed, and Meek's Motion for Summary Judgment.

**IT IS FURTHER ORDERED** that all remaining Defendants are dismissed for Plaintiff's failure to serve pursuant to Rule 4 of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

Dated this 6th day of September, 2012.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3911910

Footnotes

1   Plaintiff is referenced as "he"by Defendants and in a prior Court order. However, Plaintiff asks to be referred to as "she." (Doc. 35, p. 2, ¶ 4).

2   Neither party specifically describes the substance of the cartoon or the note, Plaintiff disputes Defendant Avila's characterization of the note as non-threatening, (Doc. 35, p. 5, ¶ 20), but has not put forth any evidence in support of this assertion.

3   In her opposition motion, Plaintiff objects to various points in DSOF, asserting that: (1) CSH Administration did not conduct a meaningful investigation into her complaints of assault; and (2) Plaintiff never failed to cooperate in any investigation of her complaints. Plaintiff again presents no evidence in support of these contentions.

4   Neither party provides any information as to Defendant Adams' identity, occupation, or involvement in the matter. Plaintiff does not make any specific allegations against Defendant Adams, aside from broadly alleging that "Drs, Adams and Singh, and Daniel [Meek] refused to assign [her] to other housing." (Doc. 16, p. 5c).

5   A claim of "deliberate indifference" alleges that prison officials have violated an inmate's Eighth Amendment rights to adequate medical care. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding that the Eighth Amendment's prohibition against cruel and unusual punishment is applicable to the states through the Due Process Clause of the Fourteenth Amendment, and mandates that states provide adequate medical care to all of their prisoners.).

6   Although neither party mentioned Defendant. Adams, *see supra* n. 4, Plaintiff alleges that he engaged in the same conduct as Defendants Meek and Singh. Since this Court has concluded that Plaintiff has failed to adduce a disputed issue of material fact with respect to the actions of Defendants Meek and Singh, the Court will grant summary judgment in favor of Defendant Adams as well.

**End of Document**                                  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 996383
Only the Westlaw citation is currently available.
United States District Court,
E.D. California.

Jeremy JAMISON, Plaintiff,
v.
Officer DAVUE et al., Defendants.

No. CIV S–11–2056 WBS DAD P.
|
March 23, 2012.

**Attorneys and Law Firms**

Jeremy Jamison, Woodland, CA, pro se.

*ORDER*

DALE A. DROZD, United States Magistrate Judge.

**\*1** Plaintiff is a county jail inmate proceeding pro se. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983 and has filed an application to proceed in forma pauperis under 28 U.S.C. § 1915. This proceeding was referred to the undersigned magistrate judge in accordance with Local Rule 302 and 28 U.S.C. § 636(b)(1).

Plaintiff has submitted a declaration that makes the showing required by 28 U.S.C. § 1915(a). Accordingly, the court will grant plaintiff's request for leave to proceed in forma pauperis.

Plaintiff is required to pay the statutory filing fee of $350.00 for this action. 28 U.S.C. §§ 1914(a), 1915(b)(1). By this order, plaintiff will be assessed an initial partial filing fee in accordance with the provisions of 28 U.S.C. § 1915(b)(1). By separate order, the court will direct the appropriate agency to collect the initial partial filing fee from plaintiff's trust account and forward it to the Clerk of the Court. Thereafter, plaintiff will be obligated for monthly payments of twenty percent of the preceding month's income credited to plaintiff's prison trust account. These payments will be forwarded by the appropriate agency to the Clerk of the Court each time the amount in plaintiff's account exceeds $10.00, until the filing fee is paid in full. 28 U.S.C. § 1915(b)(2).

**SCREENING REQUIREMENT**

The court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1) & (2).

A claim is legally frivolous when it lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Franklin v. Murphy,* 745 F.2d 1221, 1227–28 (9th Cir.1984). The court may, therefore, dismiss a claim as frivolous where it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless. *Neitzke,* 490 U.S. at 327. The critical inquiry is whether a constitutional claim, however inartfully pleaded, has an arguable legal and factual basis. *See Jackson v. Arizona,* 885 F.2d 639, 640 (9th Cir.1989); *Franklin,* 745 F.2d at 1227.

Rule 8(a) (2) of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, in order to survive dismissal for failure to state a claim a complaint must contain more than "a formulaic recitation of the elements of a cause of action;" it must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic,* 550 U.S. at 555. In reviewing a complaint under this standard, the court must accept as true the allegations of the complaint in question, *Hospital Bldg. Co. v. Rex Hospital Trustees,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), construe the pleading in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).

**\*2** The Civil Rights Act under which this action was filed provides as follows:

Case 2:16-cv-00943-PP Filed 08/31/16 Page 28 of 90 Document 22-1

Every person who, under color of [state law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley,* 607 F.2d 858, 862 (9th Cir.1979); *Mosher v. Saalfeld,* 589 F.2d 438, 441 (9th Cir.1978). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient. *See Ivey v. Board of Regents,* 673 F.2d 266, 268 (9th Cir.1982).

## PLAINTIFF'S COMPLAINT

In the present case, plaintiff has identified as defendants Officer Davue, Lieutenant Day, Lieutenant Radamaker, Sergeant Chow, Officer Chand, and Dr. Zil.[1] All of the defendants are employed at the Yolo County Jail in Woodland, California. According to the complaint, plaintiff adheres to the Jewish faith and follows a kosher diet. Plaintiff is also transgender, with breasts, and takes female hormones. Plaintiff complains that he has had difficulty getting kosher meals and has experienced harassment as a result of his transgender status. In terms of relief, plaintiff requests monetary damages.

## DISCUSSION

The allegations in plaintiff's complaint are so vague and conclusory that the court is unable to determine whether the current action is frivolous or fails to state a claim for relief. The complaint does not contain a short and plain statement as required by Fed.R.Civ.P. 8(a)(2). Although the Federal Rules adopt a flexible pleading policy, a complaint must give fair notice to the defendants and must allege facts that support the elements of the claim plainly and succinctly. *Jones v. Community Redev. Agency,* 733 F.2d 646, 649 (9th Cir.1984). Plaintiff must allege with at least some degree of particularity overt acts which defendants engaged in that support his claims. *Id.* Because plaintiff has failed to comply with the requirements of Fed.R.Civ.P. 8(a)(2), the complaint must be dismissed. The court will, however, grant leave to file an amended complaint.

**\*3** In any amended complaint, plaintiff must allege facts demonstrating how the conditions complained of resulted in a deprivation of plaintiff's federal constitutional or statutory rights. *See Ellis v. Cassidy,* 625 F.2d 227 (9th Cir.1980). Plaintiff must also allege in specific terms how each named defendant was involved in the deprivation of his rights. There can be no liability under 42 U.S.C. § 1983 unless there is some affirmative link or connection between a defendant's actions and the claimed deprivation. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *May v. Enomoto,* 633 F.2d 164, 167 (9th Cir.1980); *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978).

If plaintiff elects to pursue this action by filing an amended complaint, he must clarify what constitutional or federal statutory right he believes each defendant has violated and support each claim with factual allegations about each defendant's actions. To the extent that plaintiff wishes to raise a claim against any of the defendants for interfering with his ability to freely exercise his religion with respect to receiving a kosher diet, he is advised that he may bring his claim under the First Amendment and/or the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Under the First Amendment, free exercise rights are "necessarily limited by the fact

of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir.1987). The constitutional right to free exercise of religion must be balanced against the state's right to limit First Amendment freedoms in order to attain valid penological objectives such as rehabilitation, deterrence of crime, and preservation of institutional security. *See O'Lone v. Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Pell v. Procunier,* 417 U.S. 817, 822–23, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). These competing interests are balanced by applying a "reasonableness test." *McElyea,* 833 F.2d at 197. Under RLUIPA, the government is prohibited from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability." 42 U.S.C. § 2000cc–1(a). Plaintiff bears the initial burden of demonstrating that an institution's actions have placed a substantial burden on plaintiff's free exercise of religion. To state a cognizable claim under the First Amendment or RLUIPA, plaintiff must specify in any amended complaint which defendants have denied him access to a kosher diet and link his claim together with specific defendant(s) and his or her specific conduct.

To the extent that plaintiff wishes to raise a claim against any of the defendants for harassing him or discriminating against him based on his transgender status, he is advised that verbal harassment or abuse alone does not violate the Constitution and thus does not give rise to a claim for relief under 42 U.S.C. § 1983. *Austin v. Terhune,* 367 F.3d 1167, 1171–72 (9th Cir.2004); *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987) (vulgar language and verbal harassment do not state a constitutional deprivation under § 1983). However, to the extent that plaintiff seeks to bring an equal protection claim against defendants for discriminating against him, he is advised that the Fourteenth Amendment Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To state a cognizable claim under the Equal Protection Clause, plaintiff "must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent." *Byrd v. Maricopa County Sheriff's Dep't,* 565 F.3d 1205, 1212 (9th Cir.2009) (quoting *Monteiro v. Tempe Union High School District,* 158 F.3d 1022, 1026 (9th Cir.1998)).

"Intentional discrimination means that a defendant acted at least in part *because of* a plaintiff's protected status." *Serrano v. Francis,* 345 F.3d 1071, 1082 (9th Cir.2003) (emphasis in original) (quoting *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir.1994)). Plaintiff is cautioned, however, that transgender individuals do not constitute a "suspect" class, so allegations that defendants discriminated against him based on his transgender status are subject to a mere rational basis review. In this regard, any regulation, policy, or practice will be upheld if it is "reasonably related to legitimate penological interests." *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

**\*4** Plaintiff is informed that the court cannot refer to a prior pleading in order to make plaintiff's amended complaint complete. Local Rule 220 requires that an amended complaint be complete in itself without reference to any prior pleading. This is because, as a general rule, an amended complaint supersedes the original complaint. *See Loux v. Rhay,* 375 F.2d 55, 57 (9th Cir.1967). Once plaintiff files an amended complaint, the original pleading no longer serves any function in the case. Therefore, in an amended complaint, as in an original complaint, each claim and the involvement of each defendant must be sufficiently alleged.

### OTHER MATTERS

Also pending before the court are plaintiff's motion for preliminary injunctive relief and motion for appointment of counsel. In plaintiff's motion for preliminary injunctive relief, plaintiff seeks a court order requiring defendants to obtain his breakfast, lunch, and dinner from a local establishment that provides kosher meals prepared in a kosher kitchen. As an initial matter, plaintiff's motion is defective because it does not comply with the Local Rules of Court. The court will not entertain any future request or motion for injunctive relief that is not supported by (1) a declaration under penalty of perjury on the question of irreparable injury, (2) a memorandum of points and authorities addressing all legal issues raised by the motion, and (3) evidence of notice to all persons who would be affected by the order sought. *See* Local Rule 231. In addition, plaintiff's motion for injunctive relief is premature. No defendants have been served at this time and thus have not been provided an opportunity to respond to plaintiff's allegations. *See Zepeda v. United*

*States Immigration Service,* 753 F.2d 719, 727 (9th Cir.1985) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court."). Finally, for the same reasons discussed above, plaintiff's motion fails to state a cognizable claim for relief and does not demonstrate that plaintiff is entitled to the requested court order. *See Stormans v. Selecky,* 571 F.3d 960, 978 (9th Cir.2009) ("The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'") (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Accordingly, plaintiff's motion for preliminary injunctive relief will be denied without prejudice.

As to plaintiff's motion for appointment of counsel, the United States Supreme Court has ruled that district courts lack authority to require counsel to represent indigent prisoners in § 1983 cases. *Mallard v. United States Dist. Court,* 490 U.S. 296, 298, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989). In certain exceptional circumstances, the district court may request the voluntary assistance of counsel pursuant to 28 U.S.C. § 1915(e)(1). *Terrell v. Brewer,* 935 F.2d 1015, 1017 (9th Cir.1991); *Wood v. Housewright,* 900 F.2d 1332, 1335–36 (9th Cir.1990).

**\*5** The test for exceptional circumstances requires the court to evaluate the plaintiff's likelihood of success on the merits and the ability of the plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved. *See Wilborn v. Escalderon,* 789 F.2d 1328, 1331 (9th Cir.1986); *Weygandt v. Look,* 718 F.2d 952, 954 (9th Cir.1983). Circumstances common to most prisoners, such as lack of legal education and limited law library access, do not establish exceptional circumstances that would warrant a request for voluntary assistance of counsel. In the present case, the court does not find the required exceptional circumstances.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's application to proceed in forma pauperis (Doc. No. 12) is granted.

2. Plaintiff is obligated to pay the statutory filing fee of $350.00 for this action. Plaintiff is assessed an initial partial filing fee in accordance with the provisions of 28 U.S.C. § 1915(b)(1). All fees shall be collected and paid in accordance with this court's order to the Sheriff of Yolo County filed concurrently herewith.

3. Plaintiff's complaint is dismissed.

4. Plaintiff is granted thirty days from the date of service of this order to file an amended complaint that complies with the requirements of the Civil Rights Act, the Federal Rules of Civil Procedure, and the Local Rules of Practice; the amended complaint must bear the docket number assigned to this case and must be labeled "Amended Complaint"; failure to file an amended complaint in accordance with this order will result in a recommendation that this action be dismissed without prejudice.

5. Plaintiff's motion to correct the spelling of defendant Davue and defendant Radamaker's names (Doc. No. 11) is granted.

6. Plaintiff's motion for preliminary injunctive relief (Doc. No. 11) is denied without prejudice.

7. Plaintiff's motion for appointment of counsel (Doc. No. 11) is denied.

8. The Clerk of the Court is directed to amend the docket to reflect the correct spelling of defendant Davue and defendant Radamaker's names and to send plaintiff the court's form for filing a civil rights action.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 996383

Footnotes

1    In his complaint, plaintiff spelled defendant Davue's name "Dauve" and spelled defendant Radamaker's name "Ratliff." Plaintiff has filed a motion to correct the spelling of the defendants' names. Good cause appearing, the court will grant plaintiff's motion and direct the Clerk of the Court to amend the docket to reflect the correct spelling of defendants' names.

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 399184
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

Dion'e KAEO–TOMASELLI, Plaintiff,
v.
Jennifer BUTTS, Iwalani Souza, Defendants.

Civ. No. 11–00670 LEK/BMK.
|
Jan. 31, 2013.

**Attorneys and Law Firms**

Dion'e Kaeo–Tomaselli, Kailua, HI, pro se.

Iwalani Souza, Honolulu, HI, pro se.

### ORDER DENYING MOTION
### FOR SUMMARY JUDGMENT

LESLIE E. KOBAYASHI, District Judge.

*\*1* Before the court is *pro se* Plaintiff Dion'e Kaeo–Tomaselli's Motion for Summary Judgment.[1] ECF # 60. Plaintiff alleges that Defendants Jennifer Butts and Iwalani Souza, respectively the owner and manager of the Pi'ikoi Clean and Sober House for Women ("Pi'ikoi House"), violated the Fair Housing Act ("FHA") of 1968,[2] the Equal Protection Clause of the Fourteenth Amendment, and state law when they allegedly refused her request for accommodation at Pi'ikoi House on August 10, 2010. Plaintiff seeks summary judgment on the allegations in her pleadings and documents she has filed showing that she is a hermaphrodite, is treated as a female by the State, and inquired about residing at Pi'ikoi House in 2010. The court elects to decide this matter without a hearing. *See* LR7.2(d). For the following reasons, Plaintiff's Motion is DENIED.

### I. BACKGROUND

This action is proceeding on Plaintiff's claims against Defendant Butts and Souza in the Second Amended Complaint ("SAC"). *See* ECF # 27. Plaintiff alleges that, on August 10, 2010, the WCCC Librarian, Harry Fuchigami, telephoned Souza to inquire whether Plaintiff

could reside at Pi'ikoi House upon her release from prison. Plaintiff alleges that Souza told Fuchigami that she would not accept Plaintiff as a resident "because former inmates who currently live in the house told [Souza] that [Plaintiff] was a sex change." *Id.* at PageID # 148. Plaintiff claims that Butts failed to properly train Souza and protect her from's Souza's alleged discrimination. Plaintiff seeks damages, continuing psychological treatment, and reformation of policies and procedures at the Pi'ikoi House.

### II. *LEGAL STANDARD*

"[T]he moving party always bears the initial responsibility of informing the district court of the basis for its motion [for summary judgment], and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001). "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.' " *C.A.R. Transportation Brokerate Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 480 (9th Cir.2000) (quoting *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992)).

Put another way, "[her] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Issues of Material Fact, 99 F.R.D. 465, 487 (1984)); *cf. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Chanel, Inc. v. Italian Activewear of Florida, Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991) ("But—particularly where, as here, the moving party is also the party with the burden of proof on the issue—it is important to remember the non-moving party must produce its significant, probative evidence *only after* the movant has satisfied its burden of demonstrating there is no genuine dispute on any material fact.") (emphasis added).

**\*2** Thus, on a summary judgment motion, the moving party bearing the ultimate burden of proof at trial must demonstrate that there is no triable issue as to the matters alleged in its own pleadings. *Calderone,* 799 F.2d at 259. This requires the moving party to establish beyond controversy every essential element of its claim or defense. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). The moving party's evidence is judged by the same standard of proof applicable at trial. *Anderson,* 477 U.S. at 252.

If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102–03 (9th Cir.2000). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84,* 546 F.3d 1121, 1126 (9th Cir.2008).

## III. *DISCUSSION*

In support of her Motion, Plaintiff provides:

(1) a verified letter from WCCC librarian, Harry Fuchigami, stating that Souza told him that: (a) Plaintiff must contact her personally to apply for residency at Pi'ikoi House; (b) current residents vote on new candidates for residence; (c) some current residents had informed Souza that they were uncomfortable accepting Plaintiff because they believed she had undergone a sex change operation; and (d) Souza believed that Plaintiff's request would likely be denied by the other residents. *See* Pl.'s Mot., Fuchigami Letter, ECF # 60–4; Fuchigami Aff., ECF # 64–1.

(2) a letter from her attorney, Deputy Public Defender E. Edward Aquino, Esq., stating that Plaintiff was born a hermaphrodite and this has caused problems for Plaintiff during her incarceration. *Id.,* Aquino Letter, ECF # 60–5, ECF # 60–6.

(3) a copy of her Hawaii Identification Certificate, listing her as female. *Id.* ECF # 60–1; ECF # 60–2.

(4) psychiatric and medical progress notes from the Hawaii Department of Public Safety, stating that Plaintiff's penis is "so atrophied [it] is more like an enlarged clitoris." Based on this, Plaintiff was assigned to the Women's Community Correctional Center, as a female inmate. *Id.* ECF # 60–3.

(5) various documents showing that Plaintiff wrote Souza on July 18, 2010, detailing her desire to reside at Pi'ikoi House, filed a complaint with the Hawaii Civil Rights Commission and contacted the U.S. Department of Justice regarding her housing discrimination claims. ECF # 60–4, # 62–2, # 62–3, # 62–5.

### A. Genuine Issues of Fact Remain Under the FHA

The FHA "protects against discrimination 'in the terms, conditions, or privileges of sale or rental of a dwelling ... because of race, color, religion, sex, familial status, or national origin[.]' " *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1063 (9th Cir.2004); 42 U.S.C. § 3604(b). To have standing to sue under the FHA, a party must be an "aggrieved person," which is defined as one who "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that [he or she] will be injured by a discriminatory practice *that is about to occur.*" 42 U.S.C. § 3602(i) (emphasis added).

### 1. Standing to Sue

**\*3** Although the Supreme Court recognizes a liberal standing requirement for actions brought under the FHA, a plaintiff must still show an actual injury traceable to a defendant's conduct; only then is she entitled to seek redress for that harm. *See Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *San Pedro Hotel Co., Inc. v. City of Los Angeles,* 159 F.3d 470, 475 (9th Cir.1998). Thus, to establish that she is an "aggrieved person," Plaintiff must demonstrate that she suffered a concrete injury in fact or one that is actual and imminent; that such injury is fairly traceable to Defendants' allegedly illegal actions; and that it is likely that such injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Plaintiff fails to demonstrate by a preponderance of the evidence that she suffered any actual injury traceable to Souza's alleged statements to Fuchigami. That is, Plaintiff

Case 2:16-cv-00943-PP   Filed 08/31/16   Page 34 of 90   Document 22-1

submits no evidence showing that she was eligible to reside at Pi'ikoi House and was denied residence on the basis of her sex or perceived gender, and thus, was subjected to an actual injury by an *imminent* discriminatory housing practice.

Fuchigami's conversation with Souza does not prove that Plaintiff actually applied for residence at Pi'ikoi house, or personally spoke with Souza as required by Pi'ikoi House's rules, and was refused. Fuchigami's letter shows only that Souza allegedly told him that Plaintiff must contact her personally, Pi'ikoi House's residents vote on who is accepted, and Souza believed the current residents would not accept Plaintiff based on their belief that she had a sex change operation. Souza may deny Fuchigami's account, or produce evidence that Pi'ikoi House management can overrule resident votes that are deemed illegal or against policy. Either possibility would create a genuine issue of fact.

More importantly, Plaintiff's documents show that Plaintiff was incarcerated in July–August 2010, when she wrote Souza and when Fuchigami contacted Souza, was incarcerated while she pursued her claims with the Hawaii Civil Rights Commission and others, and remains incarcerated now. [3] If Plaintiff was incarcerated when she and Fuchigami contacted Souza, and was not eligible for imminent release, then even accepting her claims as true, Plaintiff was not eligible for residence at Pi'ikoi House during the past three years. Plaintiff does not show any actual injury based on an illegal housing decision that occurred or was "about to occur," thus, that there is *no* genuine issue of material fact regarding her standing to sue. [4] *See* 42 U.S.C. § 3602(i).

### 2. The Roommate Exception to Liability Under the FHA

It appears that Pi'ikoi House is a group home, that is, a shared living accommodation where residents share rooms and/or living quarters and vote on accepting new residents. *See* Pl.'s Exh., "Women's Clean & Sober House Listing," ECF # 62–1 (listing Pi'ikoi House and advising those seeking "a clean and sober house," to inquire about the "the cost [and] meet your possible room mates (how many live there?, how many in a room?"); Fuchigami Letter, ECF # 64–2 (stating, "[Souza] was very cordial and explained to me that the residents of her clean and sober house take a vote to see if a candidate should be accepted into the house.").

**\*4** The Ninth Circuit Court of Appeals has recently held that, under the FHA, a " 'dwelling' does not include shared living units ... [and] excludes roommate selection from the reach of the FHA." *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC,* 666 F.3d 1216, 1222 (9th Cir.2012). In so holding, the Ninth Circuit stated, "choosing a roommate implicates significant privacy and safety considerations," and should not be subject to government regulation. *Id.* at 1221 (stating that a woman may consider modesty or security concerns when seeking a roommate, just as "[a]n orthodox Jew may want a roommate with similar beliefs and dietary restrictions," and should have the unfettered ability to do so). The court explained that, "[b]ecause we find that the FHA doesn't apply to the sharing of living units, it follows that it's not unlawful to discriminate in selecting a roommate." *Id.* at 1222.

While this court held that Plaintiff *states a claim* under the FHA, that determination does not equate to a finding that Plaintiff has *proved* her claim. The record is inadequate for the court to make a determination on whether Plaintiff has standing to sue, or whether Pi'ikoi House is a shared living accommodation, or on the overall merits of Plaintiff's claims under the FHA at this time. Nonetheless, Plaintiff fails to meet her burden of showing that there is no genuine issue of material facts regarding her FHA claims. Consequently, the burden does not shift to Defendants, the non-moving parties, to produce contrary evidence. Plaintiff's Motion for Summary Judgment is DENIED on her FHA claims.

### B. Plaintiff's § 1983 Claims

Plaintiff seeks relief under 42 U.S.C. § 1983, alleging that Defendants violated her rights to equal protection under the law. To succeed on her § 1983 claim, Plaintiff must show that the conduct at issue "was committed by a person acting under the color of state law" and that the "conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Hydrick v. Hunter,* 500 F.3d 978, 987 (9th Cir.2007) (citation omitted), *vacated and remanded on other grounds,* 556 U.S. 1256, 129 S.Ct. 2431, 174 L.Ed.2d 226 (2009).

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to

Case 2:16-cv-00943-PP Filed 08/31/16 Page 35 of 90 Document 22-1

any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (internal quotations omitted).

### 1. No Evidence That Defendants Acted Under Color of State Law

A person acts under color of state law if he or she "exercise[s] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368(1941)). "Private parties are not generally acting under state law." *Price v. Hawaii,* 939 F.2d 702, 707–08 (9th Cir.1991).

**\*5** Plaintiff submits no evidence that Butts and Souza, the owner and resident manager of an apparently privately owned and operated group home, were acting under color of state law. Thus, a genuine issue of material facts exists regarding Defendants' status as state actors.

### 2. No Similarly Situated Individuals Named

An equal protection claim may be established in two ways; the first requires a plaintiff to "show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998). Plaintiff puts forth no evidence that her status as a hermaphrodite, or transgender female, qualifies her as a member of a protected class. Nor has this court discovered any cases in which transgendered individuals constitute a "suspect" class. *See, e.g., Braninburg v. Coalinga State Hosp,* 2012 WL 391190, \*8 (E.D.Cal., Sep. 7, 2012; *Jamison v. Davue,* 2012 WL 996383, \*3 (E.D.Cal. Mar.21, 2012) (holding that transgender individuals do not constitute a suspect class).

Alternatively, if the claims do not involve a suspect classification, a plaintiff can establish an equal protection "class of one" claim by alleging that she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000);

*Squaw Valley Dev. Co. v. Goldberg,* 375 F.3d 936, 944 (9th Cir.2004). To prevail under this theory, a plaintiff must show that: (1) she is a member of an identifiable class; (2) she was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. *Vill. of Willowbrook,* 528 U.S. at 564. Plaintiff sets forth no evidence supporting a finding that other similarly situated individuals were treated differently from her and that there is no rational basis for such differential treatment. Thus, Plaintiff fails to show that there is no genuine issue of material fact regarding her equal protection claims. Plaintiff's Motion is DENIED on her equal protection claims and Defendants need not respond.

### 3. Defendant Butts is Dismissed

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case *at any time* if the court determines that ... the action or appeal ... fails to state a claim upon which relief can be granted." 28 U.S.C. § 1915(e)(2)(B)(ii) (emphasis added). Thus, the court retains a continuing duty to screen a prisoner's complaint and must dismiss a complaint or portion thereof if it determines that a claim is frivolous, malicious, or fails to state a claim. *Id.; c.f., Lopez v. Smith,* 203 F.3d 1122, 1126 n. 6 (9th Cir.2000) (en banc) (holding that a court is not relieved of its duty to screen a complaint under the Prison Litigation Reform Act of 1996 ("PLRA"), even after a motion to dismiss is brought).

**\*6** Plaintiff alleges that Butts "failed to protect [her] from" Souza's discriminatory acts by failing to train Souza, but provides no other facts linking Butts to Souza's alleged comments and supposed denial of housing. *See* SAC, ECF # 27 PageID # 147. That is, Plaintiff makes no allegations that Butts, knew of, directed, or played any role in Souza's alleged decision to deny Plaintiff housing at Pi'ikoi House. Plaintiff appears to name Butts solely because of her position as owner of Pi'ikoi House.

There is no *respondeat superior* liability under § 1983, i.e., there is no liability under the theory that one is responsible for the actions or omissions of an employee. Liability under § 1983 arises only upon a showing of personal participation by the defendant, *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989), and may be imposed only if a plaintiff can show that the defendant proximately caused a deprivation of a federally protected right and links that

defendant to the claim, *Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir.1988).

In *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Court explained that purposeful discrimination, as alleged here, requires a plaintiff to "plead and prove that the defendant acted with discriminatory purpose." *Id.* at 676; *see also Starr v. Baca,* 652 F.3d 1202, 1206 (9th Cir.2011). "Proving purposeful discrimination requires showing 'more than intent as volition or intent as awareness of consequences'; the plaintiff must show that the decisionmaker acted because of his action's adverse effects, not merely in spite of them." *Starr,* 652 F.3d at 1206 (quoting *Iqbal,* 556 U.S. at 676) (internal quotation marks omitted). Holding a supervisor liable for unconstitutional discrimination if he or she did not have a discriminatory purpose "would be equivalent to finding them vicariously liable for their subordinates' violation," which is not allowed under § 1983. *Starr,* 652 F.3d at 1206. Even alleging a supervisor's "awareness of the discriminatory effects of his or her actions or inaction does not state a claim of unconstitutional discrimination," and Plaintiff does not so allege. *Id.* Nothing within the SAC shows that Butts was aware of, directed, participated in, or acquiesced in Souza's alleged statements or actions.

Plaintiff fails to allege sufficient facts against Butts to state a claim for purposeful discrimination and claims against her are DISMISSED. Plaintiff may seek to amend only if she can allege sufficient, plausible facts showing that Butts participated in, knew of, or directed Souza's allegedly discriminatory actions.

### 4. State Law Claims

Because Plaintiff's state law claims are before the court on discretionary, supplemental jurisdiction, the court will not consider them until jurisdiction for Plaintiff's federal claims has been conclusively determined. *See Carlsbad Tech., Inc. v. HIF BIO, Inc.,* 556 U.S. 635, 639–540, —S.Ct. —, — – —, — L.Ed.2d —, — – — (2009) ("With respect to supplemental jurisdiction in particular, a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise. A district courts decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.") (citations omitted).

### IV. *CONCLUSION*

**\*7** Plaintiff provides no evidence establishing beyond doubt the elements of her claim that Defendants discriminated against her on the basis of her sex and/ or gender. Plaintiff neither directs the court to evidence entitling her to a directed verdict if that evidence went uncontroverted at trial, nor establishes beyond controversy every essential element in her claims.

Summary judgment is inappropriate, and Defendants are not required to oppose this Motion or to produce any evidence controverting Plaintiff's arguments. Plaintiff's Motion for Summary Judgment is DENIED. Claims against Defendant Butts are DISMISSED, as discussed above.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 399184

---

Footnotes

1    Plaintiff is incarcerated at the Women's Community Correctional Center ("WCCC"), and is proceeding in forma pauperis.
2    Also known as Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq.
3    Publicly available incarceration records show that Plaintiff's maximum term does not expire until November 25, 2018. *See* Hawaii SAVIN https://www.vinelink.com.
4    Plaintiff's other exhibits support her contention that she is a hermaphrodite and is considered a female by the State. They do not, however, conclusively show that Plaintiff was actually eligible to reside at Pi'ikoi House within the past three years, and was improperly denied such residence.

---

**End of Document**                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:16-cv-00943-PP   Filed 08/31/16   Page 37 of 90   Document 22-1

2009 WL 229956
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mariah LOPEZ f/k/a Brian Lopez, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

No. 05 Civ. 10321(NRB).
|
Jan. 30, 2009.

### MEMORANDUM & ORDER

NAOMI REICE BUCHWALD, District Judge.

*1 Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 alleging violations of her civil rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and also seeking redress under New York State Executive Law § 296 *et. seq.* (the "NYS Human Rights Law") and the Administrative Code of the City of New York § 8-107 *et. seq.* (the "NYC Human Rights Law"). At the times relevant to the allegations in the complaint, plaintiff was a pre operative transgender individual who was receiving hormones as part of her effort to transition from Brian Lopez to Mariah Lopez. Plaintiff alleges that during a number of short periods of incarceration at Rikers Island defendants violated her rights by (1) housing her with male inmates; (2) not permitting her to wear female clothes and undergarments; (3) not permitting her to take female hormones; (4) subjecting her to verbal harassment and threatening behavior by defendant correction officers; (5) physically assaulting her; (6) observing verbal harassment, threatening behavior, and physical assaults and failing to intervene; (7) improperly placing her in a classroom for inmates who have disciplinary problems; and (8) allowing classmates to verbally abuse and physically assault her.

Defendants Commissioner Martin Horn, Warden Patrick Walsh, Warden Peter Curcio, Kaw Aung, M.D., Capt. Kevin Buck, CO. Ronald Flemming[1], Principal Delores Jefferson, C.O. Theresa John, C.O. George Johnson, Capt. Ellen Patterson, Jane San Jose, M.D., and Capt.

Robin Walker[2] now move for summary judgment on twelve grounds: (1) failure to exhaust administrative remedies; (2) vagueness of claims; (3) the absence of evidence of excessive force; (4) the absence of personal involvement by defendant Flemming; (5) the absence of evidence of deliberate indifference to plaintiff's medical need; (6) the absence of evidence of failure to protect plaintiff; (7) the absence of evidence of personal involvement by defendants Horn, Walsh, or Curcio; (8) the absence of evidence of municipal liability; (9) the failure of emotional injury claims due to lack of physical injury; (10) the legal unrecognizability of a denial of gay or female housing claim; (11) qualified immunity; and (12) the inappropriateness of continuing to hear the state and city law claims which pend to the dismissed federal claims.

For the reasons set forth below, defendants' motion is granted.

### Background

#### I. Plaintiff's Allegations

Plaintiff was incarcerated at Rikers Island fourteen times between August 17, 2001, and July 7, 2008.[3]

Plaintiff's complaint contains a host of claims. Broadly, defendant claims that each time she was incarcerated, she was required to be housed with male inmates, not allowed to wear female clothing, not given or given improper dosages of female hormones or testosterone blockers, subjected to verbal harassment and physical assault by defendant correction officers, and not protected from other inmates. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opposition") at 2-3.) She also claims to have suffered Post-Traumatic Stress Disorder and offers this as an explanation for failing to provide dates and details about the incidents she alleges in her deposition testimony. (*Id.*)

*2 Plaintiff fails to provide specific dates for many of these assaults and oftentimes makes accusations against unnamed defendants or officers who were not served in this case.

Specifically, despite her allegations of assaults and failures to provide medical care, plaintiff did not identify many of the corrections officers and doctors who allegedly

Case 2:16-cv-00943-PP Filed 08/31/16 Page 38 of 90 Document 22-1

committed the alleged wrongs. In an effort to assist plaintiff in remedying this glaring deficiency, the Court ordered the city to gather photographs of corrections officers and medical personnel whose paths plaintiff might have crossed. Thereafter, the City proceeded to take plaintiff's deposition and presented her with an array of photographs of corrections officers and medical staff to assist her in identifying the officers and doctors she intended to sue. This deposition occurred on August 28, 2006. Following this lengthy process, which included at least four time extensions from the Court, plaintiff identified some of the defendant corrections officers, for whom the city then accepted service. Others, including Defendant Flemming, were served on the basis that they were the only officer with that particular name who worked in a facility where plaintiff was housed. Another two depositions occurred on July 10, 2007, November 16, 2007. After plaintiff's depositions were concluded, plaintiff did not depose any defendants, despite numerous extensions of the discovery period. In total, this process lasted approximately one and a half years. Thus, the pretrial record is limited to plaintiff's complaint, her deposition, and the document discovery, including some of plaintiff's medical records.

On March 21, 2008, defendants moved for summary judgment.

### Discussion

### I. Legal Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Summary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant has the burden of demonstrating that no genuine issue of material fact exists. *Adams v. Department of Juvenile Justice of the city of New York*, 143 F.3d 61, 65 (2d Cir.1998). Such disputes exist "if the evidence is such

that a reasonable jury could return a verdict for the non-moving party." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1535 (2d Cir.1997) (quoting *Anderson*, 477 U.S. at 248). If the movant meets this burden, the non-moving party must "adduce 'significant probative supporting evidence' demonstrating that a factual dispute exists." *Yearwood v. LoPiccolo*, No. 95 Civ. 2544(DC), 1998 WL 474073 *3 (S.D.N.Y. Aug.10, 1998) (*citing Dzaba v. Haythe & Curley*, No. 84 Civ. 1767(JFK), 1996 WL 31156 *2 (S.D.N.Y. Jan.26, 1996) (quoting *Anderson*, 477 U.S. at 249). Additionally, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Department of Corrections*, 84 F.3d 614, 619 (2d Cir.1996).

### II. Analysis

### A. Failure to Exhaust Administrative Remedies

**\*3** Defendants initial position is that plaintiff failed to exhaust her administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

To satisfy the PLRA in this jurisdiction, an inmate must exhaust all steps of the New York City Department of Corrections' ("DOC") well-established five-step administrative Inmate Grievance Resolution Program ("IGRP") prior to filing his or her complaint. At Rikers, this process requires an aggrieved inmate to (1) file a complaint with the Inmate Grievance Review Committee ("IGRC"), (2) request a formal hearing before the IGRC, (3) appeal to the facility warden, (4) appeal to the DOC Central Officer Review Committee ("CORC"), and (5) appeal to the Board of Correction ("BOC"). *See* 7 NYCRR § 701.

The inmate must file his or her complaint within twenty-one days of the alleged grievance. *See* 7 NYCRR § 701.5(a)(1) ("An inmate must submit a complaint to the clerk within twenty-one (21) calendar days of an alleged occurrence on an Inmate Grievance Complaint Form (Form # 2131). If this form is not readily available, a complaint may be submitted on plain paper.") Courts

have held that complaints submitted after the appropriate date are time-barred. *Wright v. Morris,* 111 F.3d 414, 417 n. 3 (6th Cir.1997) ("It would be contrary to Congress's intent in enacting the PLRA to allow inmates to bypass the exhaustion requirement by declining to file administrative complaints and then claiming that administrative remedies are time-barred and thus not then available.").

Here, plaintiff never spent more than fourteen days in prison during the five times relevant to this complaint. Once she left prison, plaintiff was not required to exhaust her administrative remedies under the PLRA because she was not a prisoner under the language of the Act. *Greig v. Goord,* 169 F.3d 165 (2d Cir.1999) (holding that litigants who file prison condition actions after release from confinement are no longer prisoners for purposes of 42 U.S.C. § 1997e(a) and thus do not need to satisfy its exhaustion requirements). *See also Mabry v. Freeman,* 489 F.Supp.2d 782, 784 (E.D.Mich.2007) (holding that "the PLRA's exhaustion requirement [does not] appl[y] to a former prisoner whose claim arose while he was incarcerated").

Defendants rely on *Berry v. Kerik,* 366 F.3d 85 (2d Cir.2003), for the proposition that plaintiff was required to file grievances while at Rikers and that plaintiff's failure to file grievances warrants the case's dismissal with prejudice. However, the *Berry* case is inapposite for two fundamental reasons. First, unlike the plaintiff here, Berry was in jail at the time he filed his complaint. Second, plaintiff was never in jail for a period greater than the length of time that an inmate has to file a grievance, i.e. for twenty-one days after any of the alleged incidents. Often, plaintiff was incarcerated for just a few days and never more than fourteen. In contrast, Berry remained in jail for more than twenty-one days after the relevant incidents alleged in his case and oftentimes for months afterward. Therefore, Berry could have filed his grievances while in jail within twenty-one days.

**\*4** Thus, we hold that plaintiff did not need to exhaust her administrative remedies under the grievance procedure because (1) she was released from jail before the 21-day time limit had elapsed and (2) once she was released from jail, she was not a "prisoner" subject to the PLRA. Summary judgment on the issue of exhaustion is therefore denied.

**B. Vagueness**

Defendants argue that plaintiff's claims of excessive force and deliberate indifference to her medical needs are vague since plaintiff failed to provide sufficient evidence or testimony specifying the names of defendants involved in the alleged conduct, dates and times of the events, and factual details. Whatever might have been the merits of this argument at the initial pleading stage, the vagueness issues-or the lack thereof-in the original complaint are subsumed by the more rigorous standard of summary judgment. The degree of specificity of plaintiff's complaint will be one factor we consider as we address the sufficiency of her claim to withstand defendant's summary judgment motion.

**C. Plaintiff's Substantive Claims**

Plaintiff does not specify in her pleading or otherwise precisely which claims she is bringing against which named defendants. Thus, we have searched plaintiff's complaint and deposition to extract the allegations against each defendant. We have found it helpful to group plaintiff's claims according to the occupation of defendants. We also set out the relevant legal standard before addressing the claims defendant by defendant.

**i. Claims against Officer Defendants**

The bulk of the claims alleged against the correctional officers named in this action involve claims of excessive force. The Eighth Amendment, applied to the States through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment. *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000).[4] "The core judicial inquiry" for claims of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 508 (quoting *Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). There is an objective and subjective component to this inquiry. *Id.* The objective component is met if it is "shown that the deprivation alleged is objectively sufficiently serious or harmful enough." *Jean-Laurent,* 540 F.Supp.2d at 509 (citing *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999)). "[T]he victim does not [have to] suffer serious or significant injury provided that the amount of force used is more than de minimis, or involves force that is repugnant to the conscience of mankind." *Id.* The

subjective component requires that a defendant has a "sufficiently culpable state of mind ... shown by actions characterized by wantonness." *Walsh,* 194 F.3d at 49 (citing *Hudson,* 503 U.S. at 20). However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

### a. Capt. Kevin Buck

**\*5** Plaintiff does not allege, in her Complaint or her Opposition, excessive force or deliberate indifference to plaintiff's medical need or safety by defendant Buck. In fact, plaintiff does not allege anything at all against defendant Buck. One short reference to defendant Buck was found in Plaintiff's November 16, 2007 Deposition:

> Physical, there is the time in the clinic where I was instructed after Captain Buck ordered me to go to the clinic because I was having chest pains and I needed my hormones as well. That's the time where I got-oh, shit, excuse me-well, one of the photographs I just remembered where I saw one of the women from and she was in the clinic that day.

(Pl. Nov. 16, 2007 Dep. at 42.) Nothing here provides any evidence that Capt. Buck violated any of plaintiff's federal or constitutional rights. Consequently, we grant summary judgment in favor of defendant Buck on all grounds.

### b. CO. Theresa John

Plaintiff does not allege, in her Complaint or her Opposition, any specific excessive force or deliberate indifference by Theresa John. She in fact does not make any specific allegations against C.O. John.

In her deposition, plaintiff states:

Q: Do you know that person's name?

A: I do, CO. John-do you realize you have her name. Anyway, I could tell you she was the steady A officer in C-73 gay housing. Horrible to transgender inmates, absolutely positively horrible. She infracted an ex-boyfriend of mine for touching me on the shoulder when we were in Rikers Island. Threatened inmates, she

would call other C.O.'s to harm them. Just really the creme of the creme of the batch. She is really bad.

Q: Did she ever physically touch you?

A: No she did not.

Q: Did she ever witness anyone physically touch you?

A: Yes?

Q: Who did she witness physically touch you?

A: There was a search that occurred while on her shift and I was in the middle of a confrontation with one of the officers and she wasn't one because, you know, they come with a team of them. She wasn't in their team, she is a steady officer, but when the male officer was in front of me, he nudged my head and pushed me in the cell. She was standing right there, that's when they closed the cell and the search was over. I had indicated to her that I wanted to speak to a captain. She has an accent and she replied just real nasty, "you are not seeing an F'in captain, I run this" and blah blah blah.

(Pl. Nov. 16. Dep. at 31-32.) She additionally makes a claim that a CO. John or Johnson was "verbally abusive." (Pl. Aug. 28, 2006 Dep. at 11.) We will assume that these references are to the same person for the purposes of this summary judgment motion. No dates were given for either incident.

As plaintiff acknowledges that C.O. John never physically touched her, there is no basis, as a matter of law, for plaintiff to maintain an excessive force claim against her. However, some portions of plaintiff's deposition could be construed to suggest the possibility that defendant John was deliberately indifferent to alleged excessive force by the male corrections officers. This claim fails for two reasons. First, the facts alleged by plaintiff above do not make out a cognizable excessive force claim. Second, assuming, *arguendo,* that the unidentified male corrections officer's "nudge" and "push" was excessive force, defendant John cannot be held liable for the unidentified officer's actions.

**\*6** First, plaintiff's recounting does not allege facts to sustain a conclusion that the male officers used force "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline." *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117

L.Ed.2d 156 (1992). Further, as plaintiff alleges no injuries resulting from the unidentified male officer's alleged force, any harm is simply not serious enough to reach a constitutional dimension. *See Roman v. Howarth*, 998 F.2d 101, 105 (2d Cir.1993); *see also Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.1997).

Second, while as a general rule, a law enforcement official can be held liable for failing to intervene in a situation where excessive force is being used, the absence of excessive force and the circumstances as recited by plaintiff preclude such a finding here. *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir.1988)). "Liability may only attach when (1) the officer had a realistic opportunity to prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citations omitted). Here, defendant John would not have had a realistic opportunity to prevent the unidentified male officer's "nudge" or "push" of plaintiff. The event, although vague, described is brief and does not approach the sort of repetitive beating that could give rise to an opportunity for defendant to intervene.

Consequently, there are no facts upon which a reasonable jury could find in favor of plaintiff for any of the claims she brings against defendant John, and, accordingly, summary judgment is granted in favor of C.O. John.

### c. Captain Robin Walker
Plaintiff's complaint does not allege any excessive force or deliberate indifference claims against defendant Walker. Contradictory references about a Captain Walker are made in Plaintiff's depositions at various times. Defendant identified someone in a photo lineup marked D-34 as Captain Walker. (Pl. Nov. 16, 2006 Dep. at 24). Among the defendants sued is Captain Robin Walker. Plaintiff identified photo D-34 as Captain Walker during her deposition. However, plaintiff had nothing negative to say about the Captain Walker she identified. Indeed, Plaintiff's description of this individual was entirely positive. Plaintiff notes that this Captain Walker never touched her and describes this Captain Walker as "exceptionally professional." (*Id.* at 24-25). Later, she describes a Captain Walker who allegedly ignored plaintiff while her male cell-mates threw shoes at her and "jumped" her. (*Id.* at 43-45.) Plaintiff explains

this contradictory evidence by stating that "[i]t would appear that one of the ACCs [Assistant Corporation Counsels] who handled this case identified the wrong Capt. Walker." (Pl. Resp. to Defs.' Local Rule 56.1 Statement ¶ 14.) However, despite being provide the opportunity to do so, at no time does plaintiff clarify which Capt. Walker, if Robin Walker is in fact either of them, she alleges wrongdoing against. Furthermore, plaintiff fails to make clear when this incident with Captain Walker occurred. Plaintiff does state that the Captain Walker identified by the ACC's is the "wrong Capt. Walker." Thus, plaintiff acknowledges that Robin Walker is not the Walker alleged to have witnessed plaintiff's alleged injuries. On the facts present in the record, even taken in a light most favorable to plaintiff, no reasonable jury could hold Robin Walker liable for any violation of plaintiff's federal or constitutional rights.

### d. George Johnson
*7 Plaintiff's allegations against defendant Johnson are as follows:

Q: D11, do you recognize that person?

A: Yes, Johnson.

Q: and can you tell me whether that individual ever touched you physically?

A: Yes.

Q: And can you tell me if it was during the period relevant in the complaint that is December of or rather August of 2001 through June of 2005?

A: Yes

Q: And can you tell me how he touched you?

A: There were more than one incidents [sic]. He smacked me on the back of my head, he pulled my hair, there is more than one incident. I would not like to go over the details if possible.

Q: We need to go over the details.

A: Well, I have known CO. Johnson since my first trip Rikers Island.[5] He studied the school area and escorted the prisoners that were in gay housing. The first time I-well, the first time he ever put his hands on me was on my way back from school at 3:00 in the afternoon. I

don't recall the date of the incident or the month, but I remember there was a group of us ... someone made a comment about another male C.O. being attractive and he started from the back of the line and hit everybody on the back of the head with an open hand.

Q: Did you suffer physical injury from that incident?

A: Pain to the back of my head.

Q: Any other physical injury?

A: No.

Q: And then the next incident you can recall? ...

A: [ ... ] me and this officer ended up getting into an argument after the principal placed me in a classroom with derelict inmates.

They jumped me and I brought this to the officer's attention when they did jump me, I brought up the fight-physically he slapped me to the ground, he slammed me on the back of the head. After this incident they were told to bring me to medical for a post injury report and on the way to medical, as I was explaining to this officer that they just failed to protect me and they had placed me in an unsafe situation, he proceed to punch me in the back of the head, to pull my hair. He struck me more physically, but the actual specifics I can't recall right now and the injuries I sustained were a lot of pains [sic] in the back of the head and whiplash to the neck.

Q: any other injuries you can recall at that second incident you described?

A: No.

Q: Is there a third incident involving this particular officer?

A: Yes.... I was in the middle of a confrontation, a verbal dispute with an officer and he heard it and he came over to inject his two cents and I got smart with him and he smacked me.... I had pain to my mouth and I believe possibly an abrasion to the inside of my mouth, you know, mostly the guards are smart enough not to leave marks on inmates.

(Pl. Nov. 16, 2007 Dep. at 9-13.) Plaintiff alleges three physical incidents with Officer Johnson. Each of these

alleged incidents involving Officer Johnson will be examined in turn.

The first incident described appears to be outside the limitations period as plaintiff stated that she had known Officer Johnson since her first time in Riker's, a date which clearly precedes the limitations period. However, given the possible ambiguity in the questioning, we will assume, for the purposes of this summary judgment motion, that all the incidents happened within the relevant time period.

**\*8** Regardless, the first incident as described fails, as a matter of law, to state facts that could support a claim of excessive force. Plaintiff alleges that defendant Johnson struck her, and a number of other inmates, in the back of the head. The only injury plaintiff claims is "pain in the back of my head." (Pl. Nov. 16, 2007 Dep. at 10.) It is settled in this district that an open-handed slap on the back of the head, with no medical evidence and no other evidentiary support of injury, does not rise to the level of a constitutional violation. *See Santiago v. CO. Campisi,* 91 F.Supp.2d 665, 674 (S.D.N.Y.2000) (holding that an open-hand slap does not rise to the level of excessive force); *Boddie,* 105 F.3d at 861; *Johnson v. Renda,* No 96 Civ. 8613, 1997 WL 576035 at \*1 (S.D.N.Y. Sep.15, 1997) (holding that a single slap to plaintiff's face does not amount to a constitutional violation). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson,* 403 U.S. at 9. Plaintiff's third allegation, that defendant Johnson smacked her and possibly caused an abrasion to the inside of her mouth, fails for the same reason.

Plaintiff's description of the second incident initially appears more substantive, but on closer examination it still fails for lack of evidence. First, it is unclear which allegations in particular are against Officer Johnson, as it seems that two different officers were involved. Assuming, *arguendo,* that the officer who "slapped" defendant to the ground and "slammed" her head is the same officer that punched her and pulled her hair, there is still not enough evidence of physical injury to maintain an excessive force claim. Plaintiff does not point to any medical evidence attributing any of these injuries related to the officers, despite stating that she was further assaulted on her way to medical, apparently as a result of an attack by other inmates. (Pl. Nov. 16, 2007 Dep. at 11.) Nor does plaintiff provide a timeframe for any of these incidents. Further, plaintiff never made any effort to corroborate any of these assaults by deposing defendant Johnson

Case 2:16-cv-00943-PP Filed 08/31/16 Page 43 of 90 Document 22-1

(or defendant Patterson, who plaintiff alleges in her Declaration witnessed these incidents). (Lopez Decl. at ¶ 20.) The absence of allegations and evidence of injury, as we have noted above, precludes a plaintiff from prevailing on such a claim.

For example, in the *Vatensever* case, the plaintiff alleged that a corrections officer slammed his head into a wall. *Vatansever v. New York City,* No. 01 Civ. 11621, 2005 WL 2396904 *1 (S.D.N.Y. Sept.28, 2005) (WHP) (granting summary judgment when plaintiff could provide no medical evidence of injuries). Though not as serious as the assault alleged by the plaintiff in the *Vatensever* case, we would also expect to find evidence of physical injury if an assault on plaintiff, involving being slapped to the ground and slammed on the back of the head, as well as having her hair pulled and being punched in the back of the head, occurred, particularly if all of these assaults happened as plaintiff traveled to a medical evaluation. *Id* at *3. However, plaintiff's "voluminous" medical records are devoid of any support for these alleged incidents. *Id.; see also United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) ("The litigant opposing summary judgment ... may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial. Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.") (internal quotation and citation omitted). Consequently, summary judgment is granted in favor of defendant Johnson.

*e. Captain Ellen Patterson*

**\*9** Plaintiff makes two allegations against Captain Ellen Patterson. First, she claims that Captain Patterson assaulted her by hitting her in the face with keys; and second, she claims that defendant Patterson witnessed her being attacked by defendant Johnson and failed to intervene.

The first incident is described as follows:

A: [ ... ] It's C-74 in the school area in the morning time. Captain Paterson and the principal both struck me with keys in the facial area while I was sitting in orientation class and that left marks on my face....

Q: So when you say someone hit you with keys in your face?

A: I was sitting there, they both had keys, Captain Patterson and Principal Jefferson both had keys. Jefferson's were longer, Patterson's were on like a ring around her belt and I was sitting at my desk and they are like-first Captain Patterson and I had a problem the day before, we had gotten into an argument and I wanted to complain about something.

I don't recall what she said to me, but she slammed keys on my face, not slammed, they was [sic] provoking me to get into it with her. She nudged me and hit me with the keys and then Jefferson came out. She was actually more open about assaulting me than Patterson. They were both-again, I don't recall what they were saying, I was much younger, but they swung the keys and it hit me in the face.

Jefferson made it seem more like an accident, "oh, I'm sorry" and that's where she sent me-ordered me into a certain classroom, even though I excelled in the class.

(Pl. Nov. 16, 2007 Dep. at 40-41.) In their moving papers on their motion for summary judgment, defendants argue that plaintiff's claims against Captain Patterson were vague and that the alleged injury ("left marks on my face") was insufficient. Apparently recognizing the force of defendant's position, plaintiff countered with a declaration asserting that she also received "a bump on my head" from the incident. (Lopez Decl. at ¶ 17.) As noted above, factual issues created solely by an affidavit crafted for the purposes of opposing a summary judgment motion do not raise issues of material fact. *Neidich v. Estate of Neidich,* 222 F.Supp.2d 357, 368 (S.D.N.Y.2002) (CM).

Consequently, the issue presented is whether the incident as originally described in plaintiff's deposition is sufficient to state a claim for excessive force. We assume, *arguendo,* that there was some contact between Patterson's keys and plaintiff's face.

However, in the absence of any evidence of injury and without any supporting medical records, the incident with the keys does rise to the level of a constitutional violation. *See Santiago,* 91 F.Supp.2d at 674; *Yearwood,* 1998 WL 47 4073 at *7; *see also Roman,* 998 F.2d at 105; *Boddie,* 105 F.3d at 862.

Plaintiff also raises for the first time in her opposition declaration that defendant Patterson witnessed the

assault, described above, by defendant Johnson. Lopez Decl. at SI 20. Curiously, there is no mention of defendant Patterson's involvement in the Johnson incident in plaintiff's deposition testimony, either as she spoke about Johnson or about Patterson. As noted *supra*, parties cannot create new factual disputes in response to a motion for summary judgment. *Hayes*, 84 F.3d at 619 (2d Cir.1996). Consequently, this claim against defendant Patterson is also dismissed and summary judgment is granted in favor of defendant Patterson.

### f. Delores Jefferson

**\*10** As defendant Jefferson's involvement in the alleged incident involving plaintiff's contact with defendant's keys is legally indistinguishable from defendant Patterson's involvement, for the reasons stated above, summary judgment is granted in favor of defendant Jefferson.

### g. Plaintiff's claim for emotional distress

As plaintiff has not shown any issues of material fact sufficient to survive summary judgment on her excessive force claims, her claims for emotional injury are dismissed. 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."); *Cox v. Malone*, 56 Fed. Appx. 43, (2d Cir.2003) ("Cox had failed to show malicious intent on the part of Simms or anything more that *de minimis* physical injury in connection with his Eighth Amendment claim, as required by the Prison Litigation Reform Act, 42 U.S.c. § 1997e(e)").

### ii. Claims against Drs. Kaw Aung and Jane San Jose

Plaintiff endeavors to assert claims of deliberate indifference to plaintiff's medical needs in violation of the Eighth Amendment to the Constitution against Drs. Aung and San Jose.

The two-prong test for deliberate indifference to medical need is well established. *See, e.g., Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir.2000). First, a plaintiff must show that she has a "serious medical condition," and second, she must show that the medical condition was met with "deliberate indifference." *Id.* As the Second Circuit did in *Cuoco*, we assume, for the purposes of this summary judgment motion, that transexualism or Gender

Identity Disorder (GID) is a serious medical condition that satisfies the first element of this analysis. *Id.*

To establish deliberate indifference, "a plaintiff must show 'something more than mere negligence.' " *Id.* at 106-107 (quoting *Weyant v. Okst*, 101 F.3d 845, 856 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994))). However, "proof of intent is not required, for the deliberate-indifference standard 'is satisfied by something less than actions or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* at 106-107. "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) (quoting *Farmer*, 511 U.S. at 837). Even medical malpractice is not deliberate indifference, unless it rises to the level of recklessness. *Id.* at 703.

The medical indifference claim is centered on plaintiff's claim that she was denied hormone therapy during some of her incarcerations at Rikers. To place the claim in a temporal perspective, it should be noted that plaintiff was incarcerated for four days in December 2002, six days in March 2004, six days in April 2004, fourteen days in September 2004, and thirteen days in June 2005. Consequently, any possible denial of hormones could have been at most for a period of no more than two weeks.

**\*11** To further contextualize this claim, it should be noted at the onset that plaintiff acknowledges that she was given hormones "most of the time." (Pl. July 10, 2007 Dep. at 38.) Plaintiff further testified that she was provided hormones during her ARDC incarcerations that occurred prior to her eighteenth birthday. (See Pl. July 10, 2007 Dep. at 38-39.) These include the March 2004 and April 2004 incarcerations.

Moreover, the medical records submitted with defendant's summary judgment motion contain numerous references to plaintiff receiving her medication and/or treatment. Bates numbered document 301 provides evidence that plaintiff was given "Conjugated Estrogens" on December 11-12, 2002. (See also Bates 434-35, 446 (indicating that plaintiff was given the hormone Premarin during her December 2002 incarceration)). The plaintiff also

refused psychiatric treatment from a social worker during this visit, since the social worker was not a "psychotherapist." (Bates 444-45, 449 .) Plaintiff also was given hormone treatment in April 2004, (Bates 00356-64) and June 2005. (Bates 305, 475.)

Thus, the only period of incarceration for which plaintiff could claim a lack of hormonal treatment is that of September 2004. While defendant points to Bates 261 as showing evidence of no treatment, this document includes the words "Shots for breast" on its face. (Bates 261.) The entry would appear to indicate hormonal treatment and plaintiff has provided no medical evidence to the contrary. Plaintiff never deposed anyone and defendant provides no evidence of whether or not this refers to treatment. Nor has plaintiff linked this document to either doctor named as a defendant.

To the extent that plaintiff's claim is not read as asserting a total denial of hormonal treatment but as a claim that the levels of hormones prescribed to plaintiff while at Rikers were insufficient to treat her condition, we note that plaintiff has neither submitted nor adduced any medical testimony to support such a claim. Such a claim cannot proceed without medical support. Nor has plaintiff adduced any testimony or submitted any evidence that the doctors at Rikers prescribed these doses with the requisite deliberate indifference or claimed that defendant doctors knew of and disregarded "an excessive risk to inmate safety," or that prescribing these drugs in lower doses posed a risk of substantial harm to plaintiff. *Chance,* 143 F.3d at 702 (2d Cir.1998); *see also Murray v. U.S. Bureau of Prisons,* 106 F.3d 401 (Table), 1997 WL 34677 at *3 (6th Cir.1997) ("However, where, as here, the prisoner is receiving treatment, the dosage levels of which are based on the considered professional judgment of a physician, we are reluctant to second-guess that judgment.")

Further, even assuming that plaintiff had supported her claims concerning hormone therapy with evidence, it is worth noting that plaintiff does not necessarily have the right to require the prison to duplicate the private treatment she may have received, and that she was offered psychological therapy which she declined. (Bates 444-45, 449.); *see Murray,* 1997 WL 34677 at *3-4. ("It is important to emphasize, however, that [the plaintiff] does not have a right to any particular type of treatment, such as estrogen therapy.... [G]iven the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgment of prison officials as to the appropriate form of medical treatment."). While a total denial of hormone therapy to a prisoner for an extended period of time might rise to the level of deliberate indifference, nothing in the record of this case supports an allegation.

**\*12** In sum, the record of the plaintiff's medical treatment during her numerous, short incarcerations simply does not demonstrate any denial of medical care due to deliberate indifference from doctors or that the treatment provided posed a substantial risk of serious harm. To the contrary, the documentary record provides ample evidence that plaintiff was provided with extensive treatment.

Furthermore, even if plaintiff had sustained her broad claims, she has failed to connect those broad claims to the two doctors named as defendants. For example, plaintiff points to Bates numbered document 472 to establish that she was given less than the dosage recommended by her attending physician. However, this document is signed by Marshall Tse, MD, not a named defendant. Personal involvement of defendants is required to assess damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 165 (2d Cir.2001). Consequently, summary judgment is granted in favor of both defendant Aung and San Jose dismissing plaintiff's claims of medical indifference.

### iii. Claims against Commissioner Martin Horn, Warden Patrick Walsh, and Warden Peter Curcio

Plaintiff does not allege any physical contact by defendants Commissioner Horn, Warden Walsh, or Warden Curcio ("Horn defendants"). Rather, plaintiff alleges that the Horn defendants were involved in "formulating, ratifying, adopting, and/or implementing the policies and procedures that resulted in the violation of her constitutional rights." (Opposition at 23.)

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffit v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991). A defendant in a supervisory position may be found to be personally involved in several ways:

> The defendant may have directly participated in the infraction.... A supervisory official, after learning of

Case 2:16-cv-00943-PP Filed 08/31/16 Page 46 of 90 Document 22-1

the violation through a report or appeal, may have failed to remedy the wrong.... A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.... Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event....

*Wright v. Smith,* 21 F.3d 496, 502 (2d Cir.1994) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). Additionally, supervisory liability could attach when an official shows "gross negligence" or "deliberate indifference" to the "constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Id .* (citing *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983)).

Plaintiff claims that defendants violated the Fourteenth Amendment by: (1) refusing to allow her to wear female clothing or undergarments, (2) housing plaintiff with male inmates and denying her gay housing, and (3) placing her, without cause, in a classroom with inmates with disciplinary problems.[6] Plaintiff has not established which policies or customs, if any, the Horn defendants have violated. Even if we assume that there are policies in place that were being enforced here, plaintiff does not articulate any actionable violations of those policies or that those policies lack a rational basis, which both parties concede is the applicable standard of review. Thus, each of these claims fails to state a claim under the Fourteenth Amendment and consequently summary judgment is granted in favor of the Horn defendants.

*a. Refusal to allow plaintiff to wear female clothing*
**\*13** As plaintiff points to no court decision that has found transgender individuals a protected class for the purposes of Fourteenth Amendment analysis, and the Court has found none, her claims that she was subjected to discrimination based on her status as transgender are subject to rational basis review.[7] Though plaintiff does not point to any clothing policy utilized at Rikers, we

assume for the purposes of this opinion that some policy exists.

Plaintiff also does not point to any authority that suggests that a transgender prisoner has the right to choose the clothing she wears while in prison. In fact, as a general matter, federal courts have in fact held the opposite. *Murray,* 1997 WL 34677 at \*2 (prisoner officials do not violate the Constitution by providing ill-fitting or aesthetically unpleasing clothing); *Knop v. Johnson,* 667 F.Supp. 467, 475 (W.D.Mich.1987), *appeal dismissed,* 841 F.2d 1126 (6th Cir.1988). Further, several rational bases, ranging from a desire to maintain order in prisons through having uniforms to disallowing plaintiff from signaling female sexuality in a male prison readily come to mind. Thus, plaintiff has failed to establish a claim arising from any clothing policy alleged under the Fourteenth amendment.

Further, assuming, *arguendo,* that some constitutional violation was found, the Horn defendants would certainly be qualifiedly immune. In the absence of any case law upholding a claim that a transgender prisoner has the right to choose what clothing she will wear, the Horn defendants could not have violated any of plaintiff's clearly established constitutional or federal rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

*b. Housing Plaintiff with Male Inmates*
As noted by the Supreme Court, "the practice of federal prison authorities is to incarcerate preoperative transsexuals with prisoners of like biological sex...." *Farmer,* 511 U.S. at 829. While the Supreme Court did not take this opportunity to comment on the constitutionality of this practice, and we decline to do so here, it clearly did not state any objection to it on constitutional grounds. We note that a number of problems could arise by altering this practice and housing biologically male inmates who identify as transgender with the female population, not the least of which would be concerns for the safety of female inmates, and consequently hold this practice or policy as rational. Further, even if we held this practice unconstitutional, the Horn defendants would be qualifiedly immune for the reasons stated above.

There is another issue present that fits more squarely in the Supreme Court's decision in *Farmer.* Generally, plaintiff contends that defendant's denial of plaintiff's gay

housing amounted to deliberate indifference to plaintiff's safety. However, plaintiff cannot maintain this claim. Defendants provide evidence that plaintiff was placed in gay housing or protective custody at each of plaintiff's visits except for a period of three days when plaintiff refused to sign a form indicating she was gay. Plaintiff refutes this evidence by denying that evidence of her housing placements, which includes prison records kept in the regular course of operations marked "protective custody" or "gay/lesbian housing," (*See e.g.*, Bates 244 and 263) supports defendants claims. (Pl. Resp. to Defs.' Local Rule 56.1 Statement at ¶ 44.) Plaintiff does not point the court to any evidence in her deposition or otherwise that these routine business records of her prison stays are inaccurate.

**\*14** Moreover, on the days where plaintiff was placed in general population, nothing in the record indicates that defendant did this with deliberate indifference to plaintiff's safety. In *Farmer,* the Supreme Court writes, "we hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety...." *Farmer,* 511 U.S. at 837. Here, Plaintiff makes no allegations that any prison official deliberately ignored an excessive risk to her safety by placing her in general population for those three days. Consequently, summary judgment is granted in favor of defendants on plaintiff's claim.

#### *c. Placing Plaintiff in a Disciplinary Classroom*
Plaintiff fails to articulate any evidence supporting her argument that she was placed in a disciplinary classroom in violation of her constitutional rights. She neither articulates any policy or custom which resulted in the placement or any constitutional principle that was violated. Beyond the bald allegation that plaintiff was placed in this classroom without cause, plaintiff fails to adduce any evidence about the process by which she was placed in a disciplinary classroom or how that process was in violation of her due process rights. Consequently, summary judgment is granted for defendants on this claim.

#### iv. Claims against the City of New York
"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As discussed above, plaintiff argues that unidentified and unnamed policies or customs concerning transgender inmates violate the Constitution. As we have found that these policies do not violate any of plaintiff's rights under the Constitution or federal law, plaintiff cannot sustain a *Monell* claim against the City of New York. Thus, summary judgment is granted in favor of the City.

#### D. Pendant: State and City Law Claims
As we have granted summary judgment in favor of defendants on all of plaintiff's federal claims, we decline to exercise supplemental jurisdiction over plaintiff's city and state law claims. 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction ... [if] the district court has dismissed all claims over which it has original jurisdiction"). Consequently, those claims are dismissed without prejudice.

#### *Conclusion*

For the foregoing reasons, defendants' motion for summary judgment is granted and the Clerk of the Court is respectfully requested to close this case on the Court's docket.

**\*15** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 229956

---

**Footnotes**

1     Defendants filed a Suggestion of Death on July 1, 2008 for named defendant Ronald Flemming. Neither party substituted Mr. Flemming's estate pursuant to Federal Rule of Civil Procedure 25(a) (1) within the requisite 90 days. Additionally,

Case 2:16-cv-00943-PP   Filed 08/31/16   Page 48 of 90   Document 22-1

defendants filed an affidavit by C.O. Flemming dated March 21, 2008 in which he stated that he had never seen plaintiff. Further, defendants submitted the employment records of two other corrections officers, Capt. Joseph Turner and C.O. Michele Turner, as well as C.O. Flemming's records showing that although plaintiff alleged that all three were involved in an attack of her, none of them ever worked in the same facility at the time of the alleged attack. Despite this evidentiary showing in support of defendants' summary judgment motion, plaintiff never sought any relief under Federal Rule of Civil Procedure Rule 56(f) in order to depose C.O. Flemming or the other officers in an effort to rebut this evidence. Nor had plaintiff sought to depose C.O. Flemming or any other defendant during the two years this case was pending before the defendants moved for summary judgment. C.O. Flemming was dismissed from this action in the Court's November 19, 2008 Order, well after the 90 day period for substitution had expired. Plaintiff sought to reargue Mr. Flemming's dismissal and was granted an opportunity to explain her failure to meet the ninety day deadline and how she could succeed on her claim against Flemming even if the ninety day substitution requirement was excused. Plaintiff's submission did not provide a persuasive argument supporting either excusable neglect for failing to substitute Mr. Flemming or a conclusion that plaintiff could prevail at trial against Mr. Flemming. We also had concerns about the equity of permitting plaintiff to proceed against an estate when plaintiff had not taken discovery which would have preserved the defendant's testimony. Consequently, the Court denied plaintiff's motion to seek relief from its November 19, 2008 Order in an Order dated December 3, 2008.

2    Though other individuals were named in this lawsuit by plaintiff, plaintiff either failed to serve or identify them. Since 120 days has long past since the filing of this complaint, all defendants, excluding those named in Defendants' Motion for Summary Judgment are dismissed without prejudice and claims brought against them are not addressed in this opinion. There may, of course, be statutes of limitations bars which would alone preclude such claims.

3    The dates of her incarcerations within the statute of limitations are as follows: December 10-13, 2002; March 21-26, 2004; April 17-22, 2004; September 11-24, 2004; and June 16-17, 2005. Defendant was previously incarcerated on August 17-22, 2001, January 8-22, 2002, April 11-15, 2002, and has since been incarcerated at least six times, most recently from April 17 through July 7, 2008.

4    The same standard of law applies to excessive force claims brought under the Fourteenth Amendment by pre-trial detainees and under the Eighth Amendment by sentenced prisoners. *United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999).

5    Defendant's first trip to Rikers Island was outside of the time period relevant for this proceeding.

6    Plaintiff also alleges "bias-based assault" but does not point to any policy or give any evidence of a custom of such assaults that would subject the Horn defendants to liability under § 1983.

7    The Ninth Circuit in *Gomez v. Maass,* 918 F.2d 181 (9th Cir.1990), held that a transsexual is not a member of a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under t he equal protection component of the due process clause. The Ninth Circuit in *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 664 (9th Cir.1977), explained that transsexualism is not a suspect class when plaintiff claimed "to have [been] treated discriminatorily [not] because she is male or female, but rather because she is a transsexual who chose to change her sex."

---

2015 WL 4138761
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Eastern Division.

Sherwood L. STARR, Plaintiff,
v.
Frank BOVA, et al., Defendants.

No. 1:15 CV 126.
|
Signed July 8, 2015.

**Attorneys and Law Firms**

Sherwood L. Starr, Conneaut, OH, pro se.

### OPINION AND ORDER

CHRISTOPHER A. BOYKO, District Judge.

**\*1** *Pro se* Plaintiff Sherwood L. Starr filed this action under 42 U.S.C. § 1983 against Cuyahoga County Sheriff Frank Bova and Cuyahoga County Jail Warden Schobert. In the Complaint, Plaintiff asserts that the Cuyahoga County Jail maintains policies which are unfavorable to lesbian, gay, bisexual, transgender and transgender non-conforming inmates. He seeks changes in policies and monetary damages.

### I. BACKGROUND

Plaintiff alleges the Cuyahoga County Jail housing policies discriminate against lesbian, gay, bisexual, transgender and transgender non-conforming inmates. He contends these inmates are housed only in dorms 9E and 9D and only in beds 1–12. He states dormitory rules limited one inmate per shower and one inmate per urinal at a time. He alleges anxiety disorders may be exacerbated by an open dormitory environment. He states without explanation that these inmates are denied equal rights and are victims of discrimination by unit staff. He claims they are more likely to taken to administrative segregation. He contends floor supervisors routinely ignore the needs of lesbian, gay, bisexual, transgender and transgender non-conforming inmates unless they are in administrative

segregation. He asks this Court to order the Jail to update its policies to allow equal rights and to allow them to be placed in cells, rather than dorms, to enforce a no retaliation policy, to alter the grievance policy and to order the Defendants to pay damages.

### II. LAW AND ANALYSIS

#### Standard of Review

Although *pro se* pleadings are liberally construed, *Boag v. MacDougall,* 454 U.S. 364, 365, 102 S.Ct. 700, 70 L.Ed.2d 551 (1982) (per curiam); *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), the district court is required to dismiss an *in forma pauperis* action under 28 U.S.C. § 1915(e) if it fails to state a claim upon which relief can be granted, or if it lacks an arguable basis in law or fact. *Neitzke v. Williams,* 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Lawler v. Marshall,* 898 F.2d 1196 (6th Cir.1990); *Sistrunk v. City of Strongsville,* 99 F.3d 194, 197 (6th Cir.1996). An action has no arguable basis in law when the Defendant is immune from suit or when the Plaintiff claims a violation of a legal interest which clearly does not exist. *Neitzke,* 490 U.S. at 327. An action has no arguable factual basis when the allegations are delusional or rise to the level of the irrational or "wholly incredible." *Denton v. Hernandez,* 504 U.S. 25, 32, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992); *Lawler,* 898 F.2d at 1199.

A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in the complaint." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 564, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The factual allegations in the pleading must be sufficient to raise the right to relief above the speculative level on the assumption that all the allegations in the Complaint are true. *Bell Atl. Corp.,* 550 U.S. at 555. The Plaintiff is not required to include detailed factual allegations, but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. A pleading that offers legal conclusions or a simple recitation of the elements of a cause of action will not meet this pleading standard. *Id.* In reviewing a Complaint, the Court must construe the pleading in the light most favorable to the Plaintiff. *Bibbo v. Dean Witter Reynolds, Inc.,* 151 F.3d 559, 561 (6th Cir.1998).

### Discrimination

**\*2** Assuming Plaintiff is either gay, bisexual, transgender or transgender non-conforming, he has not alleged sufficient facts to suggest the Jail's policies denied him equal protection. The Equal Protection Clause prohibits discrimination by government actors which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference. *Rondigo, L.L.C. v. Township of Richmond,* 641 F.3d 673, 681–82 (6th Cir.2011); *Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 312 (6th Cir.2005). The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.,* 470 F.3d 250, 260 (6th Cir.2006). When disparate treatment is shown, the equal protection analysis is determined by the classification used by government decision-makers.

To state a claim for discrimination under the Equal Protection Clause, the Plaintiff needs to allege sufficient facts to show that the Jail's policies intentionally discriminated against him because of his membership in a protected class. *Henry v. Metropolitan Sewer Dist.,* 922 F.2d 332, 341 (6th Cir.1990). *See also Brand v. Motley,* 526 F.3d 921, 924 (6th Cir.2008) (an inmate retains the right to be free from "invidious discrimination based on race") (quoting *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). Although sexual orientation and transgender have not been identified as suspect classifications in the Sixth Circuit, they constitute an "identifiable group" for equal protection purposes. *See Davis v. Prison Health Services,* 679 F.3d 433, 441 (6th Cir.2012) (citing *Stemler v. City of Florence,* 126 F.3d 856, 873–74 (6th Cir.1997)). An equal protection claim brought on this basis is governed by rational basis review under which a " 'plaintiff may demonstrate that the government action lacks a rational basis ... either by negating every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will.' " *Id.* at 438 (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.,* 470 F.3d 250, 260 (6th Cir.2006) (quoting *Warren v. City of Athens,* 411 F.3d 697, 711 (6th Cir.2005)). To state an equal protection claim in the prison context, Plaintiff must allege he was treated differently than other similarly situated prisoners. *McCleskey v. Kemp, Supt. Ga. Diagnostic and Class. Center,* 481 U.S. 279, 292–93, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Wells*

*v. Jefferson County Sheriff Dept.,* 159 F.Supp.2d 1002, 1008 (S.D.Ohio 2001)).

Here, Plaintiff does not include sufficient allegations that show or permit an inference that the Jail's policies intentionally discriminated against him based his sexual orientation or his status as a transgender inmate or a transgender non-conforming inmate. He states gay, lesbian, bisexual, transgender and transgender nonconforming inmates are housed in dorms 9E and 9D and only in beds 1–12. By inference, the other beds in the dormitory were occupied by inmates who do not identify themselves as lesbian, gay, bisexual, transgender, or transgender nonconforming. He does not allege what classification of inmates is housed in this dormitory. Cuyahoga County Court of Common Pleas records indicate Plaintiff resided in the jail for thirty-five days awaiting trial on misdemeanor charges of disorderly conduct. There are nondiscriminatory reasons why Plaintiff may have be housed in a dormitory as opposed to a cell. He was charged with a misdemeanor, not a violent felony. He was a pretrial detainee, not someone who had yet been convicted of his offense. He could post bail and be released until trial. Plaintiff does not allege facts to suggest his assignment to a dormitory had a discriminatory purpose.

**\*3** Plaintiff also alleges the jail policy for the dormitory limits one inmate at a time to a shower or urinal. While this may be inconvenient, this policy affects all inmates in the dormitory, not just those who are lesbian, gay, bisexual, transgender, or transgender nonconforming. Plaintiff fails to allege facts to suggest this had a discriminatory purpose.

Plaintiff's remaining assertions are stated solely as legal conclusions, unsupported by factual allegations. He indicates the unit staff discriminates against this group of inmates. He states they are more likely to be in administrative segregation. He contends jail staff routinely ignore the needs of this group. Although the standard of review for *pro se* pleadings is liberal, it requires more than bare assertions of legal conclusions. *Bassett v. National Collegiate Athletic Ass'n,* 528 F.3d 426, 437 (6th Cir.2008). The Complaint must give the Defendants fair notice of what the Plaintiff's claims are and the grounds upon which they rest. *Id.* Legal conclusions alone are not sufficient to meet this minimal pleading requirement to

state a claim upon which relief may be granted. *Twombly,* 550 U.S. at 555.

### *Injunctive Relief*

Finally, Plaintiff seeks an Order from this Court requiring the Jail to alter its policies. He is no longer housed in the Jail and, in fact, was in the Lorain Correctional Institution at the time he filed the Complaint. A prisoner's claim for injunctive relief becomes moot when the prisoner is no longer confined at the prison where the claim allegedly arose. *See Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir.1996).

### *III. CONCLUSION*

Accordingly, this action is dismissed pursuant to 28 U.S.C. § 1915(e). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith. [1]

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4138761

Footnotes

1       28 U.S.C. § 1915(a)(3) provides:
        An appeal may not be taken *in forma pauperis* if the trial court certifies that it is not taken in good faith.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3791450
Only the Westlaw citation is currently available.
United States District Court,
C.D. California,
Western Division.

Ramon MURILLO, Plaintiff,

v.

Ian PARKINSON, et al., Defendants.

No. CV 11–10131–JGB (VBK).
|
Signed June 17, 2015.

**Attorneys and Law Firms**

Ramon Murillo, Delano, CA, pro se.

Douglas C. Smith, Nathan Aaron Perea, The Smith Law
Offices APC, Riverside, CA, for Defendants.

ORDER (1) ACCEPTING THE FINDINGS AND
RECOMMENDATIONS OF THE UNITED STATES
MAGISTRATE JUDGE, AND (2) GRANTING IN
PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

JESUS G. BERNAL, District Judge.

**\*1** Pursuant to 28 U.S.C. § 636, the Court has reviewed
the Complaint and all other papers along with the
attached Report and Recommendation of the United
States Magistrate Judge, and has made a *de novo*
determination of the Report and Recommendation.

**IT IS THEREFORE ORDERED** that an Order be entered
(1) approving the findings of the United States Magistrate
Judge, (2) granting Defendants' Motion for Summary
Judgment with respect to the following: (a) dismissing
Plaintiff's claims against Defendants' Sheriff Parkinson
and the County of San Luis Obispo; (b) dismissing
Plaintiff's § 1983 claim based on alleged violations of her
Fourteenth Amendment rights; (c) dismissing Plaintiff's
claim regarding constitutional right of access to the
law library; (d) dismissing Plaintiff's claims based on
confinement in Administrative Segregation; (e) dismissing
Plaintiff's claims regarding denial of meals, showers,
clothing and yard time; (f) dismissing Plaintiff's 42 U.S.C.

§§ 1985 and 1986 claims; and (3) denying Defendant's
Motion for Summary Judgment based on Plaintiff's
excessive force claims.

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

VICTOR B. KENTON, United States Magistrate Judge.

This Report and Recommendation is submitted to the
Honorable Jesus G. Bernal, United States District Judge,
pursuant to 28 U.S.C. § 636 and General Order 05–07 of
the United States District Court for the Central District
of California.

*PROCEEDINGS*

On January 12, 2012, Ramon Murillo (hereinafter referred
to as "Plaintiff") filed a "Civil Rights Complaint Pursuant
to 42 U.S.C. § 1983" against Defendants Ian Parkinson—
Sheriff of San Luis Obispo County; County of San Luis
Obispo; Deputy Michael Ulloa; Deputy Mayes; Deputy
Manpal; Deputy Adams; Sgt. Rushing; and the San Luis
Obispo County Jail.

On February 3, 2012, the Court issued an Order re
Dismissal with Leave to Amend.

On March 26, 2012, Plaintiff filed a verified "First
Amended Complaint."

On October 11, 2012, the Court issued an Order directing
the United States Marshal to serve Defendants with a
Summons and First Amended Complaint.

On January 14, 2013, Defendants County of San Luis
Obispo, Ian Parkinson, Emmett Rushing, Michael Ulloa,
Tyler Adams and Jeremiah Mayes filed an "Answer to the
First Amended Complaint."

On July 1, 2014, Defendants Ian Parkinson, County
of San Luis Obispo, Michael Ulloa, Tyler Adems,
Jeremiah Mayes and Emmett Rushing filed "Defendants'
Notice of Motion and Motion for Summary Judgment
or in the Alternative Partial Summary Judgment;
and Memorandum of Points and Authorities in
Support Thereof;" "Defendants' Separate Statement

of Uncontroverted Facts and Conclusions of Law;" "Defendants' Request for Judicial Notice;" "Declaration of Emmett Rushing in Support of Defendants' Notice of Motion for Summary Judgment or in the Alternative Partial Summary Judgment;" "Declaration of Nathan A. Perea;" "Declaration of Michael Ulloa;" "Declaration of Attorney Bradford J. Hinshaw, Esq.;" and "[Proposed] Order re Defendants' Notice and Motion for Summary Judgment or in the Alternative Partial Summary Judgment."

*2 On July 3, 2014, the Court issued a Minute Order ordering Plaintiff to file an Opposition or Statement of Non–Opposition to Defendants' Motion for Summary Judgment within 30 days and attached a *Rand*[1] notice discussing the requirements for opposing a motion for summary judgment.

On August 22, 2014, Plaintiff filed a document entitled "Plaintiff's Request for Judicial Notice in Support of Opposition to Defendants' Motion for Summary Judgment."

On August 25, 2014, Plaintiff filed an "Opposition to Motion for Summary Judgment as to Plaintiff's First Amended Complaint;" "Declaration of Ramon Murillo in Support of Plaintiff's Opposition re Motion for Summary Judgment;" and "Plaintiff's Separate Statement of Uncontroverted Facts."

On September 12, 2014, Defendants filed "Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment or in the Alternative Partial Summary Judgment."

Having reviewed the First Amended Complaint, Defendants' Answer, Defendants' Motion for Summary Judgment, Plaintiff's Opposition and Defendants' Reply, the Court hereby recommends that Defendants' Motion for Summary Judgment be granted in part and denied in part.

### PLAINTIFF'S CLAIMS IN HER FIRST AMENDED COMPLAINT

Plaintiff contends that Defendants violated her First, Eighth and Fourteenth Amendment rights when Defendants allegedly denied Plaintiff access to a law

library, assaulted her, and withheld food, yard time, showers, clothing and hormone therapy. (*See* First Amended Complaint ["FAC"] at pp. 6–7, 12.) Plaintiff also alleges that Defendants have violated 42 U.S.C. § 1985 and 42 U.S.C. § 1986. (FAC at p. 2.) Plaintiff alleges that Defendants discriminated against her based on her transgender orientation. (*Id.*) Defendants denied Plaintiff law library access and retaliated against Plaintiff for exercising her First Amendment rights. (FAC at pp. 4–6, 8–12.) Defendants also denied Plaintiff her Equal Protection rights and conspired against her. (FAC at p. 2.) Plaintiff alleges that she was beaten and discriminated against for being transgender. (FAC at pp. 3, 5–6.)

### STATEMENT OF FACTS

Based on its review and consideration of the declarations and attached exhibits filed in support of and in opposition to the pending Motion for Summary Judgment, the Court finds the following facts are undisputed unless otherwise noted:

In May of 1999, Plaintiff was tried and convicted in San Bernardino County, California for violating seven counts of California Penal Code ("PC") § 288(b)(1), forced sex with a minor. (Defendants' Statement of Undisputed Facts ["DSUF"] 3.) Plaintiff was sentenced to 32 years in prison. (DUFFS 4.) In 1999, Plaintiff began to identify herself as a transgender (DUFFS 5), and began to receive hormone therapy for a Gender Identity Disorder. [2] (DUFFS 5.) Plaintiff received the therapy on and off since 1999. (DUFFS 5.)

In 2005, Plaintiff was housed at the California Mens Colony ("CMC") in San Luis Obispo, California. (DUFFS 6.) During her stay at CMC, Dr. Joseph Kuntz performed a circumcision on Plaintiff to which Plaintiff claimed she did not consent. (DUFFS 7.) In October 2006, Plaintiff filed a medical malpractice lawsuit against Dr. Joseph Kuntz. (DUFFS 8.) Plaintiff filed her lawsuit as a *pro per* plaintiff, in the Superior Court of California, County of San Luis Obispo, Case No. CV 060845 ("Kuntz Case"). (DUFFS 8.)

*3 From March 19, 2011 to April 4, 2011, Plaintiff was housed at the San Luis Obispo County Jail (FAC at ¶ 22.) Plaintiff was transported to San Luis Obispo County Jail from the California Department of

Corrections and Rehabilitation ("CDCR") for the trial on the Kuntz Case. (DUFFS 9.) Plaintiff was classified at CDCR as "Administrative Segregation, Protective Custody Classification" and consequently upon entry at the San Luis Obispo County Jail, she was also placed in Administrative Segregation. (DUFFS 9.) However, Plaintiff disputes this contention and claims she was placed in Administrative Segregation because she is transgender. (DUFFS 11.)

The Kuntz Case was strictly a civil negligence, medical malpractice lawsuit. (DUFFS 10.) The Kuntz Case did not challenge Plaintiff's conditions of confinement at any one of the California prisons Plaintiff resided; it did not challenge Plaintiff's criminal sentencing; and it did not allege Dr. Kuntz was working for a public entity giving rise to a civil rights claim. (DUFFS 10.) Plaintiff attended court for pretrial conferences in the Kuntz Case on March 23 and 24, 2011, and attended the four-day jury trial from March 28 through April 1, 2011. (DUFFS 11.) The Kuntz Case ended in a defense verdict. (DUFFS 11.) Plaintiff remained in custody at San Luis Obispo County Jail and awaited transport to CDCR, which occurred on April 4, 2011. (DUFFS 12.)

County Jail policy regarding access to the law library for inmates is to provide priority to *pro per* litigants in criminal proceedings, or litigants challenging the conditions of their confinement. (DUFFS 14.) County jail policy is to require litigants in actions not related to civil rights claims or criminal defense actions to obtain a court order allowing them to access the law library. (DUFFS 15.) Per the County Jail policy, Plaintiff's medical malpractice lawsuit in the Kuntz Case required a court order. (DUFFS 16.) Defendants Officers Adams and Rushing told Plaintiff she needed to have a Court Order to access the library for legal matters. (DUFFS 17.)

On March 23, 2011, Plaintiff requested an Order from the San Luis Obispo County Superior Court judge to allow her to have access to the law library. (DUFFS 17.) The trial judge issued a Minute Order on March 23, 2011, which stated in a handwritten note, "If it can be reasonably accomplished the Sheriff shall bring to court each day with the Plaintiff a copy of Plaintiff's legal file and Defendant's exhibits and trial documents." (DUFFS 18.) The March 23, 2011 Minute Order also stated, "The Plaintiff is self represented, facing trial on 3/28/11, and should be granted all reasonable access to legal

research facilities. The Plaintiff shall arrive in court each day, starting Monday, 3/28/11, attired in civilian clothing." (DUFFS 19.) Plaintiff had civilian clothing on at the hearing and during the trial. (DUFFS 36.) According to the *Pro Per* Log, Plaintiff had access to her legal research materials after March 23, 2011. (DUFFS 23.)

**\*4** Plaintiff alleges on March 23, 2011 Defendants Deputies Mayes, Adams, Manpal and Sgt. Rushing denied Plaintiff access to law research facilities and to her own legal materials and trial briefs. (FAC at ¶ 32.) Plaintiff alleges when returning from court on March 23, 2011 that Defendants refused to feed her and started pushing Plaintiff, calling her "faggot, queer with tits." (FAC at ¶ 33.) Defendant Deputy Ulloa smacked Plaintiff in the face and head, calling her a "rat-ass-faggot." (*Id.*) Defendant Sgt. Rushing was laughing and kicked Plaintiff, saying "we are the real thing, not no correctional officer." (*Id.*) Plaintiff alleges Defendant Sgt. Rushing then ordered Defendants Deputies Adams and Mayes to strip Plaintiff naked in the middle of the hall. Plaintiff was then punched by Defendants. Sgt. Rushing then said, "No budget, no law library." (*Id.*)

A pretrial conference hearing was held on March 24, 2011. (DUFFS 21.) Plaintiff alleges that she informed the Court of the alleged March 23, 2011 assault, that she was hurt in the knee and was hit in the face and given a bloody nose, and the Court responded with the March 24, 2011 Order. (DUFFS 37, 38.) The only statement noted on the March 24, 2011 Minute Order is, "The Plaintiff shall be allowed to bring to Court each day whatever legal materials he is able to carry with him." (DUFFS 21.) There is no mention in the March 24, 2011 Minute Order that Plaintiff was refused access to the law library. (DUFFS 21.) Also, the attorney in the civil case, representing Dr. Kuntz, never saw Plaintiff displaying injuries associated with a physical assault throughout the entire trial. (DUFFS 22.)

The Custody Post Logs for March 24, 2011 and March 25, 2011, show Plaintiff had accessed the legal research room, which the jail calls the "502 room." (DUFFS 24.) Plaintiff alleges that this room is an empty cell with a typewriter, table and chair but no other services are provided. (Plaintiff's Opposition at 3; Plaintiff's Statement of Undisputed Facts ["PSUF"] 6.)

Plaintiff alleges on April 1, 2011, "while returning from trial, Defendants Ulloa, Mayes, Manpal, Adams and Sgt. Rushing got Plaintiff naked in the A–Hall, and started to punch, strike, and kick Plaintiff" calling her a "rat faggot" and other names and placed her in Administrative Segregation without medical attention. (FAC at ¶ 36.) Defendants deny that this incident occurred. (DUFFS 25)

During the entire period Plaintiff stayed at the County Jail from March 19, 2011 through April 4, 2011, Defendants contend that Plaintiff was provided meals on a daily basis. (DUFFS 20.) Meal periods, such as breakfast, lunch and dinner, are served to all inmates at the same time in order to ensure order and safety among the inmates as well as the correctional staff. (Id.) According to Defendants Sgt. Rushing and Deputy Ulloa, Plaintiff was never denied meals (DUFFS 26); however, Plaintiff disputes this contention and alleges she was denied eight meals. Plaintiff never complained to the Trial Judge that she was not receiving meals. (DUFFS 40.) Defendants also allege that Plaintiff participated in the clothing exchanges and showers (DUFFS 27); however, Plaintiff alleges she was not provided with showers or clean clothes.

**\*5** Yard time was provided to Plaintiff when weather permitted. (DUFFS 28.) An inmate housed in Administrative Segregation is granted yard access for exercise on Tuesdays, Thursday and Saturdays, when weather permits. During the period that Plaintiff was housed at the San Luis Obispo County Jail, weather did not permit yard access on March 22–27, 2011. Plaintiff was given yard access on Tuesday, March 29, 2011, Thursday, March 31, 2011 and Saturday, April 2, 2011. (DUFFS 28.) Plaintiff attended court for pretrial conferences on March 23, 2011 and March 24, 2011 and trial from March 28, 2011 to April 1, 2011. (DUFFS 11.)

Plaintiff received her hormone therapy once during week 2 of the 16–day period, and received hormone therapy three days before she was transferred to County Jail which is consistent with her prescribed therapy. (DUFFS 30, 41.)[3]

Plaintiff has no evidence of a policy created by Defendant Sheriff Ian Parkinson or imposed by the County of San Luis Obispo and admits to neither meeting or otherwise communicating with Defendant Sheriff Ian Parkinson. (DUFFS 42.)

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants seek summary judgment or in the alternative partial summary judgment as to Plaintiff's claims for alleged violations under 42 U.S.C. § 1983 (First, Eighth and Fourteenth Amendments); and allegations of conspiracy under 42 U.S.C. §§ 1985 and 1986. Specifically, Defendants contend that Plaintiff's § 1983 claim against Defendants Sheriff Ian Parkinson and the County of San Luis Obispo fail as a matter of law and that Plaintiff's § 1983 claim based on alleged violations of her Fourteenth Amendment rights also fail. Defendants also contend they are entitled to qualified immunity against each of Plaintiff's alleged constitutional violation claims on the following grounds: (1) Plaintiff did not have a constitutional right to access the law library and if she did, the right was not clearly established; (2) confinement in Administrative Segregation is not a civil rights violation; (3) Plaintiff was not denied meals, showers, clothing or yard time; and (4) Plaintiff's alleged assaults are not supported by facts and are subject to immunity. Finally, Plaintiff's 42 U.S.C. § 1985 and § 1986 claims fail as a matter of law.

## PLAINTIFF'S OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT

Plaintiff in her Opposition contends that Defendants violated her First, Eighth and Fourteenth Amendment rights and acted with deliberate indifference when (1) Defendants denied Plaintiff access to the courts by denying her access to the law library, legal materials and legal supplies; (2) used excessive force in retaliation and discrimination against Plaintiff because Plaintiff is transgender; and (3) denied Plaintiff her equal protection rights by denying Plaintiff showers, hygiene, food (at times), yard time, clothing exchange, and enacted policies that violated Plaintiff's civil rights.

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**\*6** Defendants contend that Defendant Sheriff Ian Parkinson did not violate Plaintiff's rights in his official

or individual capacities; that Plaintiff was not retaliated against in violation of her due process rights; that Plaintiff fails to address whether she was constitutionally entitled to access a law library for the Kuntz case; that Plaintiff's excessive force claim fails; and Plaintiff has failed to present facts to dispute that she received food, showers, yard time and clothing.

### STANDARD OF REVIEW

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact.[4] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue of material fact warranting trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324. In resolving a motion for summary judgment, "[T]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

Under this standard, the mere existence of an alleged factual dispute between the parties will not withstand summary judgment. *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). A factual dispute qualifies as "material" only if it "might affect the outcome of the suit under the governing law[.]" *Anderson,* 477 U.S. at 248 (noting that "the substantive law will identify which facts are material" and that "[f]actual disputes that are irrelevant or unnecessary" in relation to the legal elements of the claims "will not be counted"); *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982) ("A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth.") (citation omitted). A "dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the non-moving

party." *Anderson,* 477 U.S. at 248; *see also Harris,* 550 U.S. at 380 ("Where the record taken as a whole would not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial").

In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the non-moving party. *Barlow v. Ground,* 943 F.2d 1132, 1134 (9th Cir.1991). However, summary judgment cannot be avoided by relying solely on conclusory allegations unsupported by factual data. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). More than a "metaphysical" doubt is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere reliance on the pleadings and conclusory allegations are insufficient to preclude summary judgment. *Celotex Corp.,* 477 U.S. at 324. A party opposing a properly supported motion for summary judgment "... must set forth specific facts showing that there is a genuine issue for trial ." *Anderson,* 477 U.S. at 247, *citing First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

**\*7** Finally, where the evidence conflicts, questions of credibility and motivation generally present an issue of material fact inappropriate for resolution on summary judgment. *See, Allen v. Scribner,* 812 F.2d 426, 435, 437 (9th Cir.1987), *amended on other grounds,* 828 F.2d 1445 (9th Cir.1987); *see also Valandingham v. Bojorquez,* 866 F.2d 1135, 1139, 1140 (9th Cir.1989) (genuine issue of material fact existed as to whether defendants committed the alleged retaliatory acts). Thus, when a plaintiff presents evidence on which the trier of fact could reasonably resolve a material factual issue in her favor, summary judgment for defendants is not appropriate. *See, Barlow v. Ground,* 943 F.2d 1132, 1136 (9th Cir.1991), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992); *see also Neely v. Feinstein,* 50 F.3d 1502, 1509 (9th Cir.1995).

### A. Plaintiff and Defendants' Requests for Judicial Notice.

Defendants have requested the Court take judicial notice pursuant to Federal Rule of Evidence 201 of a number of documents contained in Exhibits 11–15, all constituting court records. The request is unopposed.

Plaintiff seeks judicial notice for the following documents: Exhibit 1: San Luis Obispo County Sheriff's Department Court Tracking Sheet; Exhibit 2: San Luis Obispo County Sheriff Operational Directive—Use of Force; Exhibit 3: San Luis Obispo County Sheriff's Operational Directive — § 306.00, et seq.—Searches on Inmates; Exhibit 5: Law Library Operational § 1103.00, et seq.; Exhibit 6: Assembly Bill No. 382; Exhibit 7: San Luis Obispo County Jail Custody Post Log; and Exhibit 8: Declaration of Custodian of Records of San Luis Obispo County Sheriff.

To be judicially noticeable, a fact must not be subject to a reasonable dispute because it must be either generally known within the territorial jurisdiction of the Court or "capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201. "Materials from a proceeding in another tribunal are appropriate for judicial notice." *Biggs v. Terhune,* 334 F.3d 910, 916 n. 3 (9th Cir.2003) (taking judicial notice of the transcript of a habeas petitioner's hearing before the Board of Prison Terms); *see also United States ex. rel. Robinson Rancheria Citizens Counsel v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir.1992) (holding that courts may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"); *Mullis v. United States Bankruptcy Court,* 828 F.2d 1385, 1388 n. 9 (9th Cir.1987) (holding that it is proper for a court to take judicial notice of the contents in court files in other lawsuits, *cert. denied,* 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988).

Accordingly, the Court grants Defendants' request to take judicial notice of the state court records in Plaintiff's criminal case and medical malpractice case. *See* Defendants' Exs. 11–15. However, Plaintiff's request for judicial notice of Exhibits 1 through 8 is denied. As noted, Courts may only take judicial notice of adjudicative facts that are "not subject to reasonable dispute." Fed.R.Evid. 201(b). Plaintiff's Exs. 1 through 8 do not fit the requirements of Rule 201.

### DISCUSSION

**\*8** For all of the following reasons, Defendants' Motion for Summary Judgment or Partial Summary Judgment should be granted in part and denied in part.

#### A. *Section 1983 Requirements.*

In order to state a claim under section 1983, a plaintiff must allege that: (1) the defendants were acting under color of state law at the time the complained of acts were committed; and (2) the defendants' conduct deprived plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States. *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Karim–Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 624 (9th Cir.1988); *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir.1985) (en banc), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). Liability under section 1983 is predicated upon an affirmative link or connection between the defendants' actions and the claimed deprivations. *See Rizzo v. Goode,* 423 U.S. 362, 372–73, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *May v. Enomoto,* 633 F.2d 164, 167 (9th Cir.1980).

Plaintiff's claims against Defendants are in their individual and official capacities. An individual defendant is not liable on a civil rights claim unless the facts establish the defendant's *personal involvement* in the constitutional deprivation or a causal connection between the defendant's wrongful conduct and the alleged constitutional deprivation. *See Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1984). A plaintiff "must allege facts, not simply conclusions, that show an individual was personally involved in the deprivation of her civil rights." *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998), *cert. denied,* 525 U.S. 1154, 119 S.Ct. 1058, 143 L.Ed.2d 63 (1999); *see Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (stating that a complaint must contain more than legal conclusions to withstand dismissal for failure to state a claim).

#### B. *Plaintiff Fails to State a Claim Against Defendants Sheriff Parkinson in His Individual or Official Capacity or the County of San Luis Obispo.*

Plaintiff alleges that Defendants County of San Luis Obispo and Sheriff Parkinson violated her rights under the First and Fourteenth Amendments. Plaintiff alleges she was unable to complain without retaliation from Defendants. (FAC at p. 7.) Plaintiff alleges that Defendants County of San Luis Obispo and Sheriff Parkinson make the jail policies. Specifically, Plaintiff contends that Defendant County of San Luis Obispo provided the budget to the jail, and Defendant Sheriff Parkinson made the policy and custom to eliminate the

law library. (Plaintiff's Opposition at pp. 6–8.) However, Plaintiff has provided no admissible evidence that the law library was cut from the budget. Further, Plaintiff was not a *pro per* plaintiff within the class of litigants that is constitutionally entitled to law library access. As noted in Plaintiff's First Amended Complaint, she "was denied access to [her] own legal material to prepare for her civil trial, so [she] could file motions, get ready for witness [sic], court rules." (FAC at ¶ 27 .) According to Plaintiff, her claims relate to the denial of access to her file material relating to the Kuntz Case.

**\*9** A claim against a local government official in her official capacity is construed as being asserted directly against the local government entity, not the named individual defendant. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("Official capacity suits ... generally represent only another way of pleading an action against an entity of which the officer is an agent") (quoting *Monell v. Department of Social Service of the City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Where the government entity receives notice and an opportunity to respond to the official capacity suit, "[The] suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. at 166 (citation omitted).

A local government entity may not be sued under § 1983 for an injury inflicted wholly by its employees or agents. *Monell,* 436 U.S. at 691. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. *Monell,* 436 U.S. at 694; *see also Gibson v. County of Washoe, Nevada,* 290 F.3d 1175, 1185 (9th Cir.2002) (describing "two routes" to municipal liability, where municipality's official policy, regulation or decision violated plaintiff's rights, or alternatively where a municipality failed to act under circumstances showing its deliberate indifference to plaintiff's rights) (citations omitted), *cert. denied,* 537 U.S. 1106, 123 S.Ct. 872, 154 L.Ed.2d 775 (2003).

The Court has construed the First Amended Complaint in the light most favorable to Plaintiff. Even so, Plaintiff has failed to state a plausible claim that Defendant Sheriff Parkinson could be held liable for Plaintiff's claims. Plaintiff does not allege that Defendant Sheriff Parkinson

had any direct contact with Plaintiff, but rather premises her claims against him on his actions as a supervisor of the jail. Supervisory personnel generally are not liable under 42 U.S.C. § 1983 on any theory of respondeat superior or vicarious liability in the absence of state law imposing such liability. *See Redman v. County of San Diego,* 942 F.2d 1435, 1443–44 (9th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). A supervisory official may be liable under § 1983 only if he or she was personally involved in the constitutional violation. *See Id.* at 1446–47. A plaintiff who wishes "[t]o premise a supervisor's alleged liability on a policy promulgated by the supervisor ... must identify a specific policy and establish a direct causal link,' between that policy and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Here, Plaintiff contends that several policies at the County Jail violated her constitutional rights giving rise to Defendant Sheriff Parkinson's liability individually, and in his official capacity as the creator of the budget and the policies. Plaintiff states that the rules surrounding the use of the law library and the alleged lack of a grievance process violated her constitutional rights. However, Plaintiff had no constitutional right to access the law library and the jail had a grievance process.

**\*10** The Ninth Circuit has consistently held that a confined person in Plaintiff's situation could state a claim for a supervisor's liability under § 1983 against a warden, sheriff, director of corrections, or other jail administrator, for example, if he supplies sufficient specific allegations that the supervisor personally (1) set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) [committed] culpable action or inaction in training, supervision or control of subordinates; (3) ... acquiesce[d] in the constitutional deprivation by subordinates; or (4) [engaged in] conduct that shows a "reckless or callous indifference to the rights of others." *Moss v. U.S. Secret Service,* 675 F.3d 1213, 1231 (9th Cir.2012) (quoting *Al Kidd v. Ashcroft,* 580 F.3d 949, 965 (9th Cir.2009) (quoting *Larez v. City of Los Angeles,* 946 F.2d 630, 636 (9th Cir.1991).)

As the Supreme Court made clear in *Iqbal,* "a government official, regardless of his or her title, 'is liable only for his

or her own misconduct.' " *Ashcroft v. Iqbal,* 556 U.S. at 677. Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (*Id.* at 676.) The Ninth Circuit has concluded that, notwithstanding *Iqbal,* when an Eighth/Fourteenth Amendment conditions of confinement claim is governed by the "deliberate indifference" standard, "a plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates." *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir.2011), *cert. denied,* — U.S. ——, 132 S.Ct. 2101, 182 L.Ed.2d 882 (2012).

In *Starr,* the Ninth Circuit considered a § 1983 claim brought against the Sheriff of Los Angeles County (Baca) and found the allegations of the complaint to be sufficient to state a "supervisory liability claim of deliberate indifference against Sheriff Baca." *Starr,* 652 F.3d at 1217. More recently, in *Hydrick v. Hunter,* 669 F.3d 937 (9th Cir.2012), the Ninth Circuit explained that the complaint in *Starr* contained detailed factual allegations identifying what Baca knew or should have known and what Baca did or failed to do, as well as "sufficient facts to plausibly suggest Sheriff Baca's 'knowledge of' and 'acquiescence in' the unconstitutional conduct of his subordinates." (*Hydrick,* 669 F.3d at 941 (citing *Starr,* 652 F.3d at 1207, 1209.) These detailed allegations were related to, among other things, a letter and weekly reports received by Baca that discussed inmate abuse; a memorandum of understanding into which Baca entered with the Department of Justice by which Baca agreed to address constitutional violations to which inmates were subjected; a subsequent Department of Justice report, which found that Baca had failed to comply with the Memorandum of Understanding; an incident in which Baca was specifically informed about the failure to investigate a deputy's attack on an inmate that resulted in the inmate's death; another incident in which (pursuant to the approval of the settlement of a civil action) Baca was made aware of attacks on inmates by other inmates and of the failure to provide reasonable security; seven or more other incidents in which Baca was apprised, after the fact, of inmate beatings and killings that resulted from the failure of deputies to provide reasonable security; and several reports provided to Baca by a special counsel, which noted inmate abuse and problems at the jail. *Starr,* 652 F.3d at 1209–11; *see also Hydrick,* 669 F.3d at 941.

**\*11** In contrast here, the allegations of the First Amended Complaint are wholly bald and conclusory and assert merely that Defendant Sheriff Parkinson knew or should have known that Plaintiff's rights would be violated by the conditions of her confinement at the jail. Plaintiff does not allege any facts that plausibly suggest Defendant Sheriff Parkinson knew of any constitutional deprivations occurring at the San Luis Obispo County Jail. The mere fact that Defendant Sheriff Parkinson is the Sheriff of San Luis Obispo, and thus is the top official with respect to the administration of the Jail, is not an adequate factual predicate for stating a § 1983 claim against him based on the subject matter of the First Amended Complaint. As in *Hydrick,* "[T]he absence of specifics is significant," because *Iqbal* has made clear that a complaint against a government official must show that the official's own individual actions violated the Constitution. *Hydrick,* 669 F.3d at 941–42 (finding allegations of a complaint challenging the conditions of confinement, which was filed by civilly committed sexually violent predators against supervisors at a state hospital and elsewhere, to be bald and conclusory, "devoid of specifics" sufficient to plausibly suggest that defendant's knowledge of and/or acquiescence in the allegedly unconstitutional conduct (retaliation) by subordinate employees and thus inadequate to state a claim for monetary damages under § 1983).

Plaintiff's First Amended Complaint does not provide allegations describing why and how Defendant Sheriff Parkinson "reasonably should have known" that his rank and file employees were engaged in some "series of acts" (which he did not initiate, command or encourage) which would cause constitutional injury to Plaintiff if Defendant Sheriff Parkinson did not terminate that "series of acts," *Larez,* 946 F.2d at 636. Nor does the First Amended Complaint supply specific allegations describing, in more than conclusory fashion, how Defendant Sheriff Parkinson might have "set [ ] in motion a series of acts by others" (*Larez,* 946 F.2d at 636), that he knew or reasonably should have known would cause his subordinates to inflict constitutional injury on Plaintiff. Without a factually based, non-conclusory allegation that Defendant Sheriff Parkinson actually knew of the conditions to which Plaintiff refers, as a matter of law it cannot be said that Defendant Sheriff Parkinson "acquiesced" in those conditions or that his conduct exhibited "reckless or callous indifference to the rights of"

Plaintiff. Accordingly, Defendants Sheriff Parkinson and the County of San Luis Obispo are entitled to summary judgment.

### C. *Plaintiff's § 1983 Claim Based on Alleged Violations of Her Fourteenth Amendment Rights Fails.*

Plaintiff was not a pretrial detainee while at the County Jail and is not a member of a protected class. Plaintiff claims, in part, that she was physically assaulted as retaliation for seeking a Court Order for access to the law library from the Judge in her medical malpractice case and that she was further assaulted due to her transgender status. Plaintiff claims that Defendants' conduct was "deliberately indifferent" to her Fourteenth Amendment due process rights. Because Plaintiff is a convicted felon, and was at the County Jail in the middle of serving a sentence, Plaintiff's due process rights arise from the Eighth Amendment, not the Fourteenth Amendment. *See Simmons v. Navajo County, Arizona,* 609 F.3d 1011, 1017 (9th Cir.2010); *Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1242 (9th Cir.2010); *see also Hudson v. McMillan,* 503 U.S. 1, 4, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (Eighth Amendment due process is applied to inmates, while Fourteenth Amendment due process applies to pretrial detainees). To the extent Plaintiff is bringing her § 1983 claims for violation of her due process rights under the Fourteenth Amendment, they fail as a matter of law.

**\*12** Plaintiff also alleges her equal protection rights under the Fourteenth Amendment were violated because of her transgender status. Transgender is not a protected or suspect class giving rise to equal protection. An equal protection claim may be established in two ways: the first requires a plaintiff to "show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington,* 151 F.3d 1193, 1194 (9th Cir.1998). Plaintiff has put forth no evidence that her status as a transgender qualified her as a member of a protected class. Further, there are no cases in which transgender persons constitute a "suspect class." *See Braninburg v. Coalinga State Hospital,* 2012 WL 391190 at *8 (E.D.Cal. Sept. 7, 2012); *Jamison v. Davue,* 2012 WL 996383 at *3 (E.D.Cal. Mar.23, 2012) (holding that transgender individuals do not constitute a suspect class).

If the claims do not involve a suspect classification, a plaintiff can establish an equal protection "class of one" by alleging that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). To prevail under this theory, a plaintiff must show that (1) he is a member of an identifiable class; (2) he was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. *Village of Willowbrook,* 528 U.S. at 564. "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status." *Serrano v. Francis,* 345 F.3d 1071, 1082 (9th Cir.2003) (emphasis in original) (quoting *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir.1994). Plaintiff has set forth no evidence supporting a finding that other similarly situated individuals were treated differently from her, and has presented no evidence establishing that there was no rational basis for such different treatment. Accordingly, Defendants are entitled to summary judgment on this claim.

### D. *Defendants Are Entitled to Qualified Immunity on Certain Claims.*

Defendants contend they are entitled to qualified immunity because Plaintiff's allegations are insufficient to plead constitutional claims. Specifically, Defendants contend that Plaintiff did not have a constitutional right to access the law library and if she did the right was not clearly established; that confinement in administrative segregation is not a violation of a civil right; that Plaintiff was not denied meals, showers, clothing or yard time; and that Plaintiff's alleged assaults are subject to immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (citation omitted). "[Q]ualified immunity shields the arresting officer from suit when she or he 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.' " *Smith v. Almada,* 640 F.3d 931, 937 (9th Cir.2011) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."

*Mallev v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

**\*13** To determine whether an official is entitled to qualified immunity, the Court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that her conduct was unlawful in the situation she confronted. *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part on other grounds* by *Pearson,* 555 U.S. at 223. The prongs may be analyzed in the order selected by the court. *Pearson,* 555 U.S. at 236.

To survive a claim of qualified immunity, a plaintiff must show that the official's actions violated a constitutional right, and that the right was "clearly established" at the time of the conduct at issue. *Nelson v. City of Davis,* 685 F.3d 867, 875 (9th Cir.2012); *see also Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("Courts are required to resolve a threshold question: taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right?"); *Estate of Ford v. Ramirez Palmer,* 301 F.3d 1043, 1050 (9th Cir.2002) (clarifying the qualified immunity analysis for a claim under the Eighth Amendment). If no constitutional right would have been violated if the facts were as alleged, then "there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201.

If the official's actions did not violate a constitutional right, there is no violation of § 1983 and qualified immunity is not implicated. *Lacey v. Maricopa County,* 693 F.3d 896, 915 (9th Cir.2012). If the official violates a constitutional right, but that right was not "clearly established," then the official is protected by qualified immunity. (*Id.*) "Only when an officer's conduct violates a clearly established constitutional right—when the officer should have known she was violating the Constitution—does she forfeit qualified immunity." (*Id.*)

The Court will discuss each of Plaintiff's claims below.

### 1. *Defendants Are Entitled to Summary Judgment on Plaintiff's First Amendment Retaliation Claim.*

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the Government may support a § 1983 claim. *Rizzo v.*

*Dawson,* 778 F.2d 527, 532 (9th Cir.1985). *See also Valandingham v. Bojorquez,* 866 F.2d 1135 (9th Cir.1989); *Pratt v. Rowland,* 65 F.3d 802, 807 (9th Cir.1995). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of her First Amendment rights and (5) the action did not reasonably advance a legitimate correctional goal ." *Rhodes v. Robinson,* 408 F.3d 559, 567–68 (9th Cir.2005). An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support a claim under § 1983. *Bruce v. Ylst,* 351 F.3d 1283, 1288 (9th Cir.2003).

**\*14** Adverse action is action that "would chill a person of ordinary firmness" from engaging in that activity. *Pinard v. Clatskanie School District,* 467 F.3d 755, 770 (9th Cir.2006). Both litigation in court and filing inmate grievances are protected activities and it is impermissible for prison officials to retaliate against inmates for engaging in these activities. However, not every allegedly adverse action will be sufficient to support a claim under § 1983 for retaliation. In the prison context, cases in this Circuit addressing First Amendment retaliation claims involve situations where the action taken by the defendant was clearly adverse to the plaintiff. *Rhodes v. Robinson,* 408 F.3d at 568 (arbitrary confiscation and destruction of property, initiation of a prison transfer, and assault and retaliation for filing grievances); *Austin v. Terhune,* 367 F.3d 1167, 1171 (9th Cir.2004) (retaliatory placement in administrative segregation for filing grievances).

A plaintiff asserting a retaliation claim must demonstrate a causal nexus between that alleged retaliation and plaintiff's protected activity (i.e., filing a legal action). *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979); *see Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). A plaintiff must submit evidence, either direct or circumstantial, establishing a link between the exercise of constitutional rights and the alleged retaliatory action. *Pratt,* 65 F.3d at 806. The timing of events surrounding the alleged retaliation may constitute circumstantial evidence of retaliatory intent. (*See Id.*)

There is no free standing constitutional right to law library access; however, prisoners have a constitutional

right of access to the courts. *See Lewis v. Casey,* 518 U.S. 343, 346, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). This right of access to the Courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. *Bounds,* 430 U.S. at 828. The right, however, "guarantees no particular methodology but rather the conferral of capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts ... that is the touchstone of the right of access to the courts." *Lewis,* 518 U.S. at 356–357. Prison officials may select the best method to insure that prisoners will have the capability to file suit. *See id.* at 356.

To establish a violation of the right of access to the courts, a prisoner must establish that he or she has suffered an actual injury. *See Lewis,* 518 U.S. at 349. An "actual injury" is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Lewis,* 518 U.S. at 348. The right of access to the courts is limited to non-frivolous legal claims such as direct criminal appeals, habeas corpus proceedings, and § 1983 actions. *See Lewis,* 518 U.S. at 353 n. 3 and 354–355; *see also Phillips v. Hust,* 588 F.3d 652, 655 (9th Cir.2009) (to succeed on denial of access claim, a plaintiff must show that official acts or omissions hindered efforts to pursue a non-frivolous legal claim). The right of access to the courts is only a right to bring complaints to the federal court and not a right to discover such claims or to litigate them effectively once filed with the Court. *See Lewis,* 518 U.S. at 354–355.

**\*15** Here, Plaintiff's allegations fail to state a First Amendment violation. Prisoners involved in civil lawsuits that do not present constitutional questions challenging conditions of confinement or attacking a conviction are not afforded mandatory access to legal research, facilities, or law libraries, as the purpose in *Bounds* was not to create litigating engines capable of filing everything from shareholders derivative actions to slip and fall claims. *Lewis,* 518 U.S. at 355–356. Decisions by prison officials to regulate the number of inmates who can access a law library and its resources does not, by itself, constitute a denial of access to the courts. *See Lewis,* 518 U.S. at 361; *Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851, 858 (9th Cir.1985). Prison officials are afforded the

authority "in structuring when and who can access prison law libraries." *Lindquist,* 776 F.2d at 851.

Plaintiff claims that she had a constitutional right to access a law library to prepare for the Kuntz trial. She claims this right was denied. The Kuntz Case was a medical malpractice case. It did not present a challenge to the conditions of confinement or criminal sentence. (DSUF 10 and 11.) Therefore, the Kuntz Case did not present claims giving rise to a constitutional right to access legal research and a law library and therefore no constitutional right could have been violated.

Even if Plaintiff had a constitutional right to have access to a law library relating to her medical malpractice lawsuit, the cases from the Supreme Court suggest otherwise, such that a right is not clearly established for a reasonable officer to know he was violating a right by depriving Plaintiff access to the law library. Accordingly, Defendants are entitled to qualified immunity regarding this claim.

Plaintiff also alleges Defendants violated state law regarding law library access. "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, [s]ection 1983 offers no redress." *Sweanev v. Ada County, Idaho,* 119 F.3d 1385, 1391 (9th Cir.1997), quoting *Lovell v. Poway Unified Sch. Dist.,* 90 F.3d 367, 370 (9th Cir.1996). Only if the events complained of rise to the level of a federal statutory or constitutional violation may Plaintiff pursue them under § 1983. *Patel v. Kent School Dist.,* 648 F.3d 965, 971 (9th Cir.2011). There is no independent cause of action for a violation of Title 15 regulations. *See Davis v. Kissinger,* 2009 WL 256574, *12 n. 4 (E.D.Cal.2009). Thus, complaints where prison officials violated state regulations regarding law library policies or Title 15 will not support a § 1983 claim.

### 2. *Plaintiff's Claim That Confinement in Administrative Segregation Violated Her Rights Fail.*

When Plaintiff arrived from CDCR, she had a designation of Administrative Segregation Protective Custody. County Jail, complying with Plaintiff's already established classification, placed her in Administrative Segregation. (DSUF 9, 44.) Plaintiff's contention that she was retaliated against by being placed in Administrative Segregation fails as she was placed there upon arrival

on March 19, 2011 and remained there until April 4, 2011. (DSUF 9, 44.) Plaintiff argues that she was placed in Administrative Segregation because she is transgender and requested law library access. However, Plaintiff was placed in Administrative Segregation before she obtained the March 23, 2011 Order from the Superior Court in the Kuntz Case. Consequently, confinement in Administrative Segregation could not be retaliatory.

**\*16** In general, a prisoner has no liberty interest in avoiding transfer to more restrictive conditions of confinement, such as a transfer from the general population to segregation, unless he can show an atypical and significant hardship in relation to the ordinary incidents of prison life. *Wilkinson v. Austin,* 545 U.S. 209, 221–23, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005); *Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). "Typically, administrative segregation in and of itself does not implicate a protected liberty interest." *Serrano v. Francis,* 345 F.3d 1071, 1078 (9th Cir.2003); *May v. Baldwin,* 109 F.3d 557, 565 (9th Cir.1997) (administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence). Administrative segregation may implicate due process if the confinement imposes an atypical and significant hardship. *See, e.g., Wilkinson,* 545 U.S. at 223–24 (inmates' liberty interests were implicated by their indefinite confinement in highly restrictive "supermax" prison, where the inmates were deprived of almost all human contact and were disqualified from parole consideration); *Serrano,* 345 F.3d at 1078–79 (placing disabled inmate, without his wheelchair, in segregation unit not equipped for disabled persons gave rise to a liberty interest).

Because there was no constitutional right violated by Plaintiff's placement in Administrative Segregation, there is no need to analyze and discuss whether the right was clearly established so that a reasonable officer would have known the conduct violated Plaintiff's rights. It is reasonably clear that an officer would believe that placing Plaintiff in Administrative Segregation was not a constitutional violation. Accordingly, Defendants are entitled to qualified immunity on this claim.

### 3. *Defendants Are Entitled to Summary Judgment on Plaintiff's Claims Regarding Meals, Showers, Clothing and Yard Time.*

#### a. *Meals.*

Plaintiff alleges that Defendants denied her adequate meals. In Plaintiff's FAC on p. 6, ¶ 37 she alleges she missed a total of eight meals, then on p. 11, Plaintiff alleges she "was denied dinners for 14 days out of the 34 stayed in the San Luis Obispo County Jail." (DSUF 2.) Defendants contend that during the period of March 19, 2011 through April 4, 2011, Plaintiff was provided meals on a daily basis. (DSUF 20, 26.)

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. *Morgan v. Morgensen,* 465 F.3d 1041, 1045 (9th Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. at 847 and *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Prison officials must ensure that inmates receive adequate food, clothing, shelter, medical care and personal safety. *Farmer,* 511 U.S. at 832. "Adequate food is a basic human need protected by the Eighth Amendment." *Kennan v. Hall,* 83 F.3d 1083, 1091 (9th Cir.1996) (citing *Hoptowit v. Ray,* 682 F.2d at 1246), *amended by* 135 F.3d 1318 (9th Cir.1998). "While prison food need not be tasty or esthetically pleasing it must adequate to maintain health" (*Id.*), quoting *Lamaire v. Maass,* 12 F.3d 1444, 1456 (1993); *see also Foster v. Runnels,* 554 F.3d 807, 812–13 (9th Cir.2009) (prisoner allegation that officials deprived her of 16 meals over a 23–day period, leading to weight loss and dizziness was sufficient to state a claim).

**\*17** Here, Plaintiff does not allege that meals were withheld compromising her health, nor did Plaintiff mention denial of meals to the Superior Court Judge. Accordingly, Defendants are entitled to summary judgment.

#### b. *Shower Time.*

Plaintiff was at County Jail for over a two-week period of time. While the Eighth Amendment protects prisoners from cruel and unusual punishment, there is no discernable constitutional right to frequent showers. "[I]t is hardly inhuman or uncivilized to shower less commonly, as any intentional tourist can attest." *Clark v. Williams,* 2011 WL 304585 \*2 (D.Nev.2011); *see also Baptisto v. Ryan,* 2005 WL 2416356 (D.Ariz.2005); *Davenport v. DeRobertis,* 844 F.2d 1310, 1316 (7th Cir.1988) (holding

that inmate experiencing a 90–day lockdown had no right to three showers per week, with Judge Posner noting that "importance of a daily shower to the average American is cultural rather than hygienic").

Here, even if Plaintiff can show that she was deprived of showers, any deprivation does not arise to a constitutional violation, or a violation of federal rights. "Section 1983 is 'a method for vindicating federal rights,' not rights imparted by the state or county." *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). As such, for the short length of time Plaintiff was at County Jail, even if she did not participate in showers, there is no constitutional violation supportive of a § 1983 claim.

#### c. *Clothing.*

Plaintiff's claim that she was denied "clothing exchanges" is unsupported. On March 20, 2011, Plaintiff was issued County Jail clothing upon arrival to County Jail. (DSUF 36.) Plaintiff was only at County Jail for 16 days and she admits to receiving clothing during the trial. (DSUF 36.) "The denial of adequate clothing can inflict pain under the Eighth Amendment." *Walker v. Sumner,* 14 F.3d 1415, 1421 (9th Cir.1994) (*overruled on other grounds* by *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Conditions of confinement must be more than uncomfortable, however, to violate the Eighth Amendment. *Rhodes,* 452 U.S. at 347. For there to be a constitutional violation relating to clothing, Plaintiff had to go without new clothing for weeks or months which is impossible with the facts presented; therefore, there can be no constitutional right violated. *See Rainwater v. McGinniss,* 2012 WL 3276966 (E.D.Cal. Aug.9, 2012) (citing *Toussaint v. McCarthy* (N.D.Cal.1984), 597 F.Supp. 1388, 1410–11, *reversed in part on other grounds,* 801 F.2d 1080 (9th Cir.1986) (holding the Eighth Amendment is violated when weeks to months pass without a clothing exchange.)

#### d. *Yard Time.*

Plaintiff alleges she was denied yard time from March 19, 2011 to April 15, 2011. (FAC at p. 11.)[5] Defendants contend that Plaintiff was not held at the County Jail for a long enough period of time to give rise to a deliberate indifference claim for withholding outside exercise for extended periods of time.

*18 Exercise is one of the basic human necessities protected by the Eighth Amendment. *See LeMaire v. Maass,* 12 F.3d 1444, 1457 (9th Cir.1993); *Hearns v. Terhune,* 413 F.3d 1036, 1042 (9th Cir.2005); *see also Touissaint v. Yockey,* 722 F.2d 1490, 1492–93 (9th Cir.1984). Some form of regular exercise, including outdoor exercise, "is extremely important to the psychological and physical well being of prisoners." *See Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979). Determining what constitutes adequate exercise requires consideration of "the physical characteristics of the cell and jail and the average length of stay of the inmates." *Housley v. Dodson,* 41 F.3d 597, 599 (10th Cir.1994). Although the Ninth Circuit did not specify the "minimum amount of weekly exercise that must be afforded to detainees who spend the bulk of their time inside their cells," the Court held that ninety minutes per week of exercise, which is the equivalent of less than thirteen minutes per day, does not comport with Eighth Amendment standards. *Pierce v. County of Orange,* 526 F.3d 1190, 1212 (9th Cir.2008). The *Pierce* court eventually required that if detainees spent 22 hours per day in their cells, that they then be provided with at least two hours of exercise per week. *Id.* at 1213.

Here, Plaintiff cannot state a constitutional violation regarding lack of yard time. The main jail exercise yard log shows that on Thursday, March 31, 2011, Saturday, April 2, 1011, Monday, April 4, 2011, Plaintiff participated in yard time. (DSUF 28.) Furthermore, Plaintiff was at a trial, in civil court, attending trial on March 23, 2011, March 24, 2011 and March 28, 2011 through April 1, 2011. Thereafter, Plaintiff was not deprived of any significant amount of outdoor exercise is she was deprived at all and there is no clearly established law surrounding a brief deprivation even for the entire duration of Plaintiff's stay at the Count Jail, which amounted to just over two weeks. Accordingly, Defendants are entitled to summary judgment on this claim.

#### 4. *Defendants Are Not Entitled to Summary Judgment Concerning the Alleged Assaults on Plaintiff on March 23, 2011 and April 4, 2011.*[6]

Plaintiff alleges she was physically assaulted by Defendants in retaliation for obtaining the March 23, 2011 Court Order regarding law library access and again on April 1, 2011. Specifically, Plaintiff alleges when returning from court on March 23, 2011 she was subjected to a

body search. [7] Plaintiff alleges that Defendants refused to feed her and started pushing Plaintiff, calling her "faggot, queer with tits." (FAC at ¶ 33.) Defendant Deputy Ulloa smacked Plaintiff in the face and head, calling her a "rat-ass-faggot." (*Id.*) Defendant Sgt. Rushing was laughing and kicked Plaintiff, saying "we are the real thing, not no correctional officer." (*Id.*) Plaintiff alleges Defendant Sgt. Rushing then ordered Defendants Deputies Adams and Mayes to strip Plaintiff naked in the middle of the hall. Plaintiff was then punched by Defendants. Sgt. Rushing then said, "No budget, no law library." (*Id.*)

**\*19** On April 1, 2011, while Plaintiff was returning from Court Defendants Deputies Ulloa, Mayes, Manpal, Adams and Sgt. Rushing got Plaintiff naked and started to punch, strike and kick Plaintiff and called her a "rat faggot" and then denied her medical care. (FAC at ¶ 36).

Defendants contend they did not physically abuse Plaintiff or call her names at any time. (DSUF 25.)

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). When a prison official stands accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment, the question turns on whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm. *Hudson v. McMillian,* 503 U.S. at 7 (citing *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the 'threat reasonably perceived by the responsible officials' and 'any efforts made to temper the severity of the forceful response.' " *Hudson,* 503 U.S. at 7 (quoting *Whitley,* 475 U.S. at 321).

"When prison officials use excessive force against prisoners, they violate the inmates' Eighth Amendment right to be free from cruel and unusual punishment." *Clement v. Gomez,* 298 F.3d 898, 903 (9th Cir.2002). As with any Eighth Amendment violation, Plaintiff must prove the "unnecessary and wanton infliction of pain ." *Whitley,* 475 U.S. at 319–20. Neither

accident nor negligence constitutes cruel and unusual punishment, because "[i]t is obduracy and wantonness, not inadvertence or error in good faith that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." (*Id.*)

Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian,* 503 U.S. at 9. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." (*Id.* at 9–10) (internal quotation marks and citations omitted). In a case such as this one, where the force is alleged to have resulted from a personal altercation rather than from disciplinary action, the "core judicial inquiry" is not whether a certain quantum of injury was sustained, but rather "whether force is applied ... maliciously and sadistically to cause harm." *Wilkins v. Gaddy,* 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010); *see also Hudson,* 503 U.S. at 7; *Oliver v. Keller,* 289 F.3d 623, 628 (9th Cir.2002) (Eighth Amendment excessive force standard "examines whether the use of physical force is more than *de minimis"* ).

**\*20** Thus, an Eighth Amendment excessive force claim is not foreclosed simply because an inmate suffers injury that is not serious and/or is *de minimis. Wilkins,* 559 U.S. at 37. The Supreme Court has made clear, however, that the absence of serious injury is not irrelevant to the Eighth Amendment inquiry, as such an absence may "provide some indication of the amount of force applied." (*Id.*) The question under the Eighth Amendment is whether the use of physical force is more than *de minimis,* resulting in the unnecessary and wanton infliction of pain. *Oliver,* 289 F.3d at 628. If it was not, there is no constitutional violation. *Hudson,* 503 U.S. at 9–10.

Defendants seek summary judgment on the excessive force claims alleging the incidents did not occur. However, Plaintiff has set forth facts that Defendants maliciously and sadistically assaulted her on March 23, 2011 and April 1, 2011 to cause Plaintiff harm. (See FAC at 33, 36) Plaintiff further pled that the force used by Defendants was more than *de minimis.* The Court finds a genuine dispute exists as to whether Defendants used force maliciously and sadistically for the purpose of causing harm to Plaintiff. Defendants are therefore not entitled to summary judgment.

### E. *Plaintiff Has Failed to State a Claim Under 42 U.S.C. § 1985.*

Section 1985 proscribes conspiracies to interfere with certain civil rights. *Karim–Panahi v. Los Angeles Police Department,* 839 F.2d 621, 626 (9th Cir.1988). To plead a claim for conspiracy under § 1985, the complaint must allege that Defendants (1) conspired (2) to deprive any person or class of persons of the equal protection of the laws, and that (3) at least one of the conspirators did any act in furtherance of the conspiracy (4a) causing injury to his person or property or (4b) depriving the person of any right or privilege of an American Citizen. *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1970). 42 U.S.C. § 1985(2) has two parts: the first proscribes conspiracies to interfere with the administration of justice in federal courts; the second applies to conspiracies to obstruct the course of justice in state courts. *See Dooley v. Reiss,* 736 F.2d 1392, 1395 (9th Cir.1984).

The statute contains language requiring that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws. *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). The deprivation of rights must be motivated by a racial, or otherwise class-based, discrimination animus. *Sever Alaska Pulp Corp.,* 978 F.2d 1529, 1536 (9th Cir.1992). A mere allegation of conspiracy without factual specificity is insufficient. *Jaco v. Bloechle,* 739 F.2d 239, 245 (6th Cir.1984). Moreover, "bare" allegations and "rank" conjecture are insufficient to support a claim under § 1985 for a civil conspiracy. *See Mahaney v. Warren County,* 206 F.3d 770, 772 (8th Cir.2000).

Here, Plaintiff has failed to set forth any meaningful and competent facts to suggest that Defendants' purpose of denying Plaintiff access to the law library was in retaliation and discrimination of Plaintiff's transgender orientation and was done to deprive Plaintiff of equal protection. (FAC at ¶¶ 4–5.) Additionally, Plaintiff has failed to assert any allegations that Defendants acted in concert, or had a "meeting of the minds" to deprive Plaintiff of her constitutional rights. Accordingly, Plaintiff has failed to state a claim for a violation of 42 U.S.C. § 1985.

**\*21** To state a claim for conspiracy, Plaintiff must allege specific facts showing two or more persons intended to

accomplish an unlawful objective of causing Plaintiff harm and took some concerted action in furtherance thereof. *Gilbrook v. City of Westminster,* 177 F.3d 839 (9th Cir.1999); *Burns v. County of King,* 883 F.2d 819, 822 (9th Cir.1989) (conclusory allegations of conspiracy insufficient to state a valid § 1983 claim); *Margolis v. Ryan,* 140 F.3d 850, 852 (9th Cir.1998) (to state a claim for conspiracy under § 1983, Plaintiff must allege facts showing agreement of the alleged conspirators to deprive her of her rights. A conspiracy allegation, even if established, does not give rise to a liability under § 1983 unless there is a deprivation of civil rights). Plaintiff has failed to plead facts that establish that each member of the conspiracy acted in concert and came to a mutual understanding to violate Plaintiff's civil rights and that one or more of the Defendants committed an overt act to further it. *See Hinkle v. City of Clarksburg, W. Va.,* 81 F.3d 416, 421 (9th Cir.1996). A conspiracy is not established by simply alleging that the conspiring officers knew of an intended wrongful act; rather, the plaintiff must allege that conspiring officers agreed, expressly or tacitly, to achieve it.

Plaintiff has failed to plead any facts that would suggest that Defendants acted with some sort of discriminatory animus. *See United Brotherhood of Carpenters and Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–35, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *see also Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.1980) (holding that section 1985 conspiracy claim was properly dismissed because plaintiff had failed to allege facts establishing invidious discrimination). Accordingly, Defendants are entitled to summary judgment on this claim.

### F. *Plaintiff Has Failed to State a Claim Pursuant to 42 U.S.C. § 1986.*

Here, Plaintiff alleges that Defendants knew of the policy that violated Plaintiff's civil rights and had the power to prevent the violations but refused and neglected to do anything. (FAC at ¶ 10 .)

42 U.S.C. § 1986 provides a cause of action against parties who fail to prevent conspiracies to violate the civil rights of other people. Specifically, any person who knows of a conspiracy to violate civil rights (as defined by 42 U.S.C. § 1985) and who has the power to prevent the violation but refuses or neglects to do so, is liable to the person injured. 42 U.S.C. § 1986. Thus, in order to state a claim under

§ 1986, a complaint must contain a valid claim under § 1985. *Karim–Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 626 (9th Cir.1988); *Trerice v. Pedersen,* 769 F.2d 1398, 1403 (9th Cir.1985).

There are no facts asserted in the First Amended Complaint to support a § 1986 claim, as there is no basis to assert that any of the alleged conduct on the part of Defendants was racially motivated or class based under the analysis of § 1985. Where the allegations pertaining to an underlying violation of 42 U.S.C. §§ 1983 and 1985 are meritless at their core, and where there are no facts to state liability for any wrongful conduct, the 42 U.S.C. § 1986 claim must be dismissed with prejudice. Accordingly Defendants are entitled to summary judgment on this claim.

### RECOMMENDATION

**\*22** For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Court issue an

Order: (1) approving the findings of the United States Magistrate Judge; (2) granting in part Defendants' Motion for Summary Judgment with respect to (a) dismissing Plaintiff's claims against Defendants' Sheriff Parkinson and the County of San Luis Obispo; (b) dismissing Plaintiff's § 1983 claim based on alleged violations of her Fourteenth Amendment rights; (c) dismissing Plaintiff's claim regarding constitutional right of access to the law library; (d) dismissing Plaintiff's claim regarding confinement in Administrative Segregation; (e) Plaintiff's claims regarding denial of meals, showers, clothing and yard time; (f) Plaintiff's 42 U.S.C. § 1985 claim; (g) Plaintiff's 42 U.S.C. § 1986 claim; and (3) denying Defendant's Motion for Summary Judgment regarding Plaintiff's excessive force claims.

DATED: March 31, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3791450

### Footnotes

1    *Rand v. Rowland,* 154 F.3d 952, 960 (9th Cir.1998).

2    In Plaintiff's FAC, she referred to herself with masculine pronouns; in Plaintiff's Opposition, Plaintiff used feminine pronouns to describe herself. Therefore, the Court in an effort to adhere to Plaintiff's preference will also use feminine pronouns for Plaintiff.

3    Plaintiff in her Opposition states that she, "is not alleging [d]enial of Hormone Therapy in this Complaint ..." (Plaintiff's Opposition at 3.)

4    Affidavits supporting (and opposing) summary judgment must be made on personal knowledge, must set forth admissible statements of fact, and must show affirmatively that the affiant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(e). A verified complaint, to the extent it is based on a plaintiff's personal knowledge, meets the affidavit requirement. *McElyea v. Babbitt,* 833 F.2d 196, 198 n. 1 (9th Cir.1987).

5    As noted, Plaintiff was transferred from San Luis Obispo County Jail to CDCR on April 4, 2011.

6    Plaintiff in her Opposition contends that the assault occurred on April 1, 2011, not April 4, 2011.

7    Plaintiff alleges that she was subjected to body searches on March 23, 2011 and April 4, 2011. (FAC at p. 9.) The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated ..." The right against unreasonable searches and seizures extends to incarcerated prisoners. *Nunez v. Duncan,* 591 F.3d 1217, 1227 (9th Cir.2010); *Michenfelder v. Sumner,* 860 F.2d 328, 332 (9th Cir.1988) (applying the *Turner* standard to prisoner allegations of Fourth Amendment violations). *Turner* provides that "when a prison regulation impinges on a prisoner's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. "So long as a prisoner is presented with the opportunity to obtain contraband and a weapon while outside of her cell, a visual strip search has a legitimate penological purpose." *Michenfelder v. Sumner,* 860 F.2d at 333. Moreover, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell v. Wolfish,* 441 U.S. 520, 540 n. 23, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

    As in *Bell,* Defendants have presented evidence that body searches are conducted for reasons of institutional security, something that Plaintiff has not countered. This is a legitimate penological objective. *Michenfelder,* 860 F.2d at 333; *see also Bell,* 441 U.S. at 559.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

601 Fed.Appx. 632
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 10th Cir. Rule 32.1.
United States Court of Appeals,
Tenth Circuit.

Jeanne Marie DRULEY, Plaintiff–Appellant,
v.
Robert PATTON; Don Suttmiller; Michael
Addison; Buddy Honaker; James Keithley;
Joel B. McCurdy, in their individual and
official capacities, Defendants–Appellees.

No. 14–6114.
|
Feb. 3, 2015.

## Synopsis

**Background:** State prisoner filed § 1983 action against
employees of Oklahoma Department of Corrections
asserting they had violated her constitutional rights
under Eighth Amendment in connection with her care
as a transgendered individual. The United States District
Court for the Western District of Oklahoma, 2014
WL 1875102, Timothy D. DeGiusti, J., denied prisoner
temporary restraining order (TRO) and preliminary
injunction. Prisoner appealed.

**Holdings:** The Court of Appeals, Jerome A. Holmes,
Circuit Judge, held that:

[1] denial of TRO was not a final appealable order, and

[2] prisoner was unlikely to succeed on the merits of her
Eighth Amendment claim.

Affirmed.

## Attorneys and Law Firms

**\*633** Jeanne Marie Druley, Lexington, OK, pro se.

Kari Yvonne Hawkins, Wilson D. McGarry, Office of the
Attorney General for the State of Oklahoma, Oklahoma
City, OK, for Defendants–Appellees.

Before GORSUCH, O'BRIEN, and HOLMES, Circuit
Judges.

## ORDER AND JUDGMENT [*]

JEROME A. HOLMES, Circuit Judge.

Jeanne Marie Druley, an Oklahoma state prisoner, filed
a 42 U.S.C. § 1983 complaint against employees of the
Oklahoma Department of Corrections (ODOC) asserting
they had violated her constitutional rights in connection
with her care as a transgendered individual. She filed
a motion for a temporary restraining order (TRO) and
preliminary injunction at the same time she filed her
complaint. The district court denied injunctive relief,
and Ms. Druley, proceeding pro se, appeals. We lack
jurisdiction to review the denial of her TRO motion.
We affirm the denial of her motion for a preliminary
injunction.

## BACKGROUND

Prior to her incarceration in 1986, Ms. Druley was
diagnosed with gender identity disorder (GID) and had
two of three gender reassignment surgeries needed to
change the gender of her body from male to female. Her
name and birth certificate were changed to identify her as
a female. In her § 1983 complaint, Ms. Druley alleges that
the ODOC defendants violated the Eighth Amendment's
prohibition on cruel and unusual punishment by stopping
and starting her prescribed hormone medications and
giving her inadequately low dosages of her hormone
medication. She also alleges the ODOC defendants
violated the Equal Protection Clause by housing her in an
all-male facility.

Ms. Druley filed her TRO and preliminary injunction
motion the same day as her complaint, seeking a court
order directing the ODOC defendants to raise her
hormone medication to the levels recommended by the
Standards of Care established by the World Professional
Association for Transgender Health (WPATH), allow her
to wear ladies' undergarments, and move her to a non-air-

conditioned building to alleviate asthma symptoms. The matter was referred to a magistrate judge under 28 U.S.C. § 636(b)(1)(B), who issued a Report and Recommendation (R & R) to deny injunctive relief. After considering Ms. Druley's objections, the district court adopted the R & R and denied injunctive relief.

As to the TRO, the district court ruled Ms. Druley failed to give notice of her TRO request to ODOC defendants as required by Fed.R.Civ.P. 65, or to show cause in accordance with Fed.R.Civ.P. 65(b) why this notice requirement should be excused. As to the preliminary injunction, the district court ruled Ms. Druley had not shown a substantial likelihood of **\*634** success of the merits of her § 1983 complaint or that she would be irreparably harmed without her requested hormone treatment. Ms. Druley filed this interlocutory appeal of that order.

## JURISDICTION

**[1]** We must first address our appellate jurisdiction. "Ordinarily, denial of a temporary restraining order is not appealable." *Populist Party v. Herschler,* 746 F.2d 656, 661 n. 2 (10th Cir.1984); 16 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* § 3922.1 (3d ed. 2014) ("The general rule is that orders granting, refusing, modifying, or dissolving temporary restraining orders are not appealable under [28 U.S.C.] § 1292(a)(1) as orders respecting injunctions."). There are two exceptions: "when the order is appealable as a final order under 28 U.S.C. § 1291," and when the order has the practical effect of denying a preliminary injunction. *Populist Party,* 746 F.2d at 661 n. 2. Neither exception is applicable here: the district court's denial of the TRO is not a final appealable order under 28 U.S.C. § 1291, and the denial did not have the "practical effect of denying an injunction," the consequences of the denial are not irreparable, and immediate review is not the only effective means of challenging the order. *United States v. Colorado,* 937 F.2d 505, 507–08 (10th Cir.1991). We therefore dismiss the appeal of the denial of the TRO.

Orders granting or denying preliminary injunctions, however, are among the types of interlocutory orders that are immediately appealable under 28 U.S.C. § 1292(a)(1). We thus have jurisdiction to review the district court's denial of Ms. Druley's request for a preliminary injunction.

## DISCUSSION

We construe Ms. Druley's pro se brief liberally. *See Garza v. Davis,* 596 F.3d 1198, 1201 n. 2 (10th Cir.2010). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood that the party will suffer irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities tips in the party's favor; and (4) that the injunction serves the public interest. *Little v. Jones,* 607 F.3d 1245, 1251 (10th Cir.2010). A preliminary injunction requiring the nonmoving party to take affirmative action, as Ms. Druley seeks, is an extraordinary remedy that is generally disfavored. *Id.* We review a district court's denial of a motion for a preliminary injunction for abuse of discretion. *Id.* at 1250.

Ms. Druley's injunctive-relief motion requests an order directing ODOC medical staff to raise her hormone level in accordance with levels recommended by the WPATH Standards of Care. Her complaint alleges that prison officials have started and stopped her hormone treatment numerous times over the last 27 years and currently prescribe a hormone dosage for her that is below the normal lowest dosage recommended by WPATH. Her injunctive-relief motion asserts generally that ODOC medical staff does not understand the importance of the WPATH Standards of Care, but other than stating her current hormone treatment level, neither her complaint nor her injunctive-relief motion presented any medical evidence specific to her care. Thus, she presented no evidence indicating which WPATH recommended-hormone levels are medically appropriate for her.

**[2]** The district court concluded Ms. Druley failed to show a likelihood of success on the merits in light of a decision from this court, *Supre v. Ricketts,* 792 F.2d 958, 963 (10th Cir.1986), in which we declined to recognize a constitutional right **\*635** under the Eighth Amendment to estrogen hormone therapy for inmates with GID. In *Supre,* we held that prison officials must provide treatment to address the medical needs of transsexual prisoners, but we noted the record indicated the provision of estrogen hormone medication was medically controversial, and the evidence did not demonstrate "that failing to treat plaintiff

with estrogen would constitute deliberate indifference to a serious medical need," because the prison officials "made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs." *Id.* The district court also ruled that Ms. Druley had not shown she would be irreparably harmed without the requested hormone treatment, noting that Ms. Druley conceded she had not received any hormone treatments from 1988 to 2011.

On appeal, Ms. Druley makes the conclusory assertion that she demonstrated her constitutional rights would be violated if she did not receive the hormone levels suggested by WPATH, from which she argues she has satisfied the irreparable harm, balance-of-equities, and public-interest requirements. To establish an Eighth Amendment claim, Ms. Druley must show deliberate indifference to a substantial risk of serious harm. *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). She must show that the deprivation is objectively sufficiently serious and, subjectively, that the ODOC defendants were aware of a substantial risk of serious harm. *Id.* at 837, 114 S.Ct. 1970.

The WPATH "Standards of Care 'are intended to provide *flexible directions for the treatment* ' of GID," and state that 'individual professionals and organized programs may modify' the Standards' requirements in response to 'a patient's unique situation' or 'an experienced professional's evolving treatment methodology.' " *Kosilek v. Spencer,* 774 F.3d 63, 70, n. 3, 86, 88 (1st Cir.2014), *id.* at 70 n. 3 (brackets and ellipsis omitted) (quoting World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender–Nonconforming People, Version 7* (2011), at 1–2) (emphasis added). Ms. Druley presented no evidence that the ODOC defendants failed to consider the WPATH's flexible guidelines, failed to make an informed judgment as to the hormone treatment level appropriate for her, or otherwise deliberately ignored

her serious medical needs. Thus, Ms. Druley failed to demonstrate a substantial likelihood of success on the merits. *See Supre,* 792 F.2d at 963. Further, in the absence of any medical evidence, Ms. Druley also failed to make any showing that she would be irreparably harmed if she did not receive the levels of hormone treatment she requested.

Ms. Druley also argues ODOC violated the Equal Protection Clause by denying her request to wear feminine undergarments and her request to be moved to a different building. Unequal treatment that does not involve a fundamental right or suspect classification is justified if it bears a rational relation to legitimate penal interest. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439–40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims. *See Etsitty v. Utah Transit Auth.,* 502 F.3d 1215, 1227–28 (10th Cir.2007) (denying suspect-classification equal-protection employment rights for transgendered employees); *Brown v. Zavaras,* 63 F.3d 967, 972 (10th Cir.1995) (affirming the dismissal of an equal protection claim alleging the denial of estrogen treatment to a transsexual prisoner). Ms. Druley did not allege any facts suggesting the ODOC *636 defendants' decisions concerning her clothing or housing do not bear a rational relation to a legitimate state purpose. Thus, she has not demonstrated a likelihood of success on her Equal Protection claims.

The appeal of the district court's denial of a TRO is dismissed for lack of jurisdiction. The district court's denial of her motion for preliminary injunction is affirmed. The motion for *in forma pauperis* is GRANTED.

**All Citations**

601 Fed.Appx. 632

Footnotes

\*       After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 916991
Only the Westlaw citation is currently available.
United States District Court,
D. Oregon.

Anny May STEVENS, Plaintiff,

v.

Max WILLIAMS; Stan Czeriak; Betty Blaylock;
Joan Palmateer; Jim Maras; Jean Hill; Bill
Dowman; G. Stuart; and M.D. Milhorn, Defendants.

No. CV-05-1790-ST.

|

March 27, 2008.

**Attorneys and Law Firms**

Anny May Stevens, Ontario, OR, pro se.

Hardy Myers, Attorney General, Leonard W.
Williamson, Assistant Attorney General, Salem, OR, for
Defendants.

**ORDER**

BROWN, District Judge.

**\*1** Magistrate Judge Janice M. Stewart issued Findings
and Recommendation (# 38) on February 15, 2008, in
which she recommended this Court grant Defendants'
Motion for Summary Judgment (# 33). The matter is now
before this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and
Federal Rule of Civil Procedure 72(b).

Because no objections to the Magistrate Judge's Findings
and Recommendation were timely filed, this Court is
relieved of its obligation to review the record *de novo.*
*Britt v. Simi Valley Unified School Dist.,* 708 F.2d 452, 454
(9-thCir.1983). *See also Lorin Corp. v. Goto & Co.,* 700
F.2d 1202, 1206 (8-thCir.1983). Having reviewed the legal
principles *de novo,* the Court does not find any error.

**CONCLUSION**

The Court **ADOPTS** Magistrate Judge Stewart's Findings
and Recommendation (# 38). Accordingly, the Court

**GRANTS** Defendants' Motion for Summary Judgment (#
33).

IT IS SO ORDERED.

**FINDINGS AND RECOMMENDATION**

STEWART, United States Magistrate Judge:

***INTRODUCTION***

Plaintiff, Anny May Stevens ("Stevens"), appearing *pro
se,* is a pre-operative male-tofemale transsexual [1] prisoner
at the Snake River Correctional Institution ("SRCI"),
a correctional institution in Ontario, Oregon, which
houses male inmates and is operated by the Oregon
Department of Corrections ("ODOC"). The Complaint
alleges three claims pursuant to 42 USC § 1983 against
a number of state officials and employees who work at
SRCI or ODOC: [2] Max Williams, ODOC Director; Stan
Czeriak, ODOC Assistant Director of Operations; Joan
Palmateer, ODOC Institution Division Administrator;
Jean Hill, SRCI Superintendent; Bill Dowman, SRCI
Supervising Executive Assistant; Betty Blaylock, ODOC
(title unknown); Jim Maras, ODOC Program Manager
for Transfer and Classification Unit; Steve Shelton, M.D.,
Medical Director for ODOC Health Services; Larry L.
Herring, ODOC Health Services Administrator; Steve
Franky, SRCI Assistant Superintendent; G. Stuart, SRCI
Superintendent's Office; Al Hannan, SRCI Institution
Security Manager; Mike Milhorn, SRCI Correctional
Captain; Jennifer Bjerke, Oregon State Penitentiary
("OSP") Security Manager; Captain Peterson, SRCI
Segregation Captain; Robert Real, SRCI Correctional
Captain; Ricky King, SRCI Correctional Sergeant;
Katrinda Reyes, SRCI Correctional Officer; T. Hicks,
SRCI Rule/Procedures/Policies and Grievance/Minority
Affairs; S. Hodge, RN, SRCI Health Service Manager;
G. Atkins, SRCI Mental Health Manger; Mrs. Henning,
SRCI Mental Health Counselor; T. Blankenbaker,
SRCI Institutional Counselor; G. Sharp, SRCI Intensive
Management Unit Counselor; Rebecca Rouillard, SRCI
Correction Library Coordinator; Ms. Husk, SRCI Mail
Room; C. Roberts, SRCI Business Office; and K. Perry,
SRCI Records.

In his first claim, Stevens complains that ODOC has discriminated against him[3] on the basis of gender by failing to place him in a correctional facility housing female inmates and to refer to him with female titles and female pronouns ("Claim One"). Complaint, pp. 3-4. The second claim alleges that defendants have denied Stevens necessary medical treatment for his transsexualism, including failure to provide counseling for transsexualism, grant his requests for hormone therapy, and grant him sexual reassignment surgery ("Claim Two"). Id at 4. The third and final claim asserts that defendants have denied Stevens protective custody despite threats of violence received from inmates at SRCI ("Claim Three"). Id at 4-5. He believes that each of these acts violates the Eighth and Fourteenth Amendments of the United States Constitution, Article I, Sections 16 and 20 of the Oregon Constitution, and Articles 1 through 7 of the United Nations Universal Declaration of Human Rights. As a result, Stevens requests damages of $5,000,000, and injunctive relief ordering defendants to: (1) recognize him as a female; (2) reinstate hormone therapy; (3) provide him with sexual reassignment surgery; (4) provide counseling for transsexualism; and (5) protect him from any and all future violence, rape or death. Steven also requests "if [at] all possible [,] my release from prison." Id at 5.

*2 Defendants now move for summary judgment against each of Stevens' claims (docket # 33). For the reasons that follow, defendants' motion should be granted and judgment entered in favor of defendants.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." Id at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." Balint v. Carson City, 180 F3d 1047, 1054 (9-thCir1999) (citation omitted). A " 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' " does not present a genuine issue of material fact. United Steel

Workers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9-thCir), cert denied, 493 U.S. 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9-thCir1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." Id (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. Id at 631.

## FACTS

### I. Medical Treatment

Stevens was admitted to ODOC custody on September 8, 1997, to serve a 220 month sentence for Manslaughter in the First Degree. Complaint, Exhibit Part 4, pp. 18-19. He alleges that he was sentenced as a woman to a correctional institution housing females, but ODOC placed him into an institution housing males because he remains anatomically a male.

On November 22, 1994, Stevens received a legal name change (from Edward to Anny May) and gender change (from male to female) in Multnomah County Circuit Court. Id, Exhibit Part 4, p. 15. Prior to entering prison, Stevens had a history of mental health problems, as well as difficulties with drugs and alcohol. Plaintiff's Exhibit 5, pp. 1-12. Medical records submitted by Stevens show that he was treated at various times for major depression, gender identity disorder, and alcohol dependence. Id. As part of his treatment Stevens had received hormone therapy beginning in 1994. Id; Defendants' Exhibit 101 ("Shelton Aff."), Attachment No. 5, p. 4. He continued this therapy through the time he was housed in the county jail awaiting the final disposition of his criminal case. Shelton Aff., Attachment No. 2, pp. 2-6.

At his initial medical screening, Stevens told medical staff that he identifies as a female and had been taking Premarin, a female hormone replacement, before his incarceration. Id at 8 & Attachment 2, p. 6. Stevens was seen by mental health care professionals upon his transfer from intake to OSP. Id at ¶ 8 & Attachment No. 5, pp. 1-6. They noted that Stevens had suffered for years from depression, had reported multiple suicide attempts,

had been hospitalized 10 times over the prior five year period, had a history of alcohol and drug problems, and was diagnosed with major depression and borderline personality disorder. *Id.*

**\*3** On October 2, 1997, Stevens saw former ODOC staff physician Robert Ingle, M.D., to discuss his transgender issues and medication concerns. *Id* at ¶ 9 & Attachment No. 2, p. 9. Stevens agreed with Dr. Ingle that Premarin was not being used to treat a disease. *Id.* Dr. Ingle opined that neither Premarin nor sexual reassignment surgery were medically indicated and advised Stevens that Premarin would not be prescribed. *Id.* According to Dr. Ingle, "[g]ender identity disorder is a psychiatric condition which is associated with significant emotional distress; however, there is no data that castration and sexual change surgery is associated with any emotional improvement.... Patients unhappy with their biologic sex are usually just as unhappy after a sex change operation." *Id.*

Over the next 42 months, Stevens was seen by health services professionals in both OSP and SRCI and was treated for a variety of complaints. *Id* at ¶ 10 & Attachment No. 2, pp. 9-27. ODOC mental health care professionals frequently diagnosed Stevens with depression, borderline personality disorder, dysthymia, polysubstance abuse, and gender identity disorder. *Id* at 7-50. During this time Stevens continued to express interest in hormone treatment and a sex change and in being identified as a female, although at times he expressed some measure of conflict between his sexual identity and religious beliefs. *Id* at 7, 12, 17, 19, 24, 29, 34, 37, 47, 48, 50, 51.

On June 1, 2001, former SRCI staff physician Ian Duncan, D.O., met with Stevens at SRCI upon his transfer from OSP. *Id* at ¶ 11 & Attachment No. 2, p. 28. Stevens expressed his desire to take Premarin. *Id.* Dr. Duncan met with Stevens again on June 17, 2001, to discuss the result of tests done at the first meeting. *Id.* Stevens again requested surgery and hormone treatment. *Id.* Dr. Duncan agreed to present this request to the Therapeutic Level of Care Committee ("TLCC") in accordance with the ODOC Health Services Policy. *Id.*

ODOC Health Services Policy and Procedure # P-A-02.1 establishes four levels of medical care and treatment for inmates. *Id* at ¶ 4 & Attachment No. 1. Mandatory care

(Level 1) is "essential to life and health, without which rapid deterioration may be an expected outcome." *Id* at 2. Necessary Care (Level 2) is care without which the inmate suffers "significant risk of either further serious deterioration of the condition or significant reduction of the chance of possible repair after release or [ ] significant pain or discomfort." *Id* at 3. Acceptable but Not Necessary Care (Level 3) is care "for non-fatal conditions where treatment may improve the quality of life for the patient." *Id* at 4. Any procedure falling into Level 3 is subject to individual clinical review by the TLCC, which determines whether the treatment will be provided by examining factors such as "[t]he urgency of the procedure and the length of the inmate's remaining sentence stay," and "[a]ny relevant functional disability and the degree of functional improvement to be gained." *Id* at 5. Finally, care of Limited Medical Value (Level 4) is "significantly less likely to be cost-effective or to produce substantial longterm gain," and is generally not authorized by the ODOC. *Id* at 6.

**\*4** According to Steve Shelton, M.D., ODOC's Director of Health Services, ODOC has no medical policy addressing gender reassignment as a special entity separate from all other medical conditions. *Id* at ¶ 5. Rather, the policy categorizes gender identity disorder ("GID") and gender reassignment as a Level 3 or 4 condition which must be assessed by the TLCC on an individual basis according to the Level 3 care provision. *Id.* The TLCC considers a number of factors when determining whether to authorize elective care in general. *Id.* When a patient requests a "continuation" of gender reassignment, consideration is given to the extent of the patient's prior evaluations and work-ups; the completeness, findings, and expertise of prior evaluations; the extent of any prior reassignment; the patient's prior and current adjustments; and expected length of stay with ODOC. *Id* at ¶ 6. According to Dr. Shelton, a patient who has had a full evaluation and is under treatment from a GID program and has shown significant mental health or medical health improvement has a good case to present before the TLCC for continuation of treatment. *Id* at ¶ 7. Conversely, "strong consideration will be given by ODOC to the lack of consistent evidence in controlled studies of accurate medical diagnostic criteria, lack of consistent evidence of improvement of patients with reassignment, and the lack of deterioration of health without reassignment." *Id* at ¶ 6.

On July 17, 2001, a TLCC comprised of Dr. Shelton and three other physicians met to discuss Stevens' request for transgender changes. *Id* at ¶ 12; Complaint, Exhibit Part 5, p. 11. According to Dr. Shelton, "[a]fter careful consideration, TLCC concluded that the requested procedure and course of treatment was not medically necessary to either preserve [Stevens'] physical health, nor as a needed adjunct to mental health treatment." Shelton Aff., ¶ 12 & Attachment No. 4, p. 1.

Dr. Duncan informed Stevens of the TLCC's decision on August 17, 2001. *Id* at ¶ 13 & Attachment No. 2, p. 29. Dr. Duncan noted Stevens' disappointment and "clarified that neither sex-change surgery nor hormonal treatment would be likely to occur during his period of incarceration." *Id.* He encouraged Stevens to "shift his plans to the period of time following his incarceration." *Id* .

On July 31, 2001, prior to learning of the TLCC's decision, Stevens filed a grievance seeking reinstatement of hormone treatment, gender reassignment surgery and the provision of women's undergarments. *Id,* Attachment No. 6, pp. 1-11. C. Ryals, the Health Services Manager at SRCI, responded on August 26, 2001, that the procedure he requested was "not considered medically necessary." *Id* at 12. Stevens appealed. *Id* at 13. Dr. Shelton responded that "the procedure that you request is not a serious medical need and is considered entirely elective. [ODOC] Health Services will not provide or support this request." *Id* at 17.

**\*5** Over the next two years after the TLCC's determination, mental health care staff continued to be available to Stevens and saw him frequently. *Id* at ¶ 16 & Attachment No. 5, pp. 51-60.

On March 7, 2002, Stevens filed a Petition for Writ of Habeas Corpus in state court. Defendants' Exhibit 103. The Petition recounts Stevens' history of transsexualism, including his diagnosis in 1994, his name/gender change, his treatment including hormone therapy through a community health care provider, and continued hormone therapy while housed in the county jail awaiting the disposition of his criminal case. *Id* at 2-3. It also recounts Stevens' continuous efforts to receive treatment for his transsexualism, including hormone therapy and surgery, while in ODOC's custody. *Id* at 3-6. Stevens complained that he has been denied treatment for transsexualism which is a "serious medical need" and that this denial

constitutes "deliberate indifference" to his serious medical needs in violation of his constitutional rights. *Id* at 6. The state court denied Stevens' Petition by entering a Judgment on September 3, 2002. Defendants' Exhibit 104.

On May 31, 2003, an SRCI security staff member contacted health services to report that Stevens had vocalized a desire to remove his own testes. Shelton Aff., ¶ 15 & Attachment No. 2, pp. 34-35. Medical staff met with Stevens, assessed him as having a low risk of immediate self harm, and referred him to Correctional Treatment Services for continued care. *Id.* After this event, Stevens expressed on several occasions his desire for treatment for his sexual identity issues and for performing surgery on himself. *Id,* Attachment No. 5, pp. 57, 61.

In an undated letter, apparently in response to a letter from Stevens to the Federal Bureau of Prisons, Dr. Shelton again denied Stevens' request for hormone treatment, gender reassignment, and female undergarments. Complaint, Exhibit Part 6, p. 21. Dr. Shelton stated that in reaching his decision, he reviewed the treatment Stevens received during the periods both before and after his incarceration, including the treatment he received from community health care providers who were providing Stevens with hormone treatment. *Id.*

On May 6, 2004, Stevens sent an Inmate Communications Form ("kite") to "Ms. Hennen" requesting "urgent counseling" for transsexualism and gender dysphoria. Complaint, Exhibit Part 6, p. 26. Mrs. Henning responded that "we do not do counseling for this." *Id.* One day later, Stevens sent a kite to "Ms. Atkins" asking if anyone was qualified to treat an inmate for transsexualism and whether he was or had ever received treatment for transsexualism or gender dysphoria. *Id* at 28. Mrs. Henning responded to the kite, stating that "you are not being treated for this disorder-I am unaware if you have ever been treated for this disorder." *Id.*

On August 2, 2005, Stevens had an appointment with SRCI staff physician Garth Gulick, M.D., and reported no new issues with respect to his sexual orientation being changed. Shelton Aff., ¶ 17 & Attachment No. 2, p. 52. He expressed remorse over his past and said he felt trapped. *Id.* Dr. Gulick noted that gender reassignment would not be feasible "without mental health assessment and clearance." *Id.*

*6 When Dr. Gulick saw Stevens again on October 4, 2005, Stevens wanted to have his testicles removed and resume taking female hormones. *Id* at ¶ 18 & Attachment 2, p. 53. Dr. Gulick referred this request to the TLCC which concluded that neither gender reassignment surgery nor female hormone therapy was medically necessary for Stevens. *Id* at ¶ 18 & Attachment No. 4, p. 10.

A few weeks later, Stevens told a mental health care provider, T.J. Footen, that based upon his own research, he had transsexualism disorder. *Id,* Attachment No. 5, p. 75. Footen told Stevens that they do not provide treatment for that disorder. *Id.* On November 9, 2005, Stevens complained to Footen of increased depression, ineffective medications, and loss of contact with his family and issues related to his gender identity. *Id* at 76. Footen instructed Stevens that Footen's treatment of Stevens was not focused on transsexualism, "but rather on his symptoms of depression and family adjustment issues." *Id.*

A week later, Stevens tried again to turn the focus of his treatment with Footen to transsexualism, which Footen rebuffed. *Id.* Footen changed Stevens' diagnosis from dysthymia to major depression based upon his deteriorating condition. *Id.* Mental health staff at SRCI continued to see Stevens on a regular basis throughout 2005 and into 2006, the most recent records submitted. *Id* at 76-87. Notably, Stevens' depression seems to have improved in early 2006. *Id* at 86-87

In Dr. Shelton's opinion, "ODOC properly has declined to provide plaintiff with a sex-change operation and/or female hormones because neither surgery nor hormonal replacement treatment is medically indicated." *Id* at ¶ 19. He admits that "at times, there may be a difference of opinion between the patient and the physicians as to how best to treat [Stevens'] condition," but ODOC Health Services "are aware of [Stevens'] medical and mental health needs, and "will continue to monitor [Stevens'] medical mental health care needs and remain available to him" for treatment. *Id* at 20, 21. Medical and mental health services are delivered to inmates independently and without interference from ODOC security and administrative staff. *Id* at ¶ 22. Thus, "security and administrative staff have no leverage or influence as to what medical and mental health services are provided to inmates." *Id.*

## II. *Gender Issues and Discrimination*

Upon his initial placement into OSP, Stevens indicated that he felt "rotten" and discriminated against by being placed into a male prison. Shelton Aff., Attachment No. 5, p. 12.

On September 25 and October 22, 2003, Stevens sent kites to "Ms. Hicks" inquiring whether it was appropriate for a staff member to discriminate against an inmate because of their sexual orientation or status as a transsexual. Complaint, Exhibit Part 5, pp. 20-21. T. Hicks responded that it was not appropriate and suggested several options to Stevens for handling suspected discrimination. *Id.*

*7 In early 2004, Stevens made multiple requests by kite and grievance to be referred to as a female using female pronouns and titles. *Id,* Exhibit Part 6, pp. 1-23. Additionally, Stevens requested that all of his paperwork and prison file be changed to reflect his proper gender and requested that he be transferred to an institution housing females. *Id* at 2-13. Several officials at ODOC responded to Stevens' requests.

On February 23, 2004, Jim Maras, Program Manager for the Classification and Transfer Unit ("Maras"), acknowledged Stevens' request to be referred to as a female and responded that according to ODOC records, Stevens was a male, and "[a]s such, being housed in a male facility, it would be inappropriate for staff to address you as a female.... Your situation and legal status, not your desire, will dictate how staff interact with you." *Id* at 15.

On March 1, 2004, Joan Palmateer, ODOC Institution Division Administrator ("Palmateer"), responded to Stevens' letter to ODOC Director, Max Williams ("Williams"). *Id* at 16. Recognizing that Stevens had received a legal name/gender change, she wrote:

> I understand your personal feelings can be that of a female and that you have gone to court for a name/ gender change. However, since you are still a male, anatomically, the department will continue to consider and treat you as a male inmate. As such you will be referred to as either inmate Stevens or Mr. Stevens.

*Id.*

Palmateer also denied Stevens' request to be transferred to a female institution, and indicated that if he felt unsafe from other inmates due to his "transsexual condition," he should contact security staff or his counselor and request protective custody. *Id.* She concluded:

> I am denying your request to be addressed as Ms., or any other female title. I am sure you must recognize that the more you call attention to this matter, the more difficult it becomes for you to live in harmony with other male inmates. If you feel unsafe, please advise staff so they may address those issue [sic].
>
> I consider this matter closed.

*Id.*

Stevens received a similar letter from Larry L. Herring, ODOC Health Services Administrator ("Herring"), on March 11, 2004. *Id* at 18. Herring acknowledged receipt of the court documents concerning Stevens' gender change, but advised Stevens that this does not change how he will be referred to as an inmate:

> While I understand your frustration, unfortunately, you were sentenced and incarcerated as a male. Until such time that the court makes further determination as to your gender status, you will continue to be recognized by your court assigned name and gender.

*Id.*

On March 31, 2004, Bill Dowman, writing for Superintendent Hill, denied Stevens' continued requests to be referred to as a female. *Id* at 22.

Stevens filed a grievance against all of these officials on April 5, 2004. *Id* at 23-24. In response, Lt. Sherbondy, Administrative Lieutenant for SRCI, again denied Stevens' request to be referred to as a female, receive gender reassignment surgery, and be transferred to a facility that would address his transsexualism. *Id,* Exhibit Part 8, p. 21.

**\*8** Stevens sent another kite to Superintendent Hill on July 31, 2005, referencing the earlier denials by Palmateer, and Dowman, and requesting again that his institutional files be changed to refer to him as female. *Id,* Exhibit Part 8, p. 5. Dowman again denied the request. *Id* at 6.

Further efforts by Stevens on each of these issues have continued to be unfruitful. *See* Stevens Aff. (docket # 28).

### III. *Efforts to Protect Stevens from Physical Harm*

After his conviction, Stevens was initially placed into the Administrative Segregation Unit ("ASU") at OSP due to his feminine appearance. Shelton Aff., Attachment No. 5, p. 1. In June 2004, ODOC transferred Stevens to SRCI. *Id* at 28. Stevens reported to mental health professionals at SRCI on a number of occasions that he felt harassed and threatened by other inmates. *Id* at 28, 33, 34-35, 37, 46, 50, 66, 81, 84-87 & Attachment No. 2, p. 12.

In June 2005, while housed in the Intensive Management Unit ("IMU") at SRCI, Stevens submitted several kites indicating he had been threatened with physical harm and death. Complaint, Exhibit Part 7, pp. 4-11; Defendants' Exhibit 102 ("Cain Aff."), Attachment No. 2, p. 1. In each one, Stevens requested a transfer to OSP. On June 22, 2005, Correctional Sergeant C. Miller interviewed Stevens. Cain Aff., ¶ 10 & Attachment No. 2. Stevens gave Sergeant Miller the names of a number of inmates who allegedly were threatening him and requested a transfer to OSP or the ASU. *Id.* Sergeant Miller noted that some of the names given to him by Stevens referred to individuals who were never housed in the same unit at the same time as Stevens or no longer housed at SRCI. *Id.*

On July 1, 2005, Superintendent Hill denied Stevens' request to be housed in the ASU. Complaint, Exhibit Part 7, p. 12. This was in part due to the fact that Stevens was currently in the IMU due to an attempted assault on a staff member, and the IMU was a "considerably more restrictive and, thus, more protective" housing environment. *Id.*

On July 14, 2005, the Special Needs Inmate Evaluation Committee ("SCIEC") reviewed Stevens' concerns and his request. Cain Aff, ¶ 11 & Attachment No. 2, p. 4. The SCIEC found that Stevens could not be safely housed at OSP at that time because he had conflicts with individuals housed there. *Id.* It also concluded that Stevens did not meet the criteria for placement in the ASU and instructed him to report any threats he received upon his return to the general population after his release from the IMU. *Id.*

On February 26, 2006, Sergeant James Taylor interviewed Stevens about his continued desire to be placed in the ASU. *Id* at ¶ 11 & Attachment No. 2, p. 5. Stevens had no additional information to add to his request and would not provide any names or the nature of any problems. *Id.* Taylor noted that Stevens had no documented conflict with inmates at SRCI. *Id.* The SCIEC again denied his request at its next meeting. *Id* at ¶ 12.

**\*9** ODOC policy on administrative segregation (*i.e.,* protective custody), codified at OAR 291-046-0005 through OAR 291-046-0091, provides the procedures for separating and segregating inmates "who constitute a continuing and/or immediate threat to the safety, security, and orderly operation of the facility; or require protective custody." *Id* at ¶ 3 & Attachment No. 1. According to Brad Cain, Security Manager at SRCI ("Cain"), "an inmate is placed in administrative segregation when security staff and administration decide that the inmate should not have contact with inmates in general population ... for a number of reasons." *Id.* One reason an inmate may request commitment to the ASU is for protective custody. *Id* at ¶ 5. However, he must reveal to ODOC officials the identity of the person or persons he claims to fear because otherwise ODOC officials may place the inmate in the same housing unit or cell with one of his predators. *Id* at ¶ 7.

Cain states that "ODOC officials give requests for protective custody the serious attention they deserve and act swiftly to offer protection to inmates who face threats from other inmates for any valid reason." *Id* at ¶ 8. He also states that SRCI security staff have given Stevens ample opportunity to be separated from any aggressors that may exist. *Id* at ¶ 13. In his opinion, "SRCI takes threats against personal safety seriously and does not hesitate to provide protective custody if it determines that threats against an inmate's personal safety are real. Mr. Stevens' personal safety has remained intact." *Id.*

Stevens has submitted no evidence that he has ever been subjected to physical violence due to ODOC's failure to place him into protective custody.

### FINDINGS

#### I. *State and International Law Claims*
In support of his claims, Stevens invokes 42 USC § 1983 (" § 1983"). However, § 1983 provides a remedy only for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the federal government. It provides no remedy for violations of state law. *Hydrick v. Hunter,* 500 F3d 978, 989 (9-thCir2007), *petition for cert filed* (U.S. Jan 17, 2008) (No. 07-958); *Ybarra v. Bastian,* 647 F.2d 891, 892 (9-thCir1981), *cert denied,* 454 U.S. 857 (1981).

Stevens also relies on the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948). That document "does not of its own force impose obligations as a matter of international law." *Sosa v. Alvarez-Machain,* 542 U.S. 692, 734 (2004). Thus, it does not create any rights secured by federal law that could give rise to an action under § 1983. *See Flores v. S. Peru Copper Corp.,* 414 F3d 233, 259 (2-ndCir2003) (holding that Universal Declaration of Human Rights was not binding on the United States and, therefore, could not give rise to an environmental claim); *Guaylupo-Moya v. Gonzales,* 423 F3d 121, 133 (2-ndCir2005) (noting that Universal Declaration of Human Rights does not have the effect of domestic law and does not provide independent, privately enforceable rights).

**\*10** Therefore, summary judgment should be granted to the extent that Stevens' claims are based on violations of state law or the Universal Declaration of Human Rights.

#### II. *Collateral Estoppel-Claim Two*
Defendants assert that Claim Two alleging a lack of adequate medical care is barred by collateral estoppel due to Stevens' previously unsuccessful state habeas claim made on the same basis. Collateral estoppel, alternatively known as issue preclusion, prevents relitigation of "all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding against the party who seeks to relitigate the issues." *Hawkins v. Risley,* 984 F.2d 321, 325 (9-thCir1993), quoting *Robi v. Five Platters, Inc.,* 838 F.2d 318, 322 (9-thCir1988). Federal courts generally give preclusive effect to issues decided by state courts. *Allen v. McCurry,* 449 U.S. 91, 95-96 (1980). As explained by the Supreme Court, such preclusive effect derives from the common law, policies supporting collateral estoppel and 28 USC § 1738 which provides that the "judicial proceedings [of any State] ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State...." *Id.*

Thus, the Ninth Circuit has held that a decision rendered on an issue actually litigated in state habeas proceedings may not later support a § 1983 claim where the state habeas proceeding "afforded a full and fair opportunity for the issue to be heard and determined under federal standards." *Silverton v. Dep't of Treasury,* 644 F.2d 1341, 1347 (9-thCir1981), *cert denied,* 454 U.S. 895 (1981). This is true even though the relief available in § 1983 cases is different than that available in habeas proceedings. *Id.* The Ninth Circuit cautioned, however, that "[t]he existence of a full and fair hearing on constitutional claims under federal standards is the keystone of the unclimbable wall protecting the finality of a prior state habeas adjudication. In its absence, that wall crumbles ." *Id* at 1346; *see also, Sperl v. Deukmejian,* 642 F.2d 1154 (9-thCir1981) (holding that where claim of prosecutorial misconduct was tried and rejected in state habeas corpus proceedings, the doctrine of collateral estoppel precluded reconsideration of the issue in a federal civil rights case even where federal habeas was not available).

Because federal courts must give state court judgments the same preclusive effect as given by the state courts, state law applies to determine the preclusive effect of a state habeas judgment. *See Palomar Mobile-home Park Ass'n v. City of San Marcos,* 989 F.2d 362, 364 (9th Cir1993). In Oregon, the application of issue preclusion is determined by the use of the five so-called *Nelson* factors:

1. The issue in the two proceedings is identical.

2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.

*11 3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.

5. The prior proceeding was the type of proceeding to which this court will give preclusive effect.

*Nelson v. Emerald People's Util. Dist.,* 318 Or 99, 104, 862 P.2d 1293, 1296-97 (1994) (citations omitted).

The party asserting issue preclusion bears the burden of proof on *Nelson* factors one, two and four. *Barackman v. Anderson,* 214 Or.App. 660, 666-67, 167 P3d 994, 999 (2007), citing *State Farm Fire & Cas. Co. v. Century Home Components, Inc.,* 275 Or 97, 104-05, 550 P.2d 1185,

1188-89 (1976) ("*Century Home* "); *State Farm Fire and Cas. Co. v. Paget,* 123 Or.App. 558, 562-63, 860 P.2d 864 (1993), *review denied,* 319 Or 36, 876 P.2d 782 (1994). To meet that burden, the party must, "[place] into evidence the prior judgment and sufficient portions of the record, including the pleading, exhibits, and reporter's transcript of the testimony and proceedings, to enable the court to reach that conclusion [that issue preclusion applies] with the requisite degree of certainty." *Century Home,* 275 Or at 104, 550 P.2d at 1188; *see also Shannon v. Moffett,* 43 Or.App. 723, 727 n2, 604 P.2d 407, 409 n2 (1979) ( "Ordinarily the party asserting collateral estoppel must produce sufficient portions of the record of the prior proceeding to show what was actually decided ... because a judgment of a court, standing alone, rarely indicates what issues were actually decided."), *review denied,* 288 Or 701 (1980).

By providing sufficient evidence to "establish that an identical issue was actually decided" in an earlier case, the party asserting issue preclusion has demonstrated a *prima facie* case. *Century Home,* 275 Or at 105, 604 P.2d at 1189. "The burden then shifts to the party against whom estoppel is sought to bring to the court's attention circumstances indicating the absence of a full and fair opportunity to contest the issue in the first action or other considerations which would make the application of preclusion unfair ." *Id.*

Oregon courts have identified a number of exceptions to the doctrine of issue preclusion. For example, "the existence of newly discovered or crucial evidence that was not available to the litigant at the first trial would provide a basis for denying preclusion where it appears the evidence would have a significant effect on the outcome." *Id,* 275 Or at 108-09, 550 P.2d at 1191 (citations omitted). The Oregon Supreme Court has also cited the exceptions listed in Restatements (Second) of Judgments, § 28, as illustrative of other circumstances where the rule may be avoided. *Drew v. EBI Companies,* 310 Or 134, 139, 795 P.2d 531, 535 (1990).

Defendants have submitted a Petition for Writ of Habeas Corpus filed by Stevens against the SRCI Superintendent in Malheur County Circuit Court on March 7, 2002. Defendants' Exhibit 103. They have also submitted the Judgment in that case which states that the matter came before the court on August 20, 2002, for hearing on a motion to dismiss. Defendants' Exhibit 104. This

Judgment denies Stevens' Petition by checking the box next to the words "denied based upon the following findings and conclusions[.]" *Id* at 1. However, the Judgment contains no such findings or conclusions. The Judgment also has a checked box stating that it is given in favor of the defendant "for the reasons stated on the record." *Id* at 3. Defendants have not provided a transcript of this record. The record also fails to reveal whether Stevens appealed the Judgment.

**\*12** In his state habeas Petition, Stevens alleges that he is being denied treatment for the serious medical need of transsexualism. Defendants' Exhibit 103, pp. 6-7. Stevens asserts that this denial constitutes deliberate indifference, citing *White v. Farrier*, 849 F.2d 322, 325 (8-thCir1988) and *Meriwether v. Faulkner*, 821 F.2d 408, 414 (7-thCir1987), *cert denied*, 484 U.S. 935 (1987). *Id* at 7. Both of these cases hold that an inmate's transsexualism is a serious medical need to which prison officials may not be deliberately indifferent without violating the Eighth Amendment. *White*, 849 F.2d at 325; *Meriwether*, 821 F.2d at 413. Furthermore, the Petition relates Stevens' efforts through July 31, 2001, to receive treatment for his transsexualism, including the provision of female hormone treatment and sexual reassignment surgery.

The records submitted by defendants satisfy the first, second and fourth *Nelson* factors. The issue before this court is exactly the same issue as presented to the Malheur County Circuit Court, namely whether prison officials were deliberately indifferent towards Stevens' legitimate medical needs in violation of the Eighth Amendment by failing to provide him with adequate treatment for his transsexualism. Despite the lack of findings or a transcript of the record, the Petition and Judgment reveal that this issue was actually litigated and necessary to the state court's decision whether to grant habeas relief. Indeed, Stevens' Eighth Amendment right to adequate treatment for his serious medical needs was the only issue before the state court. It is also apparent that Stevens, the party against whom preclusion is asserted in this case, was a party to that habeas proceeding.

The burden then switches to Stevens to demonstrate that he did not have a full and fair opportunity to litigate the claim, or, in the alternative, that the prior proceeding was one to which Oregon courts should not give preclusive effect. Also encompassed in this last *Nelson* factor are "other considerations which would make the application

of preclusion unfair." *Barackman*, 214 Or.App. at 668, 167 Or.App. at 999, citing *State v. Donovan*, 305 Or 332, 334-35, 751 P.2d 1109, 1110 (1988).

Stevens apparently takes issue with the third *Nelson* factor by arguing that it is questionable whether the court has fairly considered the merits of an issue when it dismisses a case with prejudice but without any opinion. However, Stevens provides no evidence that he was denied an opportunity fully and fairly to litigate his claim in state court or that the state court proceedings were faulty in any way. Absent any evidence to the contrary, this court cannot presume that the state habeas proceedings were not fully and fairly litigated.

Stevens also has failed to demonstrate that it would be unfair to give preclusive effect to the state court Judgment due to the discovery of new, material evidence or due to some other applicable exception. In his state habeas Petition, Stevens asserts essentially the same facts and law as he asserts here. The only additional facts are those which developed subsequent to filing his state habeas Petition. These facts demonstrate Stevens' continued unsuccessful efforts to receive the treatment he felt he needed. The record reveals that Stevens has received the same medical services, including treatment for dysthymia, major depression, and substance abuse, throughout the entire period relevant to this motion. Thus, this court can discern no newly discovered evidence that was not available when Stevens filed his initial state habeas Petition. [4]

**\*13** As a result, Stevens is precluded from relitigating his Eighth Amendment claim for deliberate indifference to his serious medical needs.

## II. *No Constitutional Violations*

### A. *Equal Protection-Claim One*
Claim One challenges Stevens' placement by ODOC into a male correctional facility as a denial of his rights, privileges, protections and immunities as a female. Defendants respond that ODOC's policy of assigning anatomical males to male-only institutions and anatomical females to female-only institutions is substantially related to the achievement of prison security.

Transsexuals are not a suspect class for purposes of the equal protection clause. *Holloway v. Arthur*

Case 2:16-cv-00943-PP Filed 08/31/16 Page 82 of 90 Document 22-1

*Andersen & Co.,* 566 F.2d 659, 663 (9-thCir1977), *implied overruling on other grounds recognized by Schwenk v. Hartford,* 204 F3d 1187, 1201-02 (9-thCir2000). Therefore, classifications based upon these grounds must only be "reasonably related to legitimate penological interests." *Pruitt v. Cheney,* 963 F.2d 1160, 1164-66 (9-thCir1992) (rational basis scrutiny for classifications based upon homosexuality), *cert denied* 506 U.S. 1020 (1992); *Turner v. Safley,* 482 U.S. 78, 89 (1987). Preventing heterosexual crimes is a legitimate penological interest. Separating anatomical males and anatomical females into different institutions is reasonably related to achieving this interest.

Even if characterized as a sex based classification, Stevens' equal protection claim fails. Government actions based upon sex are governed by the equal protection clause of the Fourteenth Amendment. Accordingly, sex based classifications are justified only if substantially related to an important governmental objective, and "a party seeking to uphold government action based on sex must establish an exceedingly persuasive justification for the classification." *U.S. v. Virginia,* 518 U.S. 515, 524 (1996). However, this standard is not as strict as that which is used to determine whether a race based classification is constitutionally permissible. *See Wygant v. Jackson Bd. of Ed.,* 476 U.S. 267, 274 (1986).

Defendants argue that ODOC's policy of separating prisoners into institutions based upon their anatomical gender serves the important government objective of maintaining prison security by eliminating the possibility of heterosexual crimes. The policy is substantially related to this interest, they contend, because protection against heterosexual crimes could not be ensured if male and female inmates intermingled in the same prison. Stevens tries to bypass this argument by maintaining that, regardless of the fact that he is anatomically a male, he is nevertheless a transsexual who identifies as a female, and as such, should be placed into an institution with other females.

This court finds that the prevention of heterosexual crime in prisons is a substantial government interest. Although not directly on point, at least one Ninth Circuit case has recognized that prisons may have "*bona fide* reasons for segregation of the genders in prison." *Jeldness v. Pearce,* 30 F3d 1220, 1226 (1994); *see also Klinger v. Dep't of Corr.,* 107 F3d 609, 615 (8-thCir1997) ("It is

beyond controversy that male and female prisoners may lawfully be segregated into separate institutions within a prison system. Gender-based prisoner segregation and segregation based upon prisoners' security levels are common and necessary practices"); *Women Prisoners of Dist. of Columbia Dept. of Corr. v. Dist. of Columbia,* 93 F3d 910, 926 (DC Cir1996) ("the segregation of inmates by sex is unquestionably constitutional"), citing *Pitts v. Thornburgh,* 866 F.2d 1450 (DC Cir1989).

**\*14** The separation of sexes based upon anatomical characteristics is substantially related to this interest. Requiring that segregation be made upon a person's self-professed gender identity, rather than their anatomical gender, would impose the onerous burden on prison officials of sorting out those with genuine gender identity issues from those who would feign such a condition in order to be placed into an opposite sex facility for more nefarious reasons. This could result in increased risk of heterosexual crime. ODOC's policy passes constitutional muster.

With respect to his complaint that prison officials refuse to refer to him with female pronouns and titles, Stevens has failed to raise a legitimate constitutional or statutory basis for his claim. Prison officials have repeatedly stated that they will refer to Stevens using male pronouns because he remains anatomically a male. Stevens has presented no legitimate source of law which would require them to do otherwise. Although he has received a name/gender change from Multnomah County, this court can find no authority for the proposition that this document requires prison officials and staff to refer to Stevens using female pronouns and that their failure to do so violates federal rights cognizable under § 1983.

Even if this court were to construe this as a claim of verbal harassment in violation of the Eighth Amendment prohibition against cruel and unusual punishment, it would fail. As the Ninth Circuit has repeatedly held, verbal harassment alone does not violate the Eighth Amendment. *See Austin v. Terhune,* 367 F3d 1167, 1171 (9th Cir2004) ("the Eighth Amendmen"s protections do not necessarily extend to mere verbal sexual harassment"), citing *Blueford v. Prunty,* 108 F3d 251, 254-55 (9th Cir1997) and *Somers v. Thurman,* 109 F3d 614, 624 (9-thCir1997); *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir1987) (use of vulgar language toward prisoner not

sufficient to establish constitutional deprivation under § 1983).

### B. *Failure to Protect-Claim Three*

Claim Three alleges that defendants have failed to provide Stevens with protective custody despite the fact that he has been threatened by other inmates with assault, rape and death.

To state a claim under the Eighth Amendment for failure to protect, an inmate must prove that his conditions of incarceration pose a substantial risk of serious harm and that the prison official responsible had a "sufficiently culpable state of mind. *Farmer v.. Brennen,* 511 U.S. 825, 834 (1994). To satisfy the second requirement, prison officials must be deliberately indifferent to a substantial risk of serious harm to an inmate. *Id* at 828, 835. This is a subjective test requiring an inmate to show that a prison official actually "knows of and disregards an excessive risk to inmate health or safety." *Id* at 839-40. Therefore,

> to survive summary judgment, [a prisoner] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

**\*15** *Id* at 846.

Claim Three falters at the first requirement listed in *Farmer.* It is undisputed that Stevens reported to Superintendent Hill that he had received threats of violence, rape and death from inmates while housed in the IMU. In response, Sergeant Miller conducted an immediate investigation. Stevens provided Sergeant Miller with a list of names, many of which were incomplete. Sergeant Miller determined that several of the named individuals were never housed with Stevens and, thus, could not have made the alleged threats. Some

of the named inmates were no longer housed at SRCI. In addition to Sergeant Miller's investigation, the SCIEC also investigated Stevens' complaint and concluded that he did not meet the criteria for placement in the ASU and that transfer to OSP was not possible given documented conflicts at that institution.

Six months later, Sergeant Taylor interviewed Stevens who continued to request placement in the ASU. However, Stevens offered no names and declined to state the nature of any problems he was having. After this investigation, the SCIEC again rejected Stevens' request for protective custody.

On this factual record, it is not reasonable to infer that Stevens was or is being exposed to an objectively intolerable risk of harm. Other than his bald assertion that he has been threatened by a list of names of questionable veracity, Stevens has presented no evidence that he was or is exposed to any risk due to the conditions of his confinement at SRCI. Stevens need not wait until he is actually assaulted to establish an Eighth Amendment claim. *See id* at 845. Nonetheless, he must provide some evidence from which a reasonable person could infer that he was or will be exposed to an objectively intolerable risk of harm. He has failed to do so.

Claim Three also fails the second requirement of the *Farmer* test. According to the record, SRCI staff were anything but deliberately indifferent towards Stevens. The uncontested evidence shows that security staff immediately investigated his complaint in compliance with ODOC regulations on two occasions. In both instances, the evidence revealed no substantial risk to Stevens' health or safety.

Finally, it must be noted that both of these complaints occurred over two years ago. Whatever fear of assault Stevens may have subjectively had in 2005, the record reveals no actual incidents of violence towards Stevens since then. Furthermore, Stevens has failed to provide any evidence that he remains exposed to an objectively intolerable risk of harm.

Because Stevens has failed to raise a material issue of fact on either prong of the *Farmer* test, defendants' motion should be granted with respect to Claim Three.

## RECOMMENDATION

Stevens has failed to raise a genuine issue of material fact from which a reasonable juror could conclude that any of the defendants have violated his constitutional rights. Furthermore, Stevens is barred by issue preclusion from relitigating his claim that defendants failed to provide him with adequate medical treatment. Therefore, defendants' Motion for Summary Judgment (docket # 33) should be GRANTED.

## SCHEDULING ORDER

*16 Because plaintiff is appearing *pro se* and is incarcerated, objections to the Findings and Recommendation, if any, are extended beyond the deadline set forth in FRCP 72(b) to **March 17, 2008**. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

## NOTICE

This Findings and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

## All Citations

Not Reported in F.Supp.2d, 2008 WL 916991

Footnotes

1   A transsexual is "one who has '[a] rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex' and who typically seeks medial treatment, including hormonal therapy and surgery, to bring about a sex change." *Farmer v. Brennan*, 511 U.S. 825, 829 (1994) (citations omitted).

2   Although the Complaint lists only the nine defendants listed in the caption, the attachments to the Complaint list many other additional defendants.

3   Although Stevens prefers to be referred to by female pronouns, this court will use male pronouns in order to conform to, and not create confusion with, the documents in the record.

4   In this respect, *Thompson v. Armenakis*, 161 Or.App. 136, 139, 984 P.2d 320, 321 (1999), can be distinguished. *Thompson* found that by alleging facts that developed during and after his initial petition for habeas relief, the prisoner's subsequent habeas petition was not precluded. As a result, "[t]he claims were not previously asserted and could not have been asserted in the first petition." *Id.* However, the court does not indicate what differences in the facts merited this result. Here, Stevens has received the same treatment after filing his state habeas Petition as he received prior to and during the time he applied for that relief. The denial of any form of treatment for his alleged gender identity disorder has remained the same. Also relevant is the fact that in *Thompson*, the State conceded that the second habeas petition was prematurely dismissed.

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Doe v. U.S. Postal Service, Not Reported in F.Supp. (1985)

37 Fair Empl.Prac.Cas. (BNA) 1867

1985 WL 9446

United States District Court, District of Columbia.

Jane DOE, Plaintiff,

v.

UNITED STATES POSTAL

SERVICE, et al., Defendants.

Civ. A. No. 84–3296.

|

June 12, 1985.

**Attorneys and Law Firms**

Victor M. Clasberg, Alexandria, Va., for Jane Doe.

John W. Polk, Asst. U.S. Atty., Washington, D.C., for defendants.

MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

*1 In this sad case, the plaintiff has sued the United States Postal Service (Postal Service), the Postmaster General, Paul N. Carlin,* and the General Manager of the Postal Service Headquarters Personnel Division, Stephen Leavey, for rescinding an offer of temporary employment to the plaintiff, then a male, after learning that the plaintiff was a transsexual, who intended to undergo gender reassignment surgery. Plaintiff alleges violations of the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq., of her rights to equal protection and due process under the Fifth Amendment, of her constitutional right to privacy, of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), as well as two claims of violation of the statutory and common law of the District of Columbia. She seeks compensatory, punitive and injunctive relief. The defendants have filed a motion to dismiss the complaint on the grounds that the court lacks subject matter jurisdiction and that the complaint fails to state a claim upon which relief can be granted. [1]

Factual Allegations

The allegations of the complaint must be taken as true for purposes of this motion. The plaintiff alleges that she is a transsexual who underwent gender reassignment surgery to change her sex from male to female, on November 29,

1983. Prior to that time, the plaintiff was a male who had a 'medically and psychologically established need for gender reassignment surgery.' Complaint, ¶2.

On or about May 20, 1983, while still a male, the plaintiff was offered and accepted a temporary, six month Senior Clerk Typist position with the Postal Service. The position was offered based upon a personal interview, the recommendation of former employers and a job application. After accepting the offer, but before the appointment became effective, the plaintiff told her appointing authority of her intention to undergo gender reassignment surgery, and suggested that she be allowed to begin work as a woman rather than changing her physical appearance during her employment. Plaintiff alleges that the appointing authority agreed to this proposal and, in turn, obtained the approval of her supervisor. Thereafter, after learning of the plaintiff's status, defendant Leavey withdrew the offer of employment. The plaintiff claims that even after she offered to serve the entire employment term as a man, intending to postpone the surgery, Leavey refused to reinstate the offer, based solely on his opposition to her intention to undergo gender reassignment surgery.

The plaintiff filed an Equal Employment Opportunity complaint on July 5, 1983 alleging that the Postal Service discriminated against her on the basis of her sex and her transsexualism, in violation of Title VII and the Rehabilitation Act respectively. The Postal Service rejected that complaint on September 23, 1983, finding that neither claim was within the purview of the Equal Employment Opportunity Commission's (EEOC) processing regulations. That decision was appealed to the EEOC, which affirmed on October 2, 1984. This action was filed on October 26, 1984.

Discussion

*2 Defendants argue that the complaint must be dismissed in its entirety. We shall consider each argument raised.

Title VII Claim

The plaintiff urges the court to adopt the view that the prohibition against sex discrimination in federal employment contained in Title VII should be extended to cover discrimination against transsexuals. To our knowledge, no court presented with this question has

Doe v. U.S. Postal Service, Not Reported in F.Supp. (1985)

37 Fair Empl.Prac.Cas. (BNA) 1867

so held. See, e.g., Ulane v. Eastern Airlines, Inc., 742 F.2d 1081 (7th Cir. 1984) cert. denied, 105 S. Ct. 2023 (1985); Sommers v. Budget Marketing, Inc., 667 F.2d 748 (8th Cir. 1982); Holloway v. Arthur Andersen & Co., 566 F.2d 659 (9th Cir. 1977). Rather, the courts have focused, as is appropriate, on the Congressional intent discernable from the plain language of Title VII. Title VII prohibits discrimination in employment on account of sex. Especially in the absence of legislative history suggesting that Congress intended the word 'sex' to mean anything other than the biological male or female sexes, we agree with the court in Ulane, that a 'prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination based on an individual's sexual identity disorder or discontent with the sex into which they are born.' 742 F.2d at 1085. Accordingly, we find that the plaintiff has failed to state a claim upon which relief can be granted under Title VII.

### Rehabilitation Act Claim

The plaintiff alleges that she was handicapped by reason of her 'medically and psychologically established need for gender reassignment surgery.' In order to state a claim of handicap discrimination under the Rehabilitation Act, the plaintiff must allege that she is a handicapped person who was otherwise qualified for the position in question, and that her rejection was based solely on the handicap. The Rehabilitation Act defines a handicapped person as, 'Any person who (i) has a physical or mental impairment which substantially limits one or more of such persons major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment.' 29 U.S.C. § 706(7)(B).

The defendants argue that transsexualism is not a physical or mental handicap subject to the protections of the Rehabilitation Act. Our task, at this point, is not to determine whether transsexualism in fact constitutes a physical or mental impairment for this plaintiff. Rather, we must examine the complaint and decide whether the 'plaintiff can prove no set of facts in support of [her] claim.' Conley v. Gibson, 355 U.S. 41, 45–6 (1957).

Under the applicable regulations, an 'impairment' can be 'any mental or psychological disorder, such as . . . emotional or mental illness.' 45 C.F.R. § 84.3(j)(2)(i)(B). The language of the Rehabilitatio Act and of the accompanying regulations is broadly drafted, indicating a legislative intent not to limit the Act's coverage to traditionally recognized handicaps. See 45 C.F.R. 84 App. A § 3. For purposes of this motion, we find that the complaint adequately alleges the necessary 'physical or mental impairment' to state a claim under the Rehabilitation Act.[2]

**\*3** Acknowledging that the plaintiff does allege 'emotional and psychological disorders,' the defendants focus on the requirement that the plaintiff allege an impairment which 'substantially limits one or more of . . . her major life activities.' The regulations define the term 'major life activities' as 'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, and working.' 45 C.F.R. § 84.3(j)(2)(ii). No definition is given to the term 'substantially limits.' Although these elements are not alleged with great specificity, we find that taken as a whole the complaint adequately alleges that at the time of the alleged discrimination the plaintiff's impairment substantially limited at least her major life activity of 'working.'[3] The burden, of course, will be on the plaintiff to prove that her transsexualism actually is an impairment which substantially limits one or more of her major life activities, or otherwise brings her within the definition of handicapped persons. See Jasany v. United States Postal Service, No. 84–3134 (6th Cir. Feb. 28, 1985) at 7–9. On this point, we do observe that the definition of handicapped person given in the Rehabilitation Act and 45 C.F.R. § 84.3(j) extends to those who are merely 'regarded' by others as having an impairment which substantially limits major life activities. In particular, the regulations state that a handicapped person can be one who has a 'physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment.' 45 C.F.R. § 84.3(j)(2)(iv). The questions of fact necessarily raised by defendants' arguments preclude our resolving the Rehabilitation Act claim on a motion to dismiss.

Finally, defendant argues that the plaintiff does not allege that she was denied the position with the Postal Service 'solely by reason of her handicap' but rather that she was discriminated against because of her transsexualism. Defendants' argument is based on the unproven assumption that the plaintiff's transsexualism is not a handicap. Considering that this is a pivotal question, yet to be decided in this case, defendants' argument must fail. We find that the plaintiff has stated a claim of

Doe v. U.S. Postal Service, Not Reported in F.Supp. (1985)

37 Fair Empl.Prac.Cas. (BNA) 1867

handicap discrimination under the Rehabilitation Act of 1973.

### Constitutional Claims

Defendants argue that the court lacks subject matter jurisdiction over the plaintiff's constitutional claims because Title VII and the Rehabilitation Act are her exclusive remedies. The Supreme Court declared in Brown v. General Services Administration, 425 U.S. 820 (1975) that federal employees claiming discrimination are limited to the Title VII remedy, which would preclude their bringing actions under the Constitution for such discrimination. In Shirey v. Devine, 670 F.2d 1188 (D.C.Cir. 1982), the District of Columbia Circuit strongly suggested that the Brown holding on exclusivity of remedy also applies to claims of discrimination brought under the Rehabilitation Act. Id., at 1191, n. 7.

**\*4** Whether or not Brown applies to Rehabilitation Act claims, the Supreme Court has made it clear that the statutorily designed remedy of Title VII is exclusive only in those cases where the plaintiff alleges discrimination that is prohibited by the statute. In Davis v. Passman, 422 U.S. 228 (1978), the Court considered the scope of Title VII's exclusivity, stating '[t]hat [Title VII] does not prohibit discrimination on the basis of alienage did not prevent [the court in Hampton v. Mow Sun Wong, 426 U.S. 88 (1976)] from authorizing relief. In a similar manner, we do not now interpret [Title VII] to foreclose the judicial remedies of those expressly unprotected by the statute.' Id., at 247. In this case, we have already concluded that the plaintiff does not state a cognizable claim under Title VII but that she may have protection under the Rehabilitation Act. Should the plaintiff actually establish her status as a handicapped person under the Rehabilitation Act, and assuming the application of Brown to such claims, she will not be entitled to pursue remedies under the Constitution regardless of whether she prevails on the Rehabilitation Act claim. However, should we find that plaintiff is not among those protected by the Rehabilitation Act, we should then be obliged to consider whether the alleged discrimination was in violation of her constitutional rights. In short, we agree with the plaintiff that the inclusion of both statutory and constitutional claims in the complaint constitutes permissible pleading in the alternative.

### (a) Right to Privacy Claim

Defendants argue, as a matter of substantive law, that plaintiff has no special right to privacy under the Constitution as a transsexual and no protection from discrimination under the guarantees of equal protection and due process contained in the Fifth Amendment. We agree that the plaintiff has no special right of privacy under the Constitution. The court in Dronenburg v. Zech, 741 F.2d 1388 (D.C.Cir. 1984), after reviewing the Supreme Court cases that recognize a constitutional right to privacy, concluded that 'only rights that are 'fundamental' or 'implicit in the concept of ordered liberty' are included in the right of privacy.' Id., at 1396. While it could be argued that the personal decision to undergo a socially controversial surgical procedure ought to be protected against government reprisal, we have no legal basis, especially in light of the Dronenburg opinion, for holding that there is a constitutional right to privacy which protects persons in the plaintiff's situation. We shall therefore dismiss this claim.

### (b) Equal Protection Claim

As for the equal protection claim, however, the matter stands in a different posture. Defendants take the position that transsexuals are not entitled to equal protection because they are not members of a suspect class. While we agree that transsexuals do not comprise a suspect class, see Holloway, supra, 566 F.2d at 663, we are not aware of any court's having held that all governmental discrimination against transsexuals is necessarily rationally based or is somehow outside the scope of the equal protection clause. Certainly, the Holloway court did not so hold. See id., at 663–64. It has long been established in this Circuit that applications for public employment are 'not without Constitutional protection.' Scott v. Macy, 349 F.2d 183, 184 (D.C.Cir. 1965). As the court stated in Scott, both applicants and employees of the federal government are 'entitled, like other people, to equal protection against arbitrary or discriminatory treatment by the Government Id. The defendants assert that it is rationally related to a legitimate governmental interest for 'an employer to treat a transsexual in the manner the Postal Service did here.' Reply at 14. No government interest has been identified, however, and this issue is properly a question to be decided should the court reach the merits of this claim. The complaint clearly states a claim for denial of equal protection.

### Constitutional Claims against Leavey

Doe v. U.S. Postal Service, Not Reported in F.Supp. (1985)

37 Fair Empl.Prac.Cas. (BNA) 1867

*5 The plaintiff is suing defendant Leavey in his individual capacity for violation of her constitutional rights to privacy, equal protection and due process. Leavey argues that he is immune from suit under the rule of Harlow v. Fitzgerald, 457 U.S. 800 (1982). The Supreme Court held in Harlow that government officials performing discretionary functions are immune from liability for civil damages if the challenged action 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . .' Id., at 818. In Davis v. Sherer, 104 S. Ct. 3012 (1984), the Supreme Court emphasized that the clearly established right must be the basis of the claim against the official in order to defeat a defense of immunity. Id., at 3020 & n. 12.

In this case, we have already decided that the plaintiff does not state a claim against defendants for violation of her right to privacy. The remaining issue with respect to defendant Leavey's claim of immunity, therefore, is whether his alleged conduct violated the plaintiff's clearly established right to equal protection. The complaint alleges that Leavey made the decision to deny the plaintiff a clerk/typist position, notwithstanding her offer to remain a man throughout her employment. Unquestionably, the law of equal protection applies to federal government employees and applicants. Bolling v. Sharpe, 347 U.S. 497 (1954); Scott v. Macy, supra. While defendant Leavey should have known that, like any other applicant, the plaintiff was entitled to protection from arbitrary and discriminatory action it is not clear that Leavey, in the context of the facts of this case, knew or should have known that denial of employment to a transsexual was discrimination in employment and therefore a denial of equal protection. Under Harlow, supra, we cannot say that Leavey's actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known. . . .' We therefore hold Leavey immune from the claims of constitutional violation.

An order consistent with the foregoing has been entered this day.

### ORDER

Upon consideration of the defendants' Motion to Dismiss and the opposition thereto, it is by the court this 12th day of June, 1985,

ORDERED that the defendants' motion is granted with respect to the claims against the United States Postal Service and Carlin for sex discrimination under Title VII, 42 U.S.C. § 2000(e), for violation of plaintiff's constitutional right of privacy, for intentional infliction of emotional distress and for violation of the D. C. Human Rights Law, D. C. Code § 1–2512, and it is

ORDERED that defendants' motion is granted with respect to all constitutional and common law claims against defendant Leavey, and it is

ORDERED that defendants' motion is denied with respect to the claims against the United States Postal Service and Carlin for violation of the Rehabilitation Act, 29 U.S.C. § 791, et seq., and the claims against said defendants for denial of plaintiff's constitutional right to equal protection and due process, without prejudice; and it is

*6 ORDERED that defendants shall respond to plaintiff's outstanding discovery requests within 20 days, and it is

FURTHER ORDERED that a status call be held on Thursday, July 18, 1985 at 9:30 a.m., Courtroom No. 12, United States Courthouse.

### All Citations

Not Reported in F.Supp., 1985 WL 9446, 37 Fair Empl.Prac.Cas. (BNA) 1867

Footnotes
*  Paul N. Carlin became Postmaster General effective January 1, 1985 and is substituted for defendant Bolger, the former Postmaster General.
1  In response to this motion, plaintiff has agreed to the dismissal of her pendent claims. Memorandum in Opposition to Defendants' Motion to Dismiss, p. 2.
2  We disagree with defendants' contention that because a transsexual's condition may be alleviated through the use of hormones and gender reassignment surgery, plaintiff's impairment is merely 'short term' and therefore not covered by the

**Doe v. U.S. Postal Service, Not Reported in F.Supp. (1985)**

37 Fair Empl.Prac.Cas. (BNA) 1867

Rehabilitation Act. The mere fact that treatment may be available does not automatically remove an afflicted individual from the scope of this statute. Cf. 29 U.S.C. § 706(7)(B)(ii).

3    In reaching this conclusion, it has not been necessary to rely on plaintiff's two affidavits attached to the memorandum in opposition to defendants' motion to dismiss. We shall therefore consider defendants' motion to strike as moot.

---

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---